Exhibit G

Response by Federal Bureau of Investigation to FOIA Request by Steven B. Pollack, *Real Estate Appraisal and Related Studies of FBI Firearms Training Facility in North Chicago, Illinois as of April 25, 1986* (September 11, 2007)

REAL ESTATE APPRAISAL AND RELATED STUDIES

FOR

FEDERAL BUREAU OF INVESTIGATION
ROOM 6875, JEH F.B.I. BUILDING
10TH & PENNSYLVANIA AVENUES, N.W.
WASHINGTON, D.C.  20535

OF

FBI FIREARMS TRAINING FACILITY
IN
NORTH CHICAGO, ILLINOIS

AS OF

APRIL 25, 1986

BY
LEO R. MAYERS, MAI
5225 LITTLE FALLS ROAD
ARLINGTON, VIRGINIA 22207

(703) 533-3546

## TABLE OF CONTENTS

Cover Sheet

Letter of Transmittal — i

Table of Contents ii

Summary of Important Facts and Conclusions 1

Purpose of This Three Part Report 5

PART I   Analysis of Zoning and Environmental Considerations, Local Condiitions, and the Particular Needs of the FBI 5

PART II   Evaluation of the Potential Costs Involved in Relocating the Firearms Range 14

PART III   Appraisal of the Current Firearms Range Located in North Chicago, Illinois 21

Introduction 21

Qualifying and Limiting Conditions 22

Certification of Value 24

Factual Descriptions 25

Identification of the Property 26

Area, City, Neighborhood 29

Interests of Third Parties 29

Site Data 29

Descriptions of Improvements 30

Land Improvements 44

History 44

Analysis of Data and Opinions of the Appraiser 45

Highest and Best Use 45

Valuation 46

Cost Approach 46

Land Value By the Sales Comparison Approach 46

Improvement Valuation                           58

Other Buildings and Land Improvements           60

Reconciliation and Final Conclusion             62

List of Exhibits

SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS

PART I

ANALYSIS OF ZONING AND ENVIORNMENTAL CONSIDERATIONS, LOCAL
CONDITIONS AND THE PARTICULAR NEEDS OF THE FBI

a. Zoning - Currently zoned "PL-Public Land". Most probable
   zoning if property were not publicly owned would be M2-General
   Industrial District.

b. Environmental Considerations - The subject property has been
   used for a firing range since 1918. Because of this use there
   are dangerous residues.

   1. Unexploded ordnance is mixed in the soil mantle, extent
      and depth of these materials is unknown.

   2. Hazardous waste contamination, primarily from lead, makes
      the surface usuable for most commercial, industrial and
      public uses.

   3. Hazardous waste contamination, primarily from lead, may
      pose a threat to ground water and possibly to lake waters.

c. Local Conditions and the Particular Needs of the FBI - The
   subject firing range is located in an industrial area and its
   use is compatible with the adjacent and neighboring properties.
   Lake Michigan provides the needed impact area for overfiring,

1

and consists of an area of 2,975 acres of Lake Michigan.
National Rifle Association and Defense Department specifications
indicate this acreage is needed as a public safeguard.

PART II    EVALUATION OF THE POTENTIAL COSTS INVOLVED IN RELOCATING THE
FIREARMS RANGE

No replacement site was found containing sufficient acreage
for a safety impact area. Several sites were investigated,
but none were suitable. In order to replace and relocate the
existing firearms range a federal land project would have to
be authorized and funded at an estimated cost of $15,350,000
for land and improvements. This estimate does not include
administrative costs, relocation costs for persons, homes,
roads, utilities; adverse condemnation awards; etc. Several
years are typically required to take a federal land
acquisition project from conception to completion because
of required site selection, needed legislation, public
hearings, environmental impact statements, and the
acquisition process.

PART III   APPRAISAL OF THE CURRENT FIREARMS RANGE LOCATED IN NORTH
CHICAGO, ILLINOIS

1. Highest and Best Use

    a. If vacant

       (1) If uncontaminated, the property would be industrial.

       (2) As contaminated, the present use as a firing range is
           the highest and best use.

2

M2 zoning is called General Industrial District. This zoning
was established to provide areas in which manufacturing, transportation,
and heavier commercial activities are the principal uses of the land.
Such districts are not compatible with residential, institutional or
general retail areas and should be either removed or buffered from such
areas according to the official description for M2 (Exhibit "N").

The likelihood of the subject property being zoned residential
or commercial is remote because the adjacent sewage treatment plant gives
off an undesirable odor. Also, because of frontage on Lake Michigan, and
the adjacency of Foss Park on the south, the subject could be zoned for
public park or other recreational uses, however, because of environmental
problems with the subject's soil mantle, zoning for public or private
recreational use would not be prudent. The reasons for this are
discussed in the next paragraph.

b.  Environmental Considerations

The subject property has been used as a practice range for
various weapons since 1918. During this time expended and live
ammunition of various kinds and sizes has been mixed into the soil
mantle. Types and quantities of wasted ammunition on and in the
subject's soils is not known at this time, and extensive and costly soil
testing would be required to determine the extent of contamination.

Subsequent to the FBI's occupancy of the range, the berm behind
the target area was partially decontaminated because the content of lead

6

and copper became so high that firing into the berm caused bullet
splattering. This partial decontamination was done by Browning-Ferris
Industries (BFI) of Schaumberg, Illinois (phone (312) 397-7760).
According to Mr. Robert Piet, chemist for BFI, lead is a "hazardous
waste" and cannot be destroyed. He said that his experience with the
subject firing range indicated that the lead and copper content was
extremely high. The material removed from the subject contained 35% lead
and 20% copper. BFI transported the contaminated material about 5 years
ago to U.S. Ecology in Sheffield, Illinois which subsequently closed
down.

Mr. Piet stated that to decontaminate the subject property and
transport lead waste and possible live rounds to an acceptable dumping
facility could cost $2,000,000. This operation would involve stripping
off one foot of the soil mantle. Mr. Piet's estimate assumes the soils
are contaminated with hazardous wastes. He said if hazardous wastes are
not extensive the decontamination could be two-thirds less or about
$670,000.

Referral/Consult

7



In summary, there are three distinct environment problems on the subject property.

    1. Unexploded ordance, mixed in the top three feet of the soil mantle.

2. Hazardous waste contamination, primarily from lead,
   which makes the surface unusable for most commer-
   cial and public uses.

3. Hazardous waste contamination, primarily from lead,
   which could pose a threat to ground water and
   possibly lake waters.

The reader should understand that the estimated costs of curing
the environmental problems are rough estimates, and that engineering
studies would be required to pin down the costs. However, these
estimates are the best available information and will be used in the
appraisal report to demonstrate costs to cure.

c. Local Conditions and the Particular Needs of the FBI

The subject property contains 14.5 acres, more or less, and is
bounded on the south by Foss Park, on the west by Foss Park Avenue and
the Elgin, Joliet and Eastern Railway, on the north by the North Shore
Sanitary District (NSSD) sewage treatment plant, and on the east by Lake
Michigan. Most of the subject is situated on a high bluff above the
lake, as is Foss Park. Foss Park is primarily a day use facility with
heaviest usage on weekends. The FBI range is used mostly on week days
and occasionally at night for training special FBI units. It is my
understanding that Foss Park and the FBI range are compatible as
presently used. The range is enclosed with a 6 1/2 foot cyclone fence,
with 3-strands of barb wire on top, so trespassing is negligible.
Certainly no one could accidentally stray onto the range and be injured
by the firing. There are some instances of youths trespassing across the
range in the bluff area to get to the lake waters warmed by the treatment
plant outfall, but the resident agents carefully monitor this situation.

10

The treatment plant provides a buffer on the north side and is a compatible use to the range. The road and railroad on the west act as "Chinese Wall" separating the range from the industrial plant located west of the railroad right of way.

Lake Michigan gives the firing range the necessary impact area (see "Danger Zone" diagram on next page). This diagram shows an area extending into the lake 4,000 yards, with a width of 3,600 yards. This area contains 2,975 acres in Lake Michigan.

Exhibit "B" is a copy of a portion of the official U.S. Government Navigation Map showing the extent of the danger zone in Lake Michigan that provides the impact area for the firing range. Also in this exhibit are copies of portions of the code of Federal Regulations describing the location of the 2 mile deep danger zone and the restricted area extending one mile into the lake from the Great Lakes Naval Training Center.

Exhibit "C" is a copy of a portion of the National Rifle Association (NRA) pamphlet entitled: "High Power Rifle Ranges", showing a danger area plot plan.

4 September 1973

SOP FOR THE NTC OUTDOOR RIFLE AND PISTOL RANGES
APPENDIX E
DANGER ZONE DIAGRAM



East Longitude 87°47'30"

3600 Yards

900 YDS

STRAY ROUND
IMPACT AREA

STRAY ROUND
IMPACT AREA

North Latitude 42°20'30"

3600 Yards

1000 Yards

EXPECTED ROUND IMPACT AREA

4000 Yards

South Latitude 42°18'45"

Target Line

Shore Line

NTC RIFLE &
PISTOL RANGE

E-1

BUOY

Firing Line

NOT TO SCALE

Enclosure 2

Page 32 of 35

12

We called Mr. R. Helenburg (telephone no. (202) 828-6000) to confirm the measurements shown on the drawing. He said a depth of 5,500 yards beyond the target line is needed for an impact zone for rifle ranges. The NRA "Danger Area Plot Plan" requires an area of about 5,500 yards deep by 2,600 yards wide or 2,955 acres.

Therefore, based on the criteria prescribed for the subject property by the Great Lakes Naval Training Center, and substantially corroborated by the NRA's danger plot plan criteria, I conclude that the FBI firing range needs and is using almost 2,990 acres of land and water area.



SURVEY PLAT



Land Improvements.

These improvements consist of the 6.5 foot chain link fence on all perimeters except the lake frontage, the gravel driveways and parking lot, several berms, macadam walkways on the firing range underground drains, outdoor fireplace, lawn, shrubs, and trees.

History.

The subject property was acquired on November 4, 1918 from the American Steel and Wire Company. The original acquisition of 36.59 acres was made through condemnation authorized by then Acting Secretary of the Navy Franklin D. Roosevelt. Subsequently, some of the acreage was deeded out, and Foss Park was one of the outgrants.

The U.S. Marine Corps used the range for rifle firing for a number of years. During World War II, the Navy used the range for firing 3 inch naval guns at targets located in the lake. Fifty caliber machine guns were also fired on the subject range. Although no specific information was available, there is physical evidence indicating that 20 mm ammunition was used on the site.

The FBI has used the range since 1977, and has improved and maintained the property to its present excellent condition.

44

neighborhood is basically industrial and is adversely affected by odors
from the sewage treatment plant and Abbott Laboratory plants nearby.
Commercial zoning was also considered, but it was rejected for similar
reasons, in addition to the fact that the subject property is "off the
beaten track", and it would be difficult to attract retail customers into
the area. Commercial zoning and subsequent use as a lake oriented
commercial enterprise is a possibility. The high bluff (about 73 feet)
presents a problem for marina development, but depending on a proposal
plan of development and funding, the elevation difference might be
overcome.

However, even in the hypothetical context of the subject being
vacant, a prudent person could not overlook the fact that the subject
property is contaminated with lead and probably unexploded rounds of
various sizes. The cost of decontaminating and demilitarilizing the
subject's 14 acres would probably cost more than the value of the land,
based on data presented and land sales in the area, which will be
discussed.

Therefore, I conclude that the highest and best use of the subject
property is it present use as an improved firing range.

### Valuation

In the appraisal of real property there are three recognized
approaches to value. They are referred to as the market data approach,
the cost approach, and the income capitalization approach.

value of $31,000 per acre sets the upper limit of land value. What about the lower limit? A prudent buyer for the subject's land would weigh the cost of decontaminating and demilitarizing versus the value of the land uncontaminated, and would conclude that the value is negative based on the data we have included in this report. The lowest estimate for demilitarizing was $554,000.

No estimate was made for decontamination, but a "ball park" figure made by BFI was $670,000 to $2,000,000. These costs indicate to me that the subject has a negative land value in the market. It could be argued that someone might buy the subject land speculating that maybe the Government would decontaminate and demilitarized the land at no cost to the purchaser, or that some other use, not discussed in this report, would be found in which the property could be used. Both of these latter possibilities are highly speculative and what one would pay is also anybody's guess. In fact, based on my personal knowledge of a real estate acquisition by the Army at Blossom Point, Maryland, the Army concluded that the cost of demilitarizing that porperty exceeded the value of the land. The Army sought and obtained authority to acquire the land they had been leasing for about 40 years, and acquired the land.

I concluded therefore, that the subject property does not have a value in the market. It does have a value in continued use as a Government operated firing range, and for this purpose the improvements contribute the value indicated in the cost approach:

| | |
|---|---|
| Main Range Building | $194,145 |
| Other Structures and Land Improvements | 168,686 |
| | $362.831 |
| Rounded to | $363,000 |

LIST OF EXHIBITS                          Referral/Consult

Exhibit "A" - _____

Exhibit "B" - Portion of U.S. Government Navigation Chart, showing extent of danger zone in Lake Michigan.

Exhibit "C" - Portion of Copy of National Rifle Association pamphlet: "High Power Rifle Ranges"

Exhibit "D" - Map showing location of 65 acre Lake County property.

Exhibit "E" - Map showing location of Vernon Hills Military Reservation.

Exhibit "F" - Map showing location of Fox Valley Rifle Range, Inc.

Exhibit "G" - Data on four representative rural acreage sales.

Exhibit "H" - Brochure depicting existing and planned development of Waukegan lakefront.

Exhibit "I" - Chamber of Commerce brochures giving county and area data.

Exhibit "J" - Architectural floor plans, construction cross sections, and details.

Exhibit "K" - Warranty Deed for Sale No. 1.

Exhibit "L" - Sales depicted on Waukegan - Lake County Street Map and Directory.

Exhibit "M" - List of contractors that furnished current cost data for this report.

Exhibit "N" - Zoning Map and Zoning Description.

Exhibit "O" - Experience and Qualifications of Leo R. Mayers, M.A.I.

Exhibit "P" - Photographs of two possible sites for relocating firing range.

Exhibit "Q" - Current list of schools taught at the FBI Range.

Exhibit "R" - Additional aerial photographs of subject property and nearby areas.



NATIONAL OCEAN SERVICE

# UNITED STATES - GREAT LAKES

# LAKE MICHIGAN

## Waukegan to South Haven

**Polyconic Projection**
**Scale 1:120,000**
**North American 1927 Datum**

### SOUNDINGS IN FEET

**NOTES**

PLANE OF REFERENCE OF THIS CHART (Low Water Datum) ........ 576.8 ft.
Referred to mean water level at Father Point (Pointe au Pere), Quebec, International Great Lakes Datum (1955).

AIDS TO NAVIGATION. Consult U.S. Coast Guard Light List for supplemental information concerning aids to navigation.

SYMBOLS AND ABBREVIATIONS. For complete list of symbols and abbreviations see Chart No. 1.

AUTHORITIES. Hydrography and topography by the National Ocean Service, Charting and Geodetic Services with additional data from the Corps of Engineers, Geological Survey, and U.S. Coast Guard.

BRIDGE AND OVERHEAD CABLE CLEARANCES. When the water surface is above Low Water Datum, bridge and overhead clearances are reduced correspondingly. For clearances see U.S. Coast Pilot 6.

SAILING DIRECTIONS. Bearings of sailing courses are true and distances given thereon are in statute miles between points of departure.

**CAUTION**

Due to periodic high water conditions in the Great Lakes, some features charted as visible at Low Water Datum may be submerged, particularly in the near shore areas. Mariners should proceed with caution.

**CAUTION**

**POTABLE WATER INTAKE (PWI)**

Vessels operating in fresh water lakes or rivers shall not discharge sewage, or ballast, or bilge water within such areas adjacent to domestic water intakes as are designated by the Surgeon General (21 CFR 1250.93). Consult U.S. Coast Pilot 6 for important supplemental information.

**RADAR REFLECTORS**

Radar reflectors have been placed on many floating aids to navigation. Individual radar reflector identification on these aids has been omitted from the chart.

**POLLUTION REPORTS**

Report all spills of oil and hazardous substances to the National Response Center via 800-424-8802 (toll free), or to the nearest U.S. Coast Guard facility if telephone communication is impossible (33 CFR 153)

For more
Gary Harbor see
Calumet Harbor
Indiana Harbor
Buffington Harbor
Chicago Harbor se

87°50'

87°40'

23rd Ed., Aug 13/83 ■

**14905**

**CAUTION**

This chart has been corrected from the Notice to Mariners published weekly by the Defense Mapping Agency Hydrographic/Topographic

from the harbormaster, who may be contacted on VHF-FM channel 16 (156 80 MHz), call Great Lakes Harbor, or at the boathouse, Building 13, in the inner basin. The harbor is available as a refuge during storm or other emergency.

The N breakwater extends E from the shore and joins the E breakwater, which then extends S to the entrance channel. The S breakwater extends E from shore to the entrance channel. The outer ends of the breakwaters are marked by lights. In 1977, the entrance channel had a centerline controlling depth of 12 feet. A channel through the outer harbor has a depth of about 13 feet. From the outer harbor a channel leads between piers to an inner basin. The outer ends of the piers are marked by lights, and the channel is marked by a 302°45' lighted range. The channel to the inner basin has a depth of about 14 feet.

A restricted area extends 1 mile into Lake Michigan, from Great Lakes Naval Training Center Harbor S breakwater N for 1.6 miles. A danger zone for rifle firing practice extends 2 miles into the lake just N of the harbor. (See 33 CFR 207.475 and 204.175, chapter 2, for limits and regulations.)

Charts 14904, 14905.-Waukegan, Ill., is a city and small commercial harbor on the W side of Lake Michigan 35 miles N of Chicago Harbor. The principal cargoes handled in the port are bulk cement and gypsum rock. Prominent are stacks at the Commonwealth Edison Co. 1.5 miles N of the harbor and the light on the intake crib 2.1 miles N of the harbor.

Waukegan Harbor Light (42°21.6'N., 87°48.8'W.), 36 feet above the water, is shown from a white cylindrical tower with an attached building on the outer end of the S pier; a fog signal and a radiobeacon are at the light. The light is sometimes difficult to distinguish from shore lights in the background.

Channels.-The harbor is entered through a dredged entrance channel leading W from deep water in Lake Michigan between parallel piers to an inner harbor basin. A breakwater extending from shore on the N side of the entrance channel protects the entrance from NE seas. The outer ends of the piers and breakwater are marked by lights. In May-June 1982, the controlling depths were 19 feet in the S half of the entrance channel, thence 15 feet at midchannel in the channel between the piers; thence 14 feet in the basin except for shoaling along the edges. The entrance channel is subject to shoaling caused by the drift of sand from the N. Above the dredged area, the inner basin has depths of 14 to 20 feet with shoaling to 8 feet and less at the N end.

The inner basin is not adapted for anchorage, but vessels may moor to the revetment on the W side or in the slips N of the basin. During severe storms, vessels are sometimes required to moor in the middle of the slips and away from the docks to prevent damage to the vessels and revetments. Mariners are cautioned against navigating outside the channel limits in the vicinity of structures protected by stone riprap.

Dangers.-A foul area with a number of detached rock ledges is E of the harbor entrance. The area is marked by a buoy on the E side and a lighted buoy on the N side. Mariners should keep to N of the lighted buoy.

Storm warning signals are displayed at the water filtration plant on the N side of the entrance to the inner basin. (See chart.)

Caution.-Sudden wind direction or barometric pressure changes may cause water levels in the harbor to rise or fall as much as 3 feet in a short time.

Harbor regulations.-Federal regulations specify a speed limit of 4 mph (3.5 knots) in the harbor. (See 33 CFR 162.120, chapter 2, for regulations.)

Local harbor regulations have been established by the Waukegan Port District and are enforced by the dockmaster, who can be reached at the municipal launching ramps in the SW section of the harbor. Copies of the regulations can be obtained from the General Manager, Waukegan Port District, 3500 N. McAree Road, Waukegan, Ill. 60085. A speed limit of 5 mph (4.3 knots) is enforced in the inner and outer harbor of Waukegan.

Wharves.-Waukegan has two deep-draft facilities in the slip on the NW side of the inner basin. The alongside depths given for these facilities are reported depths. (For information on the latest depths, contact the operators.)

Huron Cement Dock: S side of the slip; 620-foot face; about 16 to 17 feet alongside; deck height, 7 feet; covered storage for 32,000 tons of bulk cement; receipt of bulk cement; owned by Waukegan Port Authority and operated by Huron Cement Division of National Gypsum Co.

Gold Bond Building Products Dock: N side of the slip, about 750 feet of berthing space; 15 to 16 feet alongside; deck height, 4 to 5 feet; open storage for 120,000 tons of gypsum rock; owned by Elgin, Joliet, and Eastern Railway and operated by Gold Bond Building Products, Division of National Gypsum Co.

Small-craft facilities.-Marinas in the SW corner and at the N end of the inner basin provide transient berths, gasoline, diesel fuel, water, ice, electricity, sewage pump-out, marine supplies, and launching ramps. Hoists to 25 tons are available for hull and engine repairs.

Chart 14904.-The shore from Waukegan N for 16 miles to Kenosha is low with some woods behind the beach. Shoals extend no more than 0.8 mile offshore. Small craft should avoid the submerged rock off the mouth of Barnes Creek, 11.3 miles N of Waukegan.

About 1.5 miles N of Waukegan, a breakwater extends 1,200 feet from shore to protect the intake channel of the Waukegan Generating Station, Public Service Co. The outer end of the breakwater is marked by a private light. A fish net is placed annually, between April and August, from the outer end of the breakwater to the shore about 1,200 feet SW. The net shows above the water and is marked

of bill, which will be submitted owner by the District Engineer, omptly as possible after the ves the dock. If charges are d, the vessel shall be liable to nt of the charges and the illection in the manner provided by law, and the owner of the all be denied the use of the ntil all charges and the collection have been paid to the ...ates.

is section supersedes the reg... or the use of this drydock approved april 10, 1906, which regulations hereby revoked.

L. 2, 1.26, as amended at 33 FR ... 14, 1968, 34 FR 1253, Jan. 31 R 36570, June 21, 1978; 48 FR 1, 1983)

Sturgeon Bay and Lake Michigan Canal, Wis., use and navigation.

... of canal officers. The ... all boats and floating ... the canal and in the approaches thereto shall be under the orders of the superintendent or his assistants, and their orders instructions must be obeyed.

...als. On entering the canal trance, steamers or tugs must ir whistles for 1 minute a warn craft approaching from direction and give them timely against collisions, by tying up ...ry. All steamers approaching ...ing in the opposite direction ...cken speed so as to pass in ...ompliance is required with the rules and regulations for ...nment of pilots, adopted by United States Coast Guard.

Whenever a steamer is nearing ... or curve in the channel when ...sight of the banks or other ... approaching from the opposite ... not be seen for a distance of half ... pilot of such steamer, when the ... arrived within half a mile of the bend, shall give a signal by ... of the steam whistle, which signal ... nswered by a similar blast by the ...y approaching steamer that may ... hearing. Should such signal be ... by a steamer upon the far ... bend, then the usual signal ... passing shall immediately ... ...red, but if the first signal

signal of such pilot be not answered, he is to consider the channel clear and govern himself accordingly.

(c) Speed. The rate of speed while passing through the canal shall not exceed 5 miles per hour.

(d) Keeping in the center. The center must be kept all the way through, except in passing other craft. In case of grounding, the rapid or strong working of boat's engines is strictly forbidden.

(e)–(g) [Reserved]

(h) Rafts. (1) The passage of bag or ...ack rafts, or of loose logs, into or through the canal is prohibited.

(2) Rafts shall be made up with logs parallel to each other, in the direction of raft lengths, secured and held closely together by frequent cross-sticks, chains, or cables.

(3) Rafts shall not be of greater dimensions, either ...w, than 50 feet wide by 600 feet long, and if longer than 300 feet shall be handled by two ...gs.

(4) No raft shall pass through the canal unless by special permission of the superintendent or his authorized ...istants, who will direct a time for passing that will least interfere with other navigation.

(5) Masters of tugs and other persons in charge of rafts are required to ...oid damaging the canal revetments, ...nd displacing buoys, spars, or the ...aterial of any range light aiding ...avigation through the canal. They ...ll keep careful watch when passing ...ids to navigation, and should any be ...ccidentally displaced, shall report the ...t at the earliest possible moment to the superintendent or his authorized ...istants.

(i)–(j) [Reserved]

(a) Refuse in canal. No person shall ...p or throw any stones, ashes, cinders, or other material into the canal the approaches thereto, or place ...y such material on any bank or ...rm of the canal so that it is liable to ... thrown or roll in.

(l) [Reserved]

(m) Commercial statistics. The mas...s or clerks of all vessels using the ...al (except in the case of vessels ...erely entering to seek a harbor of ...uge from storms and not bound ...ugh) shall furnish in writing to

the ...uperintendent a detailed statement of ...assengers and cargo carried.

[Regs. Feb. 15, 1895, as amended Apr. 14, 1908, 42 FR 57962, Nov. 7, 1877]

§ 207.475 Lake Michigan; naval restricted area, United States Naval Training Center, Great Lakes, Ill.

(a) The area. An area extending in a north and south direction from the Great Lakes, Illinois, south breakwater to an east-west line projecting eastward from the shore termination of the north fence of the United States Naval Training Center, Great Lakes, Illinois, and extending into Lake Michigan for a distance of one mile from the shoreline.

(b) The regulations. No vessel of any kind, except those engaged in naval operations, shall enter, navigate, anchor, or moor in the restricted area without first obtaining permission to do so from the Commander, United States Naval Training Center, Great Lakes, Illinois, or his authorized representative.

[28 FR 319, Jan. 11, 1963]

§ 207.476 The Inland Route—lock in Crooked River, Alanson, Mich., use, administration, and navigation.

(a) General. The use, administration, and navigation of the lock shall be under the direction and supervision of the District Engineer, U.S. Army Engineer District, Detroit, Mich., and his authorized agents.

(b) Authority of lockmaster. The lockmaster shall be charged with the immediate control and management of the lock, and of the area set aside as the lock area, including the lock approach channels. He shall see that all laws, rules, and regulations for the use of the lock and lock area are duly complied with, to which end he is authorized to give all necessary orders and directions in accordance therewith, both to the employees of the Government and to any and every person within the limits of the lock area, whether navigating the lock or not. No one shall cause any movement of any boat, craft or other floating object in the lock or approaches except by or under the direction of the lockmaster or his assistant.

131

**Corps of Engineers, Dept. of the Army, Do)**     **§ 204.175**

nautical miles off-
ss Island, thence
ical miles offshore
re, to a point south
y, Florida, latitude
e 85°00′00″; thence
latitude 29°17′30′,
; thence southwest-
18°40′00″, longitude
southeasterly to lati-
ongitude 84°30′00″;
longitude 86°48′00″;
h along longitude
ersection of the line
five nautical miles
n USC&GS Station
3 30°23′10.074″, long-
; thence northeaster-
of the circle to the

ons (1) The area will
ently during daylight
or 10 days at a time
ace once or twice a
marily of not more
ance notice of such
blished in local news
uch other manner as
ineer, Corps of Eng-
abama, may direct.
iods of firing, passag
will not be denied i
or passenger-carryin
proceeding on esta
case any such vess
anger area, the office
firing operations w
tion or postponeme
he vessel shall hav
ion of the danger are
ion of the area involved wi
nt observation of bo
vessels and air pas
and during periods o
ce will be given to
of intention to fire
over the vessel, us
vessels and tows a
heir established cou
clear the area as soon a

ssels will be warned o
mmediate danger a
eriods by surface pa
ing so warned such
t the area immedia
gmally will not e

(4) The regulations in this section shall be enforced by the Commanding Officer, Air Force Proving Ground Command, Eglin Field, Florida, and such agencies as he may designate.

[14 FR 2723, Mar. 29, 1951, as amended at 32 FR 8962, Nov. 5, 1957]

§ 204.134  Waters of Santa Rosa Sound and Gulf of Mexico adjacent to Santa Rosa Island, Air Force Proving Ground Command, Eglin Air Force Base, Florida.

(a) *The danger zones*—(1) *Prohibited area.* Waters of Santa Rosa Sound and Gulf of Mexico within a circle one nautical mile in radius, centered at latitude 30°23′10.074″, longitude 84°48′25.433″ (USC&GS Station Tuck 3). The portion of the area in Santa Rosa Sound includes the Gulf Intracoastal Waterway between miles 209.6 and 211.4 from Harvey Lock, Louisiana.

(2) *Restricted area.* The waters of Santa Rosa Sound and Gulf of Mexico surrounding the prohibited area described in paragraph (a)(1) of this section, within a circle five nautical miles in radius centered at latitude 30°23′10.074″, longitude 86°48′25.433″ (USC&GS Station Tuck 3). The portion of the area in Santa Rosa Sound includes the Gulf Intracoastal Waterway between miles 204.3 and 216.4 from Harvey Lock, Louisiana.

(b) *The regulations.* (1) Experimental test operations will be conducted by the United States Air Force within the prohibited area on an intermittent basis. Such test operations shall not exceed one hour, and shall not occur more than twice weekly.

(2) No vessel or other watercraft shall enter the prohibited area, except to navigate the Gulf Intracoastal Waterway. Such vessels and other watercraft shall confine their movements to the waters within the limits of the Intracoastal Waterway and shall make the passage as promptly as possible under normal vessel speed.

(3) During periods when experimental test operations are underway no vessels or other watercraft shall enter or navigate the waters of the restricted area.

(4) Warning signs will be erected on the shore lines of Santa Rosa Sound

and the Gulf of Mexico to mark the limits of the respective areas.

(5) The regulations in this section shall be enforced by the Commander, Headquarters Air Proving Ground Command, Eglin Air Force Base, Florida, and such agencies as he may designate.

[22 FR 609, Jan. 30, 1957, as amended at 23 FR 8061, Oct. 18, 1958; 23 FR 9031, Nov. 30, 1958]

§ 204.175  Lake Michigan; small-arms range adjacent to United States Naval Training Center, Great Lakes, Ill.

(a) *The danger zone.* An area bounded on the north by latitude 42°20′30″; on the east by longitude 87°47′30″; on the south by latitude 42°18′45″; and on the west by the shoreline.

(b) *The regulations.* (1) When firing affecting the danger zone is in progress, the enforcing agency will post guards at such locations that the waters in the danger zone may be observed and arrange signals whereby these guards may stop the firing should any person or vessel be seen in the waters of the danger zone. When firing is in progress, the enforcing agency will cause red flags to be displayed on shore near the rifle butts, which may be readily discernible to a person in a vessel within the danger zone.

(2) The enforcing agency is hereby authorized to use such agencies as shall be necessary to prohibit vessels from entering the area until such time as shall be convenient.

(3) If such flags are displayed it will indicate that firing is in progress, and that the waters in the danger zone are subject to impact by rounds missing or ricocheting off the impact berm and should not be entered until the flags are lowered.

(4) Wherever possible, the enforcing agency will warn the public of the contemplated times of firing and the areas involved two days in advance of the scheduled date, through the public press and the United States Coast Guard. The danger zone may, however, be closed without advance notice.

(5) [Reserved]

Case 1:08-cv-00320   Document 10-8   Filed 07/31/2008   Page 25 of 26

§ 204.180

(6) The regulations in this section shall be enforced by the Commander, United States Naval Training Center, Great Lakes, Illinois, and such agencies as he may designate.

[13 FR 8560, Dec. 31, 1948. Redesignated at 14 FR 4904, Aug. 9, 1949 and amended at 28 FR 319, Jan. 11, 1962; 45 FR 13072, Feb. 28, 1980]

§ 204.180   Waters of Lake Michigan south of Northerly Island at entrance to Burnham Park Yacht Harbor, Chicago, Illinois; danger zone adjacent to airport on Northerly Island.

(a) Danger zone—(1) Zone A. Beginning at a point 250 feet west of the center line of the runway at the south end of the air strip on Northerly Island; thence 183°, 500 feet; thence 90°, 600 feet; and thence northerly to a point 250 feet east of the center line of the runway at the south end of said air strip. During the navigation season, the southeast and southwest corners of Zone A will be marked with spar buoys colored and lettered as prescribed by the United States Coast Guard.

(2) Zone B. Beginning at the southwest corner of Zone A; thence 183°, 500 feet; thence 90°, 700 feet; thence northerly to the southeast corner of Zone A; and thence 270° to the point of beginning. During the navigation season, the southeast and southwest corners of Zone B will be marked with spar buoys colored and lettered as prescribed by the United States Coast Guard.

(b) Regulations. (1) During daylight hours (from one-half hour before sunrise to one-half hour after sunset), and when the airport on Northerly Island is in operation, no vessel or other watercraft, any part of which extends more than 15 feet above the water surface shall enter or remain in Zone A, and no vessel or other watercraft, any part of which extends 30 feet or more above the water surface shall enter or remain in Zone B.

(2) When the airport is in operation a red ball at least three feet in diameter, shall be continuously displayed at the northeast and northwest corners of Zone A. These balls shall not be displayed when the airport is not in operation.

44

## 33 CFR Ch. II (7-1-85 Ed.)

[12 FR 6665, Oct. 9, 1947. Redesignated 14 FR 4904, Aug. 9, 1949, and amended at FR 5022, Aug. 4, 1950, 36 FR 5911, Mar. 1971]

§ 204.187   Lake Erie, west end, north Erie Ordnance Depot, Lacarne, Ohio.

(a) The danger zone: Consists of the waters of Lake Erie within:

(1) Danger Area I. The sector of a circle with a radius of 6,500 yards centered at latitude 41°32′30″ N., longitude 33°01′00″ W., and intersecting the southwest boundary of Area II at latitude 41°35′00″ N., longitude 83°03′22″ W., and the southeast boundary of Area II at latitude 41°34′20″ N., longitude 82°57′10″ W.

(2) Danger Area II (Includes Area I). The area bounded as follows: Beginning at latitude 41°32′30″ N., longitude 83°01′00″ W.; thence to latitude 41°35′00″ N., longitude 83°03′22″ W.; thence to latitude 41°36′00″ N., longitude 83°03′24″ W.; thence to latitude 41°41′30″ N., longitude 83°07′30″ W.; thence to latitude 41°41′30″ N., longitude 83°00′00″ W.; thence to latitude 41°35′40″ N., longitude 82°54′50″ W.; and thence to the point of beginning.

(b) Types of firing—(1) Danger Area I. Small arms impact area.

(2) Danger Area II. Ground-based artillery, antiaircraft artillery and automatic weapons impact area.

(c) Authorized dates and hours of firing:

(1) Danger Area I. 6 a.m. to 6 p.m. e.s.t./e.d.t., daily; actual firing dates and hours within the authorized period to be announced in advance in special firing notices.

(2) Danger Area II. 8 a.m. to 5 p.m. e.s.t./e.d.t., daily except on Saturdays, Sundays, and holidays; actual firing authorized period to be announced in advance in special firing notices.

(d) Restrictions. (1) No vessel shall enter or remain in a danger area during a scheduled firing period announced in a special firing notice unless specific permission is granted in each instance by a representative of the enforcing officer.

(2) The danger areas within the danger zone shall be open to the public for navigation, fishing and

## Corps of Engineers, Dept. of the Army

other public use when firing and/or bombing is not scheduled.

(e) Enforcing agencies. The regulations in this section shall be enforced by the respective danger areas by the respective commanders and such agencies as each may designate for his assigned areas. He will be responsible for prescribing the prescribed control, signals, and special firing notices.

(1) Danger Area I. Adjutant General, State of Ohio.

(2) Danger Area II. Adjutant General, State of Ohio.

(f) Control and signals—(1) Danger Area I. When firing into Area I, red flags will be flown from the safety tower at Camp Perry, and from flag poles in the butts of the ranges being used.

(2) Danger Area II. During all types of firing in Area II, red flags will be displayed, one from the safety tower at Camp Perry and one from the safety tower at the Erie Proof Front. During firing into Area II, patrol boats will police and maintain surveillance of the area, and will be in constant radio communication with the shore station controlling the firing.

(3) [Reserved]

(4) The appropriate enforcing officer has authority to suspend any scheduled firing for reasonable periods during regattas and immediately after fishing nets are destroyed or dislocated by severe storms.

(5) The special firing notices which will include schedules of use will be published by the enforcing officer indicated in paragraph (e) of this section, in sufficient time to permit circularization to interested parties and posting on the bulletin boards of post offices in surrounding localities. Special notices will also be furnished the District Engineer, Corps of Engineers, Detroit, Mich.; the Commander, Ninth Coast Guard District, Cleveland, Ohio; the Regional Manager, Federal Aviation Administration, Chicago, Ill.; and each of the enforcing agencies listed in paragraph (e) of this section. Users of the waterway shall familiarize themselves with the current special firing notices. If in doubt, inquiry should be made to the enforcing officer indicated in paragraph (e) of this section.

45