UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Steven B. Pollack and ) | |
| Blue Eco Legal Council, ) | |
|  ) | |
| Plaintiffs, ) | Case Number: 08-cv-320 |
| ) | Assigned Judge: Guzman |
| v. ) | Magistrate Judge: Brown |
| ) | |
| United States Department of Justice, ) | |
| United States Coast Guard, ) | CWA, RCRA, CERCLA, AND |
| United States Navy, ) | PUBLIC NUISANCE FTCA CASE |
| United States Marines, and ) | |
| United States Department of Defense, ) | |
| ) | |
| Defendants. ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND FOR PRELIMINARY MANDATORY INJUNCTION**

**I. PRELIMINARY INJUNCTION**

Plaintiffs ask this Court to issue a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure to prevent irreparable harm to Plaintiffs by enjoining the Defendants from discharging any additional lead munitions from their FBI training facility or from Coast Guard training vessels into navigable waters without a Clean Water Act discharge permit.

A party seeking preliminary injunctive relief in the Seventh Circuit must show: "1) a reasonable likelihood of success on the merits, and 2) no adequate remedy at law and irreparable harm if preliminary relief is denied." Aircraft Owners and Pilots Ass'n v. Hinson, 102 F.3d 1421, 1424 (7th Cir. 1996) (citing Mil-Mar Shoe Co. v. Shonac Corp., 75 F.3d 1153, 1156 (7th Cir. 1996)); SMC Corp., Ltd. v. Lockjaw, LLC, 481 F.Supp.2d 918 (N.D.Ill. 2007).  The court must then consider: "3) the irreparable harm the non-moving party will suffer if the injunction is granted balanced against the irreparable harm the moving party will suffer if the injunction is denied, and 4) the public interest, i.e., the effect that granting or denying the injunction will have on non-parties." Id. at 1425.  See also Taylor v. Chicago, 1991 WL 111154 (N.D.Ill. 1991) (denying gun club's motion to enjoin termination of lakefront shooting range site lease.)

**A.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

Plaintiffs will ultimately succeed on the merits because the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, requires a permit to discharge any pollutant into the waters of the United States; the Defendants do not have a permit for their discharge of lead munitions pollutants into the waters of the United States; and the federal facilities provision of the Clean Water Act, 33 U.S.C. § 1322, requires the government to comply to the same extent as any nongovernmental entity.

The Clean Water Act ("CWA") requires a National Pollution Discharge Elimination System ("NPDES") permit for the 1) *discharge of any pollutant*, including toxic pollutants, 2) *from a point source* 3) *into the navigable waters* of the United States. 33 U.S.C. § 1342(a)(1) (emphasis added); Froebel v. Meyer, 217 F.3d 928, 937 (7th Cir. 2000); 33 U.S.C. § 1311(a) ("Except as in compliance with [the § 1342 NPDES permit program], the discharge of any pollutant by any person shall be unlawful.")

Under the Clean Water Act, district courts "shall have jurisdiction" to enforce "an effluent standard or limitation [of the CWA]" in a civil action brought by "any citizen" against any person, "including (i) the United States, and (ii) any other governmental instrumentality or agency . . . who is alleged to be in violation" of the Clean Water Act. 33 U.S.C. § 1365(a). The CWA specifically refers to the availability of "a temporary restraining order or preliminary injunction" in § 505(d), id. at 1365(d).

### 1.    Defendants currently discharge pollutants without a permit.

"Discharge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); Compl. at ¶ 31. "Pollutant" means "solid waste . . . munitions . . . discharged into water." Id. at 1362(6); Compl. at ¶ 33.

Munitions discharged into the waters of the United States are pollutants under the plain text of Clean Water Act. Id.; see also Long Island Soundkeeper Fund v. New York Athletic Club, 1996 WL 131863, 15 (S.D.N.Y. 1996):

> Given the statute's broad mandate, case law interpreting the meaning of 'pollutants' within the CWA, and the arguments of the EPA and [The New York State Department of Environmental Conservation], shot and target debris generated by operation of Defendant's trap shooting range constitute pollutants within the meaning of the CWA.

The CWA is a "strict liability statute", Sierra Club v. City of Little Rock, 351 F.3d 840, 843 (8th Cir. 2003), and the requirement that "all discharges covered by the CWA must have an NPDES permit 'is unconditional and absolute." See Orange Environment, Inc. v. County of Orange, 811 F.Supp. 926, 934 (S.D.N.Y. 1993) (quoting United States v. Tom-Kat Development,

Inc., 614 F.Supp. 613, 614 (D.Alaska 1985).  Doubts as to the existence of continuing CWA violations "are resolved in favor of the citizen-Plaintiff."  Connecticut Coastal Fishermen's Association v. Remington Arms Co., Inc., 989 F.2d 1305, 1311 (2nd Cir. 1993);

Defendants have discharged munitions pollution into navigable waters.  Compl. Ex. A (United States Coast Guard Live Fire Training documents); Compl. Ex. G at 12 (Real Estate Appraisal and Related Studies for Federal Bureau of Investigation: "Danger Zone Diagram". See also Exhibit 1 (Affidavit of James Barton) at ¶ 6; see generally id. at ¶¶ 3 – 5.

Defendants continue to discharge munitions pollution into navigable waters. Compl. Ex. E (Press release by U.S. Coast Guard); Compl. Ex. J (National Oceanic and Atmospheric Administration Coast Pilot 6, Chapter 11: "Lake Michigan").  See also Exhibit 1 (Affidavit of James Barton) at ¶¶ 3 – 5.

Under the Clean Water Act, 33 U.S.C. § 1362(13), "Toxic pollutant" means pollutants

> [that] will, on the basis of information available to the Administrator, cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations. . .

Lead is a regulated as toxic pollutant under the Clean Water Act.  40 C.F.R. § 423, Appendix A: "Priority Pollutants".  Lead is also listed as a Persistent Bio-accumulative Toxin (PBT) under the Toxic Reporting Inventory. 42 U.S.C. § 11001 et seq.; 40 C.F.R. § 372.

The munitions discharged by Defendants into Lake Michigan and other navigable waters are toxic pollutants because the munitions contain lead.  Defendants continue to discharge toxic pollutants from their firearms range in North Chicago and their vessels during Coast Guard training without an NPDES permit.

### 2.     Defendants' firearms range and vessels are point sources.

Point source means any discernible, confined and discrete conveyance, including any vessel, from which pollutants are or may be discharged.  33 U.S.C. § 1362(14).

The definition of "point source" under the CWA is to be broadly interpreted: "[t]he concept of a point source was designed to . . . embrac[e] the broadest possible definition of any identifiable conveyance from which pollutants might enter waters of the United States."  Dague v. City of Burlington, 935 F.2d 1343, 1354-55 (2nd Cir. 1991), rev'd in part on other grounds (quoting United States v. Earth Sciences, Inc., 599 F.2D 368, 373 (10th Cir. 1979).

Cases too numerous to list reflect the varied means of discharging that constitute CWA point sources.  See, e.g. Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) (aircraft firing bullets

3

into the water is a point source); <u>Stone v. Naperville Park Dist.</u>, 38 F.Supp.2d 651, 655 (N.D. Ill. 1999) (shooting range where lead shot and clay targets landed in water is a point source.)

In <u>Stone</u>, the United States Environmental Protection Agency (EPA) had "advised the Defendants that a[n NPDES] permit was required for trap shooting". The Northern District of Illinois granted summary judgment to the Plaintiff on the issue of the Defendants' liability under the CWA because "the undisputed facts establish[ed] that the [shooting range operators] have violated the Clean Water Act" by discharging into navigable waters without an NPDES permit. <u>Id.</u> at 656. This Court held that a "shooting range, as well as each firing station, constitutes a 'point source' as defined by the [Clean Water] Act. The whole purpose of the facility is to 'discharge pollutants' in the form of lead shot and shattered clay targets." <u>Id.</u> at 655.

See also <u>Long Island Soundkeeper Fund v. New York Athletic Club</u>, 1996 WL 131863, 14 (S.D.N.Y. 1996): A firearms shooting range "is an identifiable source from which spent shot and target fragments are conveyed into navigable waters of the United States. As such, [a] [r]ange constitutes a point source within the meaning of the CWA."

Defendants' firearms range in North Chicago and Coast Guard vessels are point sources because they are identifiable conveyances from which pollutants enter navigable waters.

### 3.     Lake Michigan is a navigable water of the United States.

"Navigable waters", 33 U.S.C. § 1362(7), means "the waters of the United States, including the territorial seas." Lake Michigan is navigable water under the Clean Water Act. <u>People of State of Ill. v. Outboard Marine Corp., Inc.</u>, 680 F.2d 473 (Ill. App. 1982)

The United States EPA recently addressed the combination of firearms ranges and water or wetland areas in its "Best Management Practices for Lead at Outdoor Shooting Ranges" (Region 2, June 2005), Compl. Ex. B, at I-6 "Legal Requirements & Court Rulings" (emphasis added):

> [M]ost litigation concerns have been at shotgun ranges where the shotfall zone impacts water or wetland areas. The potential environmental and human health risks are greater at those ranges . . . Citizen groups have been the driving force behind most legal actions taken against outdoor ranges. . . The Resource Conservation and Recovery Act (RCRA) and the Clean Water Act (CWA), *specifically provide citizens with the right to sue in cases in which the environment and human health are threatened. These citizen suits have been highly effective in changing the way ranges operate.*

See also <u>id.</u> at II-4 "Operational Aspects" (emphasis in original):

> **Shooting into water bodies or wetlands should not occur.** Besides the environmental impacts discussed previously, the introduction of lead to surface water bodies will likely cause a range to be susceptible to litigation and/or government

4

action. Shooting into water bodies or wetlands is NOT an option for ranges that want to survive in the future.

The Defendants are using 2,975 acres of Lake Michigan as an "impact area" for lead bullets and artillery. See Compl. Ex. G (Real Estate Appraisal and Related Studies for Federal Bureau of Investigation: "Danger Zone Diagram"; Compl. Ex. J (NOAA Coast Pilot 6, Chapter 11: "Lake Michigan".) Plaintiffs are therefore likely to succeed on the merits because Defendants' actions continue to violate the Clean Water Act by discharging toxic pollutants from point sources into navigable waters of the United States without an NPDES discharge permit.

**B.   PLAINTIFFS HAVE NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM IF PRELIMINARY RELIEF IS DENIED**

Plaintiffs have no adequate remedy at law because only an injunction – not monetary damages – can adequately protect Plaintiffs and other similarly affected citizens from the irreparable injury to human health and the environment caused by Defendants' ongoing discharges of lead munitions pollutants into the source of Plaintiffs' drinking water.

The Clean Water Act, among other environmental laws, is enforced prospectively to protect the public welfare and is not intended to compensate individuals for past damages. See e.g. Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 57 (1987). The CWA has been interpreted "as permitting the exercise of a court's equitable discretion, whether the source of pollution is a private party or a federal agency, to order relief that will achieve *compliance* with the Act." Weinberger, 456 U.S. at 318 (emphasis in original.) The CWA's language, structure, and "legislative history does not suggest that Congress intended to deny courts their traditional equitable discretion" regarding injunctive relief. Id. at 315.

Lead is a toxic pollutant under the Clean Water Act. 33 U.S.C. § 1362(13); 40 CFR 423, Appendix A: "Priority Pollutants". Lead is a listed Persistent Bio-accumulative Toxin (PBT) under the Toxic Reporting Inventory. 42 U.S.C. § 11001 et seq., 40 C.F.R. Part 372.

U.S. EPA's "Best Management Practices for Lead at Outdoor Shooting Ranges" (Region 2, June 2005) details some of the serious health risks posed by ranges that discharge lead into water. Compl. Ex. B, I-5 "Effects on the Human Body from Excessive Exposure to Lead":

> Lead affects the body in many ways. . . Brain or Nerve Damage. . . behavior and learning problems. . . difficulties during pregnancy. . . reproductive problems in both men and women (such as low birth weight, birth defects and decreased fertility). . . neurological disorders. . . memory and concentration problems…

5

There is one potable water intake (PWI) inside the Lake Michigan "Danger Zone" of the Defendants' firearms range and another just outside the "Danger Zone". See Compl. at ¶ 21; Compl. Ex. J (NOAA Coast Pilot 6, Chapter 11: "Lake Michigan"); 33 C.F.R. § 334.830 (Lake Michigan; small-arms range adjacent to United States Naval Training Center, Great Lakes, Ill.) Upon information and belief, the PWI within the Danger Zone of Defendants' munitions discharges serves North Chicago and the "outside" PWI serves the Great Lakes Naval Station.

The City of North Chicago's most recent water quality report states that lead had been detected in the City's public water supply. See Compl. at ¶ 22; Compl. Ex. K.

Money damages "are certainly inadequate to compensate permanent injury which could have been prevented. Plaintiff should not be required to await the harm's fruition before he is entitled to seek an inadequate remedy." Smith v. Western Electric, 643 S.W.2d 10 (Mo. App. 1982). Money damages are an inadequate remedy for preventing the irreparable injury to human health and the environment caused by Defendants' illegal discharges into Lake Michigan.

Plaintiffs will suffer irreparable harm unless preliminary relief is granted because Plaintiff Blue Eco Legal Council includes members of the public whose potable drinking water supply is affected by Defendants' illegal discharges of a toxic pollutant; whose health may be irreparably harmed unless further lead discharges are promptly enjoined; and whose members' use and enjoyment of Lake Michigan is harmed by impairment of the environment. See Compl. at ¶3.

Plaintiffs have no adequate remedy at law to prevent permanent injury. Plaintiffs will suffer irreparable harm unless preliminary relief is granted enjoining further discharges of lead munitions into Lake Michigan because lead is a toxic pollutant affecting the Plaintiffs' potable drinking water supply and because lead can cause serious long-term health effects.

### C. THE IRREPARABLE HARM THAT PLAINTIFFS WILL SUFFER IF PRELMINARY INJUNCTION IS DENIED OUTWEIGHS ANY HARM DEFENDANTS WILL SUFFER IF PRELMINARY INJUNCTION IS GRANTED

Plaintiffs will suffer irreparable harm (as detailed in section I.B. above) if Plaintiffs' Motion for Preliminary Injunction is denied, whereas Defendants have many other options, including moving the firearms training to existing land-based facilities or switching to non-lead munitions.

According to the United States Supreme Court:

> Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

6

Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 545 (1987).  See also Stone, 38 F.Supp.2d at 656: "voluntary cessation of statutory violations does not bar issuance of an injunction. . .  The balance of harms [to the parties of granting or denying injunctive relief] weighs in favor of injunctive relief against future violations" of the Clean Water Act.

Plaintiffs and the citizens of North Chicago will suffer irreparable harm if preliminary injunction is denied because emerging research indicates that even small amounts of lead exposure can cause serious long-term health effects.  See, e.g. EPA's "Best Management Practices for Lead at Outdoor Shooting Ranges" (Region 2, June 2005) at I-1: "[T]he federal EPA, the Centers for Disease Control and Prevention (CDCP) and a large number of states have identified human exposure to all forms of lead as a major health concern in the United States."

Defendants will suffer little harm if injunctive relief is granted because Defendants can continue their firearms training exercises currently performed at North Chicago by: (a) moving the training to other existing federal or private facilities; (b) building a new facility elsewhere; or (c) rotating their firearms range 90° away from Lake Michigan and towards Great Lakes Naval Station. See Exhibit 1 (Affidavit of James Barton) at ¶¶ 2, 5, and 7.  Additionally, Defendant Coast Guard can continue training by (a) switching to laser-targeted electronic training equipment that does not discharge pollution into navigable waters (see Compl. Ex. E); or (b) using non-lead munitions.  See Exhibit 1 (Affidavit of James Barton) at ¶ 2.

Any harm to the Defendants as a result of this Court granting Plaintiffs' Motion for Preliminary Injunction is reparable because the Defendants have multiple options for continuing their firearms training exercises in compliance with the Clean Water Act.  Defendants are simply externalizing their operational costs onto the environment by not spending the additional money required to comply with the law.

The harm caused by denial of Plaintiffs' Motion for Preliminary Injunction outweighs the harm caused by granting Plaintiffs' Motion for Preliminary Injunction because Plaintiffs can suffer serious, long-term health effects as a result of toxic pollution in the source of their drinking water (in violation of both the purpose and language of the Clean Water Act), whereas Defendants only need to reconfigure their training operations to prevent discharges of pollution and comply with existing legal obligations.

**D.    THE PUBLIC INTEREST WILL BE SERVED BY PRELIMINARY INJUNCTION**

7

The public interest will be served by granting the Plaintiffs' Motion for Preliminary Injunction because the public shares similar harms with Plaintiffs from Defendants' ongoing discharges of toxic pollution into the public's drinking water supply and its natural environment.

The serious, long-term health and environmental effects caused by lead in the waters of the United States, and the fact that the Defendants are in violation of the CWA, requires that this Court pay "particular regard [to] the public consequences" of issuing an injunction. See generally Weinberger, 456 U.S. at 312.

18,900 residents of North Chicago consume water drawn from the public water intake inside the "Danger Zone" where Defendants discharge toxic lead munitions directly into Lake Michigan. The Clean Water Act is a public welfare law designed to enjoin exactly these types of acts. "The objective of [the CWA] is to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a) *et seq.*

Granting Plaintiffs' Motion for Preliminary Injunction serves the public interest because an injunction will help ensure clean, uncontaminated drinking water for Plaintiffs and for the millions of citizens of the United States and Canada who obtain water from the Great Lakes.

For all of these reasons, preliminary injunction must be granted enjoining the Defendants from any further discharges of pollutants into navigable waters without an NPDES permit.

## II. PRELIMINARY MANDATORY INJUNCTION

Plaintiffs additionally ask this Court to issue a preliminary mandatory injunction under Rule 65 of the Federal Rules of Civil Procedure, as authorized by the Solid Waste Disposal Act (RCRA) to prevent irreparable harm to Plaintiffs by ordering the Defendants to conduct a wide area preliminary assessment of Defendants' accumulated lead munitions in Lake Michigan, which pose imminent and substantial endangerment to human health and the environment.

The ordinary function of a preliminary injunction is "to preserve the status quo pending final determination of the merits after a full hearing" Jordan v. Wolke, 593 F.2d 772 (7th Cir. 1979), however "there may be situations justifying a mandatory temporary injunction compelling the Defendant to take affirmative action." Id. A mandatory injunction, as opposed to a prohibitory one, does not maintain the status quo, but rather compels the performance of an affirmative act. Pinnacle Armor, Inc. v. U.S., 2008 WL 108969, 5 (E.D.Cal. 2008) (citing Stanley v. University

of Southern California, 13 F.3d 1313, 1320 (9th Cir. 1994).  A mandatory injunction orders a person to "undo the wrong or injury with which he or she is charged." Id.

### A.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

Plaintiffs will ultimately succeed on the merits because Defendants have created an imminent and substantial endangerment to the environment and have taken no action to remediate it.

The Resource Conservation and Recovery Act (RCRA) gives this Court authority to order all relief necessary to remedy "any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).  "The district court shall have jurisdiction . . . to restrain any person who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in paragraph (1)(B), to order such person to take such other action as may be necessary, or both." 42 U.S.C. § 6972(a).

A *prima facie* RCRA claim in the Seventh Circuit requires a plaintiff to allege "(1) that the defendant has *generated* solid or hazardous waste, (2) that the defendant is *contributing to or has contributed to the handling of this waste*, and (3) that this waste *may present an imminent and substantial danger to health or the environment*." Albany Bank & Trust Co. v. Exxon Mobil Corp., 310 F.3d 969, 972 (7th Cir. 2002) (emphasis added).

### 1.  Defendants have generated solid waste under RCRA's statutory definition because they have discarded lead bullets and other munitions.

Defendants have discarded spent munitions from their North Chicago firearms range.  This conduct satisfies RCRA's statutory definition of generating solid waste.  This Court therefore has the authority to order a cleanup, beginning with the requested wide area preliminary assessment.

RCRA authorizes two types of citizen suits, based on either regulatory or statutory violations:

> [*42 U.S.C. § 6972(a)(1)(A)*] enables private citizens to enforce the EPA's hazardous waste regulations and – according to 40 C.F.R. § 261.1(b)(1) – invokes the narrow *regulatory* definition of solid waste.  The second type of citizen suit, under section 7002(a)(1)(B), *42 U.S.C. § 6972(a)(1)(B)*, authorizes citizens to sue to abate an 'imminent and substantial endangerment to health or the environment.' . . . Consequently, the broader *statutory* definition of solid waste applies to citizen suits brought to abate imminent hazard[s] to health or the environment.

Connecticut Coastal, 989 F.2d at 1315 (emphasis added).  "RCRA regulations apply the broader statutory definition of solid waste to imminent hazard suits[,]" Id. at 1316, which "lie against any 'past or present' RCRA offender 'who has contributed or who is contributing' to 'past or

9

present' solid waste handling practices that 'may present an imminent and substantial endangerment to health or the environment.'" Id. (quoting 42 U.S.C. § 6972(a)(1)(B)).

RCRA's *statutory* definition of solid waste "contains the concept of 'discarded material,' 42 U.S.C. § 6903(27), but it does not contain the terms 'abandoned' or 'disposed of' as required by the regulatory definition." Id.; 40 CFR 261.2(a)(2), (b)(1).

The U.S. EPA filed an amicus brief in Connecticut Coastal, advising the court that the Agency had interpreted "the statutory definition of solid waste as encompassing the lead shot and clay targets" at issue in that case because they were "discarded." 989 F.2d at 1316. EPA stated that the materials were discarded because they had been "left to accumulate long after they ha[d] served their intended purpose." Id. The Second Circuit "agree[d] that the lead shot and clay targets in Long Island Sound ha[d] accumulated long enough to be considered solid waste." Id. In Connecticut Coastal, lead shot and clay targets had accumulated in navigable waters during "nearly 70 years of use" as a gun club impact zone. Id. at 1308.

See also U.S. EPA's discussion of lead shot as "statutory solid waste" in "Best Management Practices for Lead at Outdoor Shooting Ranges" (Region 2, June 2005), I-7; Compl. Ex. B:

> If lead shot is discarded, it is considered a solid waste as defined in [RCRA] and the facility may be subject to governmental or citizen suits. If, on the other hand, the discharged lead shot is recovered or reclaimed on a regular basis, no statutory solid waste (or hazardous waste) would be present and imminent hazard suits would be avoided.

EPA's *Military Munitions Rule* has clarified RCRA's applicability to shooting operations of military entities, which may, without limitation, include Defendants the Department of Defense, Coast Guard, Navy, and Marines. See 62 Fed.Reg. 6622, 6626-30. Section G of the Rule states that military munitions "are not a solid waste for regulatory purposes: (1) when a munition is used for its intended purpose. . . Under RCRA, the use of products for their intended purpose, even when the use of the product results in deposit on the land, does not necessarily constitute 'discard', is not waste management, and is not subject to regulation." Id. at 6628. However, "*munitions that land off range that are not promptly rendered safe (if necessary) and/or retrieved, are statutory solid wastes* under RCRA section 1004(27), potentially subject to RCRA corrective action. . . [A] *failure to render safe and retrieve a munition that lands off range would be evidence of an intent to discard the munition*." Id. at 6632 (emphasis added); see also 40 C.F.R. § 266.202(d). See also Otay Land Company v. U.E. Limited, L.P., 440 F.Supp.2d

10

1152, 1180 (S.D.Cal. 2006) (noting that "fired military munitions that land off-range become a statutory solid waste at a certain point, potentially subject to RCRA remedial authorities.")

The Ninth Circuit has gleaned three factors from other circuits as to whether something is "discarded," and therefore "solid waste" under RCRA: "(1) whether the material is 'destined for beneficial reuse or recycling in a continuous process by the generating industry itself,' (2) whether the materials are being actively reused, or whether they merely have the *potential* of being reused, (3) whether the materials are being reused by [their] original owner, as opposed to use by a salvager or reclaimer" Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1043 (9th Cir. 2004) (citations omitted) (emphasis in original.)

The lead shot and other munitions that Defendants have placed into Lake Michigan are solid waste under RCRA because Defendants have neither retrieved nor rendered safe the munitions, see Exhibit 1 (Affidavit of James Barton) at ¶¶ 1, 6; the materials are therefore discarded. See Safe Air, 373 F.3d at 1043. Upon information and belief, Defendants discharged lead munitions into the water that (1) are not destined for beneficial reuse or recycling in a continuous process by the generating industry itself; (2) are not being actively reused; and (3) are not being reused by their original owner. See generally Exhibit 1 at ¶¶ 1, 6.

Defendants have generated lead munitions waste that has accumulated in Lake Michigan adjacent to their North Chicago firearms range during 90 years of use, id.; Compl. at ¶ 1, and therefore Defendants' lead shot and other munitions fall squarely within RCRA's *statutory* definition of solid waste as defined by the statute, by the courts, and by the U.S. EPA.

2. **Defendants are contributing to the handling of their solid waste and hazardous waste.**

As described in the preceding section, lead munitions are a solid waste under RCRA if discarded into the environment without plans for retrieval. RCRA "does not define…"handling" in the context of solid waste." Safe Air, 373 F.3d at 1053. "The ordinary meaning of 'handle' is: 'to deal with; act upon; dispose of; perform some function with regard to.'" Id., quoting *Webster's Third New International Dictionary* 1027 (1993).

"Contributing to handling of solid wastes" has been broadly construed by the courts. See, e.g. Gache v. Town of Harrison, 813 F.Supp. 1037, 1041 (S.D.N.Y. 1993) ("[I]mproperly discharged wastes which continue to exist unremediated represent a continuing violation of RCRA.") See also Fallowfield Development Corp. v. Strunk, 1990 WL 52745, 10-11 (E.D.Pa. 1990) ("Because improperly disposed of hazardous waste remains a remediable threat to the

11

environment, this Court believes that Congress intended to allow citizen suits under section 7002 of RCRA for past violations where the effects of the violation remain remediable.")

In this case, Defendants contribute to the handling of solid and hazardous waste by continually discarding lead munitions into Lake Michigan for the past 90 years, which conduct creates a need to deal with or act upon the accumulated solid and hazardous waste.  See Ex. 1.

### 3. Defendants' solid waste and hazardous waste presents an imminent and substantial danger to health and the environment.

The lead munitions that the Defendants have discarded into Lake Michigan are hazardous waste that presents an imminent and substantial endangerment to health and the environment.

Under RCRA § 6972, "it is not necessary that Plaintiffs show that the contamination is harming, or will harm, human health or the environment.  A finding that an activity may present an endangerment does not require a showing of actual harm.  The term 'endangerment' has been interpreted by courts to mean a threatened or potential harm." Maine People's Alliance v. Holtrachem Mfg. Co., 211 F.Supp.2d 237, 246 (D.Me. 2002).  An endangerment is considered ongoing as long as the waste has not been cleaned up and the environmental damage has not been "sufficiently remedied."  Prisco v. New York, 902 F.Supp. 374, 395 (S.D.N.Y. 1995).

U.S. EPA's "Guidance on the Use of Section 7003 of RCRA", at 10-22 (October 1997) (citations omitted) agrees that the phrase "may present an imminent and substantial endangerment" has been broadly construed by EPA and by the courts:

> An 'endangerment' is an actual, threatened, or potential harm to health or the environment. . .  neither certainty nor proof of actual harm is required, only a risk of harm.  Moreover, neither a release nor threatened release, as those terms are used in CERCLA, is required.  No proof of off-site migration is required if there is proof that the wastes, in place, may present an imminent and substantial endangerment.
>
> An endangerment is 'imminent' if the present conditions indicate that there may be a future risk to health or the environment even though the harm may not be realized for years.  It is not necessary for the endangerment to be immediate or tantamount to an emergency.
>
> An endangerment is 'substantial' if there is reasonable cause for concern that health or the environment may be seriously harmed.  It is not necessary that the risk be quantified.

Courts must defer to reasonable Agency interpretations of governing statutes.  Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984).

Imminent and substantial endangerment has been found where buried toxic wastes "contain lead that is a constant danger to the groundwater, so that some cleaning up is necessary in the

12

interest of health, which is what [RCRA] requires." PMC, Inc. v. Sherwin-Williams Co., 151 F.3d 610, 618 (7th Cir. 1998).

Plaintiffs are likely to succeed on the merits and this Court should eventually order a cleanup because Defendants' accumulated lead violates RCRA by posing an imminent and substantial danger to health and the environment. Such a cleanup typically waits until the completion of a wide area preliminary assessment, which is what the instant Motion seeks.

### B.   PLAINTIFFS HAVE NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM UNLESS PRELIMINARY MANDATORY RELIEF IS GRANTED

Plaintiffs have no adequate remedy at law because monetary damages cannot compensate for the lack of a wide area preliminary assessment to determine the scope of irreparable harm.

RCRA is enforced prospectively to protect the public welfare and to "minimize the present and future threat to human health and the environment[.]" See Meghrig v. KFC Western, Inc., 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. 6902(b)). A "private citizen suing under 6972(a)(1)(B) could seek a mandatory injunction, i.e., one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste. . ." Id. at 484. RCRA § 6972(a) authorizes district courts to restrain any person who has contributed or is contributing to the past or present handling or disposal of any solid or hazardous waste, or "to order such person to take such other action as may be necessary, or both." Id. (quoting 42 U.S.C. § 6972(a)(1)(B).)

In United States v. Price, 688 F.2d 204 (3rd Cir. 1982), the court held that "Congress sought to invoke the broad and flexible equity powers of the federal courts in instances where hazardous wastes threaten human health. . . [RCRA has] enhanced the courts' traditional equitable powers by authorizing issuance of injunctions when there is but a risk of harm, a more lenient standard than the traditional requirement of irreparable harm." Id. at 211 (citation to Senate Report omitted.) The court noted that plaintiff's request for funds for a diagnostic study of the public health threat posed by continuing contamination and its abatement was not a traditional form of damages because funding of a diagnostic study was "preventative rather than compensatory." Id. at 212. A preliminary mandatory injunction issued against the defendant in Price, requiring the defendant to fund a study of the threat to public water supplies, among other things. Id. at 213.

See also United States v. Waste Industries, Inc., 734 F.2d 159 (4th Cir. 1984) (RCRA injunction may issue to remedy pre-existing conditions affecting citizens' potable water supply.) See generally Amoco Production, 480 U.S. at 545 (discussing the balancing of harms).

13

The longer these lead munitions remain in the environment, the more Plaintiffs will be irreparably harmed. <u>See</u> section I.B. above. Cleanup will be delayed until a preliminary assessment is complete. Prompt completion of an assessment will mitigate future harm to Plaintiffs, and only preliminary mandatory relief will ensure that Defendants properly comply.

### C. THE IRREPARABLE HARM THAT PLAINTIFFS WILL SUFFER IF PRELMINARY MANDATORY INJUNCTION IS DENIED OUTWEIGHS ANY IRREPARABLE HARM DEFENDANTS WILL SUFFER IF PRELMINARY MANDATORY INJUNCTION IS GRANTED

Plaintiffs will suffer irreparable harm (<u>see</u> discussion in sections I.B. and II.B. above) if Plaintiffs' Motion for Preliminary Mandatory Injunction is denied, whereas Defendants will not suffer any irreparable harm by performing a wide area preliminary assessment of the discarded munitions and other hazardous waste at their North Chicago firearms training range.

RCRA itself suggests the dangers and irreparable harm posed by improperly managed hazardous wastes. 42 U.S.C. § 6903(5) (emphasis added):

> [Under RCRA, hazardous waste is] a solid waste, or combination of solid wastes, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may. . . pose a substantial present *or potential* hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed.

Any harm to the Defendants as a result of this Court granting Plaintiffs' Motion for Preliminary Mandatory Injunction is reparable because Defendants are merely being asked to *assess* the hazardous waste that they have been discarding and accumulating over a 90 year span up to and including the present. Defendants should no longer be allowed to externalize their operational costs onto the environment by flouting their federal environmental obligations.

Denial of Plaintiffs' Motion for Preliminary Mandatory Injunction would cause irreparable harm to Plaintiffs and residents of North Chicago by risking serious long-term health effects caused by Defendants' hazardous waste in the source of drinking water (in violation of both the purpose and language of RCRA.) This harm to Plaintiffs outweighs the harm to Defendants caused by granting Plaintiffs' Motion for Preliminary Mandatory Injunction because Defendants would merely need to perform a wide area preliminary assessment of their impact area.

### D. THE PUBLIC INTEREST WILL BE SERVED BY PRELIMINARY MANDATORY INJUNCTION

The public interest will be served by a preliminary mandatory injunction ordering a wide area preliminary assessment of the "Danger Zone" in Lake Michigan because it will inform the

public, including the 18,900 residents of North Chicago, of the extent of lead hazard on the bottom of Lake Michigan.  See generally section I.D. above.

The "national policy behind RCRA is to minimize the present and future threat to human health and the environment."  Mehgrig, 516 U.S. at 486.  A prompt assessment will minimize public exposure to hazardous waste and will facilitate this Court's determination of what type of removal action will be required at Defendants' North Chicago firearms range to protect human health and the environment.  As such, preliminary mandatory injunction is in the public interest.

For these reasons, preliminary mandatory injunction must be granted ordering the Defendants to perform a wide area preliminary assessment of the accumulated lead munitions that pose imminent and substantial endangerment to human health and the environment in Lake Michigan.

### III. PLAINTIFF SHOULD NOT BE REQUIRED TO POST A BOND BECAUSE IT WOULD DENY MEANINGFUL ACCESS TO JUDICIAL RELIEF

Plaintiffs request that this Court set no bond or a nominal bond in accordance with Rule 65(c) of the Federal Rules of Civil Procedure.  Notwithstanding the mandatory language of the rule, this circuit has long recognized the court's discretion to either waive the requirement or allow the posting of nominal bond.  See, e.g. Cronin v. U.S. Dept. of Agriculture, 919 F.2d 439, 445 (7th Cir. 1990); Friends of the Earth, Inc. v. Brinegar, 518 F.2d 322 (9th Cir. 1975).  Plaintiffs have no money at stake in this case and are merely enforcing their rights to a clean environment.

### CONCLUSION

Plaintiffs therefore ask this Court to preliminarily enjoin the Defendants from all further discharges of lead munitions or other pollutants into navigable waters without an NPDES permit, including ordering the North Chicago Range closed, and to order the Defendants to perform the wide-area preliminary assessment outlined in Exhibit M of Plaintiffs' Complaint.

Respectfully submitted,

s/ Steven B. Pollack
Steven B. Pollack, Attorney
Executive Director, Blue Eco Legal Council
3390 Commercial Ave
Northbrook, IL 60062
847-436-9566