**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN B. POLLACK and BLUE ECO LEGAL COUNCIL, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | No. 08 C 320 |
| UNITED STATES DEPARTMENT OF JUSTICE,  UNITED STATES COAST GUARD, UNITED STATES NAVY, UNITED STATES MARINE CORPS, and UNITED STATES DEPARTMENT OF DEFENSE, | ) ) ) ) ) ) ) | Judge Guzmán |
| Defendants. | ) | |

**DEFENDANTS' COMBINED OPPOSITION TO PLAINTIFFS'**
**MOTION FOR TEMPORARY RESTRAINING ORDER AND TO**
**EXPEDITE THE MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

Defendants United States Department of Justice, United States Coast Guard, United States Navy, United States Marine Corps, and the United States Department of Defense (collectively, "United States" or "Defendants"), for the reasons set forth below, oppose Plaintiffs' Motion for Temporary Restraining Order ("TRO Motion"; Dkt. 27). The TRO Motion is without merit, brought by Plaintiffs without constitutional standing, beyond this Court's subject matter jurisdiction, and is a transparent attempt to engender a false sense of emergency. It should be denied.

While the TRO Motion is non-justiciable and legally unsupported, the Federal Bureau of Investigation ("FBI") also believes that is unwarranted because the FBI Range is designed for safe operation and runs in accordance with stringent safety protocols. The FBI Range and Foss Park, immediately to the south, are separated by an approximately 20-foot high solid barrier. The park and the FBI Range have co-existed compatibly, without incident or injury, for more than 30 years, during which literally millions of rounds of ammunition have been discharged into the impact berm at the FBI Range. Nonetheless, the FBI takes Plaintiffs' allegations of a firearms public safety situation at face value and is responding to them, in an abundance of caution, with the utmost seriousness. Accordingly, the FBI has temporarily halted all firearms discharges to the impact berm at the FBI Range until such time as the FBI can evaluate the Plaintiffs' contentions about possible ricochets into Foss Park. A TRO is, therefore, unnecessary.

That the FBI has taken such steps as a precautionary public safety measure does not change the fact that the TRO Motion does not address, let alone establish, the criteria for the drastic relief that Plaintiffs seek. Plaintiffs have simply failed to satisfy the requirements for preliminary injunctive relief with respect to the alleged conditions at Foss Park. Plaintiffs also ask the Court to expedite the briefing on the unrelated Motion for Preliminary Injunction that they filed on March 7, 2008 (Dkt. 14). There is no reason for the Court to re-visit, let alone expedite, that briefing schedule. The TRO Motion is based on Plaintiffs' newly-raised Foss Park claim, that is wholly distinct from the relief sought and the claims at issue in their Motion for Preliminary Injunction. Accordingly, in addition to denying the TRO Motion, the Court should maintain the current schedule for briefing the Motion for Preliminary Injunction.

## STANDARD OF REVIEW

For reasons set forth below, and to be addressed in the United States' upcoming motion to

dismiss, this Court lacks subject matter jurisdiction over the Proposed Second Amended Complaint (Dkt. 26-2). Most importantly, this Court lacks subject matter jurisdiction over the claim concerning Foss Park, under the citizen suit provision of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, upon which the TRO Motion is exclusively based. Before addressing the merits of this case, and in particular a claim for preliminary injunctive relief, the Court must assure itself of its jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Without jurisdiction, the court cannot proceed at all in any cause.'") (citation omitted); *Kvos, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936); *Small v. Kiley*, 567 F.2d 163, 164 n.1 (2d Cir. 1977) ("[T]he district court should not have granted a preliminary injunction without first having determined whether it had jurisdiction to do so.").

The requirements for preliminary injunctive relief are well-known and onerous. "'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To obtain such relief, Plaintiffs must show that: (1) they have a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer *irreparable harm* which, absent injunctive relief, outweighs the irreparable harm the FBI will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *See, e.g., Goodman v. Ill. Dept. of Fin. & Prof. Regulation*, 430 F.3d 432, 437 (7th Cir. 2005). Obtaining a TRO is even more difficult, given its strictly limited purpose of preventing demonstrated irreparable harm to Plaintiffs until a hearing can be held on a motion for preliminary injunction. *See Granny Goose Foods, Inc. v. Bhd of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974) (TRO is restricted to its "underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer").

## ARGUMENT

**I.     THE TRO MOTION SHOULD BE DENIED BECAUSE THE FBI HAS VOLUNTARILY HALTED FIRING INTO THE IMPACT BERM SO THAT IT CAN INVESTIGATE PLAINTIFFS' CONTENTIONS**

Effective April 1, 2008, the FBI has suspended all firearms discharges to the impact berm at the FBI Range. As such, the FBI voluntarily has ceased the conduct that Plaintiffs' allege

creates a firearms safety situation at Foss Park and has rendered unnecessary the preliminary injunctive relief that Plaintiffs seek. The Court should deny the TRO as moot without prejudice. *See Crue v. Aiken*, 370 F.3d 668, 677 (7th Cir. 2004) (recognizing a TRO as moot where the remedy sought was rendered unnecessary by subsequent action of the TRO recipient). By voluntarily halting discharges to the impact berm, the FBI in no way credits Plaintiffs' allegations or concedes that the situation Plaintiffs allege exists. Indeed, the FBI believes those allegations to be erroneous. Nevertheless, the FBI takes any public safety concern seriously. Thirty years of safe operation of the FBI Range, involving millions of bullets fired into the impact berm and *no* reported injuries to Foss Park patrons, testifies to that fact.

Firing into the impact berm will be suspended until such time as the FBI has thoroughly evaluated Plaintiffs' contentions regarding bullet fragments entering Foss Park. The FBI has, quite obviously, just become aware of these allegations and has not yet formulated an evaluation plan, however the FBI anticipates that it will assess the safety allegations related to bullets escaping the range, and react in a way that ensures the safety of its neighbors, and the general public. Henke Decl. ¶ 3, attached as Ex. 1.[1] The FBI will provide the Plaintiffs and the Court reasonable notice of any plans to resume firearms discharges into the impact berm, thus affording Plaintiffs an opportunity to pursue injunctive relief if they still believe that the alleged conditions are present. In light of this suspension of firearms discharges into the impact berm, premised as it is on Plaintiffs' allegations of potential public harm at Foss Park, it is apparent that the demonstration shoot and tracer round firing that the Court previously allowed should be postponed.

## II.    PLAINTIFFS ARE NOT REASONABLY LIKELY TO SUCCEED ON THE MERITS

If the Court does not deny the TRO Motion as moot, it should be denied because it fails to satisfy the requirements for obtaining preliminary injunctive relief. The TRO Motion is premised exclusively on the new Count III in Plaintiffs' Proposed Second Amended Complaint, entitled, "Resource Conservation and Recovery Act (RCRA) (Foss Park)." Prop. Second Am. Compl. ¶¶ 42-44. As the title confirms, Plaintiffs allege under the RCRA citizen suit provision,

---

[1] An unsigned version of the Henke declaration is being electronically filed with this brief. A signed original will be provided to the Court at the April 1, 2008, hearing.

42 U.S.C. § 6972(a)(1)(B), the existence at Foss Park[2] of an imminent and substantial endangerment to human health and the environment stemming from bullets that allegedly ricochet into Foss Park from the FBI Range.  Prop. Second Am. Compl. ¶¶ 25, 43-44.

A scant 1 ½ pages, the TRO Motion addresses *none* of the factors for preliminary injunctive relief.  As such, it says nothing about Plaintiffs' likelihood of succeeding on the merits of the new Foss Park RCRA claim – the sole basis of the TRO.[3]  It also makes no claim that the Plaintiffs in this case will be subject to irreparable harm if a temporary restraining order is not entered, nor does it address, let alone balance, the obvious and substantial harm to the FBI, more than 40 other law enforcement agencies, and the public interest of halting the vitally important firearms training and qualification functions of the FBI Range.  Critically, the TRO Motion completely ignores the Rule 65(c) mandatory requirement that Plaintiffs post a sufficient surety if the Court grants the preliminary relief they seek.  These shortcomings are cause for denial by themselves and are emblematic of a hastily-filed, ill-conceived, and unsupported motion for extraordinary emergency relief.

There are at least four reasons why Plaintiffs are unlikely to succeed on the merits of their Foss Park RCRA claim.[4]

**Plaintiffs Lack Constitutional Standing**:  Plaintiffs cannot succeed on the merits of their Foss Park RCRA claim because they do not meet their burden under the "case or controversy" requirement of Article III of the U.S. Constitution to show the "irreducible constitutional minimum" of standing, to wit:

> First and foremost, there must be alleged (and ultimately proved) an "injury in fact" -- a harm suffered by the plaintiff that is "concrete" and "actual or imminent,

---

[2] Foss Park is located adjacent to and south of the FBI Range and has been in service as a public park during the entire period of the FBI's operations at the FBI Range (late 1970s to present).

[3] The TRO Motion does not discuss or claim to incorporate the substance of Plaintiffs' previously-filed Motion for Preliminary Injunction (Dkt. 14).  Doing so would have been unavailing, as the Motion for Preliminary Injunction pre-dates, does not address, and is unrelated to the new Foss Park RCRA claim. The United States will file a separate opposition to Plaintiffs' Motion for Preliminary Injunction that addresses the claims for relief therein, none of which concern Foss Park.

[4] While the other counts of the Proposed Second Amended Complaint should be dismissed for these and other reasons, which the United States will address in its motion to dismiss, this brief, like the TRO Motion, addresses the merits of the Foss Park RCRA count only.

not 'conjectural' or 'hypothetical.'"  Second, there must be causation -- a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.  And third, there must be redressability – a likelihood that the requested relief will redress the alleged injury.

*Steel Co.*, 523 U.S. at 103(1998) (internal citations omitted); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-62 (1992).  As an organization suing in its representational capacity, Blue Eco Legal Council has standing to assert the claims of its members only if, in addition to demonstrating the constitutional prerequisites to standing, it can show that:  (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to Blue Eco's; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977).

The injury-in-fact element of standing "requires more than injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (citation omitted).  As to Plaintiffs' claims concerning conditions at Foss Park, the Supreme Court requires that injury-in-fact is alleged only if Plaintiffs "aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (internal quotation marks and citation omitted).  Consequently, "the relevant showing . . . is not injury to the environment, but injury to the *plaintiff*." *Id.* at 181 (emphasis added).

Plaintiffs fall at the first hurdle.  Neither the TRO Motion nor the Proposed Second Amended Complaint allege that Mr. Pollack, Blue Eco itself, or a single member of Blue Eco use or have any association whatsoever with Foss Park or its surrounding area, including the Lake Michigan lakefront.  Nor does either document allege that the Plaintiffs are injured by the alleged presence of a few lead bullets at Foss Park (let alone irreparably harmed or subject to imminent and substantial environmental threat, as discussed *infra*).  Rather, the Proposed Second Amended Complaint and TRO Motion speak in the most general terms imaginable of "members of the general public, especially children," Prop. Second Am. Compl. ¶ 43, and "children and Park patrons."  TRO Mot. at 1.  While such references may be designed to have some emotional appeal, they do nothing to establish that Plaintiffs "use the affected area [of Foss Park] and are persons for whom the aesthetic and recreational values of the [Foss Park] area will be lessened by

the challenged activity" as the law requires. *Laidlaw*, 528 U.S. at 183.

Indeed, Blue Eco is identified only as an organization "with an interest in the environmental safety of the Great Lakes watershed and its members['] . . . drinking water supply and natural environment." Prop. Second Am. Compl. ¶ 3. It is further alleged that Mr. Pollack and Blue Eco's members "have an interest in the condition of the Great Lakes environment and in drinking water quality." *Id.* ¶ 9. It would be hard to exaggerate how vast, generalized, and non-specific the "Great Lakes watershed," the "Great Lakes environment" and the "natural environment" are. These allegations plainly fail to satisfy Article III's requirements for concrete injury-in-fact. The Proposed Second Amended Complaint identifies only Mr. Pollack as a Blue Eco member, noting that he lives "several miles south of the North Chicago site." *Id.* ¶ 9. In fact, according to Google Maps, he lives nearly 13 miles from the FBI Range and Foss Park. Plaintiffs' Rule 26 Initial Disclosures identify only three other purported members of Blue Eco, one of whom appears to be a relative of Mr. Pollack's, who according to Google Maps live between 4.2 and 22 miles from Foss Park. None are residents of North Chicago, Illinois. They are identified only as persons who "use[] and enjoy[] the Great Lakes environment," a distinction shared by residents of Milwaukee, Mackinac Island, Cleveland, and Buffalo.

Moreover, Plaintiffs cannot assert the rights of another person, such as unidentified "members of the general public," "Park patrons," and "children." *Allen v. Wright*, 468 U.S. 737, 751 (1984). The injury-in-fact element of standing "requires more than injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (citation omitted). The Foss Park RCRA claim is, at best, an impermissible generalized grievance about the conduct of government, *see United States v. Richardson*, 418 U.S. 166, 174-75 (1974), and in no sense concerns a concrete, injury-in-fact to any Plaintiff. Prudential considerations as to standing furthermore require that Plaintiffs claim fall within the "zone of interests" protected by the law invoked, in this case RCRA. *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970). Plaintiffs' purported firearms safety concerns about persons being struck by ricochets or the alleged "attractive nuisance" of purported bullet fragments at Foss Park is plainly beyond the zone of interests of RCRA's regulatory scheme for the storage, handling, treatment and disposal of hazardous waste.

The only potentially cognizable injury alleged by Plaintiffs concerns alleged discharges of

6

"lead bullets into the potable water supply in Lake Michigan." Prop. Second Am. Compl. ¶ 18; *see also id.* ¶ 9 ("water supply . . . may be . . . endangered"). Though this alleged injury to Plaintiffs may relate to other counts in the Proposed Second Amended Complaint, it explicitly and expressly *does not apply* to the new Foss Park RCRA count. As discussed, that count says nothing about an injury to Plaintiffs, let alone about contamination of their drinking water. Rather, it speculates that "*members of the public, especially children,* are likely to find lead bullets an attractive nuisance" and that unspecified "shoreline wildlife"[5] may ingest these materials. Prop. Second Am. Compl. ¶ 43. As no injury-in-fact to Plaintiffs is alleged, they lack standing to sue.

Even if Plaintiffs were to argue that the conditions at Foss Park threaten their drinking water, such allegations in the Proposed Second Amended Complaint cannot constitute injury-in-fact in the context of a TRO. Plaintiffs allege that a potable water intake proximate to the FBI Range in Lake Michigan "serves the City of North Chicago." *Id.* ¶ 21. As noted, there is no allegation that Mr. Pollack or a single Blue Eco member resides in North Chicago. Moreover, even if Plaintiffs could establish their consumption of North Chicago drinking water, Exhibit K to the Proposed Second Amended Complaint, the 2006 North Chicago Water Quality Report, demonstrates that lead is well within regulatory levels (11 parts per billion as compared to the "Lead Action Level" of 15 ppb) and that the "Likely Source of Contamination," according to the report attached as Exhibit K, is "Corrosion of household plumbing systems; erosion of natural deposits." Prop. Second Am. Compl. ¶ 22, Ex. K. The Illinois Environmental Protection Agency, the expert state regulatory agency, has opined specifically on Plaintiffs' allegations of lead in the North Chicago drinking water supply as being well below actionable levels, saying: "The bottom line is that they are well under standards. These [standards] are established with public health issues in mind so the public health is protected." "FBI Sued Over Lead Casings in Lake," Waukegan News Sun, Jan. 18, 2008, attached as Ex. 2. Consequently, no injury-in-fact as to drinking water affecting Plaintiffs is alleged.

Plaintiffs' own allegations confirm that neither the FBI Range nor Foss Park is the source

---

[5] Any alleged harm to "shoreline wildlife" does not aid Plaintiffs' cause, as Plaintiffs have failed to allege that they use, recreate in, or enjoy the aesthetics of the Foss Park area. *See Laidlaw*, 528 U.S. at 183.

of lead in the North Chicago drinking water and that an order from the Court concerning the FBI Range or Foss Park would not redress the condition of lead, *well below* actions levels in any event, in the drinking water (rather, an abatement of lead pipes in "household plumbing systems" would be needed, *see* Prop. Second Am. Compl. Ex. K).  Finally, any connection between a handful of purported bullet fragments *at Foss Park* and the North Chicago drinking water supply is too hypothetical and conjectural to constitute injury-in-fact or to establish the required nexus between the alleged injury and the Defendants' conduct.  *Steel Co.* 523 U.S. at 103.

**CERCLA Section 113(h) Bars the Foss Park RCRA Citizen Suit Claim**: Another reason that Plaintiffs cannot succeed on the merits of their Foss Park RCRA claim is that, in light of the FBI's ongoing CERCLA response action at the FBI Range, the claim is barred by Section 113(h) of CERCLA, 42 U.S.C. § 9613(h), which provides:

> No Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under section 9604 [CERCLA Section 104] of this title, or to review any order issued under section 9606(a) [CERCLA Section 106] of this title . . . .

42 U.S.C. § 9613(h).

Section 113(h) enacts a "blunt withdrawal of federal jurisdiction" so that CERCLA cleanups can proceed quickly and efficiently.  *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991); *see also Pollack v. Dep't of Defense*, 507 F.3d 522, 525 (7th Cir. 2007) ("the upshot of § 113(h) is that private attorneys general [*e.g.*, citizen groups] must wait until a cleanup is finished before rushing to court").  The Courts have interpreted Section 113(h) broadly to encompass "any challenge[]," 42 U.S.C. § 9613(h), to a CERCLA cleanup or evaluation regardless of the statutory guise under which the challenge is brought.  *See, e.g., North Shore Gas,* 930 F.2d at 1244-45 (barring RCRA claim); *Clinton County Comm'rs v. EPA*, 116 F.3d 1018, 1026 (3rd Cir. 1997) (barring review of RCRA and NEPA claims); *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239-40 (9th Cir. 1995) (barring review of RCRA and Clean Water Act claims); *Ark. Peace Ctr. v. Ark. Dep't of Pollution Control & Ecology*, 999 F.2d 1212, 1216-17 (8th Cir. 1993) (barring review of RCRA claims); *McCellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 326, 328-29 (9th Cir. 1995) (barring review of RCRA, Clean Water Act, and state environmental law claims).  Vitally important here is that Section 113(h) bars "citizen suits challenging incomplete . . . [response] actions even where impending

irreparable harm is alleged." *Clinton County Comm'rs*, 116 F.3d at 1024 (citing cases, including *Schalk v. Reilly*, 900 F.2d 1091, 1095-96 (7th Cir. 1990).

The FBI's evaluation of the FBI Range is ongoing and, if indicated and as appropriate, will include the evaluation of off-site locations (such as Foss Park) as part of the "investigations, monitoring, surveys, testing, and other information gathering as . . . may [be] necessary or appropriate to identify . . . [the] *extent* of the release or threat thereof." 42 U.S.C. § 9604(b) (emphasis added). More specifically, the FBI will evaluate the extent and necessity for a "removal action" under CERCLA.[6/] "Removal" as defined by CERCLA includes "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances." 42 U.S.C. § 9601(23). The related EPA regulations, known as the National Contingency Plan, spell out the requirements for the lead agency (the FBI in this case) to determine the extent of any actual or threatened release of hazardous substances both on- and off-site. *See, e.g.,* 40 C.F.R. § 300.410(c)(1)(iii) (lead agency to perform "[e]valuation of the magnitude of the threat"), (d) (as to "off-site" removal site inspection). Because the FBI's ongoing response evaluation may include evaluation of Foss Park consistent with the CERCLA requirements, and because a resulting response action, if any, could encompass the Foss Park area, Plaintiffs' claim for specific injunctive relief[7/] at Foss Park in the TRO Motion clearly would interfere with any future response action at Foss Park. Plaintiffs' Foss Park RCRA claim is thus barred by Section 113(h). *Schalk,* 900 F.2d at 1095 (barring challenge to "removal action," even if remedial action is yet to be undertaken); *Smith v. Potter*, 208 F. Supp. 2d 415, 420-21 (S.D.N.Y. 2002) (Section 113(h) bars RCRA citizen suit, even if USPS removal action did not commence until after complaint filed and noting that sampling and other investigative measures "easily satisfy the definition of a Section 104 removal action"), *aff'd*, 343 F.3d 619 (2d Cir. 2003).

**Plaintiffs Failed to Provide 90-Day Notice as Required by RCRA**: Plaintiffs cannot

---

[6/] A "removal action" is which is "an action taken in the short term to 'prevent, minimize, or mitigate damage' . . . from the release or threatened release of a hazardous substance." *Clinton County Comm'rs*, 116 F.3d at 1023 (quoting 42 U.S.C. § 9601(23)).

[7/] It goes without saying that Plaintiffs' demand in the TRO Motion for affirmative injunctive relief, in the form of an abatement action, impermissibly exceeds the scope of relief available for a temporary restraining order: maintenance of the *status quo* until a motion for preliminary injunction can be heard.

succeed on the merits because they have not satisfied the statutory requirement to provide at least 90 days notice before filing a RCRA imminent and substantial endangerment citizen suit. 42 U.S.C. § 6972(b)(2)(A). Such notice is a "mandatory pre-condition for a [RCRA] citizen suit" and any purported notice is to be strictly construed. *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989); *see also Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1322 (7th Cir. 1992) ("Section 6972 requires a would-be champion to try negotiation before litigation."). Prior to filing the TRO Motion and their motion to amend the First Amended Complaint, Plaintiffs provided no notice whatsoever to the FBI (or any Defendant) regarding an alleged imminent and substantial endangerment at Foss Park, much less notice 90 days in advance of filing in accordance with the statute. 42 U.S.C. § 6972(b)(2)(a). Plaintiffs' letter of October 2, 2007, referenced in the Proposed Second Amended Complaint, ¶ 17, plainly fails to satisfy the statutory requirements as it (like the First Amended Complaint) does not concern and makes no mention of Foss Park. To the extent it discusses any geographic area, it refers to "the Department of Justice range," "federal property," "Lake Michigan," and "lake beds." There is no way to construe this notice letter as addressing the claim Plaintiffs now bring concerning the geographic area of Foss Park. Litigating Plaintiffs' RCRA citizen suit claim with respect to Foss Park is, therefore, plainly premature and not authorized by Congress at this time.

**The Spent Munitions at Foss Park Are Not Regulated by RCRA:** Even if Plaintiffs had provided the statutorily-required notice, this Court lacks subject matter jurisdiction because, except as discussed below, discharged "munitions can not be considered solid waste" under RCRA's statutory definition for purposes of an imminent and substantial endangerment citizen suit claim. *Water Keeper Alliance v. Dep't of Defense*, 152 F. Supp. 2d 163, 169 (D. P.R. 2001) (dismissing claim under 42 U.S.C. § 6972(a)(1)(B) as to Department of Defense ordnance training in Vieques, Puerto Rico); *see also Long Island Soundkeeper Fund v. New York Athletic Club*, No. 94 Civ. 0436, 1996 WL 131863, *9 (S.D.N.Y. Mar. 22, 1996) ("Spent shot and target fragments do not . . . fall within the regulatory definition of 'solid waste' under RCRA."). Rather, even under the broader statutory definition applicable to an imminent and substantial endangerment citizen suit, discharged munitions do not become "discarded," and therefore "solid waste" within the meaning of the statute, 42 U.S.C. § 6903(27), until they have been left to accumulate long after they have served their intended purpose. *Water Keeper,* 152 F. Supp. 2d at

167 (citing *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*, 989 F.2d 1305, 1316 (2d Cir. 1993)). Plaintiffs do not claim that the Foss Park bullet fragments, allegedly from the FBI Range, have accumulated for an extended period of time. To the contrary, Plaintiffs' expert opines that they had "indications of recent firing" and "could not have been sitting in their found locations more than a year or two." Barton Aff. at 1. Because this Court lacks subject matter jurisdiction over the Foss Park RCRA claim, Plaintiffs have no likelihood of success on the merits and the TRO Motion should be denied.

## II. PLAINTIFFS HAVE NOT ALLEGED, LET ALONE CLEARLY SHOWN, THAT THEY WILL SUFFER IRREPARABLE HARM WHILE THE FBI, MULTIPLE LAW ENFORCEMENT AGENCIES AND THE PUBLIC AT LARGE WILL BE SUBSTANTIALLY HARMED IF PRELIMINARY RELIEF IS ORDERED

Because this Court lacks subject matter jurisdiction over the Foss Park RCRA claim, Plaintiffs not only are unlikely, but are unable, to succeed on the merits of their claim. For that reason alone, the TRO Motion must be denied. If the Court nevertheless reaches the other factors for injunctive relief, we have shown that Plaintiffs have failed to allege injury-in-fact to support their standing to sue. Having failed even to clear that hurdle, it is all the more apparent that they have not made a "clear showing" that *Plaintiffs* will suffer irreparable harm if the Court does not grant the TRO Motion. *Mazurek*, 520 U.S. at 972.

To demonstrate irreparable injury, Plaintiffs must show that they are subject to a "likelihood of substantial and immediate irreparable injury," *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983), and the injury must be "both certain and great; it must be actual and not theoretical." *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). The Supreme Court has emphasized that there is no presumption of irreparable injury in environmental cases and that courts must balance the equities. *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987). Plaintiffs' speculative allegations of harm from lead contamination to "members of the public" from the presence of a few alleged bullet fragments at Foss Park no more establish irreparable injury to Plaintiffs than injury-in-fact. Certainly, Plaintiffs are not subject to any harm that is immediate, certain or great. As to the potential for harm from bullet ricochets, Plaintiffs have not even alleged, let alone shown, that they are subject to certain or immediate harm from such hypothetical ricochets. That no injury to *any* Foss Park patron from a ricochet is known to have occurred over 30 years and after the firing of millions of rounds, Henke Decl. ¶ 3,

11

establishes that any such harm occurrence is far from certain, immediate or imminent.

For the above-discussed reasons, Plaintiffs have not shown that they will suffer any harm, let alone irreparable harm, if the Court denies the TRO Motion. Although Plaintiffs do not even address the balance of harms, the attached declarations establish that halting operations at the FBI Range beyond the period required to evaluate Plaintiffs' allegations, as the FBI has done voluntarily, will substantially harm the FBI and the multitude of federal, state, and local entities that rely on the FBI Range for firearms training and qualification that are critical to their missions.[8] As a temporary restraining order would so plainly impede and frustrate the functions of entities with law enforcement, public safety and national security responsibilities, the public interest also would be disserved if the TRO Motion were granted.

The importance of the FBI Range to the core functions of the FBI, various federal agencies and military organizations, and more than 40 state, local and municipal law enforcement agencies cannot be overstated. The FBI Range is the primary training and qualification facility for hundreds of FBI Special Agents and thousands of state, local, and municipal law enforcement officials throughout the region. Grant Decl. ¶ 3, attached as Ex. 3. The range is in use on evenings and weekends to accommodate training demands of both the FBI and local law enforcement agencies. Henke Decl. ¶ 4. The FBI's mission is to protect and defend against terrorist and foreign intelligence threats and to enforce over 200 categories of federal law. Grant Decl. ¶ 3. The successful performance of this mission requires FBI Special Agents to be extraordinarily proficient with numerous types of weapons and various law enforcement techniques, both to protect themselves and the general public. The training in those weapons and techniques occurs at the FBI Range. *Id.* ¶ 4.

The FBI's primary use of this facility is for weapons qualification testing. Every FBI Special Agent must undergo quarterly qualification testing for each service weapon required for their operational assignment. *Id.* Such qualification testing is mandatory, meaning that for just the approximately 460 Special Agents in the Chicago Division, approximately 1800 qualifications sessions occur at the FBI Range. *Id.* ¶ 3. Specialized weapons training also is conducted at the FBI Range, such as for FBI Special Weapons and Tactics ("SWAT") teams that

---

[8] Indeed, the Court must balance the harms, such that even a showing of irreparable harm does not mandate injunctive relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

train for high risk events like hostage and barricade situations. *Id.* ¶ 5. Since September 11, 2001, SWAT training also encompasses critical training and preparations to address terrorism events. *Id.* The FBI Range is the primary training facility for several FBI SWAT teams throughout the Midwest, in addition to the Chicago SWAT team. *Id.* The sensitive nature of this training and the special weapons utilized means that SWAT training cannot be conducted on public ranges. *Id.* Other weapons and tactics training that can only be conducted at this facility includes that for undercover agents working on counterterrorism, public corruption, and violent crime assignments. *Id.* ¶ 6.

Law enforcement and military entities throughout the region, approximately 40 in all, use the FBI Range for similar qualification and training purposes. *Id.* ¶ 7; Henke Decl. ¶ 2. Assisting such entities is another part of the FBI's mission. Accordingly, the FBI not only offers its expertise and the services of its instructors to these agencies, but the FBI also makes the FBI Range and technical assistance available these agencies. By doing so, the FBI fosters vital partnerships, coordination and communication with state and local law enforcement agencies that greatly benefits the safety and security of the general public. Grant Decl. ¶ 7. As detailed below, the FBI and these other agencies would face a significant financial burden if they were forced to pay for comparable time and access at private ranges. Henke Decl. ¶ 9. Either due to lack of funding or the unavailability of private range access (given their limited number in the region), the FBI and these other law enforcement agencies likely will be unable to perform some necessary firearms training. *Id.* ¶ 9. Indeed, the FBI will be almost certainly be unable to conduct some training because private ranges prohibit the use of certain FBI weapons and ammunition and, as noted, FBI security concerns will keep it from conducting some sensitive training at private ranges. Grant Decl. ¶¶ 5, 8. In short, the intense volume of training, the type and variety of weapons, and the unique qualifying standards and training requirements of the FBI mean that these activities cannot be conducted at another facility. *Id.*

The balance between Plaintiffs' utter lack of irreparable harm and the substantial, concrete and certain harm that will result if the FBI and other law enforcement agencies are restrained from using the FBI Range overwhelmingly tips in favor of the Defendants. The public interest will also be greatly disserved if the FBI and other law enforcement agencies are barred from carrying out essential training and qualification testing at the FBI Range. The TRO Motion,

therefore, should be denied.

## III.    THE TRO MOTION SEEKS RELIEF THAT IS OVERLY BROAD AND HAS NO BEARING ON THE ALLEGED CONDITION AT FOSS PARK

Plaintiffs seek an order to "temporarily restrain the continued operation of this FBI Range." TRO Mot. at 2. Such relief, which appears to extend to all FBI operations at the FBI Range, vastly overshoots the harmful condition that is alleged – bullets that "are ricochets off the adjacent berm on Defendants' firing range." *Id.* at 1; *see also* Prop. Second Am. Compl. ¶ 25 ("lead bullets from Foss Park . . . that had ricocheted off the FBI Range impact berm"). Consequently, by Plaintiffs' own reckoning the only activity potentially subject to temporary restraint would be activities that involve firing into the "FBI Range impact berm." There is no legitimate reason for Plaintiff to seek to restrain FBI or other agency law enforcement training that does not involve the firing of live rounds into the impact berm.

## IV.    IF PLAINTIFFS' MOTION IS GRANTED, RULE 65(c) MANDATES THE POSTING OF A SUFFICIENT BOND

The Court should deny the TRO Motion. However, if the Court grants it, Rule 65(c) requires Plaintiffs to post a sufficient bond:

> The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c) (emphasis added). As the Seventh Circuit has explained: "[t]he rule . . . makes security mandatory." *Gateway Eastern Ry. Co. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1141 (7th Cir. 1994) (citing *American Hosp. Supply Corp. v. Hosp. Products Ltd.*, 780 F.2d 589, 597 (7th Cir. 1986)); *see also Lorillard Tobacco Co. v. Montrose Wholesale Candies*, No. 03C4844, 2005 WL 3115892, at *18 (N.D. Ill. Nov. 8, 2005) ("The rule, as the Seventh Circuit has stated, makes security mandatory.") (citing *Gateway*).

Like every other factor that the Court is to consider before preliminary injunctive relief can issue, Plaintiffs do not address the requirement to post a bond. Halting FBI firearms training and qualification at the FBI Range will require the FBI to secure the services of private ranges at significant additional cost. Henke Decl. ¶ 9. Furthermore, the uniqueness and intense demands of the FBI's training and qualification regime will cause the FBI to spread its training over a

14

number of commercial ranges, thus incurring travel time and expense. *Id.* ¶¶ 9, 10. Additionally, the FBI's unique demands on range facilities – essentially requiring access 7 days a week for 8 to 12 hours a day – will cause the FBI to pay premium range fees above the industry average. *Id.* 10. It is not an option for the FBI simply to forego training and qualfication activities during the pendency of a restraining order; therefore, the FBI will incur whatever costs are necessary to perform these critical functions elsewhere. In all, the FBI estimates that it will incur costs of approximately $4,000 per week if operations at the FBI Range are restrained in order to run only a severely limited scope of training. *Id.* ¶ 9. Even this limited training schedule assumes that local ranges have available range time, which is not the case. *Id.* 9. As the FBI range is in highest demand during the fair weather spring and summer months, costs would be at their highest during this time of year. *Id.* ¶ 10.

There are, of course, less quantifiable damages that will be suffered if operations at the FBI Range are restrained. First, the training and weapons proficiency of hundreds of FBI agents and thousands of other law enforcement officials could be compromised by insufficient training and qualification opportunities. Grant Dec. ¶ 3. Second, state and local law enforcement agencies that rely on the FBI Range, and use it at no cost, will likewise have to secure private range services and will suffer a relatively greater impact on their more limited budgets. Finally, the public would be damaged by the increased danger of having FBI and other law enforcement officials that are not as proficient with their weapons as they would be if the FBI Range were in operation.

Accordingly, for each 10-day period that the Court imposes a temporary restraining order, the Plaintiffs should be required to post a bond in the amount of at least $15,000.[9]

## CONCLUSION

For the foregoing reasons, the Court should deny the TRO Motion and Motion to Expedite the Motion for Preliminary Injunction.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General

---

[9] Of course, if the Court were to later enter a preliminary injunction, the amount of the bond would have to be significantly higher given the longer duration.

Environment and Natural Resources
Division

Dated: March 31, 2008

    /s/ Matthew R. Oakes
MATTHEW R. OAKES
DAVID S. GUALTIERI
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
(202) 514-4767; (202) 514-8865 (fax)
David.Gualtieri@usdoj.gov

PATRICK J. FITZGERALD
United States Attorney

/s/Linda A. Wawzenski
LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1994
linda.wawzenski@usdoj.gov