**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN B. POLLACK AND BLUE ECO LEGAL COUNCIL, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF JUSTICE,  UNITED STATES COAST GUARD, UNITED STATES NAVY, UNITED STATES MARINE CORPS, AND UNITED STATES DEPARTMENT OF DEFENSE, | ) | No. 08 C 320 Judge Guzmán |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES COMBINED MEMORANDUM OF LAW IN**
**SUPPORT OF ITS MOTION TO DISMISS SECOND AMENDED COMPLAINT**
**AND OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION AND SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     THE FBI RANGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    COAST GUARD LIVE-FIRE TRAINING ACTIVITIES . . . . . . . . . . . . . . . . . . . 3

    III.   THE NOTICE OF INTENT LETTERS AND SECOND AMENDED
          COMPLAINT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    IV.   PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION . . . . . . . . . . . . . 6

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    I.     COUNTS I-IV SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK
          STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          A.    Plaintiffs Lack Standing for their FBI Range and Foss Park Claims. . . . . . 9

          B.    Plaintiffs Lack Standing for Their Claims Concerning Coast Guard
               Training. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    II.    CERCLA SECTION 113(h) REQUIRES DISMISSAL OF COUNTS I-IV AS TO
          THE FBI RANGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          A.    The FBI Has Initiated a CERCLA Response Action at the FBI Range . . . 11

          B.    CERCLA Section 113(h) Bars Claims That Could Interfere With
               Ongoing Response Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

          C.    Plaintiff's Claims "Challenge" the Ongoing Response Action at the FBI
               Range and Should be Dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    III.   THE CLEAN WATER ACT CLAIMS IN COUNT I AS TO COAST GUARD
          TRAINING EXERCISES SHOULD ALSO BE DISMISSED . . . . . . . . . . . . . . 16

IV.    THE RCRA CLAIMS IN COUNTS II AND III SHOULD BE DISMISSED . . . . 18

    A.    Plaintiffs Have Not Alleged an Ongoing RCRA Regulatory Violation. . . 19

    B.    This Court Lacks Jurisdiction Over the FBI Range Imminent and Substantial Endangerment Claims. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.    THE CERCLA CLAIMS IN COUNT IV SHOULD BE DISMISSED . . . . . . . . 22

    A.    Plaintiffs Fail to Allege a Violation of a Substantive CERCLA Requirement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.    Plaintiffs Cannot Satisfy the Elements of a CERCLA Section 107 Claim Because They Have Not Incurred Response Costs. . . . . . . . . . . . 23

    C.    Plaintiffs Seek Injunctive Relief That Is Not Available Under CERCLA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    D.    Plaintiffs Lack Statutory Standing to Sue for Natural Resource Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VI.    PLAINTIFFS' COUNT V CLAIMS SHOULD BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES . . . . . . . . . . . . . . . . . . . . . . . 25

VII.    PLAINTIFFS ARE NOT ENTITLED TO PRELIMINARY RELIEF . . . . . . . . . 27

    A.    Plaintiffs Will Not Suffer Irreparable Harm  . . . . . . . . . . . . . . . . . . . . . . 28

    B.    The Balance of Harms Overwhelmingly Favors the Defendants. . . . . . . 28

    C.    If the Court Grants the PI Motion, Plaintiffs Must Post a Bond. . . . . . . . 29

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Allen v. Wright*,
  468 U.S. 737 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Amoco Prod. Co. v. Village of Gambell*,
  480 U.S. 531 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ark. Peace Ctr. v. Ark. Dep't of Pollution Control & Ecology*,
  999 F.2d 1212 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Artesian Water Co. v. New Castle County*,
  851 F.2d 643 (3d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Arvanis v. Noslo Eng'g Consultants, Inc.*,
  739 F.2d 1287 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bailey v. United States*,
  516 U.S. 137 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 23

*Cadillac Fairview/California, Inc. v. Dow Chem. Co.*,
  840 F.2d 691 (9th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 28

*Clinton County Comm'rs v. EPA*,
  116 F.3d 1018 (3rd Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.*,
  989 F.2d 1305 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 21

*Cooper Indus., Inc. v. EPA*,
  775 F. Supp. 1027 (W.D. Mich. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cromer v. EPA*,
  143 F. Supp. 2d 1376 (M.D. Ga. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Deloria v. Veterans Admin.*,
  927 F.2d 1009 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

*Doyle v. Town of Litchfield*,
  372 F. Supp. 2d 288 (D. Conn. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Environmental Transp. Sys. v. ENSCO, Inc.*,
  969 F.2d 503 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*FDIC v. Meyer*,
  510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

*Fairchild Semiconductor Corp. v. EPA*,
  984 F.2d 283 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Frey v. EPA*,
  403 F.3d 828 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*,
  No. 6:94CV489, 1995 WL 17133045 (E.D. Tex. Sept. 22, 1995),
  *aff'd*, 95 F.3d 358 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
  528 U.S. 167 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 11

*Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis*,
  35 F.3d 1134 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Gervasio v. United States*,
  627 F. Supp. 428 (N.D. Ill. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*,
  430 F.3d 432 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Grafon Corp. v. Hausermann*,
  602 F.2d 781 (7th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Graham v. Med. Mut. of Ohio*,
  130 F.3d 293 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*,
  484 U.S. 49 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 19, 20

*Hallstrom v. Tillamook County*,
  493 U.S. 20 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 19, 22, 26

iv

*Hughes v. United States*,
  701 F.2d 56 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hunt v. Wash. State Apple Adver. Comm'n*,
  432 U.S. 333 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jordan v. Wolke*,
  593 F.2d 772 (7th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*,
  14 F.3d 321 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Kokkonen v. Guardian Life Ins. Co.*,
  511 U.S. 375 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kvos, Inc. v. Associated Press*,
  299 U.S. 269 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lane v. Pena*,
  518 U.S. 187 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Long Island Soundkeeper Fund v. New York Athletic Club*,
  No. 94 CIV 0436, 1996 WL 131863 (S.D.N.Y. Mar. 22, 1996) . . . . . . . . . . . . . . . . . . . 9, 20, 21

*Lorillard Tobacco Co. v. Montrose Wholesale Candies*,
  No. 03C4844, 2005 WL 3115892 (N.D. Ill. Nov. 8, 2005) . . . . . . . . . . . . . . . . . . . . . . . . 29

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*McCellan Ecological Seepage Situation v. Perry*,
  47 F.3d 325 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McNeil v. United States*,
  508 U.S. 106 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Meghrig v. KFC Western, Inc.*,
  516 U.S. 479 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Military Toxics Project v. EPA*,
  146 F.3d 948 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Murrey v. United States*,
　73 F.3d 1448 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*National Ass'n of Mfrs. v. Dep't of Interior*,
　134 F.3d 1095 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Natural Res. Def. Council, Inc. v. NVF Co.*,
　No. Civ. A. 97-496-SLR, 1998 WL 372299 (D. Del. June 25, 1998) . . . . . . . . . . . . . . . . . . . . . 14

*New York v. Shore Realty Corp.*,
　759 F.2d 1032 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*North Shore Gas Co. v. EPA*,
　930 F.2d 1239 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15

*Steven B. Pollack v. Dep't of Defense*,
　507 F.3d 522 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Price v. Navy*,
　818 F. Supp. 1323 (S.D. Cal. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Razore v. Tulalip Tribes of Wash.*,
　66 F.3d 236 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Redland Soccer Club, Inc. v. Dep't of Army*,
　55 F.3d 827 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Reichenberger v. Pritchard*,
　660 F.2d 280 (7th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rennie v. Garrett*,
　896 F.2d 1057 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Richland-Lexington Airport Dist. v. Atlas Props., Inc.*,
　854 F. Supp. 400 (D.S.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Schalk v. Reilly*,
　900 F.2d 1091 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Small v. Kiley*,
　567 F.2d 163 (2d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Smith v. Potter*,
　208 F. Supp. 2d 415 (S.D.N.Y. 2002), *aff'd*, 343 F.3d 619 (2d Cir. 2003) . . . . . . . . . . . . . . . . 14

*Steel Co. v. Citizens for a Better Env't,*
523 U.S. 83 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

*Supporters to Oppose Pollution, Inc. v. Heritage Group,*
973 F.2d 1320 (7th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Tannenbaum v. Jamison,*
No. 93C3595, 1994 WL. 247120 (N.D. Ill. June 6, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Bestfoods,*
524 U.S. 51 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Cannons Eng'g Corp.,*
720 F. Supp. 1027 (D. Mass. 1989), *aff'd,* 899 F.2d 79 (1st Cir. 1990) . . . . . . . . . . . . . . . . . . . 24

*United States v. Richardson,*
418 U.S. 166 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Riverside Bayview Homes, Inc.,*
474 U.S. 121 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. White Mountain Apache Tribe,*
537 U.S. 465 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Valluzzi v. USPS,*
775 F. Supp. 1124 (N.D. Ill. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Vernon Village, Inc. v. Gottier,*
755 F. Supp. 1142 (D. Conn. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*W.A. Mack, Inc. v. General Motors Corp.,*
260 F.2d 886 (7th Cir. 1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Water Keeper Alliance v. Dep't of Def.,*
152 F. Supp. 2d 163 (D.P.R. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Weinberger v. Romero-Barcelo,*
456 U.S. 305 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Whitmore v. Arkansas,*
495 U.S. 149 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Wisconsin Gas Co. v. FERC,*
758 F.2d 669 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**STATUTES**

*Federal Tort Claims Act,*
28 U.S.C. § 2675(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

28 U.S.C. § 2679(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Title 28 Judiciary and Judicial Procedure,*
28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Clean Water Act,*
33 U.S.C. §§ 1251-1387 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 1251(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 1311(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 1365(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 1365(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

33 U.S.C. § 1365(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18, 26

33 U.S.C. § 1365(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Resource Conservation & Recovery Act,*
42 U.S.C. § 6902(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 6903(27) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

42 U.S.C. § 6972(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

42 U.S.C. § 6972(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 6972(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19, 20

42 U.S.C. § 6972(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 22

42 U.S.C. § 6972(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

42 U.S.C. § 6972(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

42 U.S.C. § 6972(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Comprehensive Environmental Response, Compensation, & Liability Act,*
42 U.S.C. § 9601(23), (24) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. §§ 9605, 9616, 9617, 9621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 9604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 12

42 U.S.C. § 9604(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

42 U.S.C. § 9604(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

42 U.S.C. § 9606(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 9607(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 9607(a)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 9607(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

42 U.S.C. § 9607(a)(4)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25

42 U.S.C. § 9607(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

42 U.S.C. § 9613(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

42 U.S.C. § 9613(h)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

42 U.S.C. § 9620(a)(1), (4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 9659(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 9659(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 9659(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

42 U.S.C. § 9659(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**RULES**
Fed. R. Civ. P. 12(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Civ. P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 65(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

## CODE OF FEDERAL REGULATIONS

3 C.F.R. 193 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

33 C.F.R. § 334.830(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

40 C.F.R. pt. 135 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

40 C.F.R. § 261.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

40 C.F.R. § 266.201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. § 266.202 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. § 266.202(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. § 266.202(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

40 C.F.R. § 300.120(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

40 C.F.R. § 300.410(c)(1)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## FEDERAL REGISTER

13 Fed. Reg. 9547 (Dec. 31, 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

44 Fed. Reg. 66,213 (Nov. 19, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

62 Fed. Reg. 6622 (Feb. 12, 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

71 Fed. Reg. 43,402 (Aug. 1, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

72 Fed. Reg. 520 (Jan. 5, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 17, 20

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Court should dismiss the Second Amended Complaint (Dkt. 26-2; "Complaint" or "SAC")[1] because it presents claims that the Plaintiffs lack standing to bring and over which this Court lacks subject matter jurisdiction for a host of other reasons. It is, therefore, also plain that the Court should deny their Motion for Preliminary Injunction (Dkt. 13; "PI Motion") because they have no reasonable prospect of succeeding on the merits of their claims and fail to meet their heavy burden to show palpable, non-speculative and imminent irreparable harm. We first explain in Argument Sections I-VI of this brief the numerous, insurmountable jurisdictional obstacles that Plaintiffs face in bringing their claims and why every count in the Complaint must be dismissed. We then explain the additional reasons why the Court should deny the PI Motion in Argument Section VII.

This case concerns the Federal Bureau of Investigation's Regional Training Facility in North Chicago, Illinois ("FBI Range") as well as water-based live-fire training activities conducted by the United States Coast Guard on the Great Lakes and purportedly in unidentified locations on the "East Coast." Other federal agencies are Defendants, including: the United States Navy, the United States Marines Corps, and the United States Department of Defense. Plaintiffs assert that subject matter jurisdiction exists under the citizen suit provisions of the Clean Water Act ("CWA"), the Resource Conservation and Recovery Act ("RCRA"), and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Claims are also raised under the Federal Tort Claims Act ("FTCA"). Plaintiffs are Blue Eco Legal Council, a self-styled "environmental organization," and Steven Pollack, Blue Eco's counsel of record in this case and Blue Eco's executive director. Pollack is the only individual mentioned in the Complaint.

Argument Sections I-VI expose the Complaint's numerous jurisdictional deficiencies, including that the Plaintiffs: lack standing; failed to comply with mandatory conditions precedent to suit; failed to comply with statutory venue provisions; and seek relief that is not authorized by the statutes they invoke. Addressing just a few of these problems by way of introduction, it first is apparent that Plaintiffs have not met the constitutional standing requirements by showing concrete, cognizable injury resulting from the Defendants' activities at the FBI Range or from Coast Guard training exercises that can be redressed by this Court. Additionally, all of Plaintiffs' federal environmental claims as to the FBI Range are barred, as a matter of law, by CERCLA's prohibition

---

[1] The Second Amended Complaint supersedes the First Amended Complaint (Dkt. 10, filed Jan. 31, 2008), which superseded the initial complaint (Dkt. 1; filed Jan. 14, 2008).

against pre-implementation review under Section 113(h) until the FBI completes its ongoing response action at the FBI Range.  In the unlikely event Plaintiffs clear that hurdle, they also have failed to allege an "ongoing" violation of a specific RCRA regulatory requirement at the FBI Range as the law requires.  As to the Coast Guard, the complained-of training exercises were formally halted in 2006, and Plaintiffs allege no specific facts about what the Coast Guard is supposedly doing currently to violate either the CWA or RCRA on the "East Coast" to establish this Court's jurisdiction.  As to some claims, Plaintiffs failed to provide statutorily required notice prior to filing suit and they provided no notice whatsoever to Defendant Department of Defense as to *any* of their claims.  We address other issues below, including venue problems as to Plaintiffs' claims arising in unspecified and far-flung areas of the "Great Lakes" and the "East Coast."  Plaintiffs' claims for tort damages under the FTCA are also not within this Court's jurisdiction, as Plaintiffs did not exhaust their administrative remedies.

In short, the Court should dismiss the Complaint and deny the PI Motion because Plaintiffs are not likely to prevail on the merits of their claims and have made no showing of irreparable harm.

## FACTUAL AND PROCEDURAL BACKGROUND

## I.    THE FBI RANGE AND IMPACT AREA

The FBI Range is the primary training and qualification facility for hundreds of FBI Special Agents and thousands of state, local, and municipal law enforcement agencies throughout the region.  Grant Decl., Att. 1,[2] ¶ 3.  The facility is approximately 14 acres in size and includes an associated safety zone area of approximately 2,975 acres in adjacent Lake Michigan that the FBI controls, and from which the FBI can prohibit public access (the "Impact Area").  SAC, Exhibit ("Ex.") G (graphical depiction of Impact Area); 33 C.F.R. § 334.830(a) (geographic dimensions of Impact Area).  From 1918 until approximately 1977, the site was used by the United States military, including Defendants Navy and Marines, as a practice range for various types of artillery and small arms training.  *See* SAC ¶ 16, Ex. G.  Since approximately 1977, the FBI has used the range for small arms training (pistol, rifle, and shotgun), as have numerous federal, state, and local law enforcement agencies, including Defendants Navy and Marines.  *See* SAC ¶ 18; Grant Decl. ¶ 7.  A 1948 regulation shows that the Impact Area was once larger than it is today and that rounds were fired directly into

---

[2] Attachments to this brief are referred to as "Att." to distinguish them from the Complaint's ("Ex." herein).

Lake Michigan.  *See* 13 Fed. Reg. 9547, 9560 (Dec. 31, 1948), Att. 2.  Following the FBI's assumption of the range, the safety protocol for the Impact Area was modified "to accommodate the current [*i.e.*, FBI] training and practice routine," which included the installation and use of an impact berm, as "all fire is intended to impact into the berms and not impact into the lake."  44 Fed. Reg. 66,213, 66,213 (Nov. 19, 1979), Att. 3.  Thus, unlike the pre-1979 conditions, where there was no impact berm and rounds were fired directly into the lake, the use of the impact berm means that "[o]nly an errant round or ricochet would impact the lake."  *Id.*[3/]  In 1987, the General Services Administration transferred the site from the Navy to the FBI. Att. 4.

In early 2006, the FBI commenced an environmental assessment of the FBI Range, which resulted in a July 5, 2006 report prepared by the FBI's environmental contractor.  *See* Lorenz Decl. ¶ 3, Att. 5.  Based on the recommendations in that report, the FBI has undertaken a more intensive evaluation of the environmental conditions at the FBI Range, which to date has included analytical sampling.  *Id.*  In January 2008, the FBI notified the Illinois Environmental Protection Agency ("IEPA") about the conditions at the FBI Range and also informed Region 5 of the United States Environmental Protection Agency ("EPA") of the response actions the FBI had taken, and would continue to take, at the FBI Range pursuant to CERCLA Section 104, 42 U.S.C. § 9604, and related legal authorities.  *Id.* ¶ 4.  The FBI's response action is ongoing.  *Id.* ¶ 6; *see also infra* at 12-13.

## II.    COAST GUARD LIVE-FIRE TRAINING ACTIVITIES

The Coast Guard provides for the security of the Great Lakes region, including, among other things, 11 major ports, 13 nuclear power plants, and 348 regulated terminals and facilities.  72 Fed. Reg. 520, 521 (Jan. 5, 2007), Att. 6.  To counter overseas, cross-border, and domestic threats, the Coast Guard began arming Coast Guard cutters and smaller vessels in the Great Lakes, giving rise to the need for training in the maritime environment in which it operates.  *Id.*  In light of these new training needs, the Ninth District of the Coast Guard conducted live-fire weapons training exercises at various locations on the five Great Lakes in 2006.  SAC ¶ 1, Ex. A.

For possible future such exercises involving Coast Guard vessels on the Great Lakes, in August 2006, the Coast Guard proposed a regulation to establish permanent safety zones throughout

---

[3/] The foregoing is offered for background purposes and basic FBI Range history only.  While the United States does not concede that bullets or bullet fragments reach Lake Michigan under current FBI operating procedures, the United States does *not* in this motion assert that all bullets are trapped by the impact berm or, at this time, contend that the Court lacks subject matter jurisdiction on that basis.

the Great Lakes from which vessels would be excluded during live-fire gun exercises.  71 Fed. Reg.

43,402 (Aug. 1, 2006), Att. 7; SAC ¶ 11, Ex. D.  The Coast Guard convened numerous public

meetings throughout the Great Lakes region on its proposal and  received over 900 comments through

two rounds of public comments.  72 Fed. Reg. at 520-21.  While there was a measure of support for

the Coast Guard's proposal, concerns were raised about, among other things, the number and location

of the proposed safety zones and public safety, notification, and environmental issues.  *Id.* at 521.

In light of these concerns, the Coast Guard formally withdrew its proposal to establish safety

zones and conduct further gunnery training on the Great Lakes, stating:

> the Coast Guard is withdrawing the current [proposed rule].  The Coast Guard will not
> conduct further gunnery training on the Great Lakes to satisfy non-emergency training
> requirements unless the Coast Guard publishes notice of its proposed action, allows
> the public an opportunity to comment, and publishes a final rule.

*Id.*; *see also* SAC ¶ 11, Ex. D.  The Coast Guard has not proposed additional live-fire weapons

exercises on the Great Lakes since this withdrawal.

## III.    THE NOTICE OF INTENT LETTERS AND SECOND AMENDED COMPLAINT

In a letter dated November 9, 2006, Plaintiff Blue Eco Legal Council indicated that it "intends

to sue the Coast Guard for violations of federal and state environmental laws resulting from its past

and future live fire training exercises on the Great Lakes."  Att. 8 at 2, ¶ 1.3; *see also* SAC ¶ 10.  The

letter does not identify or address any geographic area beyond the "Great Lakes."  The letter is not

addressed to and does not mention Defendant Department of Defense. In another letter, dated October

1, 2007, Plaintiffs Blue Eco Legal Council and Steven Pollack indicated that they "intend to sue the

U.S. Department of Justice, U.S. Navy, and U.S. Marine Corps for violations of federal and state

environmental laws resulting from its past and present training exercises next to and into Lake

Michigan [at the FBI Range]."  Att. 9 at 3, ¶ 1.3; *see also* SAC ¶ 17.  Like the November 9, 2006,

letter, this letter is not addressed to and does not mention Defendant Department of Defense.[4]

Count I of the Complaint, the first of five, alleges a CWA violation by Defendants FBI, Navy

and Marines for unpermitted discharges of lead bullets into Lake Michigan from the FBI Range.  SAC

¶¶ 16, 31, 35.  Defendant Coast Guard is allegedly "currently" violating the CWA by "discarding" lead

---

[4] The specific notice requirements under the RCRA, CERCLA and CWA citizen suit provisions are addressed
below.  Plaintiffs' failure to provide notice to the Department of Defense as to Plaintiffs' claims under these
statutes, by itself, warrants dismissal of Counts I-IV as to Defendant Department of Defense.

bullets without a permit in "waters of the United States" on "the East Coast (Atlantic Ocean)." *Id.* ¶ 16; *see also id.* ¶¶ 31, 35. The lone basis for this allegation is a single, cryptic line in a Coast Guard press release. *Id.* ¶ 14, Ex. E. Plaintiffs do not allege an ongoing CWA violation by the Coast Guard on the Great Lakes or Lake Michigan.

Count II asserts two types of claims under the RCRA citizen suit provision that, as confirmed by the title, pertain only to "(Lake Michigan)." First, Plaintiffs allege, under 42 U.S.C. § 6972(a)(1)(A), that lead bullets previously "discharged" by the "President" during "Coast Guard live fire training exercises and from the [FBI Range]," SAC ¶ 38, violate "RCRA's cradle to grave regulatory system." SAC ¶¶ 2, 39. Second, Plaintiffs allege that "the President" has "discarded" lead to the Lake Michigan lakebed adjacent to the FBI Range (*i.e.*, the Impact Area) that constitutes an "imminent and substantial endangerment" within the meaning of 42 U.S.C. § 6972(a)(1)(B). SAC ¶¶ 40, 41 (citing SAC, Exs. M & N, which pertain only to the "Lake Michigan Lakebed at North Chicago, IL").[5] Count III is another RCRA imminent endangerment claim alleging that bullets from the FBI Range are discarded in neighboring Foss Park. *Id.* ¶¶ 42-44.

Count IV refers only to "Defendants" and "the President" but appears to allege that the shooting of lead bullets into Lake Michigan from Coast Guard vessels and from the FBI Range constitute releases of hazardous substances that give rise to various claims under CERCLA. SAC ¶¶ 48-49. Presumably as to all Defendants (as well as unidentified municipal or state police departments), Plaintiffs seek under CERCLA "cleanup costs and compensation for damage to natural resources." *Id.* ¶ 52. Plaintiffs' demand that "the President . . . assess the damage and remove past discharges" appears limited to the FBI Range Impact Area. *See id.,* Prayer for Relief ¶ 4 (as to "underwater assessment and removal of the hazardous materials from the lakebed" adjacent to FBI Range). Count V alleges that the above activities resulted in the discharge of lead into public drinking water supplies in violation of the Illinois common law of public nuisance and that Defendants are liable for damages pursuant to the FTCA. *Id.* ¶ 54. Finally, other than referring broadly to the "Defendants" or "the President," the Complaint makes *no specific allegation* as to Defendant Department of Defense.

---

[5] *See also* Prayer for Relief ¶ 4 (for finding only as to "accumulation of lead at the FBI site"); Plaintiffs' Rule 26(f) Report, Dkt. 15, at 1 (describing RCRA imminent endangerment claim only as to "North Chicago facility").

5

## IV.    PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On March 7, 2008, Plaintiffs filed the PI Motion seeking to enjoin, under the purported authority of the CWA, alleged unpermitted discharges of lead shot into Lake Michigan from the FBI Range and into unidentified "navigable waters" from Coast Guard vessels.  PI Mot. at 1.  The PI Motion also seeks, under the purported authority of RCRA, a preliminary *mandatory* injunction ordering the Defendants to perform an $8.2 million "wide-area preliminary assessment" of the Impact Area.  *Id.* at 15 (citing SAC, Ex. M).[6]

## STANDARD OF REVIEW

Motion to Dismiss:  In considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the Court should inquire whether the Complaint sets forth factual allegations sufficient to establish that it has jurisdiction over the subject matter of the claims for relief.  Where subject matter jurisdiction does not exist, "the court cannot proceed at all in any cause."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  When reviewing a Rule 12(b)(1) motion to dismiss, "the district court is not bound to accept as true the allegations of the complaint which tend to establish jurisdiction where a party properly raises a factual question concerning the jurisdiction of the district court to proceed with the action. The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists."  *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir. 1979); *see also Rennie v. Garrett,* 896 F.2d 1057, 1057-58 (7th Cir. 1990).  Ultimately, Plaintiffs bear the burden of demonstrating this Court's subject matter jurisdiction:

> Federal courts are courts of limited jurisdiction.  They possess only that power authorized by Constitution and statute. . . . It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction.

*Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994) (citations omitted); *Grafon Corp.,* 602 F.2d at 783 ("the party invoking jurisdiction has the burden of supporting the allegations of jurisdictional facts by competent proof").

Additionally, an applicable express waiver of the United States' sovereign immunity is a

---

[6] The PI Motion concerns different claims and pre-dates Plaintiffs' Motion for Temporary Restraining Order ("TRO Mot.") (Dkt. 27; filed Mar. 28, 2008), which concerns only the Foss Park RCRA claim in Count III. *See also* Defendants' Opposition to Motion for Temporary Restraining Order ("TRO Opp.") (Dkt. 35; filed Mar. 31, 2008).

prerequisite to subject matter jurisdiction. *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472 (2003) ("Jurisdiction over any suit against the Government requires a clear statement from the United States waiving sovereign immunity."). Waivers of sovereign immunity are to be narrowly construed, "must be unequivocally expressed in [the] statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted). It is well-established that the federal question statute, 28 U.S.C. § 1331, asserted by Plaintiffs here, is not a waiver of sovereign immunity. *Arvanis v. Noslo Eng'g Consultants, Inc.*, 739 F.2d 1287, 1290 (7th Cir. 1984).

The Court should grant a Rule 12(b)(6) motion if no cause of action could be proven in a manner consistent with the facts in the Complaint. *Reichenberger v. Pritchard*, 660 F.2d 280, 282 (7th Cir. 1981). Only factual allegations will be considered, and legal conclusions which may be alleged are not binding on the court. *Id.*

Preliminary Injunction: Before addressing the merits of this case, and in particular a claim for preliminary injunctive relief, the Court must assure itself of its jurisdiction. *Steel Co.,* 523 U.S. at 94; *Kvos, Inc. v. Associated Press*, 299 U.S. 269, 278 (1936); *Small v. Kiley*, 567 F.2d 163, 164 n.1 (2d Cir. 1977) ("[T]he district court should not have granted a preliminary injunction without first having determined whether it had jurisdiction to do so."). The onerous requirements for preliminary injunctive relief are well-known: "'a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). To obtain such relief, Plaintiffs must show that: (1) they have a reasonable likelihood of success on the merits; (2) no adequate remedy at law exists; (3) they will suffer *irreparable harm* which, absent injunctive relief, outweighs the harm the to Defendants if the injunction is granted; and (4) the injunction will not harm the public interest. *See, e.g., Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (emphasis added).

## **ARGUMENT**

## I.    **COUNTS I-IV SHOULD BE DISMISSED BECAUSE PLAINTIFFS LACK STANDING**

This Court lacks jurisdiction over the CWA, RCRA and CERCLA claims in Counts I-IV because Plaintiffs do not meet their burden under the "case or controversy" requirement of Article III of the U.S. Constitution to establish the "irreducible constitutional minimum" of standing:

First and foremost, there must be alleged (and ultimately proved) an "injury in fact"
-- a harm suffered by the plaintiff that is "concrete" and "actual or imminent, not
'conjectural' or 'hypothetical.'" Second, there must be causation -- a fairly traceable
connection between the plaintiff's injury and the complained-of conduct of the
defendant. And third, there must be redressability – a likelihood that the requested
relief will redress the alleged injury.

*Steel Co.*, 523 U.S. at 103 (internal citations omitted); *Lujan v. Defenders of Wildlife*, 504 U.S. 555,

560-61 (1992). As an organization suing in its representational capacity, Blue Eco Legal Council has

standing to assert the claims of its members only if, in addition to demonstrating the constitutional

prerequisites to standing, it can show that: (1) its members would otherwise have standing to sue in

their own right; (2) the interests it seeks to protect are germane to Blue Eco's; and (c) neither the claim

asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt*

*v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 342-43 (1977). No harm to Blue Eco itself is

even alleged. Blue Eco also lacks organizational standing because no individual Blue Eco member

has standing, as shown below.

The injury-in-fact element of standing "requires more than injury to a cognizable interest. It

requires that the party seeking review be himself among the injured." *Lujan*, 504 U.S. at 563 (citation

omitted). Thus, the Supreme Court requires that Plaintiffs "aver that they use the affected area and

are persons for whom the aesthetic and recreational values of the area will be lessened by the

challenged activity." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000)

(internal quotation marks and citation omitted). In other words, "the relevant showing . . . is not injury

to the environment, but injury to the *plaintiff*." *Id.* at 181 (emphasis added). Moreover, bald

assertions of harm and purely subjective fears of environmental hazards are not enough for standing,

rather a plaintiff's decision to deny himself aesthetic or recreational pleasures based on concerns about

pollution is cognizable injury only if there is a realistic threat. *See id.* at 184; *see also City of Los*

*Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("the reality of the threat . . ., not the plaintiff's

subjective apprehensions," is the cognizable injury).

The Complaint contains two short paragraphs bearing upon Plaintiffs' standing, SAC ¶¶ 3, 9,

and no allegation directly links them to North Chicago, the FBI Range (or the Impact Area), Foss Park,

or any location where the Coast Guard is alleged to have conducted, or be conducting, live-fire

training exercises. Rather, Plaintiffs simply describe Blue Eco as an organization "with an interest

in the environmental safety of the Great Lakes watershed and its members['] . . . drinking water supply

8

and natural environment." *Id.* ¶ 3. It further is alleged that Pollack and unidentified Blue Eco members "have an interest in the condition of the Great Lakes environment and in drinking water quality." *Id.* ¶ 9. The Complaint identifies only Pollack as a Blue Eco member and states that he lives "several miles south of the North Chicago site." *Id.* ¶ 9. In fact, according to Google Maps, he lives nearly 13 miles from the FBI Range and Foss Park. As we discuss below, there is a vast difference between asserting a vague "interest" in the natural environment or another community's drinking water supply and sufficiently alleging a concrete injury-in-fact that is caused by the Defendants and can be redressed by this Court. *Lujan*, 504 U.S. at 563; *see also Doyle v. Town of Litchfield*, 372 F. Supp. 2d 288, 302-04 (D. Conn. 2005) (no standing for RCRA citizen suit where plaintiff does not rely on property at issue for aesthetic or recreational value, "alleges no physical contact at all," and is not "proximate" to the property).

A.    **Plaintiffs Lack Standing for their FBI Range and Foss Park Claims.**

Plaintiffs' claimed "interest" in the "Great Lakes watershed," the "Great Lakes environment" and the "natural environment" are far too generalized and non-specific to satisfy Article III's requirements for concrete injury-in-fact. Indeed, it would be hard to exaggerate how vast and all-compassing these areas are. As such, Plaintiffs' allegations amount to no more than impermissible generalized grievances about the conduct of government. *See United States v. Richardson*, 418 U.S. 166, 174-75 (1974). For example, regarding the alleged imminent endangerment under RCRA at Foss Park from the presence of lead bullets, the Complaint alleges only injury to "members of the general public, especially children" and unspecified "shoreline wildlife." SAC ¶ 43. Such generic references to others do not establish that *Plaintiffs* "use the affected area [of Foss Park] and are persons for whom the aesthetic and recreational values of the [Foss Park] area will be lessened by the challenged activity" as the law requires. *Laidlaw*, 528 U.S. at 183; *see Doyle*, 372 F. Supp. 2d at 303.[7] Moreover, in failing to allege any injury to themselves, Plaintiffs impermissibly assert the rights of others (*e.g.*, "members of the general public" that use Foss Park). *Allen v. Wright*, 468 U.S. 737, 751 (1984).

_____

[7] By contrast, the affidavits the court considered in *Long Island Soundkeeper Fund v. New York Athletic Club*, No. 94 CIV 0436, 1996 WL 131863 at *6 (S.D.N.Y. Mar. 22, 1996), established "actual aesthetic injury to individual members of both Plaintiff groups," including "members of each group who regularly use the lower harbor for recreational purposes, who intend to continue to use it, and who attest to aesthetic injury caused by activities conducted by Defendant."

The only potentially cognizable injury claimed by Plaintiffs concerns alleged discharges of "lead bullets into the potable water supply in Lake Michigan." SAC ¶ 18; *see also id.* ¶ 9 ("water supply . . . may be . . . endangered").[8] The specific allegations about drinking water are limited to an alleged potable water intake proximate to the FBI Range in Lake Michigan that "serves the City of North Chicago." *Id.* ¶ 21. However, Plaintiffs do not allege that they reside in North Chicago or consume its water. Obviously, there cannot be concrete, non-speculative injury-in-fact to Plaintiffs from water they do not even claim to drink. Significantly, the Complaint attaches the 2006 North Chicago Water Quality Report that shows the lack of any injury or causal connection to the Defendants, as lead in the North Chicago water supply is shown to be well within safe regulatory levels (11 parts per billion as compared to the "Lead Action Level" of 15 ppb)[9] and the "Likely Source of Contamination" is identified as "[c]orrosion of household plumbing systems; erosion of natural deposits," not lead bullets. *Id* ¶ 22, Ex. K. Thus, an order from this Court would not redress the condition of lead in the North Chicago drinking water supply. Rather, an abatement of lead pipes in "household plumbing systems" would be needed. *See* SAC, Ex. K.

Pertinent to the PI Motion, it is all the more clear that Plaintiffs will not suffer irreparable injury absent an injunction, as the IEPA, the expert state regulatory agency, has addressed Plaintiffs' allegations of lead in the North Chicago drinking water supply as being well below actionable levels, saying: "The bottom line is that they are well under standards. These [standards] are established with public health issues in mind so the public health is protected." Att. 10. Consequently, Plaintiffs have not alleged any injury as to drinking water.

### B.    Plaintiffs Lack Standing for Their Claims Concerning Coast Guard Training.

Plaintiffs' alleged injuries from Coast Guard training activities are even more tenuous and speculative. Plaintiffs acknowledge, as they must, that there is no Coast Guard gunnery training in

---

[8] We note that this alleged injury explicitly and expressly *does not apply* to the Foss Park RCRA claim, which focuses on highly speculative injury from ingestion of bullet fragments to "members of the public" and unspecified wildlife. SAC ¶ 43.

[9] *Cf. Price v. Navy*, 818 F. Supp. 1323, 1325 (S.D. Cal. 1992) (RCRA imminent endangerment claim dismissed where remaining lead contaminant levels below "levels that are considered acceptable by the State"), *aff'd*, 39 F.3d 1011 (9th Cir. 1999); *Vernon Village, Inc. v. Gottier,* 755 F. Supp. 1142, 1147, 1155 (D. Conn. 1990) (mere allegation of "imminent and substantial endangerment" from drinking water supply insufficient where undisputed that "no violations of the maximum contaminant levels have occurred" as to contaminants at issue).

the Great Lakes presently.  SAC ¶ 11, Ex. D.  While some Coast Guard training did occur in 2006 at some locations on the Great Lakes, *id.* ¶ 5, Plaintiffs allege no specific, concrete injury-in-fact resulting from those exercises.  *Laidlaw*, 528 U.S. at 183.  Rather, they assert only an inadequate generalized "interest" in the "Great Lakes," the "natural environment," and the "drinking water supply."  SAC ¶ 3.  Moreover, their claims of injury and potentially imminent endangerment from bullets deep in Lake Michigan are, at best, hypothetical, speculative and conjectural.  Indeed, "[a] possibility that pollutants might eventually accumulate and perhaps cause harm does not constitute an injury that is 'certainly impending.'"  *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp.*, No. 6:94CV489, 1995 WL 17133045 at *7 (E.D. Tex. Sept. 22, 1995) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)), *aff'd*, 95 F.3d 358 (5th Cir. 1996).  As discussed, the only potentially colorable allegation of harm concerns impacts to the North Chicago drinking water supply; yet Plaintiffs allege no connection between themselves, the North Chicago drinking water supply, and Coast Guard training exercises in Lake Michigan or elsewhere.

Plaintiffs' lack of standing is manifest with respect to vague claims concerning unspecified Coast Guard activities on the "East Coast (Atlantic Ocean)."  SAC ¶ 16.  Plaintiffs allege no injury whatsoever, of any kind, from these activities.  Nor could they, as the Complaint does not identify a specific Coast Guard action, in a specific location, that could cause an injury.  Indeed, the two paragraphs intended to establish Plaintiffs standing, *id.* ¶¶ 3, 9, make no mention of the East Coast (or any area beyond the "Great Lakes"), nor is it alleged that Plaintiffs reside on the East Coast, much less use a drinking water supply that could be affected by the Coast Guard activities there, or that they are otherwise affected in the least by such alleged unspecified activities.

## II.    CERCLA SECTION 113(h) REQUIRES DISMISSAL OF COUNTS I-IV AS TO THE FBI RANGE

### A.    The FBI Has Initiated a CERCLA Response Action at the FBI Range.

Congress enacted CERCLA as a response to serious public health threats posed by abandoned or inactive hazardous waste disposal facilities.  *See United States v. Bestfoods*, 524 U.S. 51, 55 (1998).  CERCLA authorizes the President to respond to such releases, including both emergency and long-term responses, 42 U.S.C. § 9604, which authority has been delegated to EPA and other federal agencies under specified criteria.  *See* Exec. Order No. 12,580, 3 C.F.R. 193 (1988).  CERCLA prescribes specific statutory requirements for the response process and cleanup standards.  42 U.S.C.

§§ 9604, 9605, 9616, 9617, 9621.

In early 2006 – well before receiving the October 1, 2007, notice of intent to sue letter (Att. 9) or the filing of the initial complaint in this action in January 2008 – the FBI began a formal review of the environmental impacts of range operations. This review resulted in a July 4, 2006, report by the FBI's environmental contractor, Events Analysis Corporation (the "EAC Report") and the initiation of a more intensive environmental evaluation. Lorenz Decl. ¶ 3. The EAC Report concluded, among other things, that "[t]he FBI should conduct a comprehensive site investigation to determine the extent of contamination from the firing range operations." *Id.* at Ex. 1 at 5. That further environmental assessment by the FBI, which so far has included laboratory analysis of soil, groundwater, and Lake Michigan sediment samples, is ongoing. *Id.* Based on the information it had gathered, the FBI initiated a preliminary assessment pursuant to CERCLA Section 104(a) and the National Contingency Plan ("NCP"), the federal regulations implementing CERCLA. *Id.* ¶¶ 4-5.

Section 104(b) of CERCLA authorizes federal agencies to conduct "investigations, monitoring, surveys, testing, and other information gathering as . . . may [be] necessary or appropriate to identify the . . . *extent* of the release or threat thereof." 42 U.S.C. § 9604(b) (emphasis added). The NCP provides procedures a federal agency follows to evaluate the extent of any actual or threatened release of hazardous substances both on- and off-site. *See, e.g.,* 40 C.F.R. § 300.410(c)(1)(iii) (lead agency to perform "[e]valuation of the magnitude of the threat"), (d) ("off-site" removal site inspection). Pursuant to the NCP, the FBI, as the lead agency at the FBI Range, has designated an On-Scene Coordinator ("OSC") to direct its CERCLA response efforts at the FBI Range. *See* 40 C.F.R. § 300.120(c)(2); Lorenz Decl. ¶ 2. The FBI is conducting a preliminary assessment, which will address Foss Park and Lake Michigan, and has engaged Events Analysis Corporation to conduct further soil and sediment sampling both on- and off-range. *Id.* ¶¶ 5-7. The FBI has also tasked its consultant with performing a groundwater investigation that includes soil sampling, hydrogeologic testing, groundwater sampling, and the installation of permanent monitoring wells. *Id.* ¶ 5. The FBI presently anticipates completing this portion of the assessment by August 2008 and has established October 2008 as a target date for completing the site evaluation and preliminary assessment. *Id.* ¶¶ 5-6.

The FBI has also engaged a consultant to study, among other things, the likelihood of bullets escaping the FBI Range into Foss Park or Lake Michigan and the volume of bullets (*i.e.,* lead)

12

associated with such occurrence, if any.  *Id.* ¶ 7.[10]  The FBI has asked its consultant to recommend, if warranted, measures to minimize the potential for such events and to recommend steps related to achieving best management practices to reduce lead and other contamination for firing ranges.  *Id.* The above-discussed data and analyses will be considered in connection with the FBI's preliminary assessment, *id.*, as the FBI determines:  the potential for contamination at and around the FBI Range; the sources of that potential contamination; and whether, and to what extent, further removal or remedial action is required to prevent, minimize, or address the release of hazardous substances.

> **B.    CERCLA Section 113(h) Bars Claims That Could Interfere With Ongoing Response Actions.**

Congress, through CERCLA, grants federal agencies broad authority to respond to the release or threatened release of hazardous substances, including the selection and implementation of removal and remedial actions.  42 U.S.C. § 9604(a).  Removal and remedial actions are broadly defined to include actions designed to monitor, assess and evaluate the release or threat of release of hazardous substances into the environment, and actions to prevent or minimize such releases.  *See* 42 U.S.C. § 9601(23), (24); *North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991).  In order to ensure that litigation does not delay or sidetrack remedial actions by federal agencies, Congress enacted Section 113(h), which provides:

> No Federal court shall have jurisdiction under Federal law . . . to review any challenges to removal or remedial action selected under section 9604 [CERCLA Section 104] of this title, or to review any order issued under section 9606(a) [CERCLA Section 106] of this title . . . .

42 U.S.C. § 9613(h).  Section 113(h) enacts a "blunt withdrawal of federal jurisdiction" so that CERCLA cleanups can proceed quickly and efficiently.  *North Shore Gas Co.*, 930 F.2d at 1244; *see also Steven B. Pollack v. Dep't of Defense*, 507 F.3d 522, 525 (7th Cir. 2007) ("the upshot of § 113(h) is that private attorneys general [*e.g.*, citizen groups] *must wait until a cleanup is finished* before rushing to court") (emphasis added).  Courts have interpreted Section 113(h) broadly to encompass "any challenge[]," 42 U.S.C. § 9613(h), to a CERCLA cleanup or evaluation regardless of the statutory guise under which the challenge is brought.  *See, e.g., North Shore Gas,* 930 F.2d at 1244-45

---

[10] The FBI's investigation and evaluation of the potential for bullets or bullet fragments to escape into Foss Park is ongoing;  however, preliminary findings indicate that such materials beyond those alleged to have been found by Plaintiffs are present in the park.

(barring RCRA claim); *Clinton County Comm'rs v. EPA*, 116 F.3d 1018, 1026-27 (3rd Cir. 1997) (*en banc*) (barring RCRA and NEPA claims); *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239-40 (9th Cir. 1995) (barring RCRA and CWA claims); *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 326, 328-29 (9th Cir. 1995) ("*MESS*") (barring RCRA, CWA, and state environmental law claims); *Ark. Peace Ctr. v. Ark. Dep't of Pollution Control & Ecology*, 999 F.2d 1212, 1216-17 (8th Cir. 1993) (barring RCRA claims).

This broad coverage of Section 113(h) also encompasses challenges to the procedures for selecting a response action, because the initial data gathering and evaluation process impacts the implementation of the remedy. *Schalk v. Reilly*, 900 F.2d 1091, 1097 (7th Cir. 1990) (Section 113(h) bars challenges to remedy selection).[11] For example, the court in *Smith v. Potter*, 208 F. Supp. 2d 415, 420-21 (S.D.N.Y. 2002), *aff'd*, 343 F.3d 619 (2d Cir. 2003), applied Section 113(h) to bar CERCLA and RCRA claims that challenged the investigation of anthrax at a United States Postal Service ("USPS") facility. The plaintiff contended that the USPS CERCLA removal action did not commence until after the plaintiff filed its complaint and motion for preliminary injunction. The court disagreed, finding that the USPS removal action began at an earlier date when the USPS began to investigate the contamination at issue and that such preliminary investigative steps "easily satisfy the definition of a Section 104 removal action." *Id.* at 421. This case is similar. Well before Plaintiffs filed their initial complaint, and even before the FBI received Plaintiffs' notice of intent to sue letter, the FBI was engaged in an environmental investigation of possible contamination at the FBI Range and had begun that process in earnest by preparing its first investigative report in mid-2006. Because that investigation is ongoing, with several active facets, Plaintiffs' claims should be dismissed.

An exception to Section 113(h)'s timing provision concerns CERCLA citizen suits under Section 310(a) "alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter." 42 U.S.C. § 9613(h)(5). In *Schalk,* the plaintiff challenged an EPA action where the method of remediation had

---

[11] *See also Fairchild Semiconductor Corp. v. EPA*, 984 F.2d 283, 288 (9th Cir. 1993) (Section 113(h) bars challenges to a Consent Order that required signatories to fund and perform an environmental investigation); *Cooper Indus., Inc. v. EPA*, 775 F. Supp. 1027, 1038 (W.D. Mich. 1991) (Section 113(h) covers "*all issues that could be construed as a challenge to the response*") (citation omitted); *Natural Resources Defense Council, Inc. v. NVF Co.*, No. Civ. A. 97-496-SLR, 1998 WL 372299 at *14 (D. Del. June 25, 1998) (Section 113(h) bars claims during the "removal assessment" phase of a CERCLA clean-up).

been chosen, but the remedial action itself had not been completed. *Id.* The Seventh Circuit has also acknowledged that "it is quite clear that EPA is entitled to gather data and assess alternatives before selecting an appropriate response." *Frey v. EPA*, 403 F.3d 828, 834-35 (7th Cir. 2005). Thus, if an agency has initiated a response action, federal courts lack jurisdiction over claims challenging that response action.

> **C.     Plaintiff's Claims "Challenge" the Ongoing Response Action at the FBI Range and Should be Dismissed.**

The gravamen of the Complaint is Plaintiffs' request for a court order "to *assess and remove the hazardous material* in Lake Michigan at the FBI facility in North Chicago." SAC ¶ 1. Plaintiffs seek not only a clean up of the site but, rather, the performance of *specific remedial* action at the FBI Range. *Id.,* Prayer for Relief ¶ 4. The statutory basis for these remedies is unclear. It is clear, however, that Plaintiffs' demands are rooted in Plaintiffs' central goals in this case – to cease operations at the FBI Range and initiate a clean up of Plaintiffs' choosing. Indeed, Plaintiffs have gone so far as to attach to the Complaint formal remedial proposals prepared by Plaintiffs' contractor. *Id.*, Exs. M & N. As such, Plaintiffs' claims directly challenge both the process and the substance of the FBI's response action at the FBI Range and are barred by section 113(h). Plaintiffs' less overt challenges to the FBI's response action are also barred, as the Seventh Circuit has made clear that indirect challenges to a response action cannot be used to "skirt a clear statutory bar to suit" when their "*intended* effect" is to interfere with a response action. *Pollack*, 507 F.3d at 527.

Because the FBI's ongoing preliminary assessment will include an evaluation of Foss Park and Lake Michigan, consistent with the CERCLA requirements, Plaintiffs' claim for far-reaching injunctive relief at the FBI Range – including the selection of particular remedial contractors to perform specified remedial actions – clearly interferes with the FBI's response action. Congress made clear that cleanup actions qualifying under Section 113(h) are to proceed without interruption by lawsuits, such as Plaintiffs' here. *See, e.g., North Shore Gas,* 930 F.2d at 1244 ("the purpose of Section 113(h) is to prevent litigation from delaying remediation"). For example, insofar as Plaintiffs' claims are based on the FBI's failure to apply "best management practices" at the FBI Range to reduce lead contamination, including with regard to the alleged unpermitted discharge of lead to Lake Michigan, *see* SAC ¶¶ 16, 24, 51 and Exhibit B, Plaintiffs' citizen suit claims under RCRA, CERCLA, and the CWA will impede, complicate, and divert the FBI's attention from *its own*

*evaluation under CERCLA* of those very same matters.  Thus, Section 113(h) bars this Court's jurisdiction over the claims in Counts I-IV, and those claims should be dismissed.

## III.    THE CLEAN WATER ACT CLAIMS IN COUNT I AS TO COAST GUARD TRAINING EXERCISES SHOULD ALSO BE DISMISSED[12]

The CWA, 33 U.S.C. §§ 1251-1387, is a "comprehensive legislative attempt 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132 (1985) (quoting 33 U.S.C. § 1251(a)).  One way the CWA accomplishes its objectives is by prohibiting "the discharge of any pollutant by any person" into waters of the United States, except when authorized by a CWA permit.  33 U.S.C. § 1311(a).  Among other means, violations of the CWA may be addressed through private citizen enforcement in accordance with CWA Section 505(a)(1), which provides that "any citizen may commence a civil action on his own behalf --

> (1)  against any person (including [] the United States and [] any other governmental instrumentality or agency . . .) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation[.]

*Id.* § 1365(a)(1).[13]  It is a jurisdictional prerequisite to bringing suit under this provision that the plaintiff make a good faith allegation that CWA violations are ongoing at the time of the complaint: "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation."  *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1987). As a mandatory condition precedent to suit, citizen plaintiffs also must comply with the notice provisions of 33 U.S.C. § 1365(b).  *See Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989); 40 C.F.R. part 135 (EPA CWA citizen suit notice regulations).

It is generous to say that Plaintiffs' CWA claim against the Coast Guard is vague and imprecise.  Plaintiffs allege that "it is a violation under the CWA to discharge lead into the Nation's navigable waters" and "[t]his is exactly what the Coast Guard does from its vessels when it conducts firearms training."  SAC ¶ 31.  To support CWA citizen suit jurisdiction, Plaintiffs must allege an ongoing violation as to Coast Guard training exercises.  However, while Count I itself says nothing

---

[12] We explained in the preceding section why the CWA claims as to the FBI Range should be dismissed.

[13] The Complaint does not include a citizen suit claim under 33 U.S.C. § 1365(a)(2) against the EPA Administrator for failure to perform a duty that is not discretionary.

about where such discharges are allegedly currently occurring or from what Coast Guard vessels, Plaintiffs do discuss *completed* Coast Guard live-fire training exercises on the Great Lakes during 2006. *Id.* ¶ 5. But those training exercises are not alleged to be ongoing or to have continued beyond 2006. Indeed, Plaintiffs acknowledge the opposite by attaching a December 18, 2006, Coast Guard press release announcing the Coast Guard's decision "not [to] conduct live-fire training on the Great Lakes unless we publish a rule." *Id.* ¶ 11, Ex. D. The Coast Guard formally halted Great Lakes training exercises, stating in a Federal Register notice: "the Coast Guard is withdrawing the current [proposed rule]. The Coast Guard will not conduct further gunnery training on the Great Lakes to satisfy non-emergency training requirements unless the Coast Guard publishes notice of its proposed action, allows the public an opportunity to comment, and publishes a final rule." 72 Fed. Reg. at 521. The Coast Guard has not proposed any further gunnery training on the Great Lakes, and the Complaint does not allege as much. Thus, Plaintiffs do not allege an ongoing CWA violation by the Coast Guard on the Great Lakes that satisfies *Gwaltney*, and Count I should be dismissed in that regard.

Having effectively conceded that *Gwaltney*'s standards are not met as to the terminated Coast Guard activities on the Great Lakes, Plaintiffs assert that "the Coast Guard admitted in a press release that it continues to discard lead bullets into the waters of the United States, making the Coast Guard's violations ongoing as required by *Gwaltney*." SAC ¶ 14. This press release, the stated purpose of which was to publicize a laser training system to "train boat crews *without using live ammunition and expending projectiles*," refers to a "training alternative[] that include[s] . . . [t]he departure of Coast Guard crews to East Coast cutters to train to ensure an adequate level of proficiency on the weapons." *Id.* ¶ 14, Ex. E. Based exclusively on this cryptic statement, Plaintiffs go on to allege ongoing CWA violations by the Coast Guard on "the East Coast (Atlantic Ocean)." *Id.* ¶ 16.[14] Such conclusory and speculative allegations fall far short of *Gwaltney*'s good faith allegation requirements.

This conclusory pleading also contravenes the pleading standards the Supreme Court recently announced in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007):

> a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level. . . .

---

[14] That the press release is Plaintiffs' sole basis to allege an ongoing violation by the Coast Guard is confirmed by the PI Motion, which rests exclusively on the press release for the same point. PI Mot. at 3.

*Id.* at 1964-65 (citations and internal punctuation omitted). Indeed, "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* at 1967 (citation and quotation marks omitted). Failing to make factual allegations that meet this standard, Plaintiffs instead make the hyperbolic claim that this single line in a press release is an "Admission of Ongoing Violation." SAC ¶ 14 n.6. The law requires more, and the CWA claim against the Coast Guard therefore should be dismissed.

Insofar as the CWA claim against the Coast Guard concerns alleged ongoing violations on "the East Coast (Atlantic Ocean)," *Id.* ¶ 16, it also must be dismissed because Plaintiffs failed to provide advance notice to the Coast Guard as required by 33 U.S.C. § 1365(b) and EPA's guidelines for such notice. *See* 40 C.F.R. pt. 135 (notice to furnish "sufficient information" as to, *inter alia*, "the activity alleged to constitute a violation, . . . the location of the alleged violation, the date or dates of such violation"); *see also Tannenbaum v. Jamison*, No. 93C3595, 1994 WL 247120 at *1 (N.D. Ill. June 6, 1994) (applying *Hallstrom* and dismissing CWA citizen suit for lack of notice). Plaintiff may claim to have satisfied this requirement through a November 9, 2006, letter to the Coast Guard. SAC ¶ 10. However, that letter states plainly that Plaintiffs "intend[] to sue the U.S. Coast Guard for violations of federal and state environmental laws resulting from its past and future live fire training exercises *on the Great Lakes*." Att. 8 at 2 (emphasis added). This notice of intent to sue letter, the only one sent to the Coast Guard, refers to the Great Lakes expressly, repeatedly and exclusively.

Even if Plaintiffs had provided notice and alleged an ongoing CWA violation on the "East Coast (Atlantic Ocean)," they are in the wrong court as 33 U.S.C. § 1365(c)(1) provides that an action can be brought "only in the judicial district in which such [discharge] source is located." Finally, if Plaintiffs' claims regarding the "East Coast (Atlantic Ocean)" are properly plead in this Chicago court, they offer no basis whatsoever to find that they have suffered concrete injury-in-fact to demonstrate standing to sue. *See supra* at 8-11. Thus, the Court should dismiss Count I.

## IV.    THE RCRA CLAIMS IN COUNTS II AND III SHOULD BE DISMISSED

Counts II and III raise claims under RCRA, the primary purpose of which is to "ensure the proper treatment, storage and disposal of [hazardous] waste . . . 'so as to minimize the present and future threat to human health and the environment,'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996) (quoting 42 U.S.C. § 6902(b)). RCRA's citizen suit provision – Section 7002(a)(1), 42 U.S.C. § 6972(a)(1) – allows a citizen to initiate a civil action against the United States in certain,

carefully defined circumstances. Citizen suits under RCRA must be filed in the district court for the district in which the alleged violation occurred or endangerment may occur. *Id.*§ 6972(a). Additionally, a would-be plaintiff must provide notice before filing suit; however, depending on the type of claim, the period of delay after notice varies. *Id.* § 6972(b)(1)(A), (2)(A). The notice and delay requirements are "mandatory conditions precedent to commencing suit under the RCRA citizen suit provision," and any purported notice is to be strictly construed. *Hallstrom*, 493 U.S. at 31; *see also Supporters to Oppose Pollution, Inc. v. Heritage Group*, 973 F.2d 1320, 1322 (7th Cir. 1992) ("Section 6972 requires a would-be champion to try negotiation before litigation.").

Plaintiffs' claims in Count II pertain to Lake Michigan and include: (1) the alleged violation of RCRA regulatory requirements, pursuant to Section 7002(a)(1)(A), in connection with the FBI Range (specifically, the Impact Area) and Coast Guard live-fire training exercises; and (2) the alleged presence of an "imminent and substantial endangerment," pursuant to Section 7002(a)(1)(B), in the Impact Area. SAC ¶¶ 38-41; Prayer for Relief ¶ 4. Count III alleges the presence of an "imminent and substantial endangerment," pursuant to 7002(a)(1)(B), in Foss Park, due to the presence of lead bullets allegedly originating from the FBI Range. SAC ¶¶ 38-41. For the reasons that follow, all of Plaintiffs' RCRA claims should be dismissed.

### A.      Plaintiffs Have Not Alleged an Ongoing RCRA Regulatory Violation.

Under RCRA Section 7002(a)(1), a citizen suit may be brought to compel any person, including the United States, to comply with any "permit, standard, regulation, condition, requirement, prohibition, or order" under RCRA. 42 U.S.C. § 6972(a)(1)(A). Just as is required under the CWA, a citizen suit under Section 7002(a)(1)(A) requires that the defendant currently be in violation of an identified RCRA standard, and a claim cannot be premised on a wholly past violation. *Gwaltney*, 484 U.S. at 57 & n.2 (RCRA citizen suit provision has "identical language" to CWA's as to the requirement of ongoing violation); *see also Conn. Coastal Fishermen's Ass'n v. Remington Arms Co., Inc.,* 989 F.2d 1305, 1315 (2d Cir. 1993) (dismissing Section 7002(a)(1)(A) claim because "claim alleges a 'wholly past' RCRA violation").

With regard to Coast Guard live-fire training exercises in Lake Michigan and the Defendants' alleged activities at the FBI Range, to plead a regulatory violation, Plaintiffs must allege an ongoing violation in Lake Michigan of a "permit, standard, regulation, condition, requirement, prohibition, or order" under RCRA. 42 U.S.C. § 6972(a)(1)(A). Plaintiffs failed to do so, and, instead, rely on the

generic and patently deficient allegation of a "violation of RCRA's cradle to grave regulatory system." SAC ¶ 39. Such pleading provides absolutely no notice as to what RCRA requirement has supposedly been violated and fails to satisfy the requirements of *Gwaltney* and *Bell Atlantic*. *See supra* at 16-18. Thus, this Court lacks subject matter jurisdiction over the RCRA regulatory claims in Count II.

The Complaint is additionally deficient because the four Coast Guard live-fire training exercises in Lake Michigan that are in issue (*see* SAC, Ex. A) occurred in 2006, are completed, and will not recur, if ever, unless the Coast Guard completes an administrative rulemaking. 72 Fed. Reg. at 521. The Complaint, therefore, fails to allege an ongoing violation and is impermissibly premised on, at most, "wholly past" violations. *Remington Arms*, 989 F.2d at 1315 (Section 7002(a)(1)(A) claim based on "wholly past" violation where gun club had ceased operation).[15]

This Court furthermore lacks jurisdiction over Plaintiffs' RCRA regulatory claim in Count II because, according to EPA's longstanding interpretation of the regulatory definition of "solid waste" for purposes of RCRA Subtitle C, "[s]pent shot and target fragments do not . . . fall within the regulatory definition of 'solid waste' under RCRA." *Long Island Soundkeeper Fund,* 1996 WL 131863 at *9; 40 C.F.R. § 261.2(a) (definition of "solid waste").[16] The *Long Island Soundkeeper* court accepted as reasonable and applied EPA's interpretation of the narrower regulatory definition of "solid waste,"[17] as expressed in an amicus brief filed by the United States, stating: "[b]ecause the shot and target fragments come to rest on land and in water surrounding [the] NYAC [shooting facility] as a result of their proper and expected use, the EPA contends that its permitting requirements are not applicable." *Id..* EPA's conclusions regarding the proper interpretation of RCRA are entitled

---

[15] The Complaint's lack of specific allegations makes it impossible to determine whether Plaintiffs are in the right court, assuming *arguendo* Plaintiffs have a claim at all. *See* 42 U.S.C. § 6972(a) (venue).

[16] An exception to this, inapplicable here, is where collected shot and debris are regulatory "hazardous waste" and then must be managed in accordance with RCRA Subtitle C hazardous waste regulations.

[17] The regulatory definition of "solid waste" for purposes of RCRA Subtitle C is narrower than the statute's definition of solid waste. *See* 42 U.S.C. § 6903(27). Material is regulatory solid waste if it is discarded by being, among other means, abandoned, 40 C.F.R. § 261.2(a), a consideration not present in the statute. *See also Military Toxics Project v. EPA*, 146 F.3d 948, 950-51 (D.C. Cir. 1998) (material may be solid waste under the statutory definition, even if it fails to meet the regulatory definition); *Remington Arms*, 989 F.2d at 1315 ("the broader statutory definition of solid waste applies to citizen suits brought to abate imminent hazard"); *Water Keeper Alliance v. Dep't of Defense*, 152 F. Supp. 2d 163, 167-68 (D.P.R. 2001) (noting distinction between statutory and regulatory definitions, including under the Military Munitions Rule).

to deference from the federal courts.  *See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).[18]  Because the deposit of bullets (lead or otherwise) to the Impact Area from the FBI Range or during Coast Guard training activities constitutes their "proper and expected use," *Long Island Soundkeeper*, 1996 WL 131863 at *9, such materials are not regulatory "solid waste" under RCRA.

EPA's Military Munitions Rule, 62 Fed. Reg. 6622 (Feb. 12, 1997), is in keeping with EPA's long-held interpretation of its regulations and is further reason for this Court to apply EPA's interpretation of its regulatory definition.  Among other things, the Military Munitions Rule defines when military munitions are, and are not, solid waste for Subtitle C regulatory purposes.  *See id.* at 6628/1-2; 40 C.F.R. § 266.202.[19]  In the preamble to the rule, EPA explained that "regulatory jurisdiction does not apply to products that are deposited . . . in their ordinary manner of use," 62 Fed. Reg. at 6630/2, and that the firing of munitions that land on an active military training range is the use of a product for its intended purpose and not the discarding of waste material for regulatory purposes.  *See id.* at 6628, 6632.  One such "intended purpose" for which military munitions are not regulatory solid waste is the training of military personnel.  40 C.F.R. § 266.202(a).  It is plain from the regulation that the Coast Guard is the "military," rounds it fired in training were "military munitions," and the precisely designated areas where it conducted its training exercises in Lake Michigan (*see* SAC Ex. A) were "military ranges" (*i.e.* "designated land and water areas set aside, managed and used to . . . train military personnel").  40 C.F.R. § 266.201 (Definitions).[20]  For these reasons, this Court lacks jurisdiction over, and should dismiss, Plaintiffs' RCRA regulatory claims in Count II.

---

[18] EPA took the same position in its amicus brief in *Remington Arms* ("EPA . . . concludes that the lead shot and clay targets discharged [by the gun club] do not fall within the narrow regulatory definition of solid waste."); however, the Second Circuit did not reach the issue because the plaintiff failed to allege an ongoing RCRA violation.  989 F.2d at 1315.

[19] The Military Munitions Rule also addresses one of the circumstances under which military munitions may become "solid waste" under RCRA's statutory definition, explaining that "fired military munitions that land off-range become a statutory solid waste at a certain point, potentially subject to RCRA remedial authorities." 62 Fed. Reg. at 6630/2; *see also* 40 C.F.R. § 266.202(d).

[20] As noted, Plaintiffs do not allege a violation of any specific RCRA regulatory requirement, including any requirements under the Military Munitions Rule, although they refer to the Military Munitions Rule in the Complaint (¶ 42) and in the PI Motion (at 10-11).  The Military Munitions Rule does not take effect in any State until it is adopted by the State and authorized by EPA to operate *in lieu* of the federal RCRA program. *See* 62 Fed. Reg. at 6648/3-49/1 (describing State implementation of the Military Munitions Rule).

**B.     This Court Lacks Jurisdiction Over the FBI Range Imminent and Substantial Endangerment Claims.**

With regard to the FBI Range and Foss Park only, Plaintiffs bring another type of citizen suit under RCRA Section 7002(a)(1), which allows a citizen to sue any person, including the United States, "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B). Plaintiffs' claims under this provision face three insuperable hurdles. First, as we have explained, Plaintiffs' imminent endangerment RCRA claims concerning the FBI Range (which focus on the Impact Area) and Foss Park are barred by operation of CERCLA Section 113(h), as those claims clearly challenge and impede the FBI's response action at the FBI Range. Second, we also have shown that Plaintiffs lack standing to bring their Count II and III endangerment claims as they do not allege any concrete, non-speculative injury to them resulting from activities at the FBI Range. Third, and finally, Plaintiffs' Foss Park claim in Count III must be dismissed because they did not satisfy the mandatory statutory notice requirements before amending their complaint to add this claim. 42 U.S.C. § 6972(b)(2)(A); *Hallstrom*, 493 U.S. at 31. Plaintiffs' letter of October 2, 2007, Att. 9, referenced in the Complaint, ¶ 17, plainly fails to satisfy the statutory notice requirements as it, like the whole of the pre-amendment complaint, does not concern and makes no mention of Foss Park. To the extent that letter discusses *any* geographic area, it refers to "the Department of Justice range," "federal property," "Lake Michigan," and "lake beds."

Accordingly, Plaintiffs imminent and substantial endangerment claims in Counts II and III concerning the FBI Range and Foss Park should be dismissed for lack of subject matter jurisdiction.

**V.     THE CERCLA CLAIMS IN COUNT IV SHOULD BE DISMISSED**

In Count IV, Plaintiffs bring a number of claims under CERCLA regarding alleged releases of hazardous substances in Lake Michigan. Those claims are barred by operation of CERCLA Section 113(h). Moreover, we explain below why all of the relief that Plaintiffs seek is unavailable to them under CERCLA, and why Count IV should also be dismissed.

**A.     Plaintiffs Fail to Allege a Violation of a Substantive CERCLA Requirement.**

Plaintiffs assert CERCLA citizen suit claims pursuant to the Section 310(a), 42 U.S.C. § 9659(a), SAC ¶ 2, which allows citizens to bring claims against regulated parties, including the United

States, to enforce substantive violations of CERCLA where proper notice is given, and where such claims do not violate the timing provisions set out in CERCLA Section 113(h) (which they do in this case, as discussed *supra*).  *See* 42 U.S.C. § 9659(a).[21/]  Claims may be brought against a regulated party "alleged to be in violation of any standard, regulation, condition, requirement, or order" under CERCLA.  *Id.* § 9659(a)(1).  The term "requirement" as used in the statute must be given its "ordinary or natural meaning," *See Bailey v. United States*, 516 U.S. 137, 145 (1995), which is "something called for or demanded: a requisite or essential condition."  Webster's Third New International Dictionary 1929 (4th ed. 1976).  Thus, to allege a violation of a "requirement," Plaintiffs must identify some type of substantive action that is made necessary under the statute.  Plaintiffs have not done this.  Their generic, blanket allegation that the United States is "in violation of Section 120 of CERCLA," SAC ¶51, is plainly insufficient.  Among other things, that provision waives the United States' immunity from compliance with CERCLA and certain state laws.  42 U.S.C. §9620(a)(1), (4).  Plaintiffs fail to point to a specific substantive requirement in Section 120, or elsewhere, that the Defendants have violated.  The alleged failure of the Defendants to "assess and remediate" lead bullets, *id.*, is likewise insufficient, as Section 120 contains no such affirmative requirement.

Moreover, such vague pleading fails to provide notice of either the nature of the claim or the grounds upon which their claim rests, which does not suffice in the face of the statutory requirement that plaintiffs "allege" the violation of an applicable CERCLA standard, regulation, condition, requirement, or order.  42 U.S.C. § 9659(a)(1); *see also Bell Atlantic*, 127 S. Ct. at 1965 n.3 (Rule 8(a)(2) requires plaintiffs to "provid[e] not only 'fair notice' of the nature of the claim, but also 'grounds' on which the claim rests.").  Accordingly, Plaintiffs' CERCLA claim should be dismissed.

**B.    Plaintiffs Cannot Satisfy the Elements of a CERCLA Section 107 Claim Because They Have Not Incurred Response Costs.**

Plaintiffs also allege, *see* SAC ¶ 49, that the United States is liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), which creates liability for "all costs of removal or remedial action *incurred by the United States Government or a State or an Indian tribe* not inconsistent with the national contingency plan;" necessary costs of response consistent with the NCP "incurred by any other person;" and for "damages for injury to, destruction of, or loss of natural resources . . . resulting

---

[21/] Plaintiffs have not alleged a failure to perform a CERCLA non-discretionary duty and, thus, do not raise the other form of citizen suit claim under 42 U.S.C. § 9659(a)(2).

from such a release [of a hazardous substance]." 42 U.S.C. § 9607(a)(4)(A)-(C) (emphasis added). In order to establish a claim under Section 107(a)(4)(B), Plaintiffs must establish that *they* incurred costs in response to a release or threatened release of hazardous substances. *Kerr-McGee Chem. Corp. v. Lefton Iron & Metal Co.*, 14 F.3d 321, 325 (7th Cir. 1994); *Environmental Transp. Sys. v. ENSCO, Inc.*, 969 F.2d 503, 506 (7th Cir. 1992). However, Plaintiffs do not allege this. Accordingly, they have not stated a claim for the recovery of response costs and, furthermore, are not entitled to a declaratory judgment to that effect (*see* SAC ¶ 52). Those claims must be dismissed.

### C. Plaintiffs Seek Injunctive Relief That Is Not Available Under CERCLA.

Plaintiffs' CERCLA claim also seeks an order compelling the Defendants to "assess the damage and remove past discharges" from Lake Michigan. SAC ¶ 52. It is well-established that CERCLA Section 107(a) does not provide a citizen claim for injunctive relief (*i.e.,* clean up),[22] but, rather, provides only for the recovery of response costs and natural resource damages by trustees. *See* 42 U.S.C. § 9607(a)(4)(A)-(C). Only CERCLA Section 106 authorizes such relief, providing:

> when *the President* determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, *he* may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat . . .

42 U.S.C. § 9606(a) (emphasis added). Thus, only the President, acting through federal agencies, may seek an injunction pursuant to Section 106 to force a responsible party to clean up any site or spill, and Congress chose not to confer this same authority upon private citizens.[23]

### D. Plaintiffs Lack Statutory Standing to Sue for Natural Resource Damages.

Perhaps the most misguided aspect of Plaintiffs' CERCLA claim is their attempt to bring claims to recover natural resource damages. Apparently in reliance on CERCLA Section

---

[22] *See, e.g., Cadillac Fairview/California, Inc. v. Dow Chem. Co.*, 840 F.2d 691, 697 (9th Cir.1988) ("Congress did not intend to create a private cause of action for injunctive relief under CERCLA"); *United States v. Cannons Eng'g Corp.*, 720 F. Supp. 1027, 1052 (D. Mass. 1989) ("Under CERCLA, injunctive relief is available only to the United States."), *aff'd*, 899 F.2d 79 (1st Cir. 1990).

[23] *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1049 (2d Cir. 1985) ("Implying the authority to seek injunctions under section [107] would make the express injunctive authority granted in section [106] surplusage."); *Cadillac Fairview*, 840 F.2d at 697 ( "to allow parties entitled to damages under section 107(a) to seek injunctive relief under that section would enable such parties to bypass the specific limitations on the President's authority to seek injunctive relief described in section 106(a)").

107(a)(4)(C), 42 U.S.C. § 9607(a)(4)(C), Plaintiffs seek to hold the Defendants liable for "compensation for damage to natural resources," SAC ¶ 52, and to have the Defendants pay $20 million to a private organization of Plaintiffs' choosing.  *Id.*, Prayer for Relief, ¶ 5.  While CERCLA does provide that certain persons can be liable for "damages for injury to, destruction of, or loss of natural resources," it expressly provides that natural resource damages can be recovered only by an appropriately designated public "trustee," such as the United States, a State, or an Indian tribe.  42 U.S.C. § 9607(f)(1); *see also Nat'l Ass'n of Mfrs. v. Dep't of Interior*, 134 F.3d 1095, 1113-14 (D.C. Cir. 1998) ("CERCLA does not permit private parties to seek recovery for damages to natural resources held in trust by the federal, state or tribal governments"); *Artesian Water Co. v. New Castle County*, 851 F.2d 643, 649 (3d Cir. 1988) ("It is significant that [CERCLA] grants the right to assert claims for damages to natural resources only to governmental entities, not private persons.").  Plaintiffs do not allege, nor could they credibly, that they are a designated public trustee of any natural resource; thus, their natural resource damages claim must be dismissed.  Indeed, as Plaintiffs state *no claim* under CERCLA as to which this Court can grant relief, all of Count IV must be dismissed.

## VI.    PLAINTIFFS' COUNT V CLAIMS SHOULD BE DISMISSED FOR FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

Plaintiffs' claim under the FTCA, "Count V - Public Nuisance," should be dismissed for want of subject matter jurisdiction because Plaintiffs failed to exhaust their administrative remedies and failed to name an appropriate defendant.  *See* SAC ¶¶ 53-56.

Under the FTCA, a claimant must exhaust his administrative remedies before commencing any tort claim against the United States.  *McNeil v. United States*, 508 U.S. 106, 113 (1993); *see also* 28 U.S.C. § 2675(a).  To exhaust administrative remedies, a claimant must file an administrative claim with the appropriate agency, and wait at least six months while the agency investigates and resolves that claim.  28 U.S.C. § 2675(a); *see also Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011 (7th Cir. 1991) (finding that this requirement is "designed to encourage administrative consideration and settlement of claims").  An administrative claim has two essential elements: (1) a written notification of an incident with underlying facts, and (2) a demand for damages, in a sum certain, for the alleged injury.  *See Murrey v. United States*, 73 F.3d 1448, 1451-53 (7th Cir. 1996) (citation omitted); *accord Deloria*, 927 F.2d at 1011 ("A claim is deemed presented when it provides written notification of an incident and requests money damages in sum certain.").  Accordingly, the information required in an

administrative claim, Standard Form 95,

> resembles a civil complaint in not requiring a statement of legal theories, but differs in requiring a detailed statement of facts.  It is in this respect more demanding, more "formal" if you will, than the civil rules–a throwback, perhaps to the era of "fact pleading" that preceded the adoption of those rules.  But as no statement of legal theories is required, only facts plus a demand for money, the claim encompasses any cause of action fairly implicit in the facts.

*Murrey*, 73 F.3d at 1452.

In this case, Plaintiffs have not exhausted their administrative remedies.  The Complaint does not allege that they filed any administrative claim.  Moreover, none of the defendant federal agencies have a record of any claim.  *See* Ferguson, Moody, Harris, Leonard Decls*.,* Atts. 11-14,.  Notably, Plaintiffs' "notice of intent to sue" letters under separate environmental statutes, *see* SAC ¶¶ 10 & 17; Atts. 8 & 9, do not meet the administrative claim requirement;[24] nor does Plaintiffs' January 18, 2007, demand letter to the Department of Justice.[25]  *See* Att. 15.

Congress has not waived sovereign immunity under the FTCA for cases in which the plaintiffs fail to exhaust administrative remedies.  *See McNeil*, 508 U.S. at 113 ("The FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."); *FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit.").  As a result, this Court lacks subject matter jurisdiction over Count IV, and that claim should be dismissed.  *See Deloria*, 927 F.2d at 1011 (holding that the

---

[24] As has been discussed *supra*, RCRA, CERCLA, and the CWA establish their own prerequisites to litigation, including the requirement to provide notice, which are separate and distinct from the administrative claim requirement for bringing tort action under the FTCA.  *Compare* 42 U.S.C. § 9659(d) (CERCLA), 33 U.S.C. § 1365(b) (CWA), 42 U.S.C. § 6972(b) (RCRA); *Hallstrom*, 493 U.S. at 29 (stating the purposes behind the notice letter requirement), *with McNeil*, 508 U.S. at 111-13 (construing 28 U.S.C. § 2675(a)).  Notice of intent to sue letters under RCRA, CERCLA, and the CWA lack the essential elements of an administrative claim: notification of an incident with underlying facts, and a demand for damages in a sum certain.  *Compare Murrey*, 73 F.3d at 1451-53 *with* Atts. 8, 9.  A letter expressing an intent to file suit over environmental law violations or contamination does not constitute an FTCA administrative claim.  *See, e.g., Cromer v. EPA*, 143 F. Supp. 2d 1376, 1381-82 (M.D. Ga. 2001); *Richland-Lexington Airport Dist. v. Atlas Props., Inc.*, 854 F. Supp. 400, 413 (D.S.C. 1994).

[25] Plaintiffs' January 18, 2007, letter to the Department of Justice demands injunctive relief, which is unavailable under the FTCA, *see Redland Soccer Club, Inc. v. Dep't of Army*, 55 F.3d 827, 848 n. 11 (3d Cir. 1995), including a proposed $75,000 cash donation to specified charities.  *See* Att. 15.  Plaintiffs asked Department of Justice counsel to forward a copy of this demand to the Coast Guard.  *See id.*  The other Defendants did not receive it.  Moreover, this letter does not contain notice of an incident with underlying facts, and does not seek damages for injury to person or property.

administrative claim requirement is a jurisdictional prerequisite to filing suit); *see also Gervasio v. United States*, 627 F. Supp. 428, 430 (N.D. Ill. 1986) ("Rule 12(b)(1) is the proper vehicle for dismissing cases . . . over which no subject matter jurisdiction exists because the plaintiff has failed to exhaust his administrative remedies before coming to court.").

Further, Congress has not waived sovereign immunity for tort claims brought directly against individual agencies. *See* 28 U.S.C. § 2679(a). Here, Plaintiffs name five federal agencies as defendants, but fail to name the United States. This provides additional grounds for dismissing Count V. *See Meyer*, 510 U.S. at 476 (holding that a suit against the United States was the exclusive remedy for cognizable claims under the FTCA); *Hughes v. United States*, 701 F.2d 56, 57 (7th Cir. 1982) (dismissing FTCA suit where plaintiff only timely sued federal agency–not the United States); *Valluzzi v. USPS*, 775 F. Supp. 1124, 1125 (N.D. Ill. 1991) (same).

## VII.    PLAINTIFFS ARE NOT ENTITLED TO PRELIMINARY RELIEF

Plaintiffs seek preliminary relief under the authority of the CWA (as to the FBI Range and Coast Guard training activities) and RCRA (as to the FBI Range Impact Area).[26] For the reasons discussed in Sections I-IV, the Plaintiffs have no likelihood of success on the merits of those claims. Nor can they establish injury-in-fact, let alone the *irreparable* injury that must be shown to obtain preliminary relief. They fare no better under the other factors, and the PI Motion should be denied.

As they fall so short of meeting the requirements for standard preliminary relief, it is all the more evident that Plaintiffs are not entitled to the truly extraordinary preliminary *mandatory* injunction they also seek – an order for the performance of an $8.2 million "wide area preliminary assessment" of the Impact Area. PI Mot. at 8; SAC Ex. M (assessment plan and cost estimate). As they upset the *status quo*, preliminary mandatory injunctions are "'rarely issued . . . except upon the clearest equitable grounds.'" *W.A. Mack, Inc. v. Gen. Motors Corp.*, 260 F.2d 886, 890 (7th Cir. 1958) (citation omitted); *see also Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997); *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1979) ("mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued").

---

[26] The PI Motion does not address and is not related to Count III, the Foss Park RCRA claim, which Plaintiffs added well after filing the PI Motion. Rather, Count III is the subject of the earlier TRO Motion.

A.      **Plaintiffs Will Not Suffer Irreparable Harm.**

Plaintiffs must show that *they* are subject to a "'likelihood of substantial and immediate irreparable injury.'" *Lyons*, 461 U.S. at 103 (citation omitted).  The injury *to them* must be "both certain and great; it must be actual and not theoretical."  *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Plaintiffs have failed to make this showing.  Their claims of irreparable injury are limited to unsubstantiated impacts to the North Chicago drinking water supply from alleged unpermitted discharges of lead bullets to Lake Michigan.  PI Mot. at 5, 7.  Plaintiffs concede that there are no ongoing Coast Guard live-fire training exercises in Lake Michigan; thus, there are no Coast Guard actions to enjoin. Moreover, Plaintiffs offer no reason for this Court even to consider alleged, non-specific Coast Guard training activities elsewhere (such as on the "East Coast (Atlantic Ocean)"). Accordingly, the  PI Motion offers no basis to enjoin Coast Guard activities of any sort, anywhere.

As for alleged irreparable injury from conditions in Lake Michigan that Plaintiffs contend are connected to the FBI Range, we already have established that Plaintiffs lack standing due to their failure to allege *any* injury-in-fact on that basis, *supra* at 9-10, let alone the significantly more difficult to establish irreparable injury to support preliminary relief.  In any case, the Complaint itself shows that the North Chicago water supply tests well within safe regulatory levels for lead, the IEPA sees no public health concern over lead in that water supply, and, to the extent lead is present, its source is more likely old lead water pipes. *See supra* at 10.  Finally, even assuming *arguendo* that FBI Range operations result in the occasional lead bullet fragment reaching Lake Michigan (which the Defendants do *not* concede), Plaintiffs have made no showing that they will be irreparably injured by the introduction of such minimal amounts of lead into the vastness of Lake Michigan or that *their* drinking water supply will be measurably affected.  As they offer no additional showing of irreparable injury for the *affirmative* relief they seek – *immediate* assessment of the Impact Area – their request for preliminary mandatory injunction is woefully unsupported and must be denied.

B.      **The Balance of Harms Overwhelmingly Favors the Defendants.**[27]

The Supreme Court has emphasized that there is no presumption of irreparable injury in environmental cases and that courts must balance the equities, *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987), and that even a showing of irreparable harm does not mandate injunctive

---

[27] As Plaintiffs seek an injunction halting discharges to Lake Michigan only, and because no relevant Coast Guard activities occur there, there is no way to address any potential harm to the Coast Guard.

relief. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). In our TRO Opposition, we explained (supported by declarations) why halting operations at the FBI Range beyond the period required to evaluate Plaintiffs' allegations, as the FBI has done voluntarily, will substantially harm the FBI and the many federal, state, and local entities that rely on the FBI Range for firearms training and qualification to carry out their law enforcement and national security missions. TRO Opp. at 12-13. Moreover, the public interest would be disserved if the FBI and other law enforcement agencies cannot carry out essential training and qualification testing at the FBI Range. The balance between Plaintiffs' utter lack of irreparable harm and the substantial, concrete and certain harm that will result to the FBI and other law enforcement agencies overwhelmingly tips in favor of the Defendants.

The balance is even more lopsided as to Plaintiffs' demand that the Defendants expend more than $8 million to assess the potential impacts of lead on a drinking water supply that the Complaint concedes is already well within safe regulatory levels for lead and that Plaintiffs do not claim to use in any event. The public interest would be harmed by the expenditure of such a significant sum of taxpayer money without any understanding whatsoever as to whether such additional investigation is warranted, not to mention the negative impacts on the FBI's response action, which CERCLA Section 113(h) is designed to prevent. These are hardly "the clearest equitable grounds," *Graham*, 130 F.3d at 295, and Plaintiffs' request for a preliminary mandatory injunction should be denied.

**C.    If the Court Grants the PI Motion, Plaintiffs Must Post a Bond.**

The Court should deny the PI Motion. However, if the Court grants it, Rule 65(c) requires Plaintiffs to post a sufficient bond:

> The court may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.

Fed. R. Civ. P. 65(c) (emphasis added). The Seventh Circuit has explained that "[t]he rule . . . makes security mandatory." *Gateway E. Ry. v. Terminal R.R. Ass'n of St. Louis,* 35 F.3d 1134, 1141 (7th Cir. 1994) (citation omitted); *Lorillard Tobacco Co. v. Montrose Wholesale Candies*, No. 03C4844, 2005 WL 3115892, at *18 (N.D. Ill. Nov. 8, 2005).

Plaintiffs do not address the appropriate amount of a bond, but instead ask the Court to set no bond or a nominal bond. PI Mot. at 15. They claim this is appropriate, as "Plaintiffs have no money at stake" in this case. *Id.* This argument is a complete *non sequitur* that misses the point of a bond

entirely – the bond requirements addresses the harm to the *Defendants* from an improperly issued injunction. As we explained in our TRO Opposition, at 14-15, a substantial bond is necessary in light of the costs and damages that will be sustained by the FBI, which the FBI estimates to be approximately $4,000 per week in order to secure what would be only a *severely limited* scope of training at private ranges. Such costs will have to be incurred during the pendency of the preliminary injunction because the FBI cannot simply forego *mandatory* training and qualification activities during that period. *See* FBI Manual of Investigative Operations and Guidelines, Pt. 2, Section 12-10(2) (2008). Beyond these costs, less quantifiable damages will be suffered if operations at the FBI Range are restrained, such as the possibility of compromised training and weapons proficiency of hundreds of FBI agents and thousands of other law enforcement officials and costs to the numerous state and local law enforcement agencies that use the FBI Range at no cost. TRO Opp. at 15. Of course, all of these considerations harm the public interest. Accordingly, conservatively based on a six-month time period and accounting for both quantifiable costs and unquantifiable damages, the Plaintiffs should be required to post a bond of at least $200,000. Of course, if the Court grants Plaintiffs' request for preliminary mandatory injunction, Plaintiffs should be required to post bond in the amount of the assessment they have requested – $8 million.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Second Amended Complaint and deny Plaintiffs' Motion for Preliminary Injunction and Preliminary Mandatory Injunction.

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General

Dated: April 30, 2008                 _____/s/ David S. Gualtieri_____
                                      DAVID S. GUALTIERI
                                      MATTHEW R. OAKES
                                      Environment and Natural Resources Division
                                      Environmental Defense Section
                                      P.O. Box 23986
                                      Washington, DC 20026-3986
                                      (202) 514-4767; (202) 514-8865 (fax)
                                      David.Gualtieri@usdoj.gov

                                      PATRICK J. FITZGERALD
                                      United States Attorney

                                      /s/Linda A. Wawzenski_____
                                      LINDA A. WAWZENSKI
                                      Assistant United States Attorney
                                      219 South Dearborn Street
                                      Chicago, Illinois 60604
                                      (312) 353-1994
                                      linda.wawzenski@usdoj.gov