# Index of Attachments

Attachment 1........................ Declaration of Robert D. Grant

Attachment 2........................ 13 Fed. Reg. 9547, 9560 (Dec. 31, 1948) (excerpt)

Attachment 3........................ 44 Fed. Reg. 66,213 (Nov. 19, 1979)

Attachment 4........................ 1987 GSA transfer document

Attachment 5........................ Declaration of Mark S. Lorenz

Attachment 6........................ 72 Fed. Reg. 520, 521 (Jan. 5, 2007)

Attachment 7........................ 71 Fed. Reg. 147, 43402 (August 1, 2006)

Attachment 8........................ 1/9/06 Notice of Intent Letter

Attachment 9........................ 10/1/07 Notice of Intent Letter

Attachment 10...................... IEPA Drinking Water Newspaper Article

Attachment 11...................... Declaration of Lorenzo Ferguson

Attachment 12...................... Declaration of Sanders M. Moody

Attachment 13...................... Declaration of William L. Harris

Attachment 14...................... Declaration of Patricia A. Leonard

Attachment 15...................... Pollack January 18, 2007 Letter

# Attachment 1

to United States' Memorandum in Support of Motion to Dismiss Second Amended Complaint

Declaration of Robert D. Grant

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| STEVEN B. POLLACK, et al., Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF JUSTICE et al., Defendants. | No. 08-CV-320 |

## DECLARATION OF ROBERT D. GRANT

I, Robert D. Grant, affirm and state as follows:

1. I am the Special Agent in Charge ("SAC") of the Chicago Field Office of the Federal Bureau of Investigation ("FBI"). I became a Special Agent with the FBI on November 13, 1983, and was assigned to the Memphis Field Office from March 1984 to January 1987. I was subsequently assigned to the New York, Chicago and San Antonio Field Offices along with two assignments at FBI Headquarters, Washington, D.C. In November 2004, I was appointed by Director Mueller to the position of SAC of the Chicago Field Office, which includes supervising the operations of the FBI Chicago Office and the FBI Regional Training Facility in North Chicago, Illinois. I assumed those duties on January 31, 2005. I provide this declaration based upon my personal knowledge and experience, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

2. As the SAC of the FBI's Chicago Field Office, my duties include leadership responsibilities for all investigative, intelligence and administrative functions of the Chicago

Field Office, encompassing approximately 800 employees.

3. Additionally, I oversee all of the training activities conducted at the FBI Regional Training Facility in North Chicago, Illinois. This facility is the primary training location for approximately 460 FBI Special Agents and thousands of state and local law enforcement officers. The mission of the FBI is to protect and defend the United States against terrorist and foreign intelligence threats; to enforce the criminal laws of the United States; to provide leadership and law enforcement assistance to federal, state, local and international agencies; and to perform these responsibilities in a manner that is responsive to the needs of the public and is faithful to the Constitution of the United States. The FBI currently has jurisdiction over violations of more than 200 categories of federal law.

4. In order to accomplish this extensive mission, federal agents must be adequately trained to protect themselves and others when assigned to criminal and counterterrorism investigations. The primary use of this facility is FBI firearm qualification testing. FBI policy requires each FBI Special Agent to pass a qualification course every three months for each service weapon required for their operational assignment. This policy requires each of the FBI Chicago Special Agents to train at this facility at least four times a year. This qualification course is indispensable to the FBI's mission because it ensures that our federal agents are prepared to respond to live-threatening operational situations. Highly-trained law enforcement protects not only the lives of officers and agents, but also the lives of public citizens.

5. The FBI uses this facility not only for essential qualification courses, but also for specialized weapons training. FBI Special Weapons and Tactics ("SWAT") teams use this facility to train for high-risk events, such as hostage and barricade situations. Since the events of

September 11, 2001, SWAT team training is focused on preparing and training for a variety of terrorism events that may occur in the assigned region. The FBI has SWAT teams in each of its 56 field offices and teams from other divisions are often called to assist during high-risk events. The Chicago FBI SWAT team is a regional and enhanced team specially trained and equipped to serve the Chicago Field Office and several other, smaller, field offices in the Midwest. This facility is the primary training location for several FBI SWAT teams, including the FBI Chicago SWAT team. Due to the sensitivity of this training and specialized weapons involved, SWAT teams cannot train on public ranges.

6. General skill building is another important training that this facility provides to the FBI Special Agent population. Even though Special Agents qualify often on their weapons, the FBI strives to have Special Agent train for a variety of life-threatening scenarios depending on their current assignment. For example, undercover agents working on counterterrorism, public corruption, or violent gang crime cases may require additional firearms training due to their high-risk assignment. This facility serves multiple FBI divisions with specialized firearm and other tactical training that may be required to ensure the safety of those law enforcement officials who have heightened security concerns due to their specialized assignments.

7. Finally, the training that occurs at this FBI facility is absolutely critical to the entire region's law enforcement firearms proficiency. Federal, state, and local law enforcement agencies use this range to qualify their law enforcement officers. These agencies also utilize this facility to train their local SWAT teams. All agencies that use this facility have personnel that have been certified as FBI Firearm Instructors. The FBI mission includes assisting state and local law enforcement with firearms and other specialized training. The FBI has built an extensive

expertise in law enforcement weapons training and defensive tactics and provides this expertise to other law enforcement agencies to strengthen relationships between federal and local law enforcement. Training fosters partnerships between agencies that strengthen law enforcement coordination and communication, which further strengthens the safety and security of the public.

8. The closure of this facility would have a devastating impact on the FBI Chicago Field Office's ability to conduct firearms training. Special Agents would be unable to qualify and train on their firearms, causing them to diminish these life-saving skills. Diminishing these skills provides a greater risk of harm to both the agents and the general public. Due to the volume of training, variety of weapons, and high qualifying standards of the FBI, these activities cannot be conducted at another facility. Training would have to be limited and altered to fit the specifications of other ranges, if possible. Because of the limited number of ranges in the area, it is unlikely that the FBI and other agencies could obtain the range time require to keep law enforcement officials qualified on their weapons. Additionally, the FBI and local agencies lack the funding needed to pay for range time fees. Furthermore, due to the sensitivity of this training and specialized weapons involved, SWAT team training cannot be altered to fit specifications for local ranges. Closure of this facility would prohibit the FBI's ability to train federal and local SWAT teams responsible for responding to critical incidents or other high-risk situations in the Chicago region.

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the facts set forth in this Declaration are true and correct to the best of my knowledge, information and belief.

Executed this _31_ day of March, 2008.

_____
Robert D. Grant
Special Agent in Charge
Federal Bureau of Investigation
Chicago, Illinois

# Attachment 2

to United States' Memorandum in Support of Motion to Dismiss Second Amended Complaint

13 Fed. Reg. 9547, 9560 (Dec. 31, 1948) (excerpt)

*Friday, December 31, 1948* — FEDERAL REGISTER — 9547

institution not within the Territory of Hawaii.

(c) Any person exercising the privileges of this general license shall file such reports as may from time to time be required by the Office of the Governor of Hawaii, Foreign Funds Control.

(d) This section shall not be deemed to authorize any transaction which could not be effected without a license if the person exercising the privileges of this section were not a national of a blocked country.

(e) Attention is directed to the provisions of Public Circular No. H-6, as amended.

NOTE: Public Circular H-6 was revoked (11 F. R. 7719).

(40 Stat. 415, 966, 48 Stat. 1, 54 Stat. 179, 55 Stat. 838; 12 U. S. C. 95a, 50 U. S. C. App., Sup., 5 (b). E. O. 6560, Jan. 15, 1934, as amended by E. O. 8389, Apr. 10, 1940, E. O. 8785, June 14, 1941, E. O. 8832, July 26, 1941, E. O. 8963, Dec. 9, 1941, E. O. 8998, Dec. 26, 1941, E. O. 9193, July 6, 1942; 3 CFR Cum. Supp. §§ 511.1–511.7)

§ 511.510 *Public Circular No. H-10.* Notwithstanding the provisions of § 511.211a (General Ruling No. 11A), § 511.401 (General License No. H-1) continues applicable to blocked accounts in the Territory of Hawaii.

CROSS REFERENCE: For General Ruling No. 11A, see § 511.211a.

(40 Stat. 415, 966, 48 Stat. 1, 54 Stat. 179, 55 Stat. 838; 12 U. S. C. 95a, 50 U. S. C. App. Sup. 5 (b); E. O. 6560, Jan. 15, 1934, as amended by E. O. 8389, Apr. 10, 1940, E. O. 8785, June 14, 1941, E. O. 8832, July 26, 1941, E. O. 8963, Dec. 9, 1941, E. O. 8998, Dec. 26, 1941, E. O. 9193, July 6, 1942; 3 CFR Cum. Supp., §§ 511.1–511.7)

Executed at Washington, D. C., this 29th day of December 1948.

For the Attorney General.

[SEAL] HAROLD I. BAYNTON,
*Deputy Director,*
*Office of Alien Property.*

[F. R. Doc. 48-11541; Filed, Dec. 30, 1948; 10:47 a. m.]

PART 511—BLOCKED ASSETS: REGULATIONS ISSUED ORIGINALLY BY THE TREASURY DEPARTMENT

REVOCATION OF GENERAL LICENSE NO. 72

Section 511.172 of this chapter, as amended, General License No. 72, is hereby revoked.

(40 Stat. 411, 55 Stat. 839, 60 Stat. 50, 925; 50 U. S. C. and Supp. App. 1, 616; E. O. 9193, July 6, 1942, 3 CFR, Cum. Supp.; E. O. 9567, June 8, 1945, 3 CFR, 1945 Supp.; E. O. 9788, October 14, 1946, 3 CFR, 1946 Supp.; E. O. 9989, August 20, 1948, 13 F. R. 4891)

Executed at Washington, D. C., this 29th day of December, 1948.

[SEAL] HAROLD I. BAYNTON,
*Deputy Director,*
*Office of Alien Property.*

[F. R. Doc. 48-11540; Filed, Dec. 30, 1948; 10:47 a. m.]

PART 512—BLOCKED ASSETS: REGULATIONS ISSUED BY OFFICE OF ALIEN PROPERTY

NOTE: By Executive Order 9989, Aug. 20, 1948, 13 F. R. 4891, jurisdiction over certain blocked assets has been transferred from the Secretary of the Treasury to the Attorney General. See Part 511 for regulations issued originally by the Treasury Department.

SUBPART B—GENERAL LICENSES

§ 512.194 *Amendment to General License No. 94.* Section 511.194 of this chapter, as amended, General License No. 94, is hereby amended to read as follows:

CERTAIN COUNTRIES GENERALLY LICENSED

(1) *Blocked countries generally licensed subject to certain conditions.* A general license is hereby granted licensing all blocked countries and nationals thereof to be regarded as if such countries were not foreign countries designated in the order: *Provided,* That

(a) Any property in which on the effective date hereof any of the following had an interest: (i) any blocked country (including countries licensed hereby) or person therein; or (ii) any other partnership, association, corporation, or other organization, which was a national of a blocked country (including countries licensed hereby) by reason of the interest of any such country or person therein; or

(b) Any income from such property accruing on or after the effective date hereof

shall continue to be regarded as property in which a blocked country or national thereof has an interest and no payment, transfer, or withdrawal or other dealing with respect to such property shall be effected under, or be deemed to be authorized by, this paragraph.

(2) *Transactions under other licenses authorized without regard to certain restrictions.* With respect to property subject to the proviso of paragraph (1), any transaction which is authorized under any license (other than §§ 511.101, 511.104, 511.127 and 511.130a of this chapter, General Licenses Nos. 1, 4, 27, and 30A or any other license to the extent that it merely authorizes transfers between blocked accounts of the same person or changes in the form of property held in a blocked account) may be effected without regard to any terms of such license relating to the method of effecting such transaction, provided, however, that remittances to payees in Austria, Belgium, Denmark, France, Greece, Italy, Luxembourg, the Netherlands, Norway, or Sweden, shall continue to be effected in the manner set forth in paragraph (a) (3) of § 511.132 of this chapter, General License No. 32, as amended May 29, 1948.

(3) *Certain other transactions authorized.* This license also authorizes any transaction which can be effected under § 511.153 of this chapter, General License No. 53, if the countries licensed hereby were members of the generally licensed trade area, provided that this paragraph shall not be deemed to authorize any payment, transfer, or withdrawal, or other dealing with respect to any property which is subject to the proviso of paragraph (1) hereof.

(4) *Section 511.217, General Ruling No. 17, not waived with regard to certain countries.* This license shall not be deemed to waive the requirements of § 511.217 of this chapter, General Ruling No. 17, with respect to blocked property held in any account maintained in the name of any bank or other financial institution located in Switzerland, Liechtenstein, or Sweden unless such property has been certified under paragraph (1) of § 511.195 of this chapter, General License No. 95.

(5) *Effective date.* The effective date of this general license shall be December 7, 1945, except that it shall be October 5, 1945 as to France, November 20, 1945 as to Belgium, November 30, 1945 as to Switzerland and Liechtenstein, December 31, 1946 as to Germany and Japan, and March 28, 1947 as to Sweden.

(6) *Restrictions of § 511.211a, General Ruling No. 11A.* Attention is directed to the special restrictions contained in § 511.211a of this chapter, General Ruling No. 11A, pertaining to dealings in certain property in which there is any interest of Germany or Japan or certain nationals thereof.

(40 Stat. 411, 55 Stat. 839, Pub. Laws 322, 671, 79th Cong., 60 Stat. 50, 925; 50 U. S. C. and Supp. App. 1, 616; E. O. 9193, July 6, 1942, 3 CFR Cum. Supp.; E. O. 9567, June 8, 1945, 3 CFR, 1945 Supp.; E. O. 9788, October 14, 1946, 3 CFR, 1946 Supp.; E. O. 9989, August 20, 1948, 13 F. R. 4891)

Executed at Washington, D. C., this 29th day of December 1948.

For the Attorney General.

[SEAL] HAROLD I. BAYNTON,
*Deputy Director,*
*Office of Alien Property.*

[F. R. Doc. 48-11541; Filed, Dec. 30, 1948; 10:47 a. m.]

# TITLE 33—NAVIGATION AND NAVIGABLE WATERS

Chapter II—Corps of Engineers, Department of the Army

PART 202—ANCHORAGE REGULATIONS
PART 204—DANGER ZONE REGULATIONS
PART 207—NAVIGATION REGULATIONS

MISCELLANEOUS AMENDMENTS

1. Pursuant to the provisions of section 7 of the River and Harbor Act of August 8, 1917, chapter XIX of the Army Appropriation Act of July 9, 1918, and section 7 of the River and Harbor Act of March 4, 1915 (33 U. S. C. 1, 3, and 471), all remaining regulations contained in Part 6, 33 CFR Chapter I (which were adopted and continued in full force and effect by the Secretary of the Army by an order published in the FEDERAL REGISTER June 5, 1947, 12 F. R. 3664), are hereby revoked, as follows:

SUBPART A—GENERAL REGULATIONS

Sec.
6.1 to 6.34, inclusive. [Revoked.]

(2) Prior to the conduct of each firing practice a red flag will be displayed from the water tank on Henderson Point and watercraft in the vicinity will be warned by patrol boats.

(3) Any such watercraft shall, upon being so warned, immediately vacate the danger zone and shall remain outside the area until the conclusion of firing practice.

(4) The regulations in this section shall be enforced by the Commanding Officer, United States Merchant Marine Cadet Basic School, and such agencies as he may designate.

§ 204.91a-3 *Gulf of Mexico and Mississippi Sound, in vicinity of Horn Island, Miss.; area for conducting of experimental field tests, Chemical Warfare Service*—(a) *The danger zone.* An area in the Gulf of Mexico south of Horn Island, Mississippi, and in Mississippi Sound, bounded as follows: Beginning at latitude 30°14′30″, longitude 88°46′15″; thence southwesterly to latitude 30°07′21″, longitude 88°49′08″; thence southeasterly to latitude 30°03′00″, longitude 88°41′55″; thence due east to longitude 88°32′20″; thence due north to the southern shore of Horn Island; thence easterly, northerly, and westerly along the southern, eastern, and northern shore of Horn Island to longitude 88°40′00″; thence due north to latitude 30°16′00″; thence due west to longitude 88°46′15″; and thence due south to the point of beginning.

(b) *The regulations.* (1) Navigation in the danger zone is prohibited at all times when the area is in use. Patrol boats provided by the United States Coast Guard will exercise full control in the interest of safety to navigation.

(2) The regulations in this section shall be enforced by the Commanding Officer, Chemical Warfare Service, United States Army, Horn Island, Pascagoula, Mississippi, and such agencies as he may designate.

§ 204.93c *Gulf of Mexico southeast of Corpus Christi Bay; bombing, machine gunnery, and rocket firing range, Naval Air Station, Corpus Christi, Tex.*—(a) *The danger zone*—(1) *North area.* An area in the Gulf of Mexico approximately 25 statute miles long from north to south and five statute miles wide, bounded on the north by latitude 27°45′, on the east by longitude 96°50′, on the south by latitude 27°23′, and on the west by longitude 96°55′.

(2) *South area.* An area in the Gulf of Mexico approximately 45 statute miles long from east to west and 11 statute miles wide, bounded on the north by latitude 27°20′, on the east by longitude 96°30′, on the south by latitude 27°10′, and on the west by longitude 97°14′.

(b) *The regulations.* (1) The areas will be used from sunrise to sunset daily except Sundays for bombing, machine gunnery, and rocket firing.

(2) During such operations vessels may pass through the areas at their own risk, except when warned not to enter or when warned to leave the immediate danger area by surface patrol craft or by air patrol planes buzzing low over the vessel. Upon being so warned vessels shall not enter the areas or, if they are in the areas, they shall leave as soon as possible.

(3) The boat towing a bombing or gunnery target will display a red flag during operations.

(4) The regulations in this section shall be enforced by the Commanding Officer, United States Naval Air Station, Corpus Christi, Texas, and such agencies as he may designate.

§ 204.94c *Lake Michigan; small-arms range adjacent to United States Naval Training Station, Great Lakes, Ill.*—(a) *The danger zone.* An area extending in a north and south direction from an east-west line projected eastward from the outer end of the innermost leg of the Great Lakes, Illinois, north breakwater to the breakwater at Waukegan, Illinois, and extending three miles into Lake Michigan.

(b) *The regulations.* (1) When firing affecting the danger zone is in progress, the enforcing agency will post guards at such locations that the waters in the danger zone may be observed and arrange signals whereby these guards may stop the firing should any person or vessel be seen in the waters of the danger zone. When firing is in progress, the enforcing agency will cause red flags to be displayed on shore near the rifle butts, and red streamers at other points along the shore which may be readily discernible to a person in a vessel within the danger zone.

(2) The enforcing agency is hereby authorized to use such agencies as shall be necessary to prohibit vessels from entering the area until such time as shall be convenient.

(3) Is such streamers are displayed it will indicate that firing is in progress, and that the waters in the danger zone are covered by rifle fire and should not be entered until the flags and streamers are lowered.

(4) Wherever possible, the enforcing agency will warn the public of the contemplated times of firing and the areas involved two days in advance of the scheduled date, through the public press and the United States Coast Guard. The danger zone may, however, be closed without advance notice.

(5) The regulations in this section shall be enforced by the Commandant of the United States Naval Training Station, Great Lakes, Illinois, and such agencies as he may designate.

§ 204.94e *Lake St. Clair; United States Army Rifle Range, Selfridge Field, Mich.*—(a) *The danger zone.* An area approximately 1,500 yards in width and extending 4,000 yards into Lake St. Clair at Selfridge Field, Michigan.

(b) *The regulations.* (1) No vessel or other craft shall enter or remain within the danger zone during its use for target practice.

(2) The fact that target practice will take place will be indicated by the displaying of a red flag from the flagpole at the rifle range when firing is in progress.

(3) The area will be marked by buoys.

(4) The regulations in this section shall be enforced by the Commanding Officer, Selfridge Field, Michigan, and such agencies as he may designate.

§ 204.130 *Atlantic Ocean and Vieques Sound, in vicinity of Culebra Island; bombing and gunnery target area*—(a) *The danger zone.* The waters of the Atlantic Ocean and Vieques Sound within an area described as follows: Beginning at the northernmost extremity of Fungy Bowl; thence northeasterly approximately seven miles to latitude 18°26′30″, longitude 65°16′48″; thence approximately 107°30′ true to latitude 18°25′-06″; longitude 65°12′06″; thence southwesterly approximately seven miles to Matojo Cay; thence southwesterly across Culebra Island to Scorpion Point; thence approximately 180° true to latitude 18°11′00″, longitude 65°18′42″; thence approximately 300° true to Hodgkins Shoal buoy; thence approximately 47° true to the point of beginning.

(b) *The regulations.* (1) The danger zone is subject to use as a target area for bombing and gunnery practice. Appropriate notices will be issued to the public in advance of this activity by the officer in charge of such activity.

(2) The regulations in this section shall be enforced by the Commander, Training Group, Guantanamo Bay, Cuba, and such agencies as he may designate.

4. Pursuant to the provisions of section 7 of the River and Harbor Act of August 8, 1917 (40 Stat. 266; 33 U. S. C. 1), §§ 207.30, 207.150, 207.201 (c), 207.-430, 207.495, 207.500, 207.520, 207.540, 207.615, and 207.630 are hereby revoked, §§ 207.162, 207.220, 207.260, 207.440, 207.510, and 207.590 are hereby amended, and §§ 207.5, 207.23, 207.25, 207.165, 207.171, 207.176, 207.182, 207.475, 207.565, and 207.815 are hereby prescribed, as follows:

§ 207.5 *Sheepscot Bay, Me.; naval restricted area*—(a) *The area.* Beginning at latitude 43°47′00″, longitude 69°43′20″; thence to latitude 43°47′00″, longitude 69°42′36″; thence to latitude 43°45′25″, longitude 69°40′00″; thence to latitude 43°43′50″; longitude 69°42′50″; thence to latitude 43°46′18″, longitude 69°44′30″; and thence northeasterly along the shore to the point of beginning.

(b) *The regulations.* (1) This area is restricted to all vessels.

(2) This section shall be enforced by the Commandant, First Naval District, and such agencies as he may designate.

§ 207.23 *Narragansett Bay, East Passage, west of Gould Island; naval prohibited area*—(a) *The area.* Beginning at Gould Island South Light (latitude 41°32′, longitude 71°21′); thence 256° true, 710 yards; thence 346° true, 1,000 yards; thence 76° true, 850 yards, to the northern end of Gould Island; and thence southerly along the line of mean high water to the point of beginning.

(b) *The regulations.* (1) No vessel shall at any time, under any circumstances, anchor, fish, or tow a drag of any kind in the prohibited area because of the extensive cable system located therein.

(2) No vessel shall enter the prohibited area except under the direction of appropriate United States Naval authority.

# Attachment 3

to United States' Memorandum in Support of Motion to Dismiss Second Amended Complaint

44 Fed. Reg. 66,213 (Nov. 19, 1979)

delivery specified in the subject contract.

§ 277.207  Interim protective sales.

(a) *General rule.* Except as provided in § 277.208, after the expiration date of a subject contract, any natural gas subject to the provisions of this subpart shall continue to be sold to the original purchaser until the requirements of § 277.205 (concerning bona fide offers) have been met.

(b) *Conditions of sale.* Natural gas sold to the original purchaser under paragraph (a) of this section shall be sold under the terms and conditions prevailing in the subject contract on the last day the contract was in effect, except that the seller may charge no more than the price paid by the original purchaser on the day before the final determination was made.

§ 277.208  Intervening third party sales.

(a) *Applicability.* This section applies to natural gas to which this subpart applies if:

(1) The applicable subject contract has expired, and

(2) Such gas is covered by a first sale contract between the seller and a third party purchaser, entered into after the final determination and prior to the date this rule was issued as a proposed rule.

(b) *Relief.* The original purchaser may apply not later than January 15, 1980, to the Commission for such relief as the Commission may determine appropriate.

§ 277.209  Waiver of rights under this subpart.

(a) *General rule.* The original purchaser may voluntarily waive its right to a bona fide offer under § 277.205 or its right of first refusal under § 277.206 or both rights.

(b) *Method of waiver.* Waiver under paragraph (a) of this section must be in writing and signed by the original purchaser.

§ 277.210  Recordkeeping requirements.

All sellers of natural gas which is subject to this subpart must retain copies of all bona fide offers under § 277.205 and offers to the original purchasers to satisfy the original purchaser's right of first refusal under § 277.206. The sellers and purchasers of natural gas which is subject to this subpart must also retain all other documents created in the ordinary course of business and which relate to this subpart.

[FR Doc. 79-35697 Filed 11-16-79; 8:45 am]
BILLING CODE 6450-01-M

DEPARTMENT OF TRANSPORTATION

Federal Highway Administration

Urban Mass Transportation Administration

23 CFR Part 771

49 CFR Part 622

[FHWA Docket No. 79-26]

Environmental Impact and Related Procedures

**AGENCIES:** Federal Highway Administration (FHWA) and Urban Mass Transportation Administration (UMTA), DOT.

**ACTION:** Extension of Comment Period.

**SUMMARY:** In the Federal Register of October 15, 1979 (44 FR 59438), FHWA and UMTA issued a notice of proposed rulemaking concerning the coordinated responses of the two agencies to the Council on Environmental Quality (CEQ) regulations implementing the procedural provisions of the National Environmental Policy Act and to the implementing procedures issued by the Department of Transportation. Interested parties were given until November 14, 1979 to submit comments. Because of extensive interest in this action, a new closing date for comments has been established and is set out below.

**DATE:** Comments must be received on or before December 3, 1979.

**ADDRESS:** Submit written comments, preferably in triplicate, to FHWA Docket No. 79-26, Federal Highway Administration, Room 4205, HCC-10, 400 Seventh Street, SW., Washington, D.C. 20590. All comments received will be available for examination at the above address between 7:45 a.m. and 4:15 p.m. ET, Monday through Friday. Those desiring notification of receipt of comments must include a self-addressed stamped postcard.

**FOR FURTHER INFORMATION CONTACT:** FHWA: Dale Wilken, Office of Environmental Policy, 202-426-0106, or Irwin Schroeder, Office of the Chief Counsel, 202-526-0791. Office hours for FHWA are from 7:45 a.m. to 4:15 p.m. ET, Monday through Friday. UMTA: Peter Benjamin, Office of Transit Assistance, 202-472-2435, or John Collins, Office of the Chief Counsel, 202-426-1906. Office hours for UMTA are from 8:30 a.m. to 5 p.m. ET, Monday through Friday.

Dated: November 13, 1979.
John S. Hassell, Jr.,
*Acting Administrator, Federal Highway Administration.*
Lillian C. Liburdi,
*Acting Deputy Administrator, Urban Mass Transportation Administration.*
[FR Doc. 79-35520 Filed 11-16-79; 8:45 am]
BILLING CODE 4910-57-M

DEPARTMENT OF DEFENSE

Corps of Engineers, Department of the Army

33 CFR Part 204

Small Arms Range, Great Lakes, Ill.; Danger Zone

**AGENCY:** U.S. Army Corps of Engineers, DoD.

**ACTION:** Proposed Rule.

**SUMMARY:** The Corps of Engineers proposes to revise the regulations which establish a danger zone at the small arms range adjacent to the U.S. Naval Training Center, Great Lakes, Illinois. The revision is necessary to accommodate the current training and practice routine at the range.

**DATE:** Comments must be received by December 20, 1979.

**ADDRESS:** HQDA, DAEN-CWO-N, Washington, D.C. 20314.

**FOR FURTHER INFORMATION CONTACT:** Mr. Ralph T. Eppard, Telephone (202)272-0200.

**SUPPLEMENTARY INFORMATION:** Regulations have been promulgated by the Department of the Army in 33 CFR 204.175 on 30 January 1951 to establish a danger zone for a small arms range on Lake Michigan approximately 2 miles south of the entrance to Waukegan Harbor, Illinois. These amendments affect paragraph (b) by eliminating the buoys used on the north and south points on the eastern limits of the range and to delete the requirement for streamers to be displayed when firing is in progress. Red warning flags will be flown when firing is conducted at the range. When firing rifles at the range, spotters will be employed on the lake shore to observe the impact area and suspend shooting if any craft enters the danger zone. It should be noted that all fire is intended to impact into the berms and not impact into the lake. Only an errant round or ricochet would impact into the lake.

Accordingly, the U.S. Army Corps of Engineers proposes to amend 33 CFR 204.175(b) as set forth below:

§ 204.175 Lake Michigan: Small arms range adjacent to U.S. Naval Training Center, Great Lakes, Ill.

* * * * *

(b) *The regulations.* (1) When firing affecting the danger zone is in progress, the enforcing agency will post guards at such locations that the waters in the danger zone may be observed and arrange signals whereby these guards may stop the firing should any person or vessel be seen in the waters of the danger zone. When firing is in progress, the enforcing agency will cause red flags to be displayed on shore near the rifle butts, which may be readily discernible to a person in a vessel within the danger zone.

* * * * *

(3) If such flags are displayed it will indicate that firing is in progress, and that the waters in the danger zone are subject to impact by rounds missing or ricocheting off the impact berm and should not be entered until the flags are lowered.

* * * * *

(5) Deleted.

* * * * *

Authority.—(40 Stat. 266; 33 U.S.C. 1) and (40 Stat. 892; 33 U.S.C. 3).

Notes.—The Chief of Engineers has determined that this regulation will not impose unnecessary burdens on the economy or on individuals and therefore, is not significant for the purposes of E.O. 12044. A regulatory analysis is not required.

Dated: November 7, 1979.

Forrest T. Gay III,
*Colonel, Corps of Engineers, Executive Director, Engineer Staff.*

[FR Doc. 79-35515 Filed 11-16-79; 8:45 am]
BILLING CODE 3710-89-M

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Part 52

[FRL 1361-2]

### State and Federal Administrative Orders Revising the Michigan State Implementation Plan

**AGENCY:** U.S. Environmental Protection Agency.

**ACTION:** Proposed Rule; Proposed Approval of Revision.

**SUMMARY:** U.S. Environmental Protection Agency (USEPA) proposes to approve Michigan Air Pollution Control Commission's request for a revision to the Michigan State Implementation Plan (SIP). The revision is a Final Order issued by the Michigan Air Pollution Control Commission (MAPCC). The Final Order was the result of the Stipulation and Consent Order entered into by the Consumers Power Company and the Air Quality Division of the Michigan Department of Natural Resources. The Order extends the date by which the Company is required to bring sulfur dioxide emissions from coal-fired boilers at its J.H. Campbell Plant located in the Township of Port Sheldon, Ottawa County, Michigan, into compliance with certain regulations contained in the federally approved Michigan State Implementation Plan (SIP). The Order extends the date for compliance from January 1, 1980 to January 1, 1985. Any Order which has been issued to a major source and extends the SIP compliance date for meeting the sulfur dioxide emission limitations must be approved by USEPA before it becomes effective as a SIP revision under the Clean Air Act. 42 U.S.C. 7410. If approved by USEPA, the extension will constitute a revision to the SIP. The purpose of this Notice is to invite public comment on USEPA's proposed approval of the MAPCC Order dated June 25, 1979.

**DATE:** Written comments must be received by December 19, 1979.

**ADDRESSES:** Please send comments to: Steve Rothblatt, Chief, Air Programs Branch, U.S. Environmental Protection Agency, Region V, 230 South Dearborn Street, Chicago, Illinois 60604.

The State Order, supporting material and public comment received in response to this notice may be inspected and copied (for appropriate charges) during normal business hours at the above address or at: Michigan Department of Natural Resources, Air Quality Division, State Secondary Complex, General Office Building, 7150 Harris Drive, P.O. Box 30028, Lansing, Michigan 48909.

**FOR FURTHER INFORMATION CONTACT:**
Joel Morbito, Air and Hazardous Materials Division, U.S. Environmental Protection Agency, 230 South Dearborn Street, Chicago, Illinois 60604 (312) 886-6059.

**SUPPLEMENTARY INFORMATION:**
Consumers Power Company uses coal as fuel in its electrical generating facility, commonly known as the Campbell Plant, in the township of Port Sheldon, Ottawa County, Michigan.

On January 17, 1978 the Michigan Air Pollution Control Commission (Commission) received Consumers Power Company's (Consumers) request to defer compliance with the sulfur dioxide emission standards specified in Tables 3 and 4 of Rule 336.49 of the Commission's Rules and Regulations for Air Pollution Control. Consumers requested that compliance be deferred from January 1, 1980 to January 1, 1985.

Rule 336.49 sets sulfur dioxide emission limitations for power plants in the State of Michigan. Rule 336.49(1) allows for deferred compliance if power plant emissions do not create or contribute to an ambient level of sulfur dioxide in excess of the applicable air quality standards. Rule 336.49(2) prohibits exceptions to the limitations of Table 3 beyond January 1, 1980 unless authorization is granted by the Commission.

In accordance with Rule 336.49(2) Consumers applied for an extension of the January 1, 1980 compliance date for sulfur dioxide emissions. In its application Consumers requested that the compliance date be extended to January 1, 1985, and provided information and demonstrations which were required by Rules 336.141–147.

As a result of Consumers' application a public hearing was held May 15, 1979 on proposed Consent Order APC No. 05-1979 entered into by Consumers and the Air Quality Division of Michigan's Department of Natural Resources. There was testimony that the proposed Order did not appear to contain any interim reduction for the twenty-four hour average of sulfur dioxide emissions, and that the air quality models and meteorological data did not take into account the gradient onshore and lake breeze fumigation effects. The Commission authorized the entrance of the Order with the provision that the problem with the air quality modeling study be resolved.

The Order extended the compliance date for meeting sulfur dioxide emission limitations to January 1, 1985. The Commission stated in the Order that if Consumers complied with the terms of the proposed Order, the extension would not interfere with the attainment or maintenance of the National Ambient Air Quality Standards for any pollutant. The proposed Order was thereafter stipulated on June 22, 1979 as a Consent Order between Consumers and the Air Quality Division of Michigan's Department of Natural Resources. On June 25, 1979 the Consent Order was issued by the Michigan Air Pollution Control Commission as the Commission's Final Order.

The Final Order rescinds and supersedes Performance Contract No. 973-10 and extends the compliance date for meeting the sulfur dioxide emission limitations of Commission Rule 336.49 to January 1, 1985. The Order also contains provisions by which it may be modified or revoked. Under the Order Consumers must comply with the following program and time schedule for the control of

# Attachment 4

to United States' Memorandum in Support of Motion to Dismiss Second Amended Complaint

1987 GSA transfer document

# TRANSFER AND ACCEPTANCE OF MILITARY REAL PROPERTY

| 1. FROM: (Installation/Activity/Service) | 2. OPERATING UNIT | 3. DISTRICT CODE | 4. OPERATING AGENCY | 5. DATE | 6. JOB NUMBER | 7. SERIAL NUMBER | 8. CONTRACT NUMBER |
|---|---|---|---|---|---|---|---|
| Commanding Officer, Northern Division Naval Facilities Engineering Command Bldg. 77L, Naval Base Philadelphia, PA 19112 | N62472 | 04 | 25 | 9/4/87 | N/A | N/A | GSA Control No. 5-N-IL444T |

| 9. TO: (Installation/Activity/Service) | 10. OPERATING UNIT | 11. DISTRICT CODE | 12. OPERATING AGENCY | 13. ACCOUNTING COUNTABLE OFFICE NUMBER | 14. ACCOUNTING COUNTABLE OFFICE NUMBER | 15. TYPE OF TRANSACTION | |
|---|---|---|---|---|---|---|---|
| Department of Justice, Federal Bureau of Investigation, Administrative Services Division, 9th & Pennsylvania Ave., Rm. 6012, Washington, DC 20535 Attn: E. Sharp, Dir, Admin Services | | | | | | ☐ NEW CONSTR. ☒ EXISTING ☐ CAPITAL IMP. ☐ OTHER (Specify) | ☐ BENFY/O ☐ PHYSICAL COM. ☐ FINAN. COM. ☐ OTHER (Specify) |

| 17. ITEM NO. | 18. CATEGORY CODE | 19. FACILITY (Category description) | 20. NO. OF UNITS | 21. TYPE | 22. UNIT OF MEAS. | 23. TOTAL QUANTITY | 24. COST | 25. DRAWING NUMBERS | 26. REMARKS |
|---|---|---|---|---|---|---|---|---|---|
| | | **Land** | | | | | | | See Exhibit A for legal description and Exhibit B for release of land to U.S.A. Non-assignable Permit for 4" water line fr Foss Park District, City of North Chicago, IL dtd May 25, 1938. |
| 1 | 911-40 | Land in Fee | | | AC | 14.15 | 22,300 | | |
| 2 | 913 | Land in Permit | | | LF | 520 | NONE $22,300 | | |
| | | **Improvements** | | | | | | | See Exhibit "C" |
| 1 | 872-10 | Security/Perimeter Fence | 1 | P | LF | 1817 | 4675 | | |
| 2 | 730-75 | Toilet, Rifle Range | 1 | T | SF | 104 | 550 | | |
| 3 | 171-77 | Magazine, Storage | 1 | SP | SF | 335 | 467 | | |
| 4 | 171-77 | Target house, Storage/Office | 1 | T | SF | 720 | 1345 | | |
| 5 | 740-77 | R d and gun, Community Storage | 1 | T | SF | 288 | 1800 | | |
| 6 | 179-40 | Small Arms Range-Outdoor | 1 | P | SY | 2431 | 3500 | | |
| 7 | 179-40 | Small Arms Range-Outdoor | 1 | P | SY | 26667 | 16,500 | | |
| 8 | 164-20 | Groin | 1 | P | SY | 155 | 26,690 | | |

27. STATEMENT OF COMPLETION: The facilities listed hereon are in accordance with maps, drawings, and specifications and change orders approved by the authorized representative of the using agency except for the deficiencies listed on the reverse side.

TRANSFERRED BY (Signature)
TITLE [signature] VINCENT E. DiMARINO
Head, Real Estate Div, Northern Div, NAVFACENGCOM
DATE

28. ACCEPTED BY (Signature) [signature]
TITLE (Post Engr/Base Civ. Engr/Navy Rep.)
DATE 9/4/87

29. PROPERTY VOUCHER NUMBER

DD Form 1354
Nov 61
SUPERSEDES ENG FORMS 290 AND 2908 AND NAVDOCKS FORM 2317.

PAGE 1 OF 3 PAGES

# TRANSFER AND ACCEPTANCE OF MILITARY REAL PROPERTY

| 1. FROM: (Installation/Activity/Service) | | | | | | | | | | PAGE 2 OF 3 PAGES |
|---|---|---|---|---|---|---|---|---|---|---|
| 9. TO: (Installation/Activity/Service) | | 2. OPERATING UNIT | 3. DISTRICT CODE | 4. OPERATING AGENCY | 5. DATE | 6. JOB NUMBER | 7. SERIAL NUMBER | 8. CONTRACT NUMBER | | |
| | | 10. OPERATING UNIT | 11. DISTRICT CODE | 12. OPERATING AGENCY | 13. ACCOUNTING OFFICE NUMBER | 14. AC-COUNT-ABLE NUMBER | 15. TYPE OF TRANSACTION □ BENF/O □ PHYSICAL COM. □ CAPITAL IMP. □ FINAN. COM. □ OTHER (Specify) □ NEW CONSTR. □ EXISTING FAC. □ OTHER (Specify) | | | PROJECT NUMBER |

| ITEM NO. 17 | CATEGORY CODE 18 | FACILITY (Category description) 19 | NO. OF UNITS 20 | TYPE 21 | UNIT OF MEAS. 22 | TOTAL QUANTITY 23 | COST 24 | DRAWING NUMBERS 25 | REMARKS 26 |
|---|---|---|---|---|---|---|---|---|---|
| 9 | 164-20 | Groin | 1 | P | SY | 90 | 15,700 | | See Exhibit D |
| 10 | 832-10 | Sanitary Sewer Mains | 1 | P | LF | 700 (EST) | 9,533 (EST) | | See Exhibit E |
| 11 | 842-10 | Potable Water Distribution line | 1 | P | LF | 820 (EST) | 11,679 (EST) | | See Exhibit F |
| | | Class II - Total Cost | | | | | $92,439 | | |

This transfer is subject to the following:

A. Outgrants described below:
(1) USE Agreement No. N62472-84-RP-00203 between The Department of the Navy and The Department of Justice, Federal Bureau of Investigation
(2) Out Easement No. NDy(R)-65458 comprising 0.650 ac. to state of Illinois for a portion of Defense Highway
(3) Out Easement No. NF(R)-17628 comprising 0.03AC to North Shore Gas Company for a 4" gas main

B. Reservation by the Department of the Navy of the right for the continued use, operation, maintenance, repair, and replacement of a twenty-four (24) inch sanitary sewer line under and through a certain parcel of land transferred herein. This sanitary sewer line is an extension of an easement granted to the Government acting through the Department of the Navy on behalf of the Naval Training Center, Great Lakes, IL by the Grantor, Foss Park District, City of North Chicago, IL under contract No. NF(R)-15653.

STATEMENT OF COMPLETION: The facilities listed hereon are in accordance with ... and specifications and change orders approved by the authorized representatives ... except for the deficiencies listed on the reverse side.

TITLE (Publ. Engr./Base Civ. Engr./Navy Rep.)
Acting Director, Real Estate
Northern Division, Naval Facilities

DATE: 4 SEP 1987

20. ACCEPTED BY (Signature)

DATE

20. PROPERTY VOUCHER NUMBER

DD FORM 1354, NOV 71  SUPERSEDES ENG FORM ... AND NAVDOCKS FORM 2818

# TRANSFER AND ACCEPTANCE OF MILITARY REAL PROPERTY

| 1. FROM: (Installation/Activity/Service) | 2. OPERATING UNIT | 3. DISTRICT CODE | 4. OPERATING AGENCY | 5. DATE | 6. JOB NUMBER | 7. SERIAL NUMBER | 8. CONTRACT NUMBER |
|---|---|---|---|---|---|---|---|
| 9. TO: (Installation/Activity/Service) | 10. OPERATING UNIT | 11. DISTRICT CODE | 12. OPERATING AGENCY | 13. ACCOUNTING NUMBER | 14. ACCOUNTABLE COUNT OFFICE NUMBER | 15. TYPE OF TRANSACTION | PROJECT NUMBER |

PAGE 3 OF 3 PAGES

| ITEM NO. 17 | CATEGORY CODE 18 | FACILITY (Category description) 19 | NO. OF UNITS 20 | TYPE 21 | UNIT OF MEAS. 22 | TOTAL QUANTITY 23 | COST 24 | DRAWING NUMBERS 25 | REMARKS 26 |
|---|---|---|---|---|---|---|---|---|---|

Remarks:

This Transfer shall provide that, within two (2) years after the execution thereof, the Federal Bureau of Investigation, its successor or assigns will obtain a separate source of potable water supply available from the local municipal utility. Upon connection to this available source, the potable water supply now provided by Naval Training Center, Great Lakes, IL will be discontinued.

The custody and accountability of the above related real property of the Naval Training Center, Great Lakes, Illinois is hereby transferred from the Department of the Navy to the Department of Justice, Federal Bureau of Investigation, pursuant to General Services Administration, Region One, Boston, MA letter dated August 8, 1986.

27. STATEMENT OF COMPLETION: The facilities listed hereon are in accordance with plans, drawings, and specifications and change orders approved by the authorized representative of the using agency except for the deficiencies listed on the reverse side.

28. ACCEPTED BY (Signature)

TITLE (Post Engr./Base Civ. Engr./Navy Rep.)

DATE: 4 SEP 1987

DD FORM 1354

SUPERSEDES ENG FORMS 290 AND 2908 AND NAVDOCKS FORM 2517.

29. PROPERTY VOUCHER NUMBER