# Attachment 6

to United States' Memorandum in Support of Motion to Dismiss Second
Amended Complaint

72 Fed. Reg. 520, 521 (Jan. 5, 2007)

present in a food that triggers the requirement in § 101.72(c)(2)(i)(E) that the claim include a statement that reflects the limit of the benefits derived from dietary calcium intake. Elsewhere in this issue of the **Federal Register**, FDA is proposing alternative amendments to § 101.72(c)(2)(i)(E). Therefore, FDA is withdrawing this proposed amendment of the 1995 proposal.

### III. Related Action

Elsewhere in this issue of the **Federal Register**, FDA is publishing a proposed rule to amend § 101.72 to, among other things: (1) Eliminate the requirement in § 101.72(c)(2)(i)(A) that the claim list sex, race, and age as specific risk factors for the development of osteoporosis; (2) eliminate the requirement in § 101.72(c)(2)(i)(B) that the claim does not state or imply that the risk of osteoporosis is equally applicable to the general U.S. population, and that the claim identify the populations at particular risk for the development of osteoporosis; and (3) eliminate the requirement in § 101.72(c)(2)(i)(E) that the claim include a statement that reflects the limit of the benefits derived from dietary calcium intake, when the level of calcium in the food exceeds a set threshold level.

Comments specific to the proposed amendments in § 101.72(c)(2)(i)(A), (B), and (E) that were submitted in response to the 1995 proposal were considered in the development of the proposed rule that responds to the health claim petition submitted by The Beverage Institute for Health and Wellness.

Authority: Therefore, under the Federal Food, Drug, and Cosmetic Act and under authority delegated to the Commissioner of Food and Drugs, the proposed rule published on December 21, 1995 (60 FR 66206), is withdrawn in part for § 101.72(c)(i)(A), (B), and (E).

Dated: December 18, 2006.

**Michael M. Landa,**

*Deputy Director, Regulatory Affairs, Center for Food Safety and Applied Nutrition.*

[FR Doc. E6–21996 Filed 1–4–07; 8:45 am]

**BILLING CODE 4160–01–S**

---

## DEPARTMENT OF HOMELAND SECURITY

### Coast Guard

### 33 CFR Part 165

[USCG–2006–25767 formerly CGD09–06–123]

RIN 1625–AB11

### Safety Zones; U.S. Coast Guard Water Training Areas, Great Lakes

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking; withdrawal.

**SUMMARY:** The Coast Guard is withdrawing its notice of proposed rulemaking (NPRM) concerning the establishment of safety zones throughout the Great Lakes for the purpose of conducting gunnery training. The Coast Guard is authorized to conduct training in realistic conditions and in locations including in, on, and over the internal waters of the United States. In order to maximize safety, the NPRM proposed establishing safety zones in order to maintain Coast Guard control over the training area during training periods. This NPRM is being withdrawn, however, because of comments received from the public regarding the number and location of the proposed safety zones, the frequency of use, notification procedures as well as other concerns raised by the public. There will be no further gunnery training on the Great Lakes to satisfy non-emergency training requirements unless we first propose to the public and then publish a final rule. Because the Coast Guard is mandated to provide for the safety and security of the more than 30 million people in Great Lakes region, the critical infrastructure that make up the Great Lakes system, and the vessels that use it, we are evaluating all available options, including a new NPRM for gunnery training.

**DATES:** The notice of proposed rulemaking is withdrawn on January 5, 2007.

**FOR FURTHER INFORMATION CONTACT:** Commander Gustav Wulfkuhle, Enforcement Branch, Response Division, Ninth Coast Guard District, Cleveland, OH at (216) 902–6091.

**SUPPLEMENTARY INFORMATION:**

### Regulatory History

On August 1, 2006, the Coast Guard published a notice of proposed rulemaking (NPRM) (71 FR 43402) to establish permanent safety zones throughout the Great Lakes which would restrict vessels from portions of the Great Lakes during live-fire gun exercises that would be conducted by Coast Guard cutters and small boats. The initial comment period for the NPRM ended on August 31, 2006. In response to public requests, the Coast Guard re-opened the comment period (71 FR 53629, September 12, 2006) from September 12, 2006 to November 13, 2006, in order to provide the public more time to submit comments and recommendations. On September 19 and 27, 2006, the Coast Guard published brief documents announcing the dates and other information on public meetings regarding the NPRM and the gunnery exercises. (71 FR 54792, 56420).

On October 12, 2006, the Coast Guard announced the addition of three more public meetings and again stated that more detailed information related to the meetings would be published at a later date. (71 FR 60094). On October 23, the Coast Guard published a document containing detailed information about five additional public meetings. (71 FR 62075).

### Background

Thirty-four safety zones were to be located throughout the Great Lakes in order to accommodate 56 separate Coast Guard units. The proposed safety zones were all located at least three nautical miles from the shoreline.

The Coast Guard proposed to establish permanent zones on the Great Lakes to provide the public with more notice and predictability when conducting infrequent periodic training exercises of brief duration, and to give the public an opportunity to comment on the proposals. The proposed safety zones would have appeared on National Oceanographic and Atmospheric Administration nautical charts, which would have provided a permanent reference for mariners.

The proposed safety zones would have been utilized only upon notice by the cognizant Captain of the Port for the area involved in the exercise. Under the procedure outlined in the NPRM, the cognizant Captain of the Port would have issued notice of the enforcement of a live-fire exercise safety zone by all appropriate means to effect the widest publicity among the affected segments of the public including publication in the **Federal Register** as practicable, in accordance with 33 CFR 165.7(a). Such means of notification would have included, but not been limited to, Broadcast Notice to Mariners or Local Notice to Mariners before, during, and at the conclusion of training exercises.

The coordinates of the proposed safety zones were published on August

1, 2006 at 71 FR 43402. All coordinates used to determine the zones were based upon North American Datum 1983 (NAD 83).

## Withdrawal

The Coast Guard is withdrawing the NPRM published on August 1, 2006 concerning the establishment of safety zones throughout the Great Lakes, but will examine options for future consideration which may include a new NPRM. The Coast Guard will reevaluate the proposal in light of issues raised in the comments the Coast Guard received during the course of this rulemaking. Whatever option the Coast Guard pursues, it intends to address the concerns of the Great Lakes community and to work with the region's stakeholders to develop an acceptable solution that meets the readiness needs of Coast Guard Forces and addresses the public's concerns.

## Discussion of the Comments

The Coast Guard received over 900 comments regarding this NPRM. The Coast Guard received comments from Members of Congress, state and local government representatives, environmentalists, recreational boaters, commercial users, Native American tribes, local businesses, and members of the general public in the Great Lakes region.

Several commenters unconditionally supported the Coast Guard's proposal and recognized the Coast Guard's need to be trained in order to carry out its law enforcement and homeland security missions. Several other commenters supported the Coast Guard's proposal but like many commenters raised concerns about the number, size, and location of the proposed safety zones and whether they would impede recreational and commercial activity, including tourism. Some stated that the water training areas would negatively impact the economy, and some ferry operators commented that the locations of the areas would negatively impact their operations.

Commenters also expressed concerns related to safety and notification issues surrounding the establishment of the water training areas. For example, there were questions on the distance that bullets can travel if they ricochet off the surface of the water and how far they could travel generally. Notification questions included how small craft and vessels without radios would be notified that a live-fire exercise was being conducted in their area. Some people stated that the 2 hour broadcast notice to mariners was insufficient and suggested additional notification

procedures, including the use of local media or announcements on the emergency broadcast system. While some commenters suggested that notification begin two weeks before the scheduled exercise, others requested that training be limited to particular days of the week and seasons of the year. In particular, commenters requested that the training schedule avoid peak boating season to accommodate safety and notification concerns.

Many commenters mentioned environmental concerns, including the potential for lead to find its way into their drinking water. Native American tribes, along with other groups, also expressed concerns regarding subsistence fishing and the impact of lead on the food supply.

Other environmental comments related to the Preliminary Health Risk Assessment.[1] Based upon standard risk evaluation procedures and ''realistic worst case'' assumptions, the Risk Assessment concluded that the proposed training would result in no elevated risks for the Great Lakes/freshwater, estuarine/Chesapeake Bay, and riverine systems scenarios. Commenters raised concerns, among others that the Risk Assessment did not consider current levels of contamination or contemplate potential cumulative effects beyond 5 years.

Some commenters raised concerns over the Rush-Bagot Agreement of 1817 that limits naval forces on the Great Lakes, and the impact of the training exercises on the relationship between the United States and Canada. Other commenters expressed general concern over the perceived militarization of the Great Lakes.

Commenters suggested a variety of alternatives. Some commenters suggested limiting the number of zones and reducing their size. Other suggestions included using ''green'' ammunition, simulators and/or lasers, and conducting the training in areas other than the Great Lakes.

In light of these comments and input received during the public meetings, the Coast Guard is withdrawing the current NRPM. The Coast Guard will not conduct further gunnery training on the Great Lakes to satisfy non-emergency training requirements unless the Coast

Guard publishes notice of its proposed action, allows the public an opportunity to comment, and publishes a final rule. A terrorist attack or other emergency may alter these plans. The Coast Guard will ensure that any live-fire training is conducted responsibly, safely, and in accordance with applicable legal requirements.

## Future Proposals/Training Areas

The threat against our Nation remains very real, and vulnerabilities within the Great Lakes system are extensive, diverse, and significant. The Coast Guard is mandated to provide for the safety and security of the more than 30 million people in the Great Lakes Basin, as well as the 11 major ports, 13 nuclear power plants, 348 regulated terminals and facilities, 22 high capacity passenger vessels and ferries, and the hundreds of locks, dams, bridges and other critical infrastructure that make up the Great Lakes system. The Coast Guard is also responsible for the safety and security of several thousand annual Great Lakes commercial vessel transits.

The Coast Guard must be prepared to counter overseas, cross-border, or domestic threats. This includes protecting the citizens of the Great Lakes as well as vessels, ports, waterways and critical infrastructure in the Great Lakes. The Coast Guard must be trained and prepared to meet all threats and all hazards. In order to be proficient, the Coast Guard must train in the maritime environment in which it operates. Operating in the maritime environment is inherently different from land operations, and Coast Guard personnel must be able to shoot safely and effectively from vessels at moving targets in the water.

While the Coast Guard must be ready to confront threats to homeland security originating in the maritime domain, training in the environment must be conducted with due regard for public safety and in a manner that is protective of human health and the environment.

To properly consider the many equities involved, the Coast Guard is withdrawing the NPRM. The Coast Guard is analyzing temporary options to ensure that Coast Guard boat crews obtain training outside the Great Lakes that they require to retain current gunnery qualifications. Maintaining these qualifications is imperative to the Coast Guard mission of providing adequate levels of maritime security in the Great Lakes. The Coast Guard will evaluate all available options including whether to issue a new NPRM prior to conducting non-emergency training exercises on the Great Lakes.

---

[1] This study, entitled ''Preliminary Health Risk Assessment for Proposed U.S. Coast Guard Weapons Training Exercises,'' is publicly available as part of electronic docket number 25767. You may electronically access the public docket by performing a ''Simple Search'' for docket number 25767 on the Internet at *http://dms.dot.gov*. The Risk Assessment is the third document in the docket.

**Authority**

This action is taken under the authority of 33 U.S.C. 1226, 1231; 46 U.S.C. Chapter 701; 50 U.S.C. 191, 195; 33 CFR 1.05–1(g), 6.04–1, 6.04–6, and 160.5; Public Law 107–295, 116 Stat. 2064; Department of Homeland Security Delegation No. 0170.1.

Dated: December 28, 2006.

**John E. Crowley, Jr.,**

*Rear Admiral, U.S. Coast Guard, Commander, Ninth Coast Guard District.*

[FR Doc. E6–22632 Filed 1–4–07; 8:45 am]

**BILLING CODE 4910–15–P**

# Attachment 7

to United States' Memorandum in Support of Motion to Dismiss Second
Amended Complaint

71 Fed. Reg. 147, 43402 (August 1, 2006)

2. Add a temporary § 100.35–T05–075 to read as follows:

**§ 100.35–T05–075  Back River, Poquoson, VA.**

(a) *Definitions:* The following definitions apply to this section: (1) *Coast Guard Patrol Commander* means a commissioned, warrant, or petty officer of the Coast Guard who has been designated by the Commander, Coast Guard Sector Hampton Roads.

(2) *Official Patrol* means any vessel assigned or approved by Commander, Coast Guard Sector Hampton Roads with a commissioned, warrant, or petty officer on board and displaying a Coast Guard ensign.

(3) *Participant* includes all vessels participating in the Poquoson Seafood Festival Workboat races under the auspices of a Marine Event Permit issued to the event sponsor and approved by Commander, Coast Guard Sector Hampton Roads.

(4) *Regulated area* includes the waters of the Back River, Poquoson, Virginia, bounded on the north by a line drawn along latitude 37°06′30″ North, bounded on the south by a line drawn along latitude 37°06′15″ North, bounded on the east by a line drawn along longitude 076°18′52″ West and bounded on the west by a line drawn along longitude 076°19′30″ West. All coordinates reference Datum NAD 1983.

(b) *Special local regulations:* (1) Except for event participants and persons or vessels authorized by the Coast Guard Patrol Commander, no person or vessel may enter or remain in the regulated area.

(2) The operator of any vessel in the regulated area shall: (i) Stop the vessel immediately when directed to do so by any Official Patrol.

(ii) Proceed as directed by any Official Patrol.

(iii) When authorized to transit the regulated area, all vessels shall proceed at the minimum speed necessary to maintain a safe course that minimizes wake near the race course.

(c) *Effective period.* This section will be enforced from 12 p.m. to 5 p.m. on October 15, 2006.

Dated: July 18, 2006.

**S. Ratti,**
*Captain, U.S. Coast Guard, Commander, Fifth Coast Guard District, Acting.*
[FR Doc. 06–6618 Filed 7–31–06; 8:45 am]
**BILLING CODE 4910–15–M**

---

**DEPARTMENT OF HOMELAND SECURITY**

**Coast Guard**

**33 CFR Part 165**

**[CGD09–06–123]**

**RIN 1625–AA00**

**Safety Zones; U.S. Coast Guard Water Training Areas, Great Lakes**

**AGENCY:** Coast Guard, DHS.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** The Coast Guard proposes to establish safety zones throughout the Great Lakes. These zones are intended to restrict vessels from portions of the Great Lakes during live fire gun exercises that will be conducted by Coast Guard cutters and small boats. These safety zones are necessary to protect the public from the hazards associated with the firing of weapons.

**DATES:** Comments and related materials must reach the Coast Guard on or before August 31, 2006.

**ADDRESSES:** You may mail comments and related material to Commander (dre) Ninth Coast Guard District, 1240 E. 9th Street, Room 2069, Cleveland, OH 44199. The Ninth Coast Guard District Planning and Development Section (dpw–1) maintains the public docket for this rulemaking. Comments and material received from the public, as well as documents indicated in this preamble as being available in the docket, will become part of this docket and will be available for inspection or copying between 8 a.m. (local) and 4 p.m. (local), Monday through Friday, except Federal holidays.

**FOR FURTHER INFORMATION CONTACT:** Commander Gustav Wulfkuhle, Enforcement Branch, Response Division, Ninth Coast Guard District, Cleveland, OH at (216) 902–6091.

**SUPPLEMENTARY INFORMATION:**

**Request for Comments**

We encourage you to submit comments and related materials. If you submit a comment, please include your name and address, identify the docket number for this rulemaking [CGD09–06–123], indicate the specific section of this document to which each comment applies, and give the reason for each comment. You may submit your comments and material by mail (see **ADDRESSES**). If you submit them by mail or delivery, submit them in an unbound format, no larger than 8½ by 11 inches, suitable for copying and electronic filing. If you submit them by mail and would like to know that they reached

the facility, please enclose a stamped, self-addressed postcard or envelope. We will consider all comments and material received during the comment period, which may result in a modification of the rule.

**Public Meeting**

We do not now plan to hold a public meeting. But you may submit a request for a public meeting (see **ADDRESSES**) explaining why one would be beneficial. If we determine that one would aid this rulemaking, we will hold one at a time and place announced by a later notice in the **Federal Register**.

**Regulatory Information**

The Coast Guard is proposing to establish these safety zones to conduct training essential to carrying out Coast Guard missions relating to military operations and national security. Accordingly, these proposed safety zones fall within the military function exception to the Administrative Procedure Act (APA), 5 U.S.C. 553(a)(1). Notice and comment rulemaking under 5 U.S.C. 553(b), and an effective date of 30 days after publication under 5 U.S.C. 553(d) are not required for this rulemaking.

However, we have determined that it would be beneficial to accept public comments on this proposed rule. Therefore, we will be accepting comments until August 31, 2006. By issuing this notice of proposed rulemaking and accepting public comments, the Coast Guard does not waive its use of the military-function exception to notice and comment rulemaking under 5 U.S.C. 553(b).

**Background and Purpose**

These safety zones are necessary to protect vessels and people from hazards associated with live fire gun exercises. Such hazards include projectiles that may ricochet and damage vessels and/or cause death or serious bodily harm.

**Discussion of Proposed Rule**

The proposed safety zones are necessary to ensure the safety of vessels and people during live fire gun exercises on the Great Lakes. Twenty-six zones will be located throughout the Great Lakes in order to accommodate 57 separate Coast Guard units. The proposed safety zones are all located at least three nautical miles from the shoreline.

The proposed safety zones will be enforced only upon notice by the cognizant Captain of the Port for the area in which the exercise will be held. The cognizant Captain of the Port will cause notice of the enforcement of a live

fire exercise safety zone to be made by all appropriate means to effect the widest publicity among the affected segments of the public including publication in the **Federal Register** as practicable, in accordance with 33 CFR 165.7(a). Such means of notification may also include but are not limited to, Broadcast Notice to Mariners or Local Notice to Mariners. The cognizant Captain of the Port will issue a Broadcast Notice to Mariners and Local Notice to Mariners notifying the public when enforcement of a live fire exercise safety zone is suspended.

The proposed live fire exercise safety zones are as follows:

*Lake Ontario*

Ontario Zone 1 (Eastern): Beginning at 43°44′18″ N, 076°30′22″ W; then south to 43°36′05″ N, 076°30′22″ W; the east to 43°36′05″ N, 076°22′58″ W; then north to 43°44′18″ N, 076°22′58″ W; then west to the point of origin.

Ontario Zone 2 (Middle): Beginning at 43°27′59″ N, 077°34′32″ W; then south to 43°24′19″ N, 077°34′36″ W; the east to 43°24′20″ N, 077°22′55″ W; then north to 43°28′06″ N, 077°23′04″ W; then west to the point of origin.

Ontario Zone 3 (Western): Beginning at 43°24′19″ N, 079°02′25″ W; then south to 43°21′50″ N, 079°00′47″ W; then east to 43°23′48″ N, 078°50′29″ W; then north to 43°26′29″ N, 078°52′05″ W; then west to the point of origin.

*Lake Erie*

Erie Zone 1 (Eastern): Beginning at 42°12′01″ N, 080°45′11″ W; then south to 42°05′22″ N, 080°38′23″ W; then east to 42°12′35″ N, 080°18′01″ W; then north to 42°15′18″ N, 080°23′52″ W; then west to the point of origin.

Erie Zone 2 (Eastern Middle): Beginning at 41°59′51″ N, 081°16′23″ W; then south to 41°56′15″ N, 081°16′02″ W; then east to 41°58′39″ N, 081°00′12″ W; the north to 42°02′20″ N, 081°01′00″ W; then west to the point of origin.

Erie Zone 3 (Western Middle): Beginning at 41°47′40″ N, 081°47′44″ W; then south to 41°41′50″ N, 081°46′22″ W; then east to 41°41′24″ N, 081°40′26″ W; then north to 41°47′26″ N, 081°37′49″ W then west to the point of origin.

Erie Zone 4 (Western): Beginning at 41°35′30″ N, 082°30′04″ W; then south to 41°30′07″ N, 082°31′02″ W; then east to 41°30′22″ N, 082°25′07″ W; then north to 41°35′30″ N, 082°25′07″ W; then west to the point of origin.

*Lake Huron*

Huron Zone 1 (Southern): Beginning at 43°43′07″ N, 082°24′23″ W; then south to 43°27′45″ N, 082°24′34″ W; then east to 43°27′45″ N, 082°20′16″ W; then north to 43°42′51″ N, 082°17′14″ W; then west to the point of origin.

Huron Zone 2 (Harbor Beach): Beginning at 44°12′00″ N, 082°40′30″ W; then south to 44°04′02″ N, 082°37′41″ W; then east to

44°04′44″ N, 082°29′24″ W; then north to 44°12′00″ N, 082°33′08″ W; then west to the point of origin.

Huron Zone 3 (Saginaw Bay): Beginning at 44°19′24″ N, 083°10′40″ W; then south to 44°09′48″ N, 083°15′55″ W; then east to 44°12′08″ N, 082°50′35″ W; then north to 44°19′30″ N, 082°55′15″ W; the west to the point of origin.

Huron Zone 4 (Thunder Bay South): Beginning at 44°45′45″ N, 083°07′19″ W; then south to 44°38′00″ N, 083°03′18″ W; then east to 44°38′00″ N, 082°54′11″ W; then north to 44°45′45″ N, 082°57′42″ W; then west to the point of origin.

Huron Zone 5 (Thunder Bay North): Beginning at 45°17′02″ N, 082°51′48″ W; then south to 45°05′54″ N, 082°51′22″ W; then southeast to 45°01′10″ N, 082°47′22″ W; then east to 05°01′07″ N, 082°35′48″ W; then north to 45°16′13″ N, 082°39′33″ W; then west to the point of origin.

Huron Zone 6 (Northern): Beginning at 45°44′35″ N, 083°58′16″ W; then south to 45°39′48″ N, 083°59′55″ W; then east to 45°38′41″ N, 083°49′26″ W; then north to 45°42′39″ N, 083°50′22″ W; then west to the point of origin.

*Lake Michigan*

Michigan Zone 1 (Charlevoix): Beginning at 45°30′00″ N, 085°25′18″ W, then southwest to 45°22′41″ N, 085°26′47″ W, then northeast to 45°27′45″ N, 085°13′50″ W, then northwest to 45°32′46″ N, 085°16′ 25″ W then southwest to the point of origin.

Michigan Zone 2 (Frankfort): Beginning at 44°47′23″ N, 086°41′12″ W; then south to 44°34′06″ N, 086°48′54″ W; then east to 44°35′55″ N, 086°33′03″ W; then north to 44°46′41″ N, 086°28′43″ W; then west to the point of origin.

Michigan Zone 3 (Manistee): Beginning at 44°22′18″ N, 086°53′41″ W; then southwest to 44°14′34″ N, 087°01′06″ W; then southeast to 44°09′18″ N, 086°51′36″ W; then northeast to 44°21′49″ N, 086°40′14″ W; then northwest to the point of origin.

Michigan Zone 4 (Ludington): Beginning at 43°59′40″ N, 086°46′24″ W; then south to 43°51′24″ N, 086°49′50″ W; then east to 43°51′11″ N, 086°42′28″ W; then north to 43°59′21″ N, 086°39′15″ W; then west to the point of origin.

Michigan Zone 5 (Grand Haven): Beginning at 43°13′03″ N, 086°46′57″ W; then south to 43°00′27″ N, 086°46′04″ W; then east to 43°00′17″ N, 086°27′13″ W; then north to 43°13′49″ N, 086°32′00″ W; then west to the point of origin.

Michigan Zone 6 (St. Joseph): Beginning at 42°12′52″ N, 086°50′10″ W; then south to 42°05′41″ N, 086°53′55″ W; then east to 42°05′24″ N, 086°43′45″ W; then north to 42°12′19″ N, 086°39′42″ W; then west to the point of origin.

Michigan Zone 7 (Michigan City): Beginning at 41°58′36″ N, 087°02′53″ W; then south to 41°48′42″ N, 087°02′53″ W; then northeast to 41°52′51″ N, 086°51′40″ W; then north to 41°59′06″ N, 086°48′00″ W; then west to the point of origin.

Michigan Zone 8 (Chicago): Beginning at 41°55′18″ N, 087°15′49″ W; then south to 41°48′29″ N, 087°17′46″ W; then east to 41°47′45″ N, 087°08′57″ W; then north to

41°55′18″ N, 087°08′48″ W; then west to the point of origin.

Michigan Zone 9 (Waukegan): Beginning at 42°22′28″ N, 087°39′14″ W; then south to 42°17′49″ N, 087°39′27″ W; then southeast to 42°13′42″ N, 087°37′35″ W; then east to 42°14′02″ N, 087°31′36″ W; then north to 42°22′58″ N, 087°33′02″ W; then west to the point of origin.

Michigan Zone 10 (Kenosha): Beginning at 42°39′28″ N, 087°33′19″ W; then south to 42°30′17″ N, 087°31′09″ W; then east to 42°30′21″ N, 087°23′23″ W; then north to 42°38′55″ N, 087°24′30″ W; then west to the point of origin.

Michigan Zone 11 (Milwaukee): Beginning at 43°05′13″ N, 087°32′48″ W; then south to 42°54′37″ N, 087°34′27″ W; then east to 42°54′50″ N, 087°26′27″ W; then north to 43°05′13″ N, 087°25′55″ W; then west to the point of origin.

Michigan Zone 12 (Two Rivers): Beginning at 44°08′20″ N, 087°24′08″ W; then south to 43°49′06″ N, 087°27′34″ W; then east to 43°48′59″ N, 087°20′19″ W; then north to 44°06′04″ N, 087°16′43″ W; then northwest to the point of origin.

Michigan Zone 13 (Sturgeon Bay): Beginning at 44°41′22″ N, 087°08′43″ W; then south to 44°32′49″ N, 087°13′21″ W; then east to 44°32′32″ N, 087°04′10″ W; then north to 44°40′33″ N, 087°01′41″ W; then west to the point of origin.

Michigan Zone 14 (Washington Island): Beginning at 45°19′17″ N, 086°35′58″ W; then southwest to 45°12′50″ N, 086°41′39″ W; then southeast to 45°10′50″ N, 086°30′48″ W; then northeast to 45°17′29″ N, 086°25′32″ W; then northwest to the point of origin.

*Lake Superior:*

Superior Zone 1 (Whitefish Bay): Beginning at 46°41′30″ N, 084°54′00″ W; then south to 46°36′00″ N, 084°55′00″ W; continuing south to 46°34′30″ N, 084°54′36″ W; then east to 46°33′18″ N, 084°50′54″ W; continuing east to 46°32′48″ N, 084°46′00″ W; then north to 46°33′12″ N, 084°45′54″ W; then northwest to 46°36′06″ N, 084°49′48″ W; continuing northwest to 46°42′00″ N, 084°52′18″ W; then southwest to the point of origin.

Superior Zone 2 (Sault Ste. Marie): Beginning at 46°56′16″ N, 085°39′01″ W; then southeast to 46°51′55″ N, 085°24′04″ W; then northeast to 46°53′07″ N, 085°12′37″ W; then northwest to 46°58′20″ N, 085°29′44″ W; then southwest to the point of origin.

Superior Zone 3 (Marquette) Beginning at 46°47′39″ N, 087°11′42″ W; then south to 46°39′54″ N, 087°09′47″ W; then east to 46°41′13″ N, 086°57′33″ W; then north to 46°48′14″ N, 086°58′31″ W; then west to the point of origin.

Superior Zone 4 (Portage): Beginning at 47°11′05″ N, 087°53′30″ W; then southwest to 47°07′21″ N, 088°02′39″ W; then southeast to 47°03′54″ N, 087°53′30″ W; then northeast to 47°07′21″ N, 087°44′21″ W; then northwest to the point of origin.

Superior Zone 5 (Bayfield): Beginning at 46°49′09″ N, 090°19′16″ W; then southwest to 46°42′50″ N, 090°21′27″ W; then northeast to 46°46′52″ N, 090°11′38″ W; then northeast to 46°52′26″ N, 090°09′15″ W; then southwest to the point of origin.

Superior Zone 6 (Duluth): Beginning at 47°03′29″ N, 091°16′57″ W; then southwest to 46°59′54″ N, 091°27′22″ W; then southeast to 46°59′13″ N, 091°20′55″ W; then northeast to 47°02′29″ N, 091°08′59″ W; then northwest to the point of origin.

Superior Zone 7 (Grand Marais): Beginning at 47°40′53″ N, 090°04′51″ W; then south to 47°34′18″ N, 090°05′09″ W; then east to 47°34′37″ N, 089°53′35″ W; then north to 47°41′47″ N, 089°53′52″ W; then west to the point of origin.

All coordinates use above are based upon North American Datum 1983 (NAD 83).

**Regulatory Evaluation**

This proposed rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866, Regulatory Planning and Review, and does not require an assessment of potential costs and benefits under section 6(a)(3) of that Order. The Office of Management and Budget has not reviewed it under that Order.

We expect the economic impact of this proposed rule to be so minimal that a full Regulatory Evaluation is unnecessary. The Coast Guard's use of these safety zones will be periodic in nature and will likely not exceed two or three one-day events per year. Moreover, these safety zones will only be enforced during time the safety zone is actually in use. Furthermore, these safety zones are located in places known not to be heavily used by the boating public. Hence, this determination is based on the minimal amount of time that vessels will be restricted from the proposed zones and that the zones are located in areas which vessels can easily transit around. The Coast Guard expects insignificant adverse impact to mariners from the activation of these zones.

**Small Entities**

Under the Regulatory Flexibility Act (5 U.S.C. 601–612), we have considered whether this proposed rule would have a significant economic impact on a substantial number of small entities. The term "small entities" comprises small businesses, not-for-profit organizations that are independently owned and operated and are not dominant in their fields, and governmental jurisdictions with populations of less than 50,000.

The Coast Guard certifies under 5 U.S.C. 605(b) that this proposed rule would not have a significant economic impact on a substantial number of small entities.

This rule will affect the following entities, some of which may be small entities: The owners and operators of vessels intending to transit or anchor in an activated safety zone.

The proposed safety zones will not have a significant economic impact on a substantial number of small entities for the following reasons: The zones will be in effect for only a short time and vessels can easily transit around them. In the unlikely event that these zones do affect shipping, commercial vessels may request permission from an on-scene representative to transit through the safety zone by contacting the on-scene representative on VHF–FM channel 16. The Coast Guard will give notice to the public via a Broadcast to Mariners that the regulation is in effect.

If you think that your business, organization, or governmental jurisdiction qualifies as a small entity and that this rule would have a significant economic impact on it, please submit a comment (see **ADDRESSES**) explaining why you think it qualifies and how and to what degree this rule would economically affect it.

**Assistance for Small Entities**

Under section 213(a) of the Small Business Regulatory Enforcement Fairness Act of 1996 (Pub. L. 104–121), we offered to assist small entities in understanding the rule so that they could better evaluate its effects on them and participate in the rulemaking. If the rule would affect your small business, organization, or governmental jurisdiction and you have questions concerning its provisions or options for compliance, please contact Commander Gustav Wulfkuhle, Enforcement Branch, Response Division, Ninth Coast Guard District, Cleveland, OH at (216) 902–6091. The Coast Guard will not retaliate against small entities that question or complain about this rule or any policy or action of the Coast Guard.

**Collection of Information**

This proposed rule would call for no new collection of information under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501–3520).

**Federalism**

A rule has implications for federalism under Executive Order 13132, Federalism, if it has a substantial direct effect on State or local governments and would either preempt State law or impose a substantial direct cost of compliance on them. We have analyzed this proposed rule under that Order and have determined that it does not have implications for federalism.

**Unfunded Mandates Reform Act**

The Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531–1538) requires Federal agencies to assess the effects of their discretionary regulatory actions. In particular, the Act addresses actions that may result in the expenditure by a State, local, or tribal government, in the aggregate, or by the private sector of $100,000,000 or more in any one year. Though this proposed rule would not result in such an expenditure, we do discuss the effects of this rule elsewhere in this preamble.

**Taking of Private Property**

This proposed rule would not effect a taking of private property or otherwise have taking implications under Executive Order 12630, Governmental Actions and Interference with Constitutionally Protected Property Rights.

**Civil Justice Reform**

This proposed rule meets applicable standards in sections 3(a) and 3(b)(2) of Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate ambiguity, and reduce burden.

**Protection of Children**

We have analyzed this proposed rule under Executive Order 13045, Protection of Children from Environmental Health Risks and Safety Risks. This rule is not an economically significant rule and would not create an environmental risk to health or risk to safety that might disproportionately affect children.

**Indian Tribal Governments**

This proposed rule does not have tribal implications under Executive Order 13175, Consultation and Coordination with Indian Tribal Governments, because it would not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes. We invite your comments on how this proposed rule might impact tribal governments, even if that impact may not constitute a "tribal implication" under the Order.

**Energy Effects**

We have analyzed this proposed rule under Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use. We have determined that it is not a "significant energy action" under that order because it is not a "significant regulatory action" under Executive Order 12866 and is not likely to have a significant adverse effect on the supply, distribution, or use of energy. The Administrator of the Office

of Information and Regulatory Affairs has not designated it as a significant energy action. Therefore, it does not require a Statement of Energy Effects under Executive Order 13211.

**Technical Standards**

The National Technology Transfer and Advancement Act (NTTAA) (15 U.S.C. 272 note) directs agencies to use voluntary consensus standards in their regulatory activities unless the agency provides Congress, through the Office of Management and Budget, with an explanation of why using these standards would be inconsistent with applicable law or otherwise impractical. Voluntary consensus standards are technical standards (e.g., specifications of materials, performance, design, or operation; test methods; sampling procedures; and related management systems practices) that are developed or adopted by voluntary consensus standards bodies.

This proposed rule does not use technical standards. Therefore, we did not consider the use of voluntary consensus standards.

**Environment**

We have analyzed this proposed rule under Commandant Instruction M16475.1D, which guides the Coast Guard in complying with the National Environmental Policy Act of 1969 (NEPA)(42 U.S.C. 4321–4370f), and have made a preliminary determination that there are no factors in this case that would limit the use of a categorical exclusion under section 2.B.2 of the Instruction. Therefore, we believe that this rule should be categorically excluded, under figure 2–1, paragraph (34)(g), of the Instruction, from further environmental documentation. This event establishes a safety zone therefore paragraph (34)(g) of the Instruction applies.

A preliminary "Environmental Analysis Check List" is available in the docket where indicated under **ADDRESSES**. Comments on this section will be considered before we make the final decision on whether the rule should be categorically excluded from further environmental review.

**List of Subjects in 33 CFR Part 165**

Harbors, Marine safety, Navigation (water), Reporting and recordkeeping requirements, Security measures, Waterways.

For the reasons discussed in the preamble, the Coast Guard proposes to amend 33 CFR part 165 as follows:

**PART 165—REGULATED NAVIGATION AREAS AND LIMITED ACCESS AREAS**

1. The authority citation for part 165 continues to read as follows:

**Authority:** 33 U.S.C. 1226, 1231; 46 U.S.C. Chapter 701; 50 U.S.C. 191, 195; 33 CFR 1.05–1(g), 6.04–1, 6.04–6, and 160.5; Public Law 107–295, 116 Stat. 2064; Department of Homeland Security Delegation No. 0170.1.

2. Add § 165.928 to read as follows:

**§ 165.928 Safety zones; U.S. Coast Guard, Water Training Areas, Great Lakes.**

(a) *Notice of Enforcement or Suspension of Enforcement.* The safety zones established by this section will be enforced only upon notice by the cognizant Captain of the Port for the area in which a live fire gun exercise will be held. The Captain of the Port will cause notice of the enforcement of a safety zone established by this section to be made by all appropriate means and to effect the widest publicity among the affected segments of the public including publication in the **Federal Register** as practicable, in accordance with 33 CFR 165.7(a). Such means of notification may also include, but are not limited to, Broadcast Notice to Mariners or Local Notice to Mariners. The appropriate Captain of the Port will issue a Broadcast Notice to Mariners and Local Notice to Mariners notifying the public when enforcement of a safety zone established by this section is suspended.

(b) *Definitions.* The following definitions apply to this section:

*Designated representative* means those persons designated by either the Captain of the Port Buffalo, Detroit, Sault Ste. Marie, and Lake Michigan to monitor these safety zones, permit entry into these zones, give legally enforceable orders to persons or vessels within these zones and take other actions authorized by the Captain of the Port. Persons authorized in paragraph (g) to enforce this section are designated representatives.

(c) *Location.* The following areas are safety zones:

*Ontario:*

Ontario Zone 1 (Eastern): Beginning at 43°44′18″ N, 076°30′22″ W; then south to 43°36′05″ N, 076°30′22″ W; then east to 43°36′05″ N, 076°22′58″ W; then north to 43°44′18″ N, 076°22′58″ W; then west to the point of origin.

Ontario Zone 2 (Middle): Beginning at 43°27′59″ N, 077°34′32″ W; then south to 43°24′19″ N, 077°34′36″ W; then east to 43°24′20″ N, 077°22′55″ W; then north to 43°28′06″ N, 077°23′04″ W; then west to the point of origin.

Ontario Zone 3 (Western): Beginning at 43°24′19″ N, 079°02′25″ W; then south to 43°21′50″ N, 079°00′47″ W; then east to

43°23′48″ N, 078°50′29″ W; then north to 43°26′29″ N, 078°52′05″ W; then west to the point of origin.

*Lake Erie:*

Erie Zone 1 (Eastern): Beginning at 42°12′01″ N, 080°45′11″ W; then south to 42°05′22″ N, 080°38′23″ W; then east to 42°12′35″ N, 080°18′01″ W; then north to 42°15′18″ N, 080°23′52″ W; then west to the point of origin.

Erie Zone 2 (Eastern Middle): Beginning at 41°59′51″ N, 081°16′23″ W; then south to 41°56′15″ N, 081°16′02″ W; then east to 41°58′39″ N, 081°00′12″ W; then north to 42°02′20″ N, 081°01′00″ W; then west to the point of origin.

Erie Zone 3 (Western Middle): Beginning at 41°47′40″ N, 081°47′44″ W; then south to 41°41′50″ N, 081°46′22″ W; then east to 41°41′24″ N, 081°40′26″ W; then north to 41°47′26″ N, 081°37′49″ W then west to the point of origin.

Erie Zone 4 (Western): Beginning at 41°35′30″ N, 082°30′04″ W; then south to 41°30′07″ N, 082°31′02″ W; then east to 41°30′22″ N, 082°25′07″ W; then north to 41°35′30″ N, 082°25′07″ W; then west to the point of origin.

*Lake Huron:*

Huron Zone 1 (Southern): Beginning at 43°43′07″ N, 082°24′23″ W; then south to 43°27′45″ N, 082°24′34″ W; then east to 43°27′45″ N, 082°20′16″ W; then north to 43°42′51″ N, 082°17′14″ W; then west to the point of origin.

Huron Zone 2 (Harbor Beach): Beginning at 44°12′00″ N, 082°40′30″ W; then south to 44°04′02″ N, 082°37′41″ W; then east to 44°04′44″ N, 082°29′24″ W; then north to 44°12′00″ N, 082°33′08″ W; then west to the point of origin.

Huron Zone 3 (Saginaw Bay): Beginning at 44°19′24″ N, 083°10′40″ W; then south to 44°09′48″ N, 083°15′55″ W; then east to 44°12′08″ N, 082°50′35″ W; then north to 44°19′30″ N, 082°55′15″ W; the west to the point of origin.

Huron Zone 4 (Thunder Bay South): Beginning at 44°45′45″ N, 083°07′19″ W; then south to 44°38′00″ N, 083°03′18″ W; then east to 44°38′00″ N, 082°54′11″ W; then north to 44°45′45″ N, 082°57′42″ W; then west to the point of origin.

Huron Zone 5 (Thunder Bay North): Beginning at 45°17′02″ N, 082°51′48″ W; then south to 45°05′54″ N, 082°51′22″ W; then southeast to 45°01′10″ N, 082°47′22″ W; then east to 45°01′07″ N, 082°35′48″ W; then north to 45°16′13″ N, 082°39′33″ W; then west to the point of origin.

Huron Zone 6 (Northern): Beginning at 45°44′35″ N, 083°58′16″ W; then south to 45°39′48″ N, 083°59′55″ W; then east to 45°38′41″ N, 083°49′26″ W; then north to 45°42′39″ N, 083°50′22″ W; then west to the point of origin.

*Lake Michigan:*

Michigan Zone 1 (Charlevoix): Beginning at 45°30′00″ N, 085°25′18″ W, then southwest to 45°22′41″ N, 085°26′47″ W, then northeast to 45°27′45″ N, 085°13′50″ W, then northwest to 45°32′46″ N, 085°16′25″ W then southwest to the point of origin.

Michigan Zone 2 (Frankfort): Beginning at 44°47′23″ N, 086°41′12″ W; then south to 44°34′06″ N, 086°48′54″ W; then east to 44°35′55″ N, 086°33′03″ W; then north to 44°46′41″ N, 086°28′43″ W; then west to the point of origin.

Michigan Zone 3 (Manistee): Beginning at 44°22′18″ N, 086°53′41″ W; then southwest to 44°14′34″ N, 087°01′06″ W; then southeast to 44°09′18″ N, 086°51′36″ W; then northeast to 44°21′49″ N, 086°40′14″ W; then northwest to the point of origin.

Michigan Zone 4 (Ludington): Beginning at 43°59′40″ N, 086°46′24″ W; then south to 43°51′24″ N, 086°49′50″ W; then east to 43°51′11″ N, 086°42′28″ W; then north to 43°59′21″ N, 086°39′15″ W; then west to the point of origin.

Michigan Zone 5 (Grand Haven): Beginning at 43°13′03″ N, 086°46′57″ W; then south to 43°00′27″ N, 086°46′04″ W; then east to 43°00′17″ N, 086°27′13″ W; then north to 43°13′49″ N, 086°32′00″ W; then west to the point of origin.

Michigan Zone 6 (St. Joseph): Beginning at 42°12′52″ N, 086°50′03″ W; then south to 42°05′41″ N, 086°53′55″ W; then east to 42°05′24″ N, 086°43′45″ W; then north to 42°12′19″ N, 086°39′42″ W; then west to the point of origin.

Michigan Zone 7 (Michigan City): Beginning at 41°58′36″ N, 087°02′53″ W; then south to 41°48′42″ N, 087°02′53″ W; then northeast to 41°52′51″ N, 086°51′40″ W; then north to 41°59′06″ N, 086°48′00″ W; then west to the point of origin.

Michigan Zone 8 (Chicago): Beginning at 41°55′18″ N, 087°15′49″ W; then south to 41°48′29″ N, 087°17′46″ W; then east to 41°47′45″ N, 087°08′57″ W; then north to 41°55′18″ N, 087°08′48″ W; then west to the point of origin.

Michigan Zone 9 (Waukeegan): Beginning at 42°22′28″ N, 087°39′14″ W; then south to 42°17′49″ N, 087°39′27″ W; then southeast to 42°13′42″ N, 087°37′35″ W; the east to 42°14′02″ N, 087°31′36″ W; then north to 42°22′58″ N, 087°33′02″ W; then west to the point of origin.

Michigan Zone 10 (Kenosha): Beginning at 42°39′28″ N, 087°33′19″ W; then south to 42°30′17″ N, 087°31′09″ W; then east to 42°30′21″ N, 087°23′23″ W; then north to 42°38′55″ N, 087°24′30″ W; then west to the point of origin.

Michigan Zone 11 (Milwaukee): Beginning at 43°05′13″ N, 087°32′48″ W; then south to 42°54′37″ N, 087°34′27″ W; then east to 42°54′50″ N, 087°26′27″ W; then north to 43°05′13″ N, 087°25′55″ W; then west to the point of origin.

Michigan Zone 12 (Two Rivers): Beginning at 44°08′20″ N, 087°24′08″ W; then south to 43°49′06″ N, 087°27′34″ W; then east to 43°48′59″ N, 087°20′19″ W; then north to 44°06′04″ N, 087°16′43″ W; then northwest to the point of origin.

Michigan Zone 13 (Sturgeon Bay): Beginning at 44°41′22″ N, 087°08′43″ W; then south to 44°32′49″ N, 087°13′21″ W; then east to 44°32′32″ N, 087°04′10″ W; then north to 44°40′33″ N, 087°01′41″ W; then west to the point of origin.

Michigan Zone 14 (Washington Island): Beginning at 45°19′17″ N, 086°35′58″ W; then southwest to 45°12′50″ N, 086°41′39″ W; then southeast to 45°10′50″ N, 086°30′48″ W; then northeast to 45°17′29″ N, 086°25′32″ W; then northwest to the point of origin.

*Lake Superior:*

Superior Zone 1 (Whitefish Bay): Beginning at 46°41′30″ N, 084°54′00″ W; then south to 46°36′00″ N, 084°55′00″ W; continuing south to 46°34′30″ N, 084°54′36″ W; then east to 46°33′18″ N, 084°50′54″ W; continuing east to 46°32′48″ N, 084°46′00″ W; then north to 46°33′12″ N, 084°45′54″ W; then northwest to 46°36′06″ N, 084°49′48″ W; continuing northwest to 46°42′00″ N, 084°52′18″ W; then southwest to the point of origin.

Superior Zone 2 (Sault Ste. Marie): Beginning at 46°56′16″ N, 085°39′01″ W; then southeast to 46°51′55″ N, 085°24′04″ W; then northeast to 46°53′07″ N, 085°12′37″ W; then northwest to 46°58′20″ N, 085°29′44″ W; then southwest to the point of origin.

Superior Zone 3 (Marquette) Beginning at 46°47′39″ N, 087°11′42″ W; then south to 46°39′54″ N, 087°09′47″ W; then east to 46°41′13″ N, 086°57′33″ W; then north to 46°48′14″ N, 086°58′31″ W; then west to the point of origin.

Superior Zone 4 (Portage): Beginning at 47°11′05″ N, 087°53′30″ W; then southwest to 47°07′21″ N, 088°02′39″ W; then southeast to 47°03′54″ N, 087°53′30″ W; then northeast to 47°07′21″ N, 087°44′21″ W; then northwest to the point of origin.

Superior Zone 5 (Bayfield): Beginning at 46°49′09″ N, 090°19′16″ W; then southwest to 46°42′50″ N, 090°21′27″ W; then northeast to 46°46′52″ N, 090°11′38″ W; then northeast to 46°52′26″ N, 090°09′15″ W; then southwest to the point of origin.

Superior Zone 6 (Duluth): Beginning at 47°03′29″ N, 091°16′57″ W; then southwest to 46°59′54″ N, 091°27′22″ W; then southeast to 46°59′13″ N, 091°20′55″ W; then northeast to 47°02′29″ N, 091°08′59″ W; then northwest to the point of origin.

Superior Zone 7 (Grand Marais): Beginning at 47°40′53″ N, 090°04′51″ W; then south to 47°34′18″ N, 090°05′09″ W; then east to 47°34′37″ N, 089°53′35″ W; then north to 47°41′47″ N, 089°53′52″ W; then west to the point of origin.

All coordinates use above are based upon North American Datum 1983 (NAD 83).

(d) *Obtaining permission to enter or move within the safety zones.* All vessels must obtain permission from the Captain of the Port or a Designated Representative to enter or move within the safety zones established in this section when these safety zones are enforced.

(e) *Compliance.* Upon notice of enforcement by the cognizant Captain of the Port, the Coast Guard will enforce these safety zones in accordance with the rules set out in this section. Upon notice of suspension of enforcement by the Captain of the Port, all persons and vessels are authorized to enter, transit, and exit these safety zones.

(f) *Regulations.* The general regulations in 33 CFR part 165 subpart C, apply to any vessel or person in the navigable waters of the United States to which this section applies. No person or vessel may enter the safety zones established in this section unless authorized by the cognizant Captain of the Port or their designated representative. All vessels authorized to enter these safety zones must operate at the minimum speed necessary to maintain a safe course and must proceed as directed by the cognizant Captain of the Port or his designated representative.

(g) *Enforcement.* Any Coast Guard commissioned, warrant, or petty officer may enforce the rules in this section.

Dated: July 14, 2006.

**John E. Crowley, Jr.,**

*Rear Admiral, U.S. Coast Guard, Commander, Ninth Coast Guard District.*

[FR Doc. E6–12332 Filed 7–31–06; 8:45 am]

**BILLING CODE 4910–15–P**

---

# FEDERAL COMMUNICATIONS COMMISSION

**47 CFR Parts 1, 2, 4, 6, 7, 9, 11, 13, 15, 17, 18, 20, 22, 24, 25, 27, 52, 53, 54, 63, 64, 68, 73, 74, 76, 78, 79, 90, 95, 97 and 101**

**[EB Docket No. 06–119; DA 06–1524]**

**Recommendations of the Independent Panel Reviewing the Impact of Hurricane Katrina on Communications Networks**

**AGENCY:** Federal Communications Commission.

**ACTION:** Proposed rule; comments requested.

---

**SUMMARY:** In this document, the Federal Communications Commission (Commission) reminds parties about the comment cycle applicable to the Notice of Proposed Rulemaking (NPRM) seeking comment on the recommendations of the Independent Panel Reviewing the Impact of Hurricane Katrina on Communications Networks (Independent Panel). In addition, the Commission requests that, in addressing the issues raised in the NPRM, parties address the applicability of the Panel's recommendations to all types of natural disasters (e.g., earthquakes, tornados, hurricanes, forest fires) as well as other types of incidents (e.g., terrorist attacks, flu pandemic, industrial accidents, etc.). Parties should also discuss whether the Panel's recommendations are broad enough to take into account the diverse topography of our Nation, the susceptibility of a region to a particular type of disaster, and the multitude of

# Attachment 8

to United States' Memorandum in Support of Motion to Dismiss Second
Amended Complaint


1/9/06 Notice of Intent Letter

**United States**
**Northern Illinois**

Blue Eco Legal Council, and
Steven B. Pollack, executive director

Dated:   November 9, 2006

to.

The President
The White House
1600 Pennsylvania Avenue NW
Washington D.C. 20500

Admiral Thad W. Allen
Commandant, U.S. Coast Guard
United States Coast Guard Coast Guard Headquarters
2100 Second Street, SW,
Washington, DC 20593

Steve Johnson
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW. (1101),
Washington, DC 20460

Regional Administrator
Region V
U.S. Environmental Protection Agency,
77 West Jackson Boulevard
Chicago, IL 60604.

Director
Illinois Environmental Protection Agency
1021 North Grand Avenue East
P.O. Box 19276
Springfield, Illinois 62794-9276

The Honorable Alberto Gonzales
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington D.C. 20530-0001

Lisa Madigan
Illinois Attorney General
Springfield Main Office
500 South Second Street
Springfield, IL 62706

## SIXTY DAY NOTICE OF INTENT TO SUE

1. Sixty-day notice of intent to sue by the Blue Eco Legal Council, a membership organization for environmental advocacy, and Steven B. Pollack, Attorney, as executive director.

    1.1 Blue Eco Legal Council

    Steven B. Pollack, Executive Director

    P.O. Box 1370

    Highland Park, IL 60035

    847-436-9566

    1.2 The United States Coast Guard began training exercises on the Great Lakes in January of 2006. These comments outline the laws being violated by the United States Coast Guard by conducting live fire training exercises on the Great Lakes and disposing of lead training bullets therein. These comments also, by implication, outline the laws not being enforced by the United States Environmental Protection Agency.

    These comments therefore serve as notice of violations for which the Blue Eco Legal Council intends to sue on behalf of its members generally, and those who live in the Lake Michigan Watershed specifically. These suits arise under various environmental laws that waive United States sovereign immunity.

    1.3 Blue Eco Legal Council intends to sue the U.S. Coast Guard for violations of federal and state environmental laws resulting from its past and future live fire training exercises on the Great Lakes.

    1.4 Blue Eco Legal Council intends to sue the U.S. Environmental Protection Agency for failing to enforce federal environmental laws prohibiting the U.S. Coast Guard from discharging large quantities of lead into the Great Lakes from its live fire training exercises.

2. ARBITRARY DECISIONS IN THE RULEMAKING PROCESS

    2.1 The lack of specific training protocol information in the proposed rule denies the public the ability to submit precise comments.

    2.1.1 The delegated rulemaking authority granted by congress, and the APA, requires the agency proposing a rule to put the public on notice of what is being proposed.

2.1.2    This rule, as proposed, only seems to concern itself with the impact of limiting public access at certain areas being used for live fire training.  The true impact of this rule is to seek an exception to several federal environmental laws against polluting the Great Lakes with lead, a Persistent Bio-accumulative Toxin (PBT).

2.1.3    The result of this misleading characterization of the nature of the proposed rule is that no specific protocols have been adopted as to the type of rounds to be used, the number of rounds to be used per training session, the number of locations per training session, and the number of training sessions per year.  The environmental supplement asserts estimates that it used for assumptions but this is not a protocol by the Coast Guard that would limit its training in any way.  Has the Coast Guard restricted its ability to test larger caliber weapons (containing Tetryl, TNT, or RDX) or other types of munitions such as depleted uranium shells?  It appears that these types of decision could come later because the rule itself only addresses the carving out of live fire training areas.

2.1.4    Without specific protocols the public cannot comment on the program with any precision because the Coast Guard has not limited its actions to anything specific.

2.1.5    Without the ability to comment on the proposed rule with precision the public comments have to be unnecessarily vague.  The public has not, therefore, been given proper notice and its comments do not represent public participation through notice and comment rulemaking.  This rulemaking violates the APA.

2.2    The failure to create an administrative record denies to the public information necessary to make informed comments.

2.2.1    An administrative record needs to be created that includes all documents upon which the Coast Guard based its decision.

2.2.2    The Coast Guard did not create an administrative record for this proposed rule.

2.2.3    While the Coast Guard did supplement the proposed rule with the CH2M environmental study, The Coast Guard withheld a second environmental study from the public upon which it based its decision.  Specifically, the Coast Guard is quoted in news stories that there were two environmental studies supporting its decision.  The Coast Guard refused to supplement the proposed rule with this second study and has failed to create an administrative record that makes this study available to the public.

2.2.4    By stating in news stories that two environmental studies support the decision to deposit lead bullets in the Great Lakes but allowing the public to view only one of the studies, some of the public might have been mislead into not making public comments.

2.2.5   By withholding the second study, the public does not have all the information necessary to make informed comments

2.3  The lack of any training protocols in the proposed rule allows the Coast Guard to take later actions that were not subject to public comments but will benefit from the presumption of having been vetted through the public participation process

2.4  The lack of any training protocols in the proposed rule allows the Coast Guard to respond to comments with a moving target where any revisions to the scope of the rule will create new subjects to which the public would be entitled to participate through notice and comment.

3    ARBITRARY DECISIONS IN THE PROPOSED RULE

3.1  Lack of authority - Submerged Lands Act – 43 U.S.C. §§ 1301- 1311

3.1.1   **(a) Confirmation and establishment of title and ownership of lands and resources; management, administration, leasing, development, and use**

It is determined and declared to be in the public interest that

(1) title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and
(2) the right and power to manage, administer, lease, develop, and use the said lands and natural resources all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and vested in and assigned to the respective States or the persons who were on June 5, 1950, entitled thereto under the law of the respective States in which the land is located, and the respective grantees, lessees, or successors in interest thereof;

43 U.S.C. § 1311(a)(1),(2).

3.1.2   The proposed rule fails to state under what authority the U.S. Coast Guard claims the right to deposit lead and other waste into the Great Lakes which are held in public trust by the various Great Lakes states.

3.1.3   While the Coast Guard has an implied right to conduct operations on public waters as necessary for the executive branch to uphold the laws of Congress, that right does not include depositing hazardous materials on state held public lands.

3.1.4   The lake bottom is public land held in trust by the various states.  This is not the case of the federal government operating at a federal facility.  The Coast Guard has no statutory right, implied or express, to use the lake bed as its hazardous waste repository.

3.1.5   Using the lake bottom of the Great Lakes as a receptacle for hazardous lead waste from this live fire training program violates the Rivers and Harbors Act, CWA, RCRA, CERCLA, and international treaties.   See Comment 4.0-et seq.

3.1.6    The Coast Guard must identify what statutory authority or executive order could allow the federal government to contaminate state held lands. The Blue Eco Legal Council asserts there is no such authority.

3.2 The study by CH2M has limitations that ignore old Buoys and call into question the validity of its conclusions on the environmental effects of training

3.2.1    The CH2M study failed to account for the buoys to be used as targets in these training exercises. The plan is to shoot at old buoys for target practice. The machine gun caliber training rounds will possibly pierce the buoys and sink them. Old buoys contain fuels that were used for power.[1] The environmental risk from sinking several hundred of these old buoys was not part of the CH2M study.

3.3 The study by CH2M limits the analysis of cumulative risks to five years which calls into question the validity of its conclusions on the environmental effects of training

3.3.1    Limiting the scope to of the study to five years even though the live fire training program will presumably go on in perpetuity kept the quantified risk below action triggering levels. The study expresses a risk quotient formula where if dividing the exposure concentration by the effect level equals, or is greater than, 1.00 then there is a potential for risk. If the number is less than 1, the "risks are very unlikely". The risk from lead to plants, invertebrates, and fish over this five year period is .96.

The study then states that "[b]ased on the results of this evaluation, proposed training will result in no elevated risks for the Great Lakes…and further investigation is not recommended." The Coast Guard certainly got its money's worth from this study because the arbitrary five year limitation imposed by CH2M brought the risk quotient in just under the trigger point for further study. The 1.00 trigger point is seemingly treated as a tipping point because the study concludes that .96 is no risk and 1.00 is a risk needing further study.

Bioaccumulation of toxins in fish and humans is well documented so in the sixth year the lead level in the tissues of fish would presumably accumulate to over a 1.00 risk level. Another cumulative effect is the quantity of lead available for fish to accumulate in year

---

[1] Amy K. Marshall, *FREQUENTLY CLOSE TO THE POINT OF PERIL: A HISTORY OF BUOYS AND TENDERS IN U.S. COASTAL WATERS 1789 – 1939,* Thesis Paper (April 1997)

6 and beyond as further training exercises add to the area covered by lead and the density of the lead fields.

CH2M repeats the mantra that the amounts of lead assumed are "realistic worst-case", implying that these are somehow greater than will actually occur. The implication is that the risks are overstated. This implication is not warranted, especially considering the Coast Guard did not commit itself to any protocols which might limit its actions. It is also overstated because there is no indication that the five year limit of the study is relevant to the actual plans of the Coast Guard.

3.4 The study by CH2M uses limiting assumptions that do not account for existing contamination in the Great Lakes and calls into question the validity of its conclusions on the environmental effects of training.

    3.4.1   Limiting the scope to the lead in the training exercises without regard to existing background levels is unrealistic. Ignoring current contamination levels downplays the likelihood that the cumulative effect of the new lead and existing lead will increase the risk quotient to above action levels for further study. The study was conducted under simplistic assumptions whereas the real live training program has risk implications that include existing levels of lead in the water column.

3.5 Externalization of costs by depositing lead waste into Great Lakes without investing in alternatives

    3.5.1   The Coast Guard could invest in a floating training platform designed to catch the stray bullets. The Coast Guard might claim that this is too expensive but the cost of not investing in an environmentally friendly live fire target training platform is the externalization of a Persistent Bio-accumulative Toxin into 95% of this country's fresh surface water supply. The training exercises therefore internalize the savings by not developing alternate methods while externalizing pollution to one of the most important natural resources within the United States.

    3.5.2   Non-lead bullets could be used. Again, the higher cost, if any, is a savings for the Coast Guard under this rule but an externalization of the higher costs on the Great Lakes environment.

    3.5.3   Such a cost/benefit decision, given the environmental importance of the Great Lakes, is arbitrary and capricious.

**4    VIOLATION OF SEVERAL LAWS**

4.1 Public Nuisance – The dumping of uncontained and uncontrolled lead on the lake bed constitutes a public nuisance on state titled lands.

4.2 NEPA – National Environmental Policy Act - 42 U.S.C. §§ 4321-4347.

    4.2.1    The training exercises represent a federal project and therefore trigger requirements to conduct an environmental assessment to determine if the project is significantly affecting the environment.

    4.2.2    The Coast Guard must then propose reasonable alternatives and analyze their impact. The alternatives should include creating a training platform designed to catch the bullets or to use non-lead bullets.

    4.2.3    The NEPA review is subject to mandatory consultation with other agencies such as U.S. EPA and U.S. Fish and Wildlife.

    4.2.4    The NEPA review must occur prior to any decision to move forward with this project.

    4.2.5    The Coast Guard is in violation of the requirement to conduct an Environmental Impact Statement under NEPA and to allow for notice and comment on such a review.

4.3 Indiana Endangered Species Act[2]

    4.3.1    The discharging of lead leads to bioaccumulation in Lake Michigan fish. River otter, an Indiana state endangered species, eats fish from the Lake Michigan watershed.

        "The North American river otter once inhabited aquatic ecosystems throughout Indiana. In the mid to late 1800s, unregulated taking and loss of habitat resulted in widespread population declines. By 1942, it is believed that breeding populations of river otters had disappeared from the state. The Indiana DNR upgraded the otter's status to endangered in 1994 in preparation for this project."[3]

    4.3.2    The live fire exercises, by disposing of lead in Lake Michigan and adding to bioaccumulation in the food chain, negatively affects the ability of the state of Indiana to protect its endangered species.

4.4 TRI – Toxic Release Inventory - 42 U.S.C. 11001 et seq., 40 C.F.R. Part 372.

    4.4.1    Defines lead as a Persistent Bio-accumulative Toxin (PBT) one of the highest threats to natural resources and human health.

    4.4.2    Requires reporting of lead release over 100 pounds.

    4.4.3    It does not appear the Coast Guard has reported releases of lead from prior training exercises and is therefore in violation of TRI.

---

[2] http://www.in.gov/dnr/fishwild/endangered/mammal.htm
[3] http://www.in.gov/dnr/fishwild/endangered/otter.htm

4.5 Rivers and Harbors Act – 33 U.S.C. § 403-407.

    4.5.1    The Rivers and Harbors Act prohibits the release of refuse into the navigable waters of the United States which might obstruct navigation. See 33 U.S.C. § 407.

    4.5.2    The United States Supreme Court read into this act a prohibition on pollution. See *United States v. Republic Steel*, 362 U.S. 482 (1960), *United States v. Standard Oil Co.*, 384 U.S. 224 (1966).

    4.5.3    The live fire exercises, insofar as they create unpermitted discharges of a toxic substance into the Great Lakes, violates the Rivers and Harbors Act.

4.6 CWA – Clean Water Act (Federal Water Pollution Prevention and Control Act) – 33 U.S.C. §§ 1252-1387.

    4.6.1    The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a).

    4.6.2    The "national goal" is to eliminate the discharge of pollutants. 33 U.S.C. § 1251(a)(1), (2).

    4.6.3    The national policy is to prohibit the discharge of toxic pollutants in toxic amounts. 33 U.S.C. § 1251(1)(a), (3).

    4.6.4    The CWA defines pollution as "the man-made or man-induced alteration of the chemical, physical, biological … integrity of water". 33 U.S.C. § 1362(19).

    4.6.5    The live fire training is a point source under the CWA because it is a "discernible, confined, and discrete conveyance" which includes a "vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

    4.6.6    The live fire training exercises therefore violate the CWA as a point source for bullets which are toxic pollutants.

    4.6.7    The Coast Guard does not have a National Pollutant Discharge Elimination System (NPDES) permit under the CWA to discharge lead into the waters of the United States.

    4.6.8    No NPDES permit may be issued without notice to the public and is subject to hearings. 33 U.S.C. § 1342(a)(1).

    4.6.9    Blue Eco Legal Council requests an adjudicatory hearing as required by the United States Supreme Court. *Costle v. Pacific Legal Foundation*, 445 U.S. 198 (1980).

    4.6.10  The CWA requires the use of best available technology economically achievable for the applicable point source. 33 U.S.C. § 1317(a). Green bullets without lead represent this standard.

4.7 Safe Drinking Water Act – 42 U.S.C. §§ 300f-300j-26

4.7.1   The Great Lakes are part of the public water system and while the statutory reach of this act appears to be ground water, U.S. EPA interprets its statutory authority to include regulation of contaminants in any drinking water, including surface water. 50 Fed. Reg. 46,941-46,943 (Nov. 13, 1985).

4.7.2   Adding lead in any amount to the water column degrades the public water system and the live fire exercises are therefore a violation of the Safe Drinking Water Act.

4.8   RCRA – Resource Conservation and Recovery Act – 42 U.S.C. § § 6901-6992k.

4.8.1   One goal of RCRA is to prevent future unregulated hazardous waste disposal sites.

4.8.2   Lead is a listed hazardous material bringing it under RCRA regulation.  See 40 C.F.R. Part 261, Subpart D.

4.8.3   The spent lead bullets are discarded material and abandoned as part of the live fire training and are therefore waste under RCRA. See 40 C.F.R. § 261.2, 50 Fed. Reg. 614(Jan. 4, 1985), § 261.2(a)(2), §261.2(b).

4.8.4   The hazardous waste bullets are disposed of under RCRA by being discharged into the waters of the Great Lakes. See 42 U.S.C. 6903(3), 40 C.F.R. § 260.10, 40 C.F.R. § 264.

4.8.5   The live fire training exercises therefore violate RCRA as illegal discharges of hazardous waste into the waters of the United States.

4.8.6   Violations under the Clean Water Act are also violations under RCRA. See 40 C.F.R. § 257.3-3.

4.8.7   Uncontrolled discharge of lead onto the lake beds will create open dumps that cannot meet sanitary landfill requirements and is therefore prohibited.  See 42 U.S.C. § § 6903(14), 6945(a).

4.8.8   The Lake Michigan watershed is a critical habitat for the North American River Otter, an Indiana endangered species.  Discharging uncontrolled lead into its environment violates RCRA. See 40 C.F.R. § 257.3-2.

4.9   CERCLA – Comprehensive Environmental Response, Compensation and Liability Act – 42 U.S.C. §§9601-9675

4.9.1   Congress enacted CERCLA to address "the serious environmental and health risks posed by industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 54 (1998). To carry out this goal, the statute grants "broad power to command government agencies and private parties to clean up hazardous waste sites." Id.

4.9.2   Although many of CERCLA's provisions are directed at prioritizing, and apportioning financial liability for, cleanups on private property, CERCLA Section 120 provides that "[e]ach department, agency, and instrumentality of the United States . . . shall be subject

to, and comply with, [CERCLA] in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity . . . . " 42 U.S.C. § 9620(a)(1). The statute further provides that "[n]o department, agency, or instrumentality of the United States may adopt or utilize any [ ] guidelines, rules, regulations, or criteria which are inconsistent with the guidelines, rules, regulations and criteria established by the Administrator," – i.e., "the Administrator of the United States Environmental Protection Agency." Id. §§ 9620(a)(2), 9601(2).

4.9.3    Upon petition, the US EPA is required under the National Contingency Plan to conduct a Preliminary Assessment into the release, or threatened release, of any hazardous substance that threatens human health or the environment, giving special consideration to releases affecting drinking water. See 42 U.S.C. § 9605

4.9.4    A Preliminary Assessment can be triggered by citizen petition after each Toxic Reporting Inventory report of 100 pounds of lead, each training exercise adding to existing lead dump fields, or each training session creating new dumps. A Site Investigation will then be triggered and will remain valid until the next training session when more lead will be deposited.

4.9.5    CERCLA requires permanent containment or reduction of exposure for hazardous wastes that threaten human health and the environment. In evaluating the alternative methods of site closure, the agency must evaluate nine criteria, including such factors as the protection of human health and the environment; applicable or relevant and appropriate requirements under federal and state law; effectiveness and permanence; feasibility and cost; and community and state acceptance. Id. § 300.430(e)(9). Once the agency has developed a proposed remediation plan, it must again solicit public input, before making its Record of Decision, in which the agency must explain the basis for the chosen alternative. Id. § 300.430(f)(1)-(5).

4.9.6    The Coast Guard live fire plan will create new hazardous waste dump sites after each training exercise that will need to be closed under CERCLA.

4.9.7    A prohibition on creating new uncontrolled CERLCA sites is implied by the RCRA statute. RCRA provides for a cradle to grave system for disposal of toxic waste and 30-year financial assurances for containment once the site is closed. CERCLA was not created to be a backstop against RCRA scofflaws. The Coast Guard, in ignoring RCRA prohibitions and creating uncontrolled fields of lead in the Great Lakes that will need to be assessed, is acting arbitrarily and capriciously with respect to RCRA and CERCLA.

4.10    Great Lakes Water Quality Agreement of 1978

**4.10.1  Article II – Purpose**

Consistent with the provisions of this Agreement, it is the policy of the Parties that:

    a.   The discharge of toxic substances in toxic amounts be prohibited and the discharge of any or all persistent toxic substances be virtually eliminated;

**4.10.2  Article VI – Programs And Other Measures**

1. The Parties…shall continue to develop and implement programs and other measures to fulfill the purpose of this Agreement and to meet the General and Specific Objectives….

The programs and measures shall include the following:

    (b) Pollution From Industrial Sources

        ii. Requirements for the substantial elimination of discharges into the Great Lakes System of persistent toxic substances;

4.10.3  Lead in bullets is a persistent toxic substance

4.10.4  The discharge of lead by the U.S. Coast Guard into the Great Lakes therefore violates the Great Lakes Water Quality Agreement of 1978.

 

Steven B. Pollack, Attorney
Director, Blue Eco Legal Council
P.O. Box 1370
Highland Park, IL 60035
847-436-9566

# Attachment 9

to United States' Memorandum in Support of Motion to Dismiss Second
Amended Complaint

10/1/07 Notice of Intent Letter

**United States**
**Northern Illinois**

Blue Eco Legal Council, and
Steven B. Pollack

October 1, 2007

to

| | |
|---|---|
| The President | Lisa Madigan |
| The White House | Illinois Attorney General |
| 1600 Pennsylvania Avenue NW | 500 South Second Street |
| Washington D.C. 20500 | Springfield, IL 62706 |

United States Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington D.C. 20530-0001

The Honorable Donald C. Winter
Secretary of the Navy
1000 Navy Pentagon
Washington, D.C. 20350-1000

Commandant of the Marine Corps
Headquarters, U.S. Marine Corps (Code CL)
3000 Marine Corps Pentagon, Room 4E475
Washington, DC  20350-3000

Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Ave., NW. (1101)
Washington, DC 20460

Regional Administrator, Region V
U.S. Environmental Protection Agency,
77 West Jackson Boulevard
Chicago, IL 60604

Director
Illinois Environmental Protection Agency
1021 North Grand Avenue East
P.O. Box 19276
Springfield, Illinois 62794

**SIXTY AND NINETY DAY NOTICE OF INTENT TO SUE**

1.  Sixty-day and ninety-day notice of intent to sue the Department of Justice, Navy, and Marine Corps by the Blue Eco Legal Council, a membership organization whose mission is environmental watchdog litigation and advocacy, and Steven B. Pollack as executive director and member.

    1.1  Blue Eco Legal Council

    Steven B. Pollack, Attorney

    3390 Commercial Ave.

    Northbrook, IL 60062

    847-436-9566

    1.2  The United States Federal Bureau of Investigation conducts firearm training on the Lake Michigan shoreline in North Chicago, Illinois. By design, this Department of Justice range is oriented to discharge lead into the drinking water of the United States in violation of public nuisance laws, RCRA, the Safe Drinking Water Act, the Clean Water Act, the Rivers and Harbors Act, CERCLA, and the Great Lakes Water Quality Agreement with Canada. The EPA and Illinois state regulators refuse to enforce these federal laws that prohibit such discharge or to order a cleanup of past discharges. The federal laws contain citizen suit provisions, mandates for the federal government to adhere to the same degree as private polluters, and clear waivers of sovereign immunity for suits against the federal government. That the DOJ is being brought in as a defendant, the Executive has fully abdicated its role as faithful executor of the federal environmental law when it polices itself.

    These comments outline the laws being violated by the United States Department of Justice via the Federal Bureau of Investigation through ongoing training exercises in the Lake Michigan watershed, therein disposing of lead bullets and other lead emissions which present an imminent and substantial endangerment to the local water supply; and further for owning contaminated federal property presenting an imminent and substantial endangerment to the local water supply and having failed to remediate it.

    The Navy has violated its legal obligations to remediate past contamination as the discharger that created uncontrolled hazardous waste sites in the Lake Michigan watershed that present an imminent and substantial endangerment to the local water supply; and for potentially owning contaminated federal property presenting an imminent and substantial endangerment to the local water supply and having failed to remediate it.

2

The Marine Corps has violated its obligation to remediate its past contamination as the discharger that created uncontrolled hazardous waste sites in the Lake Michigan watershed that present an imminent and substantial endangerment to the local water supply.

These comments also outline the laws not being enforced by the United States Environmental Protection Agency, the Department of Justice, or the Illinois Environmental Protection Agency.

These comments therefore serve as notice that the Blue Eco Legal Council intends to sue on behalf of its members generally, and those who live in the Lake Michigan Watershed specifically.

1.3 The Blue Eco Legal Council and Steven B. Pollack intend to sue the U.S. Department of Justice, U.S. Navy, and U.S. Marine Corps for violations of federal and state environmental laws resulting from its past and present training exercises next to and into Lake Michigan.

2    VIOLATION OF SEVERAL LAWS

2.1 Public Nuisance – The unauthorized dumping of uncontained and uncontrolled lead on the lake bed constitutes a public nuisance on state titled lands.

2.2 RCRA – Resource Conservation and Recovery Act – 42 U.S.C. § § 6901-6992k.

1. One goal of RCRA is to prevent future unregulated hazardous waste disposal sites.

2. Lead is a listed hazardous material bringing it under RCRA regulation.  See 40 C.F.R. Part 261, Subpart D.

3. The spent lead bullets are discarded material and abandoned as part of the lake oriented training and are therefore waste under RCRA. See 40 C.F.R.  § 261.2, 50 Fed. Reg. 614(Jan. 4, 1985), § 261.2(a)(2), §261.2(b).

4. The hazardous waste bullets are disposed of under RCRA by being discharged into the waters of the Great Lakes. See 42 U.S.C. 6903(3), 40 C.F.R. § 260.10, 40 C.F.R. § 264.

5. The lakeside training exercises therefore violate RCRA as illegal discharges of hazardous waste into the waters of the United States.

6. Clean Water Act violations are also violations under RCRA. See 40 C.F.R. § 257.3-3.

7. Uncontrolled discharge of lead onto the lake beds have created, and continue to create, open dumps that cannot meet sanitary landfill requirements and is therefore prohibited.  See 42 U.S.C. § § 6903(14), 6945(a).

8. The past and ongoing creation of uncontrolled hazardous waste dumps therefore poses an imminent and substantial endangerment to the public water supply. RCRA § 7002(a)(1)(B).

2.3 Safe Drinking Water Act – 42 U.S.C. §§ 300f-300j-26

1. The Great Lakes are part of the public water system. While the statute appears limited to ground water, U.S. EPA interprets its statutory authority to regulation of contaminants in any drinking water, including surface water. 50 Fed. Reg. 46,941-46,943 (Nov. 13, 1985).

2. Adding lead in any amount to the water column degrades the public water system and the lake oriented range operating inside the Lake Michigan Watershed (which serves as a public water source) therefore violates the Safe Drinking Water Act.

2.4 CWA – Clean Water Act (Federal Water Pollution Prevention and Control Act) – 33 U.S.C. §§ 1252-1387.

1. The purpose of the CWA is to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251(a).

2. The "national goal" is to eliminate the discharge of pollutants. 33 U.S.C. § 1251(a)(1), (2).

3. The national policy is to prohibit the discharge of toxic pollutants in toxic amounts. 33 U.S.C. § 1251(1)(a), (3).

4. The CWA defines pollution as "the man-made or man-induced alteration of the chemical, physical, biological … integrity of water". 33 U.S.C. § 1362(19).

5. The lakeside range is a point source under the CWA because it is a "discernible, confined, and discrete conveyance" 33 U.S.C. § 1362(14).

6. The lakeside training therefore violates the CWA as a point source for lead bullets and lead contamination, which are toxic pollutants.

7. The FBI does not have a National Pollutant Discharge Elimination System (NPDES) permit under the CWA to discharge lead into the waters of the United States.

8. No NPDES permit may issue without public notice and is subject to hearings. 33 U.S.C. § 1342(a)(1).

9. Blue Eco Legal Council requests an adjudicatory hearing as required by the United States Supreme Court. *Costle v. Pacific Legal Foundation*, 445 U.S. 198 (1980).

10. The CWA requires the use of best available technology economically achievable for the applicable point source. 33 U.S.C. § 1317(a). Green bullets without lead or laser training represent this standard.

2.5 TRI – Toxic Release Inventory - 42 U.S.C. 11001 et seq., 40 C.F.R. Part 372.

1. Defines lead as a Persistent Bio-accumulative Toxin (PBT) one of the highest threats to natural resources and human health.

2. The TRI requires self-reporting of lead releases over 100 pounds.

3. It does not appear the Department of Justice, Navy, or Marines ever reported releases of lead from prior training exercises and are therefore in violation of TRI.

2.6 CERCLA – Comprehensive Environmental Response, Compensation and Liability Act – 42
U.S.C. §§9601-9675

1.  Congress enacted CERCLA to address "the serious environmental and health risks posed by
    industrial pollution." *United States v. Bestfoods*, 524 U.S. 51, 54 (1998). To carry out this
    goal, the statute grants "broad power to command government agencies and private parties to
    clean up hazardous waste sites." Id.

2.  CERCLA Section 120 provides that "[e]ach department, agency, and instrumentality of the
    United States . . . shall be subject to, and comply with, [CERCLA] in the same manner and to
    the same extent, both procedurally and substantively, as any nongovernmental entity . . . . "
    42 U.S.C. § 9620(a)(1). The statute further provides that "[n]o department, agency, or
    instrumentality of the United States may adopt or utilize any [ ] guidelines, rules, regulations,
    or criteria which are inconsistent with the guidelines, rules, regulations and criteria
    established by the Administrator," – i.e., "the Administrator of the United States
    Environmental Protection Agency." Id. §§ 9620(a)(2), 9601(2).

3.  Upon petition, the US EPA is required under the National Contingency Plan to conduct a
    Preliminary Assessment into the release, or threatened release, of any hazardous substance
    that threatens human health or the environment, giving special consideration to releases
    affecting drinking water. See 42 U.S.C. § 9605

4.  CERCLA requires permanent containment or reduction of exposure for hazardous wastes that
    threaten human health and the environment.  In evaluating the alternative methods of site
    closure, the agency must evaluate nine criteria, including such factors as the protection of
    human health and the environment; applicable or relevant and appropriate requirements under
    federal and state law; effectiveness and permanence; feasibility and cost; and community and
    state acceptance. Id. § 300.430(e)(9). Once the agency develops a proposed remediation plan,
    it must again solicit public input before making its Record of Decision, in which the agency
    must explain the basis for the chosen alternative. Id. § 300.430(f)(1)-(5).

5.  A prohibition on creating new uncontrolled CERLCA sites is implied by the RCRA statute.
    RCRA provides for a cradle to grave system for disposal of toxic waste and 30-year financial
    assurances for containment once the site is closed.  CERCLA was enacted to address past
    releases, those occurring prior to RCRA safeguards.  The Department of Justice, in ignoring
    RCRA prohibitions and creating uncontrolled fields of lead in Lake Michigan that need to be
    assessed, is acting arbitrarily and capriciously with respect to RCRA and CERCLA.

2.7 Rivers and Harbors Act – 33 U.S.C. § 403-407.

1. The Rivers and Harbors Act prohibits the release of refuse into the navigable waters of the United States which might obstruct navigation. See 33 U.S.C. § 407.

2. The United States Supreme Court read into this act a prohibition on pollution. See *United States v. Republic Steel*, 362 U.S. 482 (1960), *United States v. Standard Oil Co*., 384 U.S. 224 (1966).

3. The live fire exercises, insofar as they allow unpermitted discharges into the Great Lakes, violates the Rivers and Harbors Act.

2.8 Great Lakes Water Quality Agreement of 1978

1. **Article II – Purpose**

Consistent with the provisions of this Agreement, it is the policy of the Parties that:

    a. The discharge of toxic substances in toxic amounts be prohibited and the discharge of any or all persistent toxic substances be virtually eliminated;

2. **Article VI – Programs And Other Measures**

    1. The Parties…shall continue to develop and implement programs and other measures to fulfill the purpose of this Agreement and to meet the General and Specific Objectives.… The programs and measures shall include the following:

    (b) Pollution From Industrial Sources

        ii. Requirements for the substantial elimination of discharges into the Great Lakes System of persistent toxic substances;

3. Lead in bullets is a persistent toxic substance

4. The discharge of lead by the U.S. Department of Justice into the Great Lakes therefore violates the Great Lakes Water Quality Agreement of 1978.

3  **Wherefore** we demand the immediate irrevocable suspension of training activities that discharge lead into the environment and establishment of a complete cleanup plan for existing contamination in the next 90 days or else suit will be brought in the United States District Court for the Northern District of Illinois.

Steven B. Pollack, Attorney
Individually and as Director, Blue Eco Legal Council
3390 Commercial Ave.
Northbrook, IL 60062
847-436-9566

# Attachment 10

to United States' Memorandum in Support of Motion to Dismiss Second
Amended Complaint


IEPA Drinking Water Newspaper Article

Waukegan News Sun (IL)
FBI sued over lead bullet casings in lake
January 18, 2008
By Frank Abderholden

NORTH CHICAGO -- A Northbrook group has filed suit to stop the FBI from using a shooting range in North Chicago and force the FBI to pay $35.2 million for an environmental assessment and cleanup.

Blue Eco Legal Council is also asking for $20 million in compensation that would be split between the Alliance for the Great Lakes and the Natural Resource Defense Council.

The lawsuit claims that the FBI range uses more than 2,900 acres of Lake Michigan as an impact area for discarded lead bullets, and the city of North Chicago's water intake for drinking water is within the zone, while the drinking water intake for Great Lakes Naval Base is just outside the zone.

"By filing this lawsuit, we hope to set an important precedent and to force federal officials to stop poisoning our children," said Steve Pollack, attorney and executive director for the group. "This is simply another case of the federal government believing they're above the law."

Ross Rice, a spokesman for the FBI in Chicago, said Wednesday that officials had not seen the lawsuit. He said the firing range in North Chicago recently underwent several renovations that included increasing the height of berms.

"You would have to intentionally point the weapon above the berm to get it to go into Lake Michigan," Rice said.

Pollack also said North Chicago's last public water quality report indicated lead was detected in the water supply. But according to the Illinois Environmental Protection Agency, the last report found there was lead -- 11 parts per billion -- but that was below the actionable level of 15 parts per billion.

The test involves 30 water samples drawn from various homes and other water users in the city. Some water pipes in older homes leach lead from the old waterline.

"The bottom line is they are well under the standards," said Maggie Carson, IEPA spokeswoman. "These are established with public health issues in mind so the public health is protected."

Pollack contends the federal Clean Water Act does not allow anyone to discharge lead into waterways. He also said it is dangerous because water at a certain pH level will bio-accumulate in organisms which are eaten by fish, which are then eaten by other animals, and the lead makes its way up the food chain.

"It just keeps accumulating," he said.

The Blue Eco Legal Council was among several groups that also objected in October 2007 to Coast Guard plans to periodically close 2,500 square miles of the Great Lakes for live-fire machine gun exercises. That plan was withdrawn.

"Lake Michigan is a public drinking water source. Lead has been proven to cause learning disabilities and permanent brain damage in children," Pollack said.