**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Steven B. Pollack and ) | |
| Blue Eco Legal Council, ) | |
| ) | |
| Plaintiffs, ) | Case Number:   08-cv-320 |
| ) | Assigned Judge:   Guzman |
| v. ) | Magistrate Judge:   Brown |
| ) | |
| United States Department of Justice, ) | |
| United States Coast Guard, ) | CWA, RCRA, CERCLA, AND |
| United States Navy, ) | PUBLIC NUISANCE FTCA CASE |
| United States Marines, and ) | |
| United States Department of Defense, ) | |
| ) | |
| Defendants. ) | |

## REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND FOR PRELIMINARY MANDATORY INJUNCTION

Defendants consolidated their motion to dismiss with their response to Plaintiffs' motion for preliminary injunction and preliminary mandatory injunction. This Reply will address some of their arguments while others will be addressed in Plaintiffs' separate response to their motion to dismiss. Not addressed here are arguments regarding 1) the nuisance claim brought pursuant to the Federal Tort Claims Act, 2) if Plaintiffs adequately pled a CERCLA claim, and 3) if Plaintiffs gave proper notice to the Department of Defense.

Addressed in this brief are 1) if Plaintiffs have standing to bring their claims, 2) if Defendant Coast Guard's partial voluntary cessation of illegal acts before suit was filed precludes jurisdiction, 3) if Defendant Department of Justice's shutdown of illegal acts after suit was filed precludes jurisdiction, and 4) if initiating a CERCLA cleanup after suit was filed bars the relief sought.

Additionally, new facts learned during discovery will show the need for a preliminary injunction.

### NEW FACTS FROM DISCOVERY

It is important to establish the timeline because some of Defendants' arguments rely on actions taken after suit was filed. The following chart details the various dates on which Defendants gained knowledge of their violations and when they took various actions:

## Timeline of FBI's Knowledge and Action

| Event | Date | 1970's | 1980's | 1990's | 2000's |
|---|---|---|---|---|---|
| | | Before Suit | | | |
| Clean Water Act Enacted | 1972 | ■━━━━━━━━━━━━━━━━━━━━━━━━━━ | | | |
| Resource Conservation Recovery Act Enacted | 1976 | ■━━━━━━━━━━━━━━━━━━━━━━━━━━ | | | |
| Navy Preliminary Investigation concludes high potential for lead contaminating ground and surface waters | August 1984 | | ■ | | |
| Navy Initial Assessment study recommends remedial measures when site is no longer a range | March 1986 | | ■ | | |
| FBI Appraisal<br>• Expert calculates surface danger zone; ricochet area extends into Foss Park, beach, and Lake Michigan<br>• Cleanup would cost more than residual land value clean<br>• Highest and best use therefore is as [polluting] range/no remedial measures taken | 04/25/86 | | ■ | | |
| Lake County Board complains to FBI about danger posed to Foss Park | 05/25/90 | | | ■ | |
| Military Munitions Rule defines off-range discharges as statutory waste under RCRA until recovered | 02/12/97 | | | ■━━━━━━━━━━━ | |
| North Shore Sanitary District worker hit by off-range ricochet | August 2001 | | | | ■ |
| Replace earthen berm even though rubberized material was suggested | 04/14/06 | | | | ■ |
| FBI Phase I Study<br>• Does not refer to itself as CERCLA document<br>• Marked "Privileged and Confidential Attorney-Client Work Product" on every page<br>• Not produced in response to Plaintiffs' 03/07 FOIA request for all environmental assessments | 07/05/06 | | | | ■ |
| Blue Eco files 90-Day Notice | 10/01/07 | | | | ■ |
| FBI seeks Illinois EPA oversight but is rejected | 01/11/08 | | | | ■ |
| Blue Eco Files Suit | 01/14/08 | | | | ▼ |
| FBI Closes Shotgun Range | 01/18/08 | | | | ▼ |
| Blue Eco files mandatory Prel. Injunction | 03/06/08 | | | | ▼ |
| FBI initial notification to US EPA of cleanup | 03/07/08 | | | | ▼ |
| Blue Eco Finds Bullets in Park, files TRO | 03/26/08 | | | | ▼ |
| FBI temporarily shuts range | 04/01/08 | | | | ▼ |
| Blue Eco property inspection of range | 04/28/08 | | | | ▼ |
| FBI hires expert to evaluate ricochets | 04/30/08 | | | | ▼ |

2

On April 1, 2008 during Plaintiffs' motion for temporary restraining order, this Court asked if there had been any prior incidents or complaints regarding offsite discharges that would support Plaintiffs' allegation that the bullets they found in Foss Park and the beach below the range were the result of ricochets from the range. Defendants answered no whereas information received through discovery reflects otherwise.

From the TRO hearing transcript:

**THE COURT:** …And I want to ask you point blank: Does the FBI or does any other agency have any record of any complaints by anyone over the last – how long has the berm been there? Since '9- --
**MR. GUALTIERI:** Well, the FBI has been conducting operations similar to these since the late 1970's, and the park has been there –
**THE COURT:** Since that time –
**MR. GUALTIERI:** --the entire time.
**THE COURT:** --have there been any complaints by anyone of ricochets or bullets or projectiles or anything else from the shooting range spilling over into the park?
**MR. GUALTIERI:** Right. Yeah, your Honor, we're not presently aware of any. We've had minimal time for any such inquiries, but we're not aware of any.
**THE COURT:** Are you?
**MR. POLLACK:** No.
**MR. GUALTIERI:** And—
**THE COURT:** Okay. So as I understand it then, the proximity of these two areas, on the one side as a park, on the other as a shooting range, has been going on for approximately –the FBI has had it since when?
**MR. GUALTIERI:** Well, with regard to the FBI, at least 30 years. And there were, you know, firing range operations different from the FBI's but similar before that.
**THE COURT:** This particular relationship has been going on for 30 years?
**MR. GUALTIERI:** Yes.
**THE COURT:** And nobody at this point is aware of a single incident or occurrence which has engendered a complaint from any of the public?
**MR. GUALTIERI:** That's correct, your Honor.
**THE COURT:** Okay. Have there been any other notifications or notices or situations such as this one which bring to light the use of—the possibility that there is some sort of spillover of—the possibility that shots are going into the park from the range? Does anyone know of any such incident, information, complaint?
**MR. GUALTIERI:** We're aware of none, your Honor.

3

According to the FBI's 2006 Phase I Environmental Site Assessment[1], the document Defendants claim initiated their CERCLA cleanup, "[b]ased on information obtained from facility personnel, a facility person at the North Shore Sanitary District Sewage Treatment Plant was hit by debris from a richocheted bullet which was fired at the subject property. The injury was not fatal." See Def. Response, Attachment 5, Page 44 of 62. The FBI has therefore been on notice since August 2001 that ricochets present a real danger to the adjacent properties, including Foss Park to the south. This puts the bullet Plaintiffs found under the swing set in Foss Park on March 26, 2008 into better perspective.

Additionally, in 1990 the Lake County Board complained to the FBI "on behalf of…the 520,000 residents of Lake County" (including Plaintiff Pollack and other Blue Eco members) that the range posed a danger to Foss Park, the beach below, and Lake Michigan. See Exhibit 1. This official letter requested the FBI vacate this location and even offered the use of the Lake County Sheriffs department range. The FBI rejected this request and offer.

As can be seen, Defendants have been denying that their range endangers the adjacent property and Lake Michigan for a long time[2]. The ricochet hitting the North Shore Sanitary District worker is also notable because the property boundary to the north is 240.5' from the closest firing position on the range. By contrast, the Foss Park property boundary to the south is just 50' from the closest firing position. See Affidavit Barton2.

There is also evidence that the FBI knew about this ricochet danger as far back as 1986. The FBI's Real Estate Appraisal, see Compl. Ex. G (redacted under FOIA), included an exhibit that was turned over in discovery that is a NRA surface danger zone plot showing a lateral ricochet area. See Exhibit 2. This surface danger zone would naturally extend into the adjacent properties and Lake Michigan because there is no buffer area between the properties. This ricochet area corresponds to the location near the berm where Plaintiffs found bullets in Foss Park.

---

[1] This document forms the basis of Defendants' assertion throughout litigation that their cleanup precludes jurisdiction. It is therefore reasonable to presume they had read it prior to telling this Court there had been no offsite incidents.

[2] Defendants attempted to rectify their denial to this Court by inserting this fact at the end of their status report of May 12, 2008 (docket at 53). They also try to minimize its impact by stating this accident was before berm improvements were made in 2006. But Defendants had previously claimed that the 1979 berm was so effective as to deny jurisdiction because at 25 feet tall it caught all the bullets. If the 2006 berm improvements are the reason why the 2001 incident should be discounted, why have Defendants now engaged an expert to assess the possibility of ricochets as evidenced by the 40 bullets and fragments Plaintiffs found in Foss Park in 2008?

The trespass of the FBI Range surface danger zone into Foss Park is also supported by the US Army Range Safety Pamphlet that includes a chart showing the lateral ricochet area extension (W) to be from 100m to 400m depending on the caliber being shot. See Exhibit 3, Pg. 172-3, 175, 180, 183, 184-8. This is well beyond the capacity of this 14 acre range and shows that the range, by design, uses the adjacent properties and Lake Michigan as impact areas.

Finally, during Plaintiffs Rule 34 property inspection on 04/28/08, the FBI side of the wood fence between the berm and Foss Park was riddled with gunshot fragments. These lead fragments are present all the way to the top of the fence indicating that higher ricochets would head straight towards Foss Park. An intact bullet was found at the base of the wood fence in the same condition, on the surface, as Plaintiffs found outside the range at Foss Park. see Affidavits Barton1 and Barton2. Also of note from this visit is the patched and painted condition of the ricochet plates which, as shown in the Barton2 Affidavit, masks the substantial ricochets shown in the Berm Maintenance records turned over as part of discovery (FBI Chicago Facility Lead Recovery Project, 2006, Attachment 3 Site Photographs)(Bates Stamped FBI001023). See Barton 2 Affidavit. These deflection plates are part of the reason for the lateral ricochets and the reason the FBI refused to let Plaintiffs intentionally target them as part of the Court ordered tracer test. See Barton2 Affidavit.

Defendants' assertion at the TRO hearing that the bullets found by Plaintiffs in Foss Park and beach below the range could be related to "repeated, you know, issues with criminality…in the park" was a crass disparagement of a city severely burdened economically by a high percentage of its land being non-taxable, including large amounts of public land. Such public land includes this and other federal property. See Exhibit 1[3].

Defendants use the fact that access to this range is offered at no cost to local law enforcement as a reason to not shut it down. A new range, however, properly designed on property that did not need Lake Michigan as an impact area would cost more and would internalize the higher costs of operating a facility that complies with federal environmental law. By leaving the range

---

[3] "Your facility, on the other hand, makes none of these positive contributions. It's impact is entirely negative. It pays no taxes. And it actively inhibits the growth of public and private facilities which can provide either an increase in the tax base, or add to public amenity and health, or both. Apart from the generic benefit of law enforcement officers who may become more proficient in the use of firearms, there are virtually no positives to your presence here. And even that generic benefit is of far greater value to communities outside of North Chicago, or even Lake County for that matter." Letter from Lake County Board to FBI, (May 25, 1990).

5

at its present location the President is externalizing some of the real operating costs onto the environment and passing on the "savings" to law enforcement. The CWA, RCRA, and CERCLA all contain Federal Facility provisions that command a different result. 33 U.S.C. § 1323; 42 U.S.C. § 6961; 42 U.S.C. § 9620. This Court should therefore order this range shut for all purposes except for the environmental remediation the Navy recommended in 1984 and 1986 and the FBI's Appraisal recommended in 1986. See Exhibit 4; Compl. Ex. G. Once Defendants identified the property to be so contaminated it was likely impacting the lake, the decision to put off cleanup while it continued as a range was an abuse of discretion.

A bond amount of $1 would match the price the FBI paid to the Navy for the property in 1987, and would be equitable. See Exhibit 5. In fact, this is at least $1 more than the FBI actually valued the property in 1986 when its appraiser calculated the cost of cleanup to be higher than the land value clean so that the property had a negative value. Defendants' failure to find and build a new facility elsewhere is what brings us to this decision so it would be unfair to assess Plaintiffs with a bond covering the FBI's temporary costs in relocating.

## PLAINTIFFS HAVE STANDING

Defendants spend the biggest portion of their response and motion to dismiss on their assertion that Plaintiffs have no standing to complain about its various munitions discharges to public land and water. From Foss Park where they claim Plaintiffs have no connection, to the Lake Michigan danger zone where they only allow that accumulated discharges affect North Chicago's water supply, to the middle of Lake Michigan where Coast Guard bullets are discarded into vast and deep water, to other areas of the country where Plaintiffs organization has members in some areas and not in others.

All these arguments are rooted in a hopeful application of *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), in which the Supreme Court ruled Article III standing requirements limited Congressional authority to broadly empower private attorney general actions. In *Lujan*, the Supreme Court held that an environmental group and its members did not have sufficient connection to overseas areas affected by a government regulation made pursuant to the Endangered Species Act. The Court held that Plaintiffs had not asserted a sufficient connection to those overseas areas to have suffered a concrete discernible injury from the regulation.

A major defect in Defendants' invocation of *Lujan* is that the complained of activity was the legality of a regulation, not the direct discharge of toxic pollutants into the nations waters as

6

complained of here. *Lujan* can therefore be distinguished based solely upon the public welfare at stake and the government's actions that injure it. According to *Lujan*, 504 U.S. 555, 561-2:

> When the suit is one challenging the legality of government action or inaction, the nature and extent of facts that must be averred…in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it. When, however, as in this case, a plaintiffs asserted injury arises from the government's allegedly unlawful regulation…of someone else, much more is needed.

Even though Defendants' actions are directed at Plaintiffs' environment so that standing is not really a question, for the sake of the record each of Defendants' geographic challenges to standing will be addressed. Plaintiffs do in fact have a real and particularized connection to the water bodies and public lands affected by Defendants actions.

Defendants assert that Pollack and Blue Eco do not have standing to sue for discharges of lead bullets into Foss Park because Plaintiffs do not allege they go to this park. Defendants do not address the bullets also found on the beach below the range but presumably they would raise the same issue. This Court addressed this at the TRO hearing by stating "they were there the other day"[4] and Plaintiffs find this reasoning, on its own, to be correct and enough to create standing. More than that, however, is that many Blue Eco members are Lake County residents and the public parks and beaches should be viewed in context of their likely users. See Blue Eco Affidavit. In this case, Lake County residents are all likely users as evidenced by the fact that the Lake County Board, and not the city of North Chicago, wrote the FBI to complain about the endangerment to Foss Park and beach by the range. see Exhibit 1. Finally, Blue Eco now has several members from North Chicago, including current Mayor Leon Rockingham, Jr.

Defendants make much of the fact that Plaintiffs did not identify the wildlife affected by lead bullets and fragments laying around for them to take up. It is unclear if Defendants are denying there is wildlife that uses the lake shore and might take the lead up as food or grit. Defendant DOJ, in fact, brought suit against Playboy Enterprises for a shotgun range in Lake Geneva seeking the dredging of wetlands contaminated with lead shot. See 98-C-0972 (ED WI 1998). This was after 218 Canadian geese were found dead, having ingested the lead. The US EPA found an imminent and substantial danger for the lead shot being accessible to wildlife, its

---

[4] April 2, 2008 Temporary Restraining Order Hearing Transcript, Pg. 16. (referring to Plaintiffs' time at Foss Park and beach on March 26, 2008 picking up bullets)

7

habitat, and potentially a threat to surface water. See Exhibit 6. Lake Geneva, WI is 48 miles from the FBI Range according to Google. These same Canadian Geese and other shore birds can be similarly expected to use Lake Michigan for their migration and water needs and will be similarly affected by lead shot and bullets in shallow water and open land. Plaintiffs have standing to complain about the local wildlife whose well being and existence they enjoy in their Lake Michigan environment. See Pollack and Miller Affidavits.

Plaintiffs, many of them residents of Lake and Cook County, drink municipal water drawn from Lake Michigan, the potable water supply affected by the Coast Guard and FBI's discharge. Defendants try to artificially limit the water affected by their violations to only that drawn by the city of North Chicago, but the permanence of bullets in the underwater environment presents an ongoing and continuous source of degradation to the general water supply. Defendants take refuge in the fact that North Chicago's lead level is 11ppb whereas action levels are 15ppb but these readings are limited in number and do not account for the ability of lead to bioaccumulate in tissue and organs. According to US EPA, it is not even required under RCRA to prove illegal discharges of pollutants into water have a specific damaging effect before action can be taken to abate an imminent and substantial endangerment. See Exhibit 7, Pg. 9-10. It is hard to imagine anyone who would not feel a concrete and particularized harm when informed that toxic pollutants are being discharged into the potable water supply and are aggregating 13 miles from their own city's water intake crib. It is certainly a more immediate geographic scenario and proximate harm than was considered in *Lujan*.

Next Defendants argue that Plaintiffs do not have standing for bullets discarded by the Coast Guard deep in the middle of the Great Lakes as part of ongoing training. When the Coast Guard proposed making the 34 training areas in the Great lakes permanent, over 900 public comments were submitted. These comments by public representatives, environmental groups, boating groups, and individuals were almost universally against the continued discharge of lead bullets into the water for environmental reasons.[5] According to Defendants' argument, however, without the direct connection to a nearshore water intake or nearshore wildlife habitats, Plaintiffs don't have the concrete and particularized connection to those discharges to allow for standing. Under their argument then, none of those 900 public commenters would have standing, yet they

---

[5] Both Plaintiffs organization and Plaintiffs' expert James Barton submitted public comments and attended the public meetings regarding this rulemaking.

8

felt such a connection to their marine environment that they took time out of their busy lives to write substantive comments in opposition to the Coast Guards ongoing discharges. Prudential concerns of case and controversy standing must not be analyzed from ivory towers but rather should look at the reality of the connection the public feels towards their natural environment.

Finally, Plaintiffs have standing for the Coast Guards' ongoing violations in other areas of the country because a) they arise from the same firearms training activity resulting in discharges into water, b) the President refuses to accept this violates the law, c) Plaintiffs have members on the East Coast, and d) Defendants theory of standing would create a nonsensical protective bubble around a small organization for actions taken by a large organization.

## COAST GUARD'S INTERMITTENT VIOLATIONS

Defendants claim that the Coast Guard's voluntary suspension of non-emergency live fire training in January of 2007 precludes suit based on prohibitions discussed in *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49 (1987) on citizen suits for wholly past violations. Defendants' argument rests on the presumption that its Great Lakes violations are separate from their ongoing violations elsewhere. Where Defendants view each violation as separate and requiring a new lawsuit for each geographic violation, Plaintiffs assert that all violations stem from the same Executive activity resulting in ongoing discharges of lead bullets into the Nations waters. The voluntary cessation of violating activities does not ordinarily deprive a federal court of its authority to pass judgment. See *Friends of the Earth, Inc. v. Laidlaw Environmental Services Inc.*, 528 U.S. 167 (2000). Here, there is no admission of violation and no regulatory enforcement action so that the voluntary cessation is not dispositive as to future violations.

In fact, there is evidence that the Coast Guard continues to violate the Clean Water Act in the Great Lakes by discharging lead munitions without a permit. The Coast Guard shooting team won top honors at the NRA sponsored National Matches in the summer of 2007 at Camp Perry where shooting still occurs directly into Lake Erie. See Exhibit 8. Additionally, Coast Guard's Port Security Unit (PSU) 309 operates near Camp Perry Ohio and has conducted live fire training on Lake Erie in the past. See Exhibit 9. Because it is a rapid response unit, able to deploy on three days notice, it is unlikely that its training has been shifted away from its home base to the East Coast like the rest of the Coast Guard training. See Compl. Ex. E ("The Coast Guard heard those comments and responded with a number of training alternatives that include:

The departure of Coast Guard crews to East Coast cutters to train to ensure an adequate level of proficiency on the weapons.")

Finally, the training on the East Coast still violates the same laws and should be viewed as ongoing violations of the suspended Great Lakes training. The Clean Water Act makes the discharge of waste into the Nations waters a violation without distinguishing between the Great Lakes and the oceans. Additionally, Blue Eco has members on the East Coast. See <u>Blue Eco Affidavit</u>.

Plaintiffs recognize the Coast Guard and other agencies need to train on water but there are options. So called "green" bullets made from non-lead material are available in all calibers used by the military. Green bullets cost more initially but as this Army Magazine article explains, after factoring in the cost of post-discharge recovery, the real cost of lead bullets is higher. <u>See Exhibit 10</u>. The reason the Coast Guard does not use green bullets is because they never recover their discharges and instead discard them in violation of RCRA and the Military Munitions Rule. Until this Court enjoins the Coast Guard from using lead munitions during their on-water training, they will always choose the initially lower cost lead bullets, preferring to externalize the higher real cost (factoring in post-discharge recovery) onto the environment.

## FBI'S INTERMITTENT SHOTGUN VIOLATIONS

It is difficult to read Defendants' brief and know if they are still asserting their previous claim that the berm catches all bullets so that Plaintiffs' claims are barred as challenging wholly past violations or if they have abandoned that line of argument. See *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49 (1987). To the degree this assertion is still part of their argument, Plaintiffs alert this Court that the FBI shut down the shotgun portion of the range on 01/18/08, four days after this suit was filed. <u>See Exhibit 11</u>[6]. Plaintiffs' good faith allegations of ongoing violations are not, therefore, barred by the holding in *Gwaltney*.

## CERCLA CLEANUP INITIATED AFTER SUIT FILED

Defendants are loudly proclaiming that they have an ongoing Preliminary Assessment

---

[6] "AGC [redacted] advised DOJ attorneys (who are familiar with the Chicago firearms facility as a result of ongoing litigation) have opined, based on recent court decisions, that any firearms training involving skeet shooting be discontinued since the shotgun is fired toward Lake Michigan without the benefit of an intervening earthen berm….Out of an abundance of caution, however, it is directed that any training involving the use of the skeet facility, or any other proposed firearms training scenarios where discharged ammunition could reach the lake, be discontinued until further notice." Letter to Chicago FBI (01/18/08)

10

(PA) pursuant to CERCLA authority and that this precludes Plaintiffs from demanding their remedial actions presented as Exhibits M and N in their complaint. While it is true that CERCLA Section 113(h) prevents challenges to ongoing cleanups, Plaintiffs dispute that Defendants had an ongoing CERCLA cleanup at the time suit was filed January 14, 2008.

The centerpiece of Defendants claim that their CERCLA process predates this suit is a 2006 Phase I Assessment. There are four reasons this document does not represent the initiation of a CERCLA response. First, it was held as a secret document which is contrary to CERCLA requirements that such documents be public. Second, the document does not refer to itself as part of a CERCLA action and CERCLA itself makes no mention of Phase I studies. Third, this document is no more detailed an assessment of environmental conditions than prior studies in 1984 and 1986 that already declared the property in need of cleanup because it is affecting the lake. Finally, and perhaps most important, this assessment was not done in consultation with any state or federal regulatory agency as required under CERCLA.

CERCLA requires all studies, with very limited exceptions not applicable here, to be public. According to 42 U.S.C. § 9604(e)(7):

> "Any records, reports, or information obtained from any person under this section (including records, reports, or information obtained by representatives of the President) shall be available to the public…"

This Phase I Assessment, however, was held as a secret document so as to not bind the President to carry out a CERCLA cleanup but still available, as here, to thwart a challenge to agency inaction. This is why Congress requires such documents to be public.

Every page of the Phase I Assessment is marked "Privileged and Confidential Attorney-Client Work Product." Why would an assessment into the threat to human health and the environment posed by this facility be labeled as such unless Defendants were holding open their option to not to go forward with a CERCLA cleanup? This alone dooms this document from being considered the initiation of a CERCLA response as asserted by Defendants. Defendants additionally withheld this document from the public when Plaintiffs requested it in their March 2007 Freedom of Information Act Request. <u>See Compl. Ex. F</u>. Defendants were apparently not ready to declare a CERCLA cleanup then so they kept the study quiet. Now that suit has been filed, they are declaring a CERCLA cleanup and released the study as part of discovery. Prior to the jurisdictional discovery handover on 04/21/08, Plaintiffs had repeatedly asked Defendants'

counsel if there are any publicly available documents pertaining to this purported CERCLA cleanup. Defendants never turned over this document in response to these requests until the discovery date further showing Defendants intent to hold this document close to the vest until it decided a CERCLA cleanup was needed to thwart Plaintiffs requested relief. Secret documents like this one, withheld from the public, cannot be said to initiate an action under CERCLA.

Apart from being secret, this document does not refer to itself as a CERCLA response document. Phase I assessments are done for real estate transactions whereas CERCLA only requires a Preliminary Assessment, a Remedial Investigation, Risk Assessment, Feasibility Study, and Record of Decision. CERCLA nowhere mentions Phase I assessments as part of the remedial action process.

Next, this property has been known to be contaminated since the Navy did the preliminary Investigation in 1984. Based on the contamination and the threat to surface water, the Navy in 1986 recommended the property for remedial action, albeit when the property was no longer a range. See Exhibit 4. Because this 2006 Phase I assessment simply reiterates the conclusion of contamination from 20 years prior, it does not add much to the category of action. According to *Frey v. EPA*, 403 F.3d 828, 834 (7th Cir. 2005):

> We can only conclude from this exchange that EPA considers itself protected from review under CERCLA § 113(h) as long as it has any notion that it might, some day, take further unspecified action with respect to a particular site.
>
> There is no support in the statute for such an open-ended prohibition on a citizen suit. *Frey I* spoke of "active steps designed to clean up a site" and held that "the time limits in § 113(h) are geared to concrete, existing, remedial measures; not measures that might be devised at some future date." 270 F.3d at 1134. For EPA to delay Frey's suit, it must point to some objective referent that commits it and other responsible parties to an action or plan. No such objective evidence exists in this record. There is no timetable or other objective criterion by which to assess when EPA's amorphous study and investigation phase may end.

Defendants in this case appear content to continue the assessment phase in perpetuity, never getting to any action. Such action, if it ever were to come, would still be limited to the removal proposed by Plaintiffs in Compl. Ex N. Otherwise it would continue to violate the prohibition in RCRA for abandoning waste and the Military Munitions Rule for not recovering off-range discharges.

12

Finally, this Phase I assessment was not done in consultation with any regulatory agency. In fact, Plaintiffs never called the Illinois EPA (IEPA) to discuss the investigation until well after Plaintiffs filed their notice of intent to sue. But the FBI did in fact call IEPA on 01/11/08, three days before suit was filed, to discuss testing. The legal significance of this phone call, however, is not the initiation of a CERCLA action because IPEA rejected the FBI's entreaty:

> On January 11, 2008, Supervisory Special Agent (SSA) Mike Pavia, of the FBI's Chicago Division, called the IEPA to discuss preliminary environmental testing that had been conducted between October and December 2007 at the North Chicago Firearms Range Facility. SSA Pavia spoke with you, and was informed that, only in the event that the FBI were planning to sell the range property would the IEPA engage in oversight of further investigative activities.

See Def. Response, Attachment 5, Pg. 62 of 62. So the phone call to IEPA cannot be said to have initiated the FBI's CERCLA remedial response. See 42 U.S.C. § 9604(c)(2). On March 7, 2008, the day after this motion for preliminary injunction and preliminary mandatory injunction was filed, the FBI sent a letter to US EPA notifying them that FBI was pursuing a remedial action under CERCLA and would coordinate its actions with US EPA. See Exhibit 12. This is possibly the first date CERCLA action can be said to have legally begun. But because it commenced after suit was filed this Court has authority pursuant to RCRA to order the wide area preliminary assessment requested by Plaintiffs without interfering with an ongoing CERCLA action. In fact, the first time a preliminary assessment is even mentioned by Defendants is in their Response to Preliminary Injunction. See Def. Response. Exhibit 5, Pg. 1-5 of 62. The FBI has never given public notice that any CERCLA actions have been initiated.

Once again in this litigation, it is only in reaction to Plaintiffs actions that Defendants are moved from inaction. If this Court allows Defendants' half-hearted and late preliminary assessment to preempt Plaintiffs comprehensive preliminary assessment, the likelihood of ongoing cleanup actions beyond what Defendants have grudgingly initiated is suspect at best.

## CONCLUSION

Plaintiffs therefore ask this Court to preliminarily enjoin the Defendants from all further discharges of lead munitions into navigable waters without an NPDES permit, including ordering the North Chicago Range closed and ordering the Coast Guard to switch to non-lead munitions

13

for its on-water training, and order the FBI to pay for the wide area preliminary assessment outlined in Exhibit M of Plaintiffs' Complaint.

            Respectfully submitted,

            /s/ Steven B. Pollack
            Steven B. Pollack, Attorney
            Executive Director, Blue Eco Legal Council
            3390 Commercial Ave
            Northbrook, IL 60062
            steve@ecoesq.com
            847-436-9566

**CERTIFICATE OF SERVICE**

I hereby certify that on the date below the foregoing **REPLY BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND FOR PRELIMINARY MANDATORY INJUNCTION** was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

 Dated: May 15, 2008          /s/Steven B. Pollack
                     Counsel for Plaintiffs