Exhibit 7 – US EPA GUIDANCE ON THE USE OF SECTION 7003 OF RCRA

# GUIDANCE ON THE USE OF SECTION 7003 OF RCRA

**October 1997**

**Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency**

NOTICE:  This document is intended solely as guidance for employees of the U.S. Environmental Protection Agency.  It is not a rule and does not create any legal obligations.  Whether and how EPA applies this guidance in any given case will depend on the facts of the case.

# GUIDANCE ON THE USE OF SECTION 7003 OF RCRA

## Table of Contents

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   CASE SCREENING FACTORS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  RELATIONSHIP OF RCRA § 7003 TO OTHER REQUIREMENTS AND
      AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
      A.    Relationship to Other RCRA Requirements  . . . . . . . . . . . . . . . . . . . . . . . . 3
      B.    Relationship to Other Enforcement and Response Authorities . . . . . . . . . . . . . . 4
            1.    Comparison of RCRA § 7003 and CERCLA § 106(a) . . . . . . . . . . . . . 5
            2.    Comparison of RCRA § 7003 and RCRA § 3008(h) . . . . . . . . . . . . . . 7

IV.   LEGAL REQUIREMENTS FOR INITIATING ACTION . . . . . . . . . . . . . . . . . . . . 9
      A.    Conditions May Present an Imminent and Substantial Endangerment
            to Health or the Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            1.    The meaning of "may present an imminent and substantial
                  endangerment" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            2.    Examples of imminent and substantial endangerments . . . . . . . . . . . . . 11
      B.    The Potential Endangerment Stems from the Past or Present Handling, Storage,
            Treatment, Transportation, or Disposal of Any Solid or Hazardous Waste . . . 12
            1.    The meaning of "handling, storage, treatment, transportation,
                  or disposal" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
            2.    The meaning of "any solid waste or hazardous waste" . . . . . . . . . . . . . 14
            3.    Examples of solid waste and hazardous waste that could be addressed
                  under Section 7003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
      C.    The Person Has Contributed or Is Contributing to Such Handling, Storage,
            Treatment, Transportation, or Disposal . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            1.    The meaning of "any person"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
            2.    The meaning of "who has contributed or is contributing to
                  such handling, storage, treatment, transportation, or disposal" . . . . . . . 17
            3.    Strict liability  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
            4.    Joint and several liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

V.    ACTIONS AND RESTRAINTS THAT CAN BE REQUIRED . . . . . . . . . . . . . . . . 19
      A.    Interim Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
      B.    Investigation and Assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
      C.    Long-Term Cleanup Work . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      D.    Controls on Future Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      E.    Environmental Restoration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      F.     <u>Recovery of Government Costs Expended under Section 7003</u> . . . . . . . . . . . . 22
           1.      Restitution under RCRA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
           2.      Cost recovery under CERCLA § 107(a) . . . . . . . . . . . . . . . . . . . . . . 23

VI.     RELIEF AVAILABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
      A.     <u>Choosing Between an Administrative Order and Judicial Action</u> . . . . . . . . . . . 24
      B.     <u>Administrative Orders</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
           1.      Choosing between unilateral administrative orders and administrative
                 orders on consent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
           2.      Unilateral administrative orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
           3.      Administrative orders on consent . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
      C.     <u>Judicial Relief Available</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
      D.     <u>Judicial Review</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VII.    OTHER REQUIREMENTS AND CONSIDERATIONS . . . . . . . . . . . . . . . . . . . . . 32
      A.     <u>Notification and Posting</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
           1.      Notice to the affected state . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
           2.      Notice to local government agencies/posting . . . . . . . . . . . . . . . . . . . 33
      B.     <u>Public Participation</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
           1.      Public participation in judicial settlements . . . . . . . . . . . . . . . . . . . . . 34
           2.      Public participation in administrative settlements . . . . . . . . . . . . . . . . 34
           3.      Other appropriate public participation . . . . . . . . . . . . . . . . . . . . . . . . 35
      C.     <u>Procedural Considerations</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
           1.      Administrative record file . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
           2.      Other procedures for unilateral administrative orders . . . . . . . . . . . . . 37

VIII.  ENFORCEMENT OF UNILATERAL ADMINISTRATIVE ORDERS AND
      ADMINISTRATIVE ORDERS ON CONSENT . . . . . . . . . . . . . . . . . . . . . . . . . . 38
      A.     <u>Elements of an Enforcement Action Initiated under Section 7003(b)</u> . . . . . . . . 38
           1.      "[A]ny person who" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
           2.      "[W]illfully violates, or fails or refuses to comply with any order" . . . . . 39
           3.      "[M]ay, in an action brought in the appropriate United States district
                 court to enforce such order, be fined not more than [$5,500] for each day
                 in which such violation occurs or such failure to comply continues" . . . 39
      B.     <u>Settling Claims for Civil Penalties under Section 7003(b)</u> . . . . . . . . . . . . . . . 39
           1.      Overview of the penalty calculation process . . . . . . . . . . . . . . . . . . . . 40
           2.      Determination of gravity-based penalty amount . . . . . . . . . . . . . . . . . . 40
           3.      Penalties for multi-day violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
           4.      Economic benefit of noncompliance . . . . . . . . . . . . . . . . . . . . . . . . . . 44
           5.      Adjustment factors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
           6.      Penalties for multiple respondents . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
           7.      Documentation of penalty claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Attachment 1 -- Delegations, Consultation, and Concurrence
Attachment 2 -- Comparison of RCRA § 7003 to Other Enforcement and Response Authorities
Attachment 3 -- Possible Sources of Evidence
Attachment 4 -- Resources Available
Attachment 5 -- Judicial Relief and Judicial Review
Attachment 6 -- Worksheet for Documentation of Penalty Claims

# GUIDANCE ON THE USE OF SECTION 7003 OF RCRA

## I.    INTRODUCTION

Section 7003 of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6973, provides the U.S. Environmental Protection Agency (EPA) with broad and effective enforcement tools that can be used to abate conditions that may present an imminent and substantial endangerment to health or the environment.  Section 7003 allows EPA to address situations where the handling, storage, treatment, transportation, or disposal of any solid or hazardous waste may present such an endangerment.  In these situations, EPA can initiate judicial action or issue an administrative order to any person who has contributed or is contributing to such handling, storage, treatment, transportation, or disposal to require the person to refrain from those activities or to take any necessary action.

Among its many benefits, Section 7003 provides EPA with a strong and effective means of furthering risk-based enforcement and implementing its strategy for addressing the worst RCRA sites first, a strategy which EPA developed in response to its 1990 RCRA Implementation Study.[1] Under this strategy, EPA is addressing the universe of waste management facilities on the basis of environmental priorities.  Furthermore, at any given site, EPA is attempting to use whatever legal authority is best suited to achieving environmental success.  Section 7003 provides an invaluable means for achieving environmental success at many of these sites.

In consultation with EPA regional offices and other headquarters offices, the Office of Site Remediation Enforcement and the Office of Regulatory Enforcement have developed this guidance document to assist the regional offices in exercising the Agency's authorities under RCRA § 7003.  In addition to providing practical advice on the use of Section 7003, this document summarizes significant legal decisions that have addressed Section 7003.[2]  This document supersedes (1) the "Final Revised Guidance Memorandum on the Use and Issuance of Administrative Orders Under Section 7003 of the Resource Conservation and Recovery Act (RCRA)" which was issued on September 26, 1984 ("1984 Guidance"), and (2) the fact sheet entitled "The Imminent and Substantial Endangerment Provision of Section 7003," which was issued by the Office of Site Remediation Enforcement in May 1996.

EPA references RCRA § 7003 in various policy and guidance documents.  In light of the issuance of this guidance, the Region should consult with headquarters regarding the applicability of any of those documents to particular actions described in this guidance.  Before taking any particular action, the Region should examine Attachment 1 regarding delegations, consultations, and concurrence.

---

[1] *See, e.g.*, Proposed Rule on Standards Applicable to Owners and Operators of Closed and Closing Hazardous Waste Management Facilities; Post-Closure Permit Requirement; Closure Process; State Corrective Action Enforcement Authority, 59 Fed. Reg. 55780 (November 8, 1994).

[2] Before considering or taking any action described in this guidance, the Region should determine whether any new court decisions address any of the issues relevant to the action.

- 2 -

Section 7003 is available for use in several situations where other enforcement tools may not be available.  For example, Section 7003 can be used at sites and facilities that are not subject to Subtitle C of RCRA or any other environmental regulation.  The Regions are strongly encouraged to explore the wide range of uses of this authority to compel responsible persons to abate conditions that may present an imminent and substantial endangerment.  At the same time, the Regions should remember the Agency's goal of prioritizing enforcement actions at sites and facilities that pose serious risk to health or the environment.

## II.     CASE SCREENING FACTORS

Subsequent sections of this document discuss the requirements and procedures for initiating judicial actions and issuing administrative orders under Section 7003.  Presented below in order of generally decreasing importance are factors for the Regions to consider when determining whether to take either type of action.  The Regions should keep in mind that the importance of any particular factor may vary depending on the facts of a particular case.

•      Risk to health or the environment -- When prioritizing actions to be taken under Section 7003, the Regions should give the highest priority to those sites and facilities that pose serious risks.  As part of this analysis, the Regions should give particular consideration to sites and facilities that pose environmental justice concerns, such as those involving risk aggregation.

•      Strength of evidence that all statutory requirements are met -- As a threshold matter, the Region should not consider initiating action under Section 7003 unless there is adequate evidence that all requirements of Section 7003(a) have been met (see Section IV below).

•      Technical capability of the responsible persons to perform the required actions -- The Region should assess the technical difficulty of performing the required actions and the likelihood that the responsible persons will be capable of performing those actions or have adequate resources to hire a contractor to perform those actions.  In rare circumstances, the Region may conclude that the responsible persons are technically incapable of performing the required actions, even with careful oversight.  In these situations, the Region should consider whether it can use other authorities to perform the required work and whether other moneys are available, or whether any other governmental agency has authority and resources to perform the required actions.

•      Financial ability of the responsible persons to perform the required actions -- The Region should assess whether each responsible person has sufficient financial resources to perform the required actions.  When making this assessment, the Region should remember that some actions, such as provision of site access or security, require no or relatively few financial resources.

Possible sources of financial information include the following:  (1) responses to information requests issued under any applicable statutory authority; (2) documents compiled during the RCRA permitting process; (3) information obtained by EPA or state agencies while

- 3 -

conducting inspections and financial assurance reviews; (4) publicly available information from the Securities and Exchange Commission, Dun & Bradstreet®, LEXIS-NEXIS®, and other services; and (5) financial information obtained by the National Enforcement Investigations Center.  The Region may consult a regional, headquarters, or Department of Justice (DOJ) financial analyst regarding additional services that may be available.  Because some financial information may be subject to claims of confidentiality or privilege, the Region should take appropriate measures when handling such information.

•    Feasibility of Agency oversight -- Based on the technical difficulty of the required actions and Agency resources available to oversee those actions, the Region should assess whether it will be able to properly oversee the performance of the required actions, and, if not, whether the state, tribes, or local government may be able to provide oversight assistance.

•    Availability of other authorities and moneys -- The Region should evaluate whether statutory authorities other than RCRA § 7003 are available to require the same actions by the responsible persons (see Section III below and Attachment 2), whether funds are available to use those alternative authorities, and whether it would be more appropriate to use an alternative authority.  Lack of availability of Superfund, Oil Spill Fund, Leaking Underground Storage Tank Fund, and other moneys is a factor that supports the use of Section 7003.

## III.    RELATIONSHIP OF RCRA § 7003 TO OTHER REQUIREMENTS AND AUTHORITIES

### A.    Relationship to Other RCRA Requirements

By beginning Section 7003 with the language "notwithstanding any other provision of this chapter," Congress indicated its intent to create "a broadly applicable section dealing with the concerns addressed by the statute as a whole."[3]  Section 7003 can therefore be used to address potential endangerments that may be presented by solid or hazardous waste even if the persons or activities causing the potential endangerment are not subject to any other provision of RCRA or other environmental law.[4]  Section 7003 can also be used to address potential endangerments caused by persons or facilities that are in compliance with a regulation or permit issued pursuant to RCRA.[5]  Thus, a permit holder may not assert a "permit as shield" defense under Section 7003 (i.e., the holder cannot claim that he or she is protected from liability for problems resulting from activities covered by a permit).  Nonetheless, when a permit provides for corrective action under RCRA § 3004(u) or (v), 42 U.S.C. § 6924(u) or (v), or other measures under RCRA § 3005(c)(3), 42 U.S.C. § 6925(c)(3), or for other activities that may be necessary to abate a potential endangerment, the Region should consider requiring the necessary activities using its

---

[3] *United States v. Waste Industries, Inc.*, 734 F.2d 159, 164 (4th Cir. 1984).

[4] *See id.*

[5] *See Greenpeace v. Waste Technologies Industries*, 37 ERC 1736, 1740 (N.D. Ohio 1993).

- 4 -

permit authorities before it exercises its authorities under Section 7003.  In the event that these permit authorities are inadequate (for example, because they do not allow EPA to address the particular material present at the site or facility), cannot be used to address the potential endangerment in a timely manner, or are otherwise inappropriate for the potential endangerment at issue, the Region should then consider using the tools available under Section 7003.

Furthermore, actions under Section 7003 are not subject to requirements contained in other RCRA provisions.[6]  For example, it is not necessary for EPA to (1) comply with the provisions of Section 3008 of RCRA, 42 U.S.C. § 6928, requiring notice to authorized states,[7] or (2) exhaust its administrative remedies under that section before initiating an action under Section 7003.[8]  Further, persons complying with a RCRA § 7003 order under EPA's direction may treat, store, or dispose of waste without securing a RCRA permit for the actions required by that order.[9]

B.     Relationship to Other Enforcement and Response Authorities

Some elements of Section 7003 are similar to elements of other statutory provisions that allow EPA to address potential endangerments and to respond to the release of materials that may harm human health or the environment.  Attachment 2 is a chart which summarizes the general purpose, triggering activity, materials and persons covered, and response authority contained in the following provisions:  Sections 7003(a), 3008(h), 3013, and 9003(h) of RCRA, 42 U.S.C. §§ 6973(a), 6928(h), 6934, and 6991b(h); Sections 104(a) and 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9604(a) and 9606(a); Sections 311(c) and (e) and 504 of the Clean Water Act (CWA), 33 U.S.C. §§ 1321(c) and (e) and 1364; Section 1431 of the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300i; and Section 303 of the Clean Air Act (CAA), 42 U.S.C. § 7603.  The Regions are encouraged to use the chart when considering which enforcement authorities might be appropriate for the situations they encounter.  In many cases, it may be appropriate for the Regions to use a combination of these authorities.

If there are serious violations of environmental law or regulations at a facility or site being evaluated for action under RCRA § 7003, the Regions should also consider the possibility of criminal action against the responsible person.  When considering whether to initiate action under

---

[6] *United States v. Conservation Chemical Co.*, 619 F. Supp. 162, 212 (W.D. Mo. 1985).

[7] Note that Section VII.A below explains the notice requirements of Section 7003.

[8] *Conservation Chemical*, 619 F. Supp. at 212.

[9] For further guidance, see Memorandum, "RCRA Permit Requirements for State Superfund Actions" (OSWER Policy Directive #9522.00-2, November 16, 1987), which discusses the waiver of permit requirements for RCRA § 7003 actions based on the "notwithstanding any other provision of this Act" clause of  RCRA § 7003.  The guidance also discusses permit waivers by states with authority similar to RCRA § 7003.

- 5 -

Section 7003 when there is an ongoing criminal investigation or prosecution against the same person concerning the same or a related matter, the Regions should consult the June 22, 1994 memorandum from Steven A. Herman entitled "Parallel Proceedings Policy" and the applicable DOJ parallel proceedings policy.

RCRA § 7003(a) is also similar in some respects to the citizen suit provision set forth in RCRA § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B). That provision allows any person, including any state, to initiate a civil action against any person who has contributed or is contributing to certain activities which may present an imminent and substantial endangerment to health or the environment. Because Section 7002(a)(1)(B) contains an endangerment standard and many terms that are identical to those used in Section 7003(a), some court decisions addressing Section 7002(a)(1)(B) may assist the Regions in interpreting Section 7003.[10]

It is EPA's position, and at least one court agrees, that EPA may take action under Section 7003 even if the government is simultaneously taking action against the defendant under CERCLA.[11] The Regions may therefore use Section 7003 either independently or as a supplement to actions taken under CERCLA or other statutes.

In practice, the Regions may find that they sometimes need to choose between using Section 7003 over CERCLA § 106(a) or RCRA § 3008(h). The following discussion describes when to consider using RCRA § 7003 instead of those two authorities.

      1.      <u>Comparison of RCRA § 7003 and CERCLA § 106(a)</u>

Under CERCLA § 106(a), EPA may initiate a judicial action or issue an administrative order when there may be an imminent and substantial endangerment because of an actual or threatened release of a "hazardous substance."

      a.      <u>Advantages of RCRA § 7003</u>

The Regions may consider using RCRA § 7003 instead of CERCLA § 106(a) in order to:

•    <u>Address potential endangerments caused by materials that meet RCRA's statutory definition of "solid waste" but are not "hazardous substances" under CERCLA</u> -- The definition of "hazardous substance" in Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), does not include all materials that qualify as "solid waste" under RCRA

---

[10] *See, e.g., Connecticut Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305 (2d Cir. 1993), *rev'd in part on other grounds*, 505 U.S. 557 (1992); *Dague v. City of Burlington* ("*Dague II*"), 935 F.2d 1343 (2d Cir. 1991); *Lincoln Properties v. Higgins*, 23 Envtl. L. Rep. (Envtl. L. Inst.) 20665 (E.D. Cal. Jan. 18, 1993).

[11] *See, e.g.,United States v. Reilly Tar & Chemical Corp.*, 546 F. Supp. 1100, 1111 (D. Minn. 1982).

- 6 -

§ 1004(27), 42 U.S.C. § 6903(27).  Note, however, that the CERCLA definition of "hazardous substances" does encompass some materials, such as radionuclides, which are not "solid waste" under RCRA.

- Address potential endangerments caused by "hazardous waste" that meets the broad definition of that term under Section 1004(5) of RCRA, 42 U.S.C. § 6903(5), but which is not a CERCLA "hazardous substance" because it fails to meet the more narrow definitions of "hazardous waste" promulgated in 40 C.F.R. Part 261 pursuant to RCRA § 3001 -- CERCLA's definition of "hazardous substance" includes "hazardous waste" having characteristics identified under or listed pursuant to Section 3001 of RCRA, 42 U.S.C. § 6921.  It does not include all materials that qualify as "hazardous waste" as defined in RCRA § 1004(5).

- Address potential endangerments caused by petroleum -- Petroleum is excluded from the definition of "hazardous substance" in CERCLA § 101(14), but not from the definitions of "solid waste" under RCRA § 1004(27) or "hazardous waste" under RCRA § 1004(5). The courts have consistently held that a spill or release of a petroleum substance is a solid waste because the material is discarded.[12]  In addition, at least one court has recognized that shipments of oil to reclaimers may render the material "discarded" if the person sending the oil intended to get rid of it.[13]

- Enter into an administrative order on consent (AOC) requiring long-term cleanup work -- As provided in CERCLA § 122(d)(1)(A), 42 U.S.C. § 9622(d)(1)(A), each agreement requiring remedial action under CERCLA § 106 must be in the form of a judicial consent decree.  RCRA is more flexible and allows in appropriate circumstances for the use of AOCs for long-term cleanup work.  Nonetheless, there are also advantages to using consent decrees, including recourse to the court's contempt powers in the event of noncompliance.

b.    Advantages of CERCLA § 106(a)

Particularly when issuing orders to persons who are unlikely to comply, the Regions may consider using CERCLA § 106(a) instead of or in addition to RCRA § 7003 in order to:

- Seek higher civil penalties -- Under CERCLA § 106(b), EPA may seek penalties of up to $27,500 for each day of failure to comply with an order issued under CERCLA § 106(a).

---

[12] *Zands v. Nelson*, 779 F. Supp. 1254, 1262 (S.D. Cal. 1991); *Paper Recycling, Inc. v. Amoco Oil Co.*, 856 F. Supp. 671, 675 (N.D. Ga. 1993); *Craig Lyle Limited Partnership v. Land O'Lakes, Inc.*, 877 F. Supp. 476, 482 (D.Minn. 1995); *Agricultural Excess & Surplus Insurance Co. v. A.B.D. Tank & Pump Co.*, 878 F. Supp. 1091, 1095 (N.D. Ill. 1995); *Dydio v. Hesston Corp.*, 887 F. Supp. 1037 (N.D. Ill. 1995).

[13] *United States v. Valentine* ("*Valentine III*"), 885 F. Supp. 1506, 1513-14 (D. Wyo. 1995).

- 7 -

Under Section 7003(b), EPA may seek penalties of up to $5,500 for each day for violation of an order issued under Section 7003(a).[14]  Issuing an order under CERCLA § 106(a) may therefore provide greater incentive for the respondent to comply.

•   Seek punitive damages -- CERCLA § 106(a) provides for damages of up to three times the amount of Fund moneys expended as a result of the person's failure to comply with an order issued under CERCLA § 106(a).  Because RCRA contains no similar punitive damages provision, CERCLA may provide greater incentive for the respondent to comply.

•   Have access to Fund financing and other resources available under CERCLA -- When proceeding under CERCLA, the Regions may have access to additional staff, oversight, and contractor resources, as well as Fund financing, if needed.

•   Avoid disputes over the timing and scope of judicial review -- CERCLA contains an express bar against pre-enforcement review and expressly provides for record review of remedy decisions.  It is EPA's position, consistent with applicable principles of law, that orders issued under RCRA § 7003 are not subject to pre-enforcement review, and that in an enforcement action under Section 7003, the scope of judicial review of such orders is limited to the administrative record.  However, because CERCLA contains express statutory provisions addressing these issues, these issues are less likely to be disputed under CERCLA than under RCRA § 7003.

2.   Comparison of RCRA § 7003 and RCRA § 3008(h)

RCRA § 3008(h) allows EPA to require corrective action to address the release of hazardous waste and hazardous constituents at any treatment, storage, or disposal (TSD) facility authorized to operate under interim status pursuant to Section 3005(e) of RCRA, 42 U.S.C. § 6925(e).  EPA interprets the term "authorized to operate" to include facilities that have or should have had interim status, as well as some facilities that had interim status at one time but no longer do.[15]

---

[14] Pursuant to EPA's Civil Monetary Penalty Inflation Adjustment Rule (implementing the Debt Collection Improvement Act of 1996 and codified at 40 C.F.R. Part 19), EPA adjusted for inflation the maximum civil monetary penalties that can be imposed pursuant to the Agency's statutes.  For violations occurring after January 30, 1997, the maximum penalty amounts under CERCLA § 106(b) and RCRA § 7003(b) are $27,500 and $5,500, respectively.  For violations occurring on or before January 30, 1997, the maximum penalty amounts under these sections are $25,000 and $5,000, respectively.

[15] See United States v. Environmental Waste Control, Inc., 917 F.2d 327 (7th Cir. 1990), cert. denied 499 U.S. 975 (1991) (affirming that facility that lost interim status is liable for corrective action under RCRA § 3008(h)); United States v. Indiana Woodtreating Corp., 686 F. Supp. 218, 223-24 (S.D. Ind. 1988) (holding an unpermitted facility that never obtained interim status liable for corrective action).

- 8 -

a.     Advantages of RCRA § 7003

The Regions may consider using RCRA § 7003 instead of RCRA § 3008(h) in order to:

• Address potential endangerments caused by "solid waste" that meets the definition of that term under Section 1004(27) of RCRA, but which does not meet the definition of "hazardous waste" under RCRA § 1004(5) and is not a hazardous constituent -- RCRA § 3008(h) does not apply to the release of "solid waste" that is not a hazardous waste or a hazardous constituent.  RCRA § 3008(h) applies to the release of "hazardous waste," which EPA and courts interpret to include the release of hazardous constituents listed by EPA in Appendix VIII of 40 C.F.R. Part 261.[16]

• Address potential endangerments at locations other than TSD facilities --
RCRA § 3008(h) may only be used to address releases from TSD facilities.  RCRA § 7003 imposes no locational limitations.

• Address potential endangerments caused by generators at facilities that are not subject to RCRA's interim status provisions, or where interim status is in question -- EPA interprets RCRA § 3008(h) to apply to releases from TSD facilities that have or should have had interim status, as well as from some TSD facilities that had interim status at one time but no longer do.  However, one court has held that EPA cannot use RCRA § 3008(h) to obtain corrective action at facilities that never had interim status (i.e., "illegal operators").[17]

• More expeditiously address potential endangerments due to fewer procedural requirements -- 40 C.F.R. Part 24 establishes procedures for issuing corrective action orders under RCRA § 3008(h) and for administrative hearings on those orders.  40 C.F.R. Part 22 sets forth administrative hearing requirements that apply to certain orders issued under RCRA § 3008(h) and to which 40 C.F.R. Part 24 does not apply.  Because RCRA § 7003 is designed to address conditions that may present an imminent and substantial endangerment, it contains fewer procedural requirements than either Section 3008(h), under which EPA may address releases of hazardous wastes that may not rise to the level of presenting an imminent and substantial endangerment, or Section 3008(a), under which EPA may seek penalties for regulatory violations.  Therefore, neither the Part 22 nor the Part 24 regulations apply to orders issued under RCRA § 7003.  Nevertheless, recipients of Section 7003 orders are provided due process by the opportunity to confer with EPA

---

[16] *United States v. Environmental Waste Control, Inc.,* 710 F. Supp. 1172, 1226 (N.D. Ind. 1989); *Indiana Woodtreating*, 686 F. Supp. at 223-24; *United States v. Clow Water Systems*, 701 F. Supp. 1345, 1356 (S.D. Ohio 1988); "Interpretation of  Section 3008(h) of the Solid Waste Disposal Act," Porter and Price (December 16, 1985).

[17] *See United States v. Hawaiian Western Steel, Ltd.,* Civ. No. 92-00587 ACK, at 31 n. 6 (D. Hi. May 16, 1996); *cf.* cases cited in n. 15, above.

- 9 -

regarding the order and subsequent review by a court if an action is brought to enforce the order.

b.    Advantages of RCRA § 3008(h)

The Regions may consider using RCRA § 3008(h) instead of RCRA § 7003 in order to:

- Address releases of hazardous waste or hazardous constituents without a finding that conditions may present an imminent and substantial endangerment -- Because RCRA § 3008(h) does not require such a finding, the Regions may consider using RCRA § 3008(h) instead of RCRA § 7003 when they have insufficient resources to determine whether conditions may present an imminent and substantial endangerment or where there is insufficient evidence that conditions may present such an endangerment.
    .
- Seek civil penalties of up to $27,500 for each day for violation of an order issued under RCRA § 3008(h) -- As noted above, penalties under Section 7003(b) are limited to $5,500 for each day for violation of an order issued under Section 7003(a).[18]  Issuing an order under RCRA § 3008(h) may therefore provide greater incentive for the respondent to comply.

## IV.    LEGAL REQUIREMENTS FOR INITIATING ACTION

The three basic requirements for initiating action against a particular person under Section 7003 are the following:  (1) conditions may present an imminent and substantial endangerment to health or the environment; (2) the potential endangerment stems from the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste; and (3) the person has contributed or is contributing to such handling, storage, treatment, transportation, or disposal.[19]  The following discussion includes definitions of key terms and summaries of significant case law on Section 7003.  Attachment 3 lists possible sources of evidence related to the three requirements.

A.    Conditions May Present an Imminent and Substantial Endangerment to Health or the Environment

1.    The meaning of "may present an imminent and substantial endangerment"

Demonstrating the existence of conditions that may present an imminent and substantial endangerment to health or the environment generally requires careful documentation and scientific

---

[18] For violations occurring on or before January 30, 1997, the maximum penalty amount under RCRA § 3008(h) is $25,000.  *See* n. 14, above.

[19] *See, e.g., United States v. Bliss*, 667 F. Supp. 1298, 1313 (E.D. Mo. 1987).

- 10 -

evidence.  However, courts have repeatedly recognized that the endangerment standard of RCRA § 7003 is quite broad.[20]  Courts interpreting the "imminent and substantial endangerment" provision of Section 7003 have found:

- An "endangerment" is an actual, threatened, or potential harm to health or the environment.[21]  As underscored by the words "may present" in the endangerment standard of Section 7003, neither certainty nor proof of actual harm is required, only a *risk* of harm.[22]  Moreover, neither a release nor threatened release, as those terms are used in CERCLA, is required.[23]  No proof of off-site migration is required if there is proof that the wastes, in place, may present an imminent and substantial endangerment.[24]

- An endangerment is "imminent" if the present conditions indicate that there may be a future risk to health or the environment[25] even though the harm may not be realized for years.[26]   It is not necessary for the endangerment to be immediate[27] or tantamount to an emergency.[28]

---

[20] *See, e.g., United States v. Valentine* ("*Valentine I*"), 856 F. Supp. 621, 626 (D. Wyo. 1994).

[21] *See, e.g., Valentine I*, 856 F. Supp. at 626; *Waste Industries*, 734 F.2d at 165.

[22] *See, e.g., Dague II*, 935 F.2d at 1356.

[23] *United States v. Aceto Agricultural Chemicals Corp.*, 872 F.2d 1373, 1382 (8th Cir. 1989).

[24] *Valentine I*, 856 F. Supp. at 626-27.

[25] *See, e.g., Dague II,* 935 F.2d at 1356; *Fairway Shoppes Joint Venture v. Dryclean U.S.A. of Florida*, No. 95-8521-CIV-HURLEY (S.D. Fla. Aug. 2, 1996) (affirming a magistrate's finding that "[a] plume of toxic contaminants migrating toward a source of potable water supply... unquestionably meets the 'imminent and substantial endangerment' standard of RCRA."); *Morris v. Primetime Stores of Kansas, Inc.*, No. 95-1328-JTM (D. Kan. Sept. 5, 1996) (denying a motion to dismiss RCRA § 7002 claim because there was "no indication the Morris house is safe for human occupation").

[26] *Valentine I*, 856 F. Supp. at 626; *Conservation Chemical*, 619 F. Supp. at 194.  However, one court has held, in the context of a motion to dismiss, "[i]f the waste is trapped or contained in such a way that exposure (and harm) is foreclosed. . . it could not then be considered an imminent endangerment to health," *Davies v. Nat'l Cooperative Refinery Ass'n*, No. 96-1124-WEB (D. Kan. July 12, 1996).

[27] *See, e.g., Dague II*, 935 F.2d at 1356.

[28] *See, e.g., Waste Industries*, 734 F.2d at 165; *Valentine I*, 856 F. Supp. at 626.

- 11 -

•      An endangerment is "substantial" if there is reasonable cause for concern that health or the environment may be seriously harmed.[29]  It is not necessary that the risk be quantified.[30]

Because conditions vary dramatically from site to site, there is no comprehensive list of factors that EPA should consider when determining whether conditions may present an imminent and substantial endangerment.  In some cases, the potential endangerment may be immediately apparent; in others, the risks may be less readily identified.  Some of the factors that the Regions may consider as appropriate are:  (1) the levels of contaminants in various media; (2) the existence of a connection between the solid or hazardous waste and air, soil, groundwater, or surface water; (3) the pathway(s) of exposure from the solid or hazardous waste to the receptor population; (4) the sensitivity of the receptor population; (5) bioaccumulation in living organisms; (6) visual signs of stress on vegetation;[31] (7) evidence of wildlife mortalities, injuries, or disease;[32] (8) a history of releases at the facility or site; (9) staining of the ground; and (10) "missing" (*i.e.*, unaccounted for) solid or hazardous waste.  It is important to note, however, that in any given case, one or two factors may be so predominant as to be determinative of the issue.[33]

Attachment 4 contains a list of documents that may assist the Regions in assessing whether conditions may present an imminent and substantial endangerment.  When assessing ecological impacts, the Regions may consider consulting the U.S. Fish and Wildlife Service and the National Oceanic and Atmospheric Administration, as well as state, local, and tribal agencies.  Depending on allocation of regional RCRA and CERCLA resources, the Regions may also consult their Regional Biological Technical Assistance Groups.

     2.      <u>Examples of imminent and substantial endangerments</u>

The following are some examples of situations where courts have determined that conditions may have presented an imminent and substantial endangerment under RCRA:

•      At a shooting range where lead from lead shot had accumulated in the tissues of nearby waterfowl and shellfish.[34]

---

[29] *See, e.g., Conservation Chemical*, 619 F. Supp. at 194; *Leister v. Black & Decker Inc.*, No. 96-1751 (4th Cir. July 8, 1997) (holding that a waste must pose "a current serious threat of harm" for an endangerment to be substantial).

[30] *Conservation Chemical,* 619 F. Supp. at 194.

[31] *See, e.g., Dague v. City of Burlington* ("*Dague I*"), 732 F. Supp. 458, 468 (D. Vt. 1989).

[32] *Valentine I*, 856 F. Supp. at 624-25.

[33] *Conservation Chemical*, 619 F. Supp. at 194.

[34] *Connecticut Coastal*, 989 F.2d at 1317.

- 12 -

- At a facility containing several open, unlined pits of oily waste and where oily waste containing hazardous constituents had leaked from tanks into surrounding soils.[35]  EPA documented the death of several animals and introduced evidence from the U.S. Fish and Wildlife Service indicating that there was a continuing threat to migratory birds and other wildlife.  In addition, access to the site was unrestricted and there was limited information available regarding the migration of oily wastes within the site and off-site.

- At a municipal landfill that had leaked at least 10% of its leachate containing low levels of lead into an adjacent wetland.[36]  Lead levels in test wells surrounding the landfill were generally below the maximum contaminant levels (MCLs) for drinking water, and no actual harm was shown to the wetland.[37]  However, the court found an imminent and substantial endangerment because the leachate contained toxic constituents, lead had bioaccumulated in the wetland, and some of the chemicals "which continue to migrate from the landfill, may have a dramatic adverse impact on the food chain" in the area of the site.[38]

- At a shopping center where dry cleaning solvents discharged from dry cleaning facilities had contaminated groundwater in a populated area.[39]  Contaminant levels in the migrating plume exceeded MCLs.  Although some area wells had been closed at least in part because of the contaminated plume, the court found that the conditions may have presented an imminent and substantial endangerment to the environment, but not necessarily to human health.

   B.   The Potential Endangerment Stems from the Past or Present Handling, Storage, Treatment, Transportation, or Disposal of Any Solid or Hazardous Waste

   As clarified by the 1984 amendments to RCRA, Section 7003 is generally intended to abate conditions resulting from past or present activities.[40]  Because EPA need only show that one type of activity listed in Section 7003 has occurred or is occurring, the Regions should consider alleging and showing that the potential endangerment stems from past or present "handling," the broadest of the five categories.

---

[35] *Valentine I*, 856 F. Supp. at 624-25.

[36] *Dague II*, 935 F.2d at 1356.

[37] *Dague I*, 732 F. Supp. at 463, 469.

[38] *Dague II*, 935 F.2d at 1355-56.

[39] *Lincoln Properties*, 23 Envtl. L. Rep. at 20671-72.

[40] H.R. Rep. No. 1133, 98th Cong., 2d Sess. 119 (1984).

- 13 -

1.    The meaning of "handling, storage, treatment, transportation, or disposal"

a.    "Handling"

The statute does not define "handling."  EPA agrees with at least one court that has applied a dictionary definition of "handle" as "to deal with or have responsibility" for something.[41] One example of an activity that a court has determined to constitute "handling" under RCRA is using mercury during manufacturing and failing to provide adequate safety measures for employees.[42]

b.    "Storage"

When assessing whether particular activities may constitute "storage" of solid waste or hazardous waste under Section 7003, the Regions should apply the definition set forth in RCRA § 1004(33), 42 U.S.C. § 6903(33).  Although that definition refers to hazardous waste only, the Regions may apply an analogous definition when addressing the possible storage of solid waste.

c.    "Treatment"

The statutory definition of "treatment" refers to hazardous waste but not solid waste. Thus, when assessing whether particular activities may constitute "treatment" of hazardous waste under Section 7003, the Regions should apply the definition set forth in RCRA § 1004(34), 42 U.S.C. § 6903(34).[43]  EPA does not agree with courts that have interpreted that definition to require that a process change the character of the waste as defined in RCRA and be purposefully designed to have that effect.[44]  When assessing whether particular activities may constitute "treatment" of solid waste under Section 7003, the Regions may apply the following definition, which is based on the statutory definition of "treatment":  any method, technique, or process objectively designed to change the physical, chemical, or biological character or composition of any solid waste so as to render it safer for transport, amenable for recovery, amenable for storage, or reduced in volume.

---

[41] *Lincoln Properties*, 23 Envtl. L. Rep. at 20672.

[42] *State of Vermont v. Staco, Inc.*, 684 F. Supp. 822, 836 (D. Vt. 1988).

[43] *See, e.g, United States v. Ottati & Goss*, 630 F. Supp. 1361, 1393-94 (D.N.H. 1985); *Connecticut Coastal*, 989 F.2d at 1315-16.

[44] *See United States. v. Great Lakes Castings Corp.*, 1994 U.S. Dist. LEXIS 5745 at 13-15 (W.D. Mich. 1994) (*citing Shell Oil Co. v. U.S. Environmental Protection Agency*, 950 F.2d 741, 753-54 (D.C. Cir. 1992) and holding that the dewatering of sludge did not constitute "treatment" because there was no intent to alter the character of the waste); *but see United States v. Pesses*, 794 F. Supp. 151, 157 (W.D. Pa. 1992) (broadly interpreting the term "treatment" in RCRA, which is incorporated by reference in CERCLA § 101(29)).

- 14 -

d.    "<u>Transportation</u>"

The statute does not define "transportation." However, the RCRA regulations include the following definition of "transportation" at 40 C.F.R. § 260.10: "the movement of hazardous waste by air, rail, highway, or water." Again, although this regulatory definition refers to hazardous waste only, the Regions may apply an analogous definition when addressing the transportation of solid waste.

e.    "<u>Disposal</u>"

When assessing whether particular activities may constitute "disposal" under Section 7003, the Regions should apply the definition set forth in RCRA § 1004(3), 42 U.S.C. § 6903(3). EPA and the majority of courts maintain that the leaking of waste satisfies that definition.[45] It is EPA's interpretation that the reference to "disposal" in Section 7003 therefore applies to passive contamination[46] and both intentional and unintentional disposal practices.[47]

2.    <u>The meaning of "any solid waste or hazardous waste"</u>

The RCRA statute and regulations contain two different sets of definitions of "solid waste" and "hazardous waste." The regulatory definitions set forth in 40 C.F.R. Part 261 identify materials that are subject to regulation under Subtitle C of RCRA. It is EPA's position, and at least two courts have recognized, that the broad statutory definitions, not the regulatory definitions, govern in Section 7003 actions.[48]

---

[45] *See, e.g., Waste Industries*, 734 F.2d at 164-65; *Acme Printing Ink Co. v. Hartford Accident Indemnity Co.*, 812 F. Supp. 1498, 1512 (E.D. Wis. 1992); *Jones v. Inmont Corp.*, 584 F. Supp. 1425, 1436 (S.D. Ohio 1984); *United States v. Price* ("*Price I*"), 523 F. Supp. 1055, 1071 (D.N.J. 1981).

[46] *Price I*, 523 F. Supp. at 1071; *see also, Connecticut Coastal*, 989 F.2d at 1314. This definition of disposal that includes passive disposal should not be confused with the definition of "disposal facility" for permitting purposes, which requires intentional placement into or on any land or water. *See* 40 C.F.R. § 260.10. It is also distinct from the definition of "land disposal" for purposes of application of the Part 268 land disposal restrictions (LDRs). 40 C.F.R. § 268.2 defines "land disposal" for LDRs to require placement in or on the land. Because CERCLA § 101(29) incorporates by reference the definition of "disposal" in RCRA § 1004(3), a significant number of CERCLA cases have interpreted the RCRA definition. *See, e.g., HRW Systems, Inc. v. Washington Gas Light Co.*, 823 F. Supp. 318, 339 (D. Md. 1993); *accord Redwing Carriers v. Saraland Apartments*, 94 F.3d 1489 (11th Cir. 1996); *Tanglewood East Homeowners v. Charles-Thomas, Inc.*, 849 F.2d 1568, 1572-73 (5th Cir. 1988); *but see, e.g., United States v. CDMG Realty Co.*, 96 F.3d 706 (3d Cir. 1996).

[47] *United States v. Northeastern Pharmaceutical and Chemical Co. (NEPACCO)*, 810 F.2d 726, 740 n.5 (8th Cir. 1986), *quoting* H.R. Rep. No. 198 (Part 1), 98th Cong., 2d Sess. 47-49 (1983), *cert. denied*, 484 U.S. 848 (1987).

[48] *See, e.g., Valentine I*, 856 F. Supp. at 627 (*citing* 40 C.F.R. § 261.1 (b)(2)); *Connecticut Coastal*, 989 F.2d at 1314-15.

- 15 -

The broadest category of RCRA waste is "solid waste" as defined in RCRA § 1004(27). "Hazardous waste" as defined in RCRA § 1004(5) is a very large subset of statutory solid waste. "Hazardous waste" as defined in 40 C.F.R. § 261.3 is in turn a fairly large subset of statutory hazardous waste, as well as a subset of "solid waste" as defined in 40 C.F.R. § 261.2. Thus, when determining whether a particular material is a solid waste or hazardous waste for purposes of Section 7003, the Region may be able to readily determine whether the material is a "solid waste" under 40 C.F.R. § 261.2 and also a "hazardous waste" under 40 C.F.R. § 261.3. If the material meets those definitions, then the analysis is complete and the material is a "hazardous waste."[49]

If the material is not a regulatory solid waste and hazardous waste or if it would require too much time or too many resources to determine whether it is, the Region should determine whether the material is a "solid waste" under RCRA § 1004(27) or a "hazardous waste" under RCRA § 1004(5), taking particular care to examine whether the material is excluded from the definition of "solid waste"[50] and consulting the Office of General Counsel and relevant case law as appropriate. If the material meets either of those definitions, then the analysis is complete and the material is a "solid waste" or "hazardous waste," as appropriate, for purposes of Section 7003.

3.    Examples of solid waste and hazardous waste that could be addressed under Section 7003

Some of the many types of solid waste and hazardous waste that can be addressed under Section 7003 include: (1) hazardous waste that is spilled at facilities where such waste is generated but which are not required to be permitted under Subtitle C of RCRA and which do not have, never had, nor were required to have, interim status under Section 3005(e) of RCRA; (2) solid or hazardous waste that is spilled during transport; (3) solid or hazardous waste that is released from TSD units; (4) hazardous constituents in or from solid waste or hazardous waste; (5) gasoline that has leaked from tanks at gasoline stations;[51] (6) expended lead shot, spent rounds, and target fragments located in and around shooting ranges;[52] (7) waste materials found at slaughterhouses; (8) biological and chemical munitions waste; (9) waste oil and oil pit skimmings that are below marketable petroleum grade and sent to an oil reclaimer;[53] (10) medical waste; (11) discarded material produced during pharmaceutical processes; (12) dioxin emissions from solid waste incinerators; (13) wastes containing radioactive materials (*i.e.*, radionuclides that are not exempt from the statutory definition of "solid waste"); (14) with the exception of materials listed

---

[49] 40 C.F.R. § 261.1(b)(2).

[50] For example, the definition of "solid waste" under Section 1004(27) specifically excludes industrial discharges which are point sources subject to permits under the National Pollutant Discharge Elimination System of the Clean Water Act, 33 U.S.C. § 1432.

[51] *Zands*, 779 F. Supp. at 1262.

[52] *Connecticut Coastal*, 989 F.2d at 1316-17.

[53] *Valentine III*, 885 F. Supp. at 1513-14.

- 16 -

in 40 C.F.R. §§ 261.4(a)(1)-(4) (*i.e.,* materials excluded from the statutory definition of "solid waste"), the wide variety of materials that are otherwise excluded from Subtitle C regulation under 40 C.F.R. § 261.4; (15) drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil or natural gas ("Bentsen wastes"), exempted from regulation as hazardous waste under RCRA § 3001(b)(2)(A); (16) fly ash, bottom ash waste, slag waste, and flue gas emission control waste generated from the combustion of fossil fuels, wastes from the extraction, beneficiation, and processing of ores and minerals, and cement kiln dust waste ("Bevill wastes"), exempted from regulation as hazardous wastes under RCRA § 3001(b)(3)(A); and (17) piles of scrap tires.

C.   The Person Has Contributed to Such Handling, Storage, Treatment, Transportation, or Disposal

1.   The meaning of "any person"

Section 7003 specifies that "any person" includes any past or present generator, past or present transporter, or past or present owner or operator of a TSD facility.[54]  Section 1004(15) of RCRA defines "person" as including an individual, corporation, and political subdivision of a state, as well as each department, agency, and instrumentality of the United States.

The definition of "person" does not exclude corporate officers or employees.  With respect to corporate officer liability, EPA's position, which has been adopted by at least one court, is that it is not necessary to "pierce the corporate veil" in order to find individual corporate officer liability (*i.e.*, corporate officers are not immune from personal liability for corporate activities).[55]  Thus, a corporate officer who is either personally involved in actual company decisions regarding the handling of solid or hazardous wastes, or in charge of and directly responsible for a company's operations with the ultimate authority to control the disposal of such wastes, can be held individually liable under Section 7003 as a contributor to the handling, storage, treatment, transportation, or disposal of a solid or hazardous waste.[56]

---

[54] The 1984 Guidance included a detailed discussion of the application of Section 7003 to past, non-negligent, off-site generators.  The 1984 amendments to RCRA clarified that the term "any person" includes any past or present generator, transporter, or owner or operator of a TSD facility.  Furthermore, the legislative history of those amendments notes that "[Section 7003] has always reached those persons who have contributed in the past or are presently contributing to the endangerment, including but not limited to generators, regardless of fault or negligence."  H.R. Rep. No. 1133, 98th Cong., 2d Sess., 130 Cong. Reg. H. 11137 (October 3, 1984).

[55] *NEPACCO*, 810 F.2d at 745.

[56] *Id.*  The Regions may also find it helpful to consult cases brought under RCRA § 3008(a) that have discussed this issue.  *See, e.g., United States v. Production Plated Plastics, Inc.*, 742 F. Supp. 956 (W.D. Mich. 1990); *United States v. Conservation Chemical Co. of Illinois*, 733 F. Supp. 1215 (N.D. Ind. 1989).

- 17 -

With respect to employee liability, EPA agrees with at least one court that has held that an employee of a corporation can be subject to individual liability under Section 7003 if he or she had the authority to control and in fact undertook responsibility for waste disposal procedures.[57] However, under RCRA § 6001, 42 U.S.C. § 6961, Congress specifically excluded any federal employee from personal liability for any civil penalty with respect to any act or omission within the scope of his or her official duties.

    2.    <u>The meaning of "who has contributed or is contributing to such handling, storage, treatment, transportation, or disposal"</u>

Congress intended that the phrase "has contributed to or is contributing to" be broadly construed.[58]  Section 7003 therefore imposes strict liability upon persons who have contributed or are contributing to activities that may present an endangerment, regardless of fault or negligence.[59]

EPA agrees with one circuit court that has stated that the plain meaning of "contributing to" is "to have a share in any act or effect."[60]  It is not necessary for EPA to prove that the person had control over the activities that may create an imminent and substantial endangerment.[61]  For example, one court has held that a person contributed to the handling and disposal of pesticide-related wastes because that person had (1) contracted with a company that formulates commercial grade pesticides through a process that inherently involves the generation of wastes, and (2) maintained ownership of those pesticides throughout the process.[62]

As indicated in Section 7003, a transporter is considered a contributor to waste management that takes place after the waste has left the possession or control of such transporter unless the transporter (1) was under a sole contractual arrangement arising from a published tariff and acceptance for carriage by common carrier by rail, and (2) has exercised due care in the management of such waste.  In contrast to CERCLA § 107(a)(4), 42 U.S.C. § 9607(a)(4), it is not necessary for the transporter to have actually selected the site or disposal facility.[63]

Some other examples of "contributors" for purposes of Section 7003 are the following:

---

[57] *Acme Printing Ink Co. v. Menard, Inc.*, 870 F. Supp. 1465, 1491 (E.D. Wis. 1994).

[58] H.R. Rep. No. 1133, 98th Cong., 2d Sess. (October 3, 1984); *Aceto*, 872 F.2d at 1383; *Price I*, 523 F. Supp. at 1073.

[59] *See, e.g.*, H.R. Rep. No. 1133, 98th Cong., 2d Sess. (October 3, 1984); *Aceto*, 872 F.2d at 1377.

[60] *Aceto*, 872 F.2d at 1384, *quoting* Webster's Third New International Dictionary 496 (1961).

[61] *Id*. at 1383; *accord Valentine III*, 885 F. Supp. at 1512 (finding transporter liable even though he had no authority to control handling of the material at the site).

[62] *Aceto,* 872 F.2d at 1384.

[63] *Valentine III*, 885 F. Supp. at 1512.

- 18 -

(1) an owner who fails to abate an existing hazardous condition of which he or she is aware;[64] (2) a person who owned the land on which a facility was located during the time that solid waste leaked from the facility;[65] (3) a person who operated equipment during the time that solid waste leaked from that equipment;[66] (4) a person who installed equipment that later leaked;[67] (5) a person who simply provided a receptacle for existing wastes;[68] (6) a generator who sold below grade materials to a reclamation facility in order to dispose of them;[69] and (7) a county that sited, licensed, and franchised a privately owned and operated landfill for the disposal of industrial wastes.[70]

### 3.    Strict liability

Liability under Section 7003 is strict.  EPA does not need to show negligence or willful misconduct on the part of the defendant or respondent.[71]  The legislative history of the 1984 amendments to RCRA states that the "amendments clearly provide that anyone who has contributed or is contributing to the creation, existence, or maintenance of an imminent and substantial endangerment is subject to the equitable authority of [the statute], without regard to fault or negligence."[72]

### 4.    Joint and several liability

Congress intended Section 7003 to be a codification and expansion of the common law of public nuisance.[73]  Courts have recognized that Congress intended to impose joint and several liability where the injury is indivisible.[74]  Thus, if the defendants or respondents have caused an indivisible harm, each may be held liable for the entire harm.  EPA's position, which has been adopted by at least one court, is that when the respondents or defendants believe that the harm is divisible, they bear the burden of demonstrating the divisibility of harm and the degree to which

---

[64] *Price I*, 523 F. Supp. at 1073-74.

[65] *Zands*, 779 F. Supp. at 1264.

[66] *Id.*

[67] *Id.*

[68] *Environmental Defense Fund v. Lamphier*, 714 F.2d 331, 336 (4th Cir. 1983).

[69] *Valentine III,* 885 F. Supp. at 1514.

[70] *Waste Industries*, 734 F.2d at 161-62.

[71] *Aceto*, 872 F.2d at 1377.

[72] H.R. Rep. No. 198, 98th Cong., 2d Sess., Part 1, at 48 (1983).

[73] S. Rep. No. 96-172, 96th Cong., 1st Sess., at 5, *reprinted in* 1980 U.S. Code Cong. & Ad. News 5019, 5023.

[74] *United States v. Valentine* ("*Valentine II*"), 856 F. Supp. 627, 633 (D. Wyo. 1994) (*citing Conservation Chemical*, 619 F. Supp. at 199).

- 19 -

each respondent or defendant is responsible.[75]

However, considering the adequacy of evidence of each responsible person's liability, financial ability, and contribution to the site, as well as the constraints imposed by the Region's limited resources, the Region should attempt to be inclusive with respect to the responsible persons that it pursues in its action under Section 7003. The Regions can assess a particular responsible person's "contribution to the site" by considering that person's contribution to the conditions that may present an imminent and substantial endangerment, as well as its participation in any previous phases of the required actions.

## V.    ACTIONS AND RESTRAINTS THAT CAN BE REQUIRED

Section 7003 gives courts the authority to order each responsible person "to take such other action as may be necessary." "The forms of relief which are 'appropriate' must be determined on a case by case basis in order to achieve the remedial [and protectiveness] purposes contemplated by [RCRA]."[76]

Courts have consistently relied on the legislative history of Section 7003 to interpret the breadth of EPA's authority and courts' discretion under this section. They have concluded that this section was intended as a broad grant of authority to respond to situations involving a risk of substantial endangerment to health or the environment. Most courts have found that "Section 7003 empowers the Court to grant the full range of equitable remedies. . . so long as such relief serves to protect public health and the environment."[77] The section's broad grant of authority to "take such other actions as may be necessary" includes "both short- and long-term injunctive relief, ranging from the construction of dikes to the adoption of certain treatment technologies, upgrading of disposal facilities, and removal and incineration."[78] This authority also includes the authority to require in appropriate cases environmental assessment, controls on future operations, and, potentially, environmental restoration.

### A.    Interim Measures

Interim measures may be appropriate under Section 7003 depending on the urgency of the situation.[79] EPA or a court may order the containment, stabilization, and removal of contaminant sources. Thus, the Regions or a court may use Section 7003 to order immediate sampling or

---

[75] *Ottati & Goss*, 630 F. Supp. at 1401.

[76] *United States v. Price* ("*Price II*"), 688 F.2d 204, 214 (3d Cir. 1982).

[77] *Valentine II*, 856 F. Supp. at 633 (citing cases that emphasize the broad grant of authority in Section 7003).

[78]  H.R. Committee Print No. 96-IFC 31, 96th Cong., 1st Sess. 32 (1979).

[79] *United States v. Rohm and Haas Co.* ("*Rohm and Haas III*"), 2 F.3d 1265, 1271 (3d Cir. 1993).

- 20 -

testing programs as part of a broader set of required actions.  For example, the Region may issue an order under Section 7003 to require immediate security and cleanup action in response to hazards that have already been identified and to conduct additional assessments of potential threats.

A few examples of interim measures that have been ordered under Section 7003 and that EPA could order administratively or seek judicially include:  (1) removal of drums and other containers;[80] (2) recontainment of all leaking barrels, construction of a new building and movement of all barrels inside, and containment of all contaminated soil and storm water;[81] and (3) assessment of the integrity of tanks and impoundments on-site and performance of any interim measures necessary to prevent releases.  EPA and courts have also required interim measures that focus on site security and preventing exposure, including:  (1) installation of a fence around the site and the posting of warning signs;[82] (2) construction of a barrier around contamination and runoff control mechanisms; (3) groundwater stabilization; (4) temporary measures that might be necessary to protect wildlife from exposure;[83] (5) temporary evacuation of the affected area; and (6) provision of an alternative safe drinking water supply to an impacted area.

B.    Investigation and Assessment

The legislative history of Section 7003 clearly states that Congress intended Section 7003 to give EPA the authority to obtain relevant information about potential endangerments.[84]  EPA may also gather information under RCRA § 3007, 42 U.S.C. § 6907, or RCRA § 3013, 42 U.S.C. § 6934, where those authorities apply.  A few examples of investigation and assessment actions that have been ordered include:  (1) sampling, testing, and analysis of media to determine the nature and extent of contamination;[85] (2) assessment of the integrity of tanks and impoundments on-site;[86] (3) evaluation of the nature and extent of any migration of hazardous wastes from the site;[87] (4) a survey of affected receptors, studies to assess exposure, and studies of the effects on health and the environment; (5) performance of a risk assessment; and (6) performance of a

---

[80] *See, e.g., United States v. Midwest Solvent Recovery*, 484 F. Supp. 138, 145 (N.D. Ind. 1980).

[81] *United States v. Vertac Chemical Corp.*, 489 F. Supp. 870, 875-76 (E.D. Ark. 1980).

[82] *See Valentine I*, 856 F. Supp. at 625 and 625 n. 4.

[83] *Id.*

[84] H.R. Rep. No. 1185, 93d Cong., 2d Sess. (1974).

[85] *See, e.g., Vertac*, 489 F. Supp. at 875-76 (respondents to an administrative order on consent agreed to "an extensive program of sampling and analysis").

[86] *Valentine III*, 885 F. Supp. at 1510.

[87] *United States v. Rohm and Haas Co.* ("*Rohm and Haas II*"), 790 F. Supp. 1255, 1259 (E.D. Pa. 1992), *rev'd on other grounds*, 2 F.3d 1265 (3d Cir. 1993).

- 21 -

diagnostic study of the threat that hazardous wastes leaching from a landfill posed to a public water supply.[88]

### C.    Long-Term Cleanup Work

Under Section 7003, EPA may also order or seek a court order requiring long-term cleanup, including the design, construction, and implementation of any measures necessary to abate the conditions that may present an endangerment.[89]

EPA or a court can thus require extensive work under Section 7003. For example, EPA may seek, administratively or judicially, to require the responsible persons to: (1) identify and evaluate potential remedies; (2) design, construct, and implement a chosen remedy; (3) provide an alternative safe drinking water supply to an impacted area,[90] including connecting affected areas to a municipal water supply; (4) install or restore clay covers and containment walls over and around certain areas of contaminated soils; (5) install and operate a wastewater treatment system as an alternative to impoundments contaminated with historical wastes; (6) close contaminated impoundments; (7) remove all wastes from the site or facility; (8) implement a groundwater recovery system; (9) provide access to state and federal agencies; (10) monitor the effectiveness of the remedy; (11) provide samples from monitoring wells to EPA and the state for analysis;[91] (12) provide periodic reports to EPA;[92] and (13) provide resources and information that will allow a local community to develop the capacity to monitor and enforce compliance with an order issued by EPA or a court.

### D.    Controls on Future Operations

Section 7003(a) explicitly provides the authority to a court to restrain handling, storage, treatment, transportation, and disposal that may present an endangerment. Therefore, RCRA § 7003 actions are particularly useful to require the responsible person to cease any ongoing activity that may contribute to conditions that may present an imminent and substantial endangerment. Section 7003 authorities may also be used in appropriate circumstances to impose controls on future operations at any facility or site, regardless of whether it is a permitted RCRA facility.

---

[88] *Price II*, 688 F.2d at 214.

[89] *Id.* at 213, *quoting* H.R. Committee Print No. 96-IFC 31, 96th Cong., 1st Sess. at 32.

[90] *See id.* at 214.

[91] *Vertac*, 489 F. Supp. at 888-89.

[92] *Valentine III*, 885 F. Supp. at 1510.

- 22 -

One court has ordered that "[n]o party shall move any drums, tanks, containers, cartons, chemicals or chemical residues" at the facility.[93]  EPA may also seek or impose restraints on actions that are related to conditions that may present an imminent and substantial endangerment such as:  (1) shutting down a groundwater recovery system that is creating a threat to the environment; (2) shutting down an incinerator that has inadequate controls; (3) terminating all facility operations until all workers have been adequately trained in hazardous waste management; (4) installing new pollution control equipment on a treatment unit; (5) applying for and obtaining appropriate permits; and (6) constructing secondary containment.

E.     Environmental Restoration

To the extent appropriate to abate conditions that may present an imminent and substantial endangerment, EPA also may seek to accomplish environmental restoration using the broad authority of Section 7003.  Congress intended this authority "to invoke nothing less than the full equity powers of the federal courts."[94]  Thus, where solid or hazardous waste may present an imminent and substantial endangerment that consists of or includes ecosystem damage, EPA could obtain restoration of the environmental damage.[95]  This form of recovery could include, for example, restoration of wetlands affected by releases of pollutants.

F.     Recovery of Government Costs Expended under Section 7003

1.     Restitution under RCRA

It is EPA's position that the Agency may use Section 7003 to recover from responsible persons costs expended to address a potential endangerment.[96]  Since Congress, in enacting the endangerment provision of RCRA, sought to provide federal courts with full equity powers, the equitable remedy of restitution should be available under Section 7003.[97]  Therefore, pursuant to common law principles of restitution, "the recovery of costs incurred by the United States pursuant to its activities under RCRA may be an appropriate form of relief in an action brought

---

[93] *Midwest Solvent Recovery*, 484 F. Supp. at 145.

[94] *Price II*, 688 F.2d at 214.  The Senate Report on the 1984 amendments expressly approved additional language in this decision indicating that Section 7003 was intended as a broad grant of authority to order affirmative equitable relief.

[95] At least one court has held that the equitable remedy of restitution is available under Section 7003. *See Conservation Chemical*, 619 F. Supp. at 201.

[96] *See, e.g., NEPACCO*, 810 F.2d at 749-50.

[97] *Price II*, 688 F.2d at 214 (noting that where circumstances dictated prompt preventive action, EPA could undertake such action and "[r]eimbursement could thereafter be directed against those parties ultimately found to be liable").

- 23 -

pursuant to RCRA Section 7003."[98]  While developing their cases under Section 7003, the Regions are encouraged to assess on a case-by-case basis and to consult with the appropriate contact in the Office of Enforcement and Compliance Assurance (OECA) on the cost-effectiveness and appropriateness of seeking recovery of costs.  Costs that may be recoverable include EPA staff salaries and expenses, contractor support, indirect costs,[99] and other expenses associated with investigating the site or facility.

In March 1996, the Supreme Court denied recovery to a private party for past costs in a case brought under RCRA § 7002, where the site no longer posed an imminent and substantial endangerment at the time the action was brought.[100]  That decision, however, does not address a restitution action by the United States under Section 7003.  Courts discussing cost recovery under RCRA, including the Supreme Court in its March 1996 decision, have frequently noted the unique function of the government in implementing the statutory scheme.  Further, the United States' position remains that, in appropriate cases, restitution is available under RCRA § 7002 when the court's jurisdiction is properly invoked under the statute.

### 2.   Cost recovery under CERCLA § 107(a)

Costs incurred by EPA pursuant to RCRA § 7003 may be recoverable under CERCLA § 107(a).  The courts have generally agreed that EPA can recover certain costs under CERCLA § 107(a) for actions taken under other statutory authority as long as each of the elements of CERCLA § 107(a) is satisfied.  Costs incurred by EPA pursuant to a RCRA action may therefore be recoverable under CERCLA § 107(a) to the extent that such costs are (1) incurred as part of a "removal" or "remedial" activity, as those terms are defined in CERCLA § 101, 42 U.S.C. § 9601; (2) incurred in responding to a release or threat of release of a CERCLA hazardous substance, as defined in CERCLA § 101; and (3) not inconsistent with the National Contingency Plan (NCP), 40 C.F.R. Part 300.[101]

---

[98] *Conservation Chemical*, 619 F. Supp. at 201; *accord United States v. Shell,* 605 F. Supp. 1074, 1078-79 (D. Colo. 1985); *Mayor of Boonton v. Drew Chemical Corp.*, 621 F. Supp. 663, 668-69 (D.N.J. 1985); *United States v. Ward*, 618 F. Supp. 884, 898-900 (D.N.C. 1985); *United States v. Hooker Chemicals and Plastics Corp.*, 680 F. Supp. 546, 558 (W.D.N.Y. 1988).

[99] *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1502-05 (6th Cir. 1989, *cert. denied*, 494 U.S. 1057 (1990); *United States v. Hardage*, 733 F. Supp. 1427, 1438 (W.D. Okla. 1989), *aff'd*, 982 F.2d 1436 (10th Cir. 1992), *cert. denied sub nom. Advance Chemical Co. v. United States,* 510 U.S. 913 (1993).

[100] *Meghrig v. K.F.C. Western, Inc.*, 116 S.Ct. 1251 (1996).  *See also Agricultural Excess & Surplus Ins. Co. v. A.B.D. Tank & Pump Co.*, No. 95 C 3681 (N.D. Ill. Sept. 6, 1996) and *Andritz Sprout-Bauer v. Beazer East, Inc.*, 4:CV-95-1182 (1997 U.S. Dist. LEXIS 10970) (M.D. Pa. July 28, 1997), in which these courts expanded *Meghrig* to preclude recovery of costs incurred after a complaint was filed in a Section 7002 action.

[101] *See, e.g., Rohm and Haas III*, 2 F.3d at 1274-75.

- 24 -

CERCLA § 107(a)(4)(A) permits EPA to recover response costs incurred as part of either "removal" or "remedial" actions. The Regions should examine CERCLA's broad definitions of "removal" and "remedial action" set forth in CERCLA §§ 101(23) and (24), 42 U.S.C. §§ 9601(23) and (24), to determine the potential scope of cost recovery. Costs that may be recoverable include EPA staff salaries and expenses, contractor support, indirect costs, and other expenses associated with investigating the site or facility.

In *United States v. Rohm and Haas Co.*, the U.S. Court of Appeals for the Third Circuit ruled that the costs of EPA's oversight of a response action conducted by a private party cannot be recovered under CERCLA § 107(a).[102] The United States believes, however, that the *Rohm and Haas* decision was incorrectly decided and applied an overly narrow definition of "removal" to exclude costs of overseeing private party work. Other courts outside the Third Circuit have not followed this aspect of the *Rohm and Haas* decision.[103] Nonetheless, the Regions should consult the relevant case law before pursuing a cost recovery action.

## VI. RELIEF AVAILABLE

### A. Choosing Between an Administrative Order and Judicial Action

Section 7003 allows EPA to "bring suit in the appropriate district court" to seek certain relief. It also allows the Agency to issue administrative orders, either unilaterally or on consent. When deciding whether to initiate a judicial action or issue an administrative order under Section 7003, the Region should consider the following issues.

If the circumstances at a facility or site require immediate action,[104] the quickest way to get work started will generally be to issue a unilateral administrative order (UAO). An administrative order can be issued as soon as EPA has evidence satisfying the statutory criteria. Alternatively, a short period of time can be provided to negotiate an AOC.

---

[102] *Rohm and Haas III*, 2 F.3d at 1278.

[103] *See, e.g., Atlantic Richfield Co. v. American Airlines*, 98 F.3d 564, 572 (10th Cir. 1996) (liable party that settled with EPA for oversight costs entitled to recover some of those costs in contribution action); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1043 (2d Cir. 1985); *United States v. Ekotek*, 41 Env't Rep. Cas. (BNA) 1981 (D. Utah 1995); *United States v. Lowe*, 864 F. Supp. 628, 631-632 (S.D. Tex. 1994); *California Dep't of Toxic Substances Control v. SnyderGeneral Corp.*, 876 F. Supp. 222, 224 (E.D. Ca. 1994) (holding that a proper construction of CERCLA allows for the recovery of costs incurred in overseeing cleanup activities by either private parties or agencies); *California Dep't of Toxic Substances Control v. Louisiana-Pacific Corp.*, No. Civ. S-89-871 LKK (E.D. Ca. May 10, 1994).

[104] The term "immediate action" should not be confused with the term "imminent and substantial endangerment." Some situations may present imminent and substantial endangerments to health or the environment without requiring immediate action.

- 25 -

The Agency may also seek immediate judicial relief or issue a UAO and seek judicial enforcement of the order, if necessary.  If the responsible person is recalcitrant, the most expedient avenue will often be an expedited judicial enforcement action requesting a preliminary injunction or temporary restraining order.  If the owner of the facility or site is unwilling to provide access to the person who will be performing the work there, a judicial referral may be needed to gain access.  In such cases, the Region should consult with DOJ immediately upon discovery of the conditions requiring immediate action.  A judicial enforcement action requires a referral to DOJ and the preparation and filing of appropriate pleadings in district court.  This can be accomplished expeditiously in appropriate circumstances.  For a preliminary injunction or temporary restraining order, the pleadings filed should contain a succinct statement describing how each requirement of Section 7003(a) has been met, as well as the injunctive relief sought.

Where noncompliance is anticipated but immediate action is not required, the Region may issue a UAO first and initiate judicial action only after the respondent has failed to comply.  In a suit for enforcement of a previously issued UAO, EPA is more likely to obtain judicial review on the administrative record (under the "arbitrary and capricious" standard of review), rather than a full hearing or trial of the issues.

B.    Administrative Orders

The plain language of Section 7003 gives EPA the direct authority to issue administrative orders without the need for civil referral.  Nonetheless, early communication with DOJ can be helpful to the Regions, particularly in situations where the respondents may not comply with an administrative order.  EPA does not interpret Section 7003 as requiring EPA to file an administrative complaint and provide an opportunity for an evidentiary hearing before an administrative law judge prior to issuance of the order.

In any administrative order issued under Section 7003, the findings of fact should describe the problems at the site or facility and relate them to the actions required to abate conditions that may present an imminent and substantial endangerment.  It is important that the findings of fact support each element of the relief sought.

To minimize the potential for confusion between responsible persons and the Agency concerning the required actions, orders issued under Section 7003 should clearly describe the required actions.  An order may dictate discrete tasks such as installing appropriate signs, ensuring that personnel handling hazardous wastes are properly trained, and removing drummed wastes.  When the conditions at the site or facility are not sufficiently well-defined to allow a precise description of the work to be performed, the order may require specific assessment work and the submission of work plans describing the steps necessary to abate the conditions.  These plans would be reviewed by EPA, modified by the respondent in accordance with EPA comments, and implemented upon approval by EPA.

- 26 -

In some situations, the Regions may find it most effective to require the respondent to meet site-specific performance standards rather than dictating the work to be performed. This allows a cooperative respondent latitude to choose the methods for achieving EPA's objective. For example, an order could require the respondent to prevent migration of a plume of contaminated groundwater within a specified time frame. This type of order should require the submission of work plans designed to meet the performance standard and, upon approval of the work plans by EPA, incorporate the work requirements into an order. When deciding whether to issue an order that does not specify the work to be performed, the Region should assess the sophistication and technical capabilities of the respondent and its agents.

An order issued to more than one person may either assign discrete tasks to different respondents or specify that all respondents are jointly responsible for performing all tasks required by the order. In the latter case, the order may cite the responsibility of each respondent to cooperate with the others. A decision to issue an order assigning discrete tasks may be based on an assessment that the respondents will be unable to work cooperatively or to divide the responsibility equitably. Alternatively, separate, coordinated orders may be issued to each person.

In rare circumstances, if new information on a site and responsible persons is identified, the Region may find it necessary to issue a series of orders to different persons. When EPA issues subsequent orders that require the same work to be performed or actions to be taken, the Region should ensure that the due dates for specific deliverables in subsequently issued orders coincide with those in the earlier orders. The Region should also require each respondent to cooperate with all other respondents and to coordinate their activities.

In any case, unless EPA believes the harm is divisible, the order should recite that the harm is indivisible and liability is joint and several.

1.    Choosing between unilateral administrative orders and administrative orders on consent

The Region may negotiate an AOC if there are one or more financially viable responsible persons who are (1) willing to undertake the required actions, including any necessary controls on future operations, and (2) willing to negotiate an AOC within a reasonable time frame. If the owner/operator is not a party to the AOC, a separate AOC or UAO for access may be necessary. The appropriate time period for negotiations will depend on the nature of the conditions at the particular site or facility. If the circumstances at the site or facility require immediate action, issuing a UAO may be less time consuming than negotiating an AOC. The Region has the discretion to issue a UAO without engaging in negotiations for an AOC. On the other hand, there are advantages to entering into an AOC which should be considered when deciding how to proceed. For example, cleanup work may proceed with less dispute and delay when it is performed in the cooperative relationship fostered by settlement.

- 27 -

2.    Unilateral administrative orders

a.    Generally

The Region may compel action by issuing a UAO.  If one or more of the respondents fail to comply with the terms of the order, EPA should prepare a referral for judicial enforcement action to compel compliance and to collect penalties (see Section VIII below).  To achieve maximum compliance with UAOs issued by the Agency, the Regions should closely monitor compliance with each order and take prompt action to collect penalties whenever violations occur.

A UAO issued under Section 7003 should include the following elements:

- Statement of jurisdiction -- This section should set forth EPA's authority under Section 7003 to issue the order and cite the delegation of this authority to the Agency official signing the order.

- Findings of fact -- These should include the facts that demonstrate that each of the legal requirements for issuing an order under Section 7003 has been met and that the actions ordered are necessary to protect health or the environment.

- Conclusions of law -- This section should include conclusions that each of the legal requirements for a Section 7003 order has been met.  The order should expressly conclude that the conditions at the facility or site may present an imminent and substantial endangerment.  In orders issued to more than one person in cases in which the harm is indivisible, the Region should also include a statement that each respondent is jointly and severally liable to carry out each obligation of the order and that failure of one or more respondents to comply does not affect the obligation of any other respondent to perform.

- Work to be performed -- The order should clearly identify the tasks to be performed, with a schedule that includes appropriate reporting and approval requirements.  As appropriate, the Region may also include provisions for the following:  performance standards; access; quality assurance; sampling, data availability, and record preservation; and other necessary provisions.  The order may also include one or more statements of work setting forth the required actions.

- Opportunity to confer -- The order should include a recitation of the respondent's right to request an opportunity to confer with EPA regarding the facts presented in the order and the terms of the order.  The order should provide a deadline for requesting a conference, which, if possible, should precede the effective date of the order.  If a conference cannot be held before the effective date of the order, it should be held as soon thereafter as possible.

- 28 -

- <u>Notice of intent to comply</u> -- The order should require the respondent to submit a notice of intent to comply with the order.  This notice should be due shortly after the effective date of the order.

- <u>Notice to the affected state</u> -- The order should recite that notice has been provided to the affected state in accordance with RCRA § 7003(a).

- <u>Enforcement</u> -- The order should set forth the potential penalties for noncompliance.

- <u>Reservation of rights</u> -- The order should include a statement of rights expressly reserved by EPA.  These may include:

  - the rights to disapprove work performed under the order, to require the respondent to correct any work disapproved, and to require the respondent to perform additional tasks;

  - all statutory and regulatory rights, authorities, and remedies, including any pertaining to respondent's failure to comply with the terms of the order;

  - the right to perform any of the specified work or any additional work necessary to protect health and the environment;

  - the right to recover costs incurred by EPA; and

  - a statement that compliance with the terms of the order does not relieve the respondent of any obligations under RCRA or any other applicable local, state, or federal laws and regulations.

- <u>Modification and termination</u> -- The order should contain a provision stating that EPA may modify or revoke the order based on information received from the respondent or discovered during the course of implementation of the order.  Any such modification should be incorporated into a revised order and issued to the respondent in the form of a modified UAO.  Each order should also provide for a clear termination point.  This may be accomplished by requiring the respondent to provide EPA with a written certification that it has satisfactorily completed all of the work in accordance with the order, followed by EPA review and approval and a notice from EPA that, based on the information then available to EPA, the provisions of the order have been satisfied.

  b.    <u>Special requirements for issuing unilateral administrative orders to federal entities</u>

Section 6001(b)(1) of RCRA provides EPA the authority to commence an administrative enforcement action against any federal department, agency, or instrumentality pursuant to RCRA

- 29 -

enforcement authorities, including Section 7003.  Section 6001(b)(2) of RCRA, 42 U.S.C.
§ 6961(b)(2), requires that "[t]he Administrator. . . initiate an administrative enforcement action
against such a department. . . in the same manner and under the same circumstances as an action
would be initiated against any other person."[105]

Section 6001(b)(2) of RCRA provides that no administrative order issued to a federal
department, agency, or instrumentality shall become final until such department, agency, or
instrumentality has had the opportunity to confer with the Administrator.[106]  It is EPA's position
that the federal entity should first confer with an appropriate regional official prior to seeking a
conference with the Administrator, and that if, following the regional conference, the head of the
federal entity wishes to confer with the Administrator, the procedures described below should
apply.

In each UAO issued to a federal entity, the Region should provide explicit instructions
regarding the conference with the regional official.  The order should also state that in the event
the conference with the regional official does not resolve the issue(s), the head of the affected
federal entity will have the opportunity to confer with the Administrator provided it complies with
the following UAO provisions:

- Within ten days after the conference with the regional official, the head of the federal
  entity, if it wishes to confer with the Administrator regarding the UAO, either through an
  exchange of letters or through a direct meeting, must file a written request addressed to
  the Administrator seeking an opportunity to confer with the Administrator.  Unless
  conditions at the site or facility require otherwise, EPA may allow an extension of the
  period for filing this request.  The request should be served on the Administrator with a
  copy to the Director, Federal Facilities Enforcement Office, and all parties of record for
  the agencies, including regional personnel.  If the conference will occur through an
  exchange of letters, the letter requesting the conference should specifically identify the
  issue(s) that the federal entity wishes the Administrator to consider.  If the federal entity
  wishes to confer through a direct meeting, the request for a conference should also
  specifically identify the issue(s) that the federal entity proposes to discuss with the
  Administrator, as well as the person(s) who will represent the federal entity.  In addition,
  as part of its request for a conference either through an exchange of letters or a direct
  meeting, the head of the federal entity should attach copies of all necessary information
  regarding the issue(s).  Failure to request a conference within the ten-day period or within

---

[105] However, because the Anti-Deficiency Act, 31 U.S.C. § 1341, makes payments by federal
agencies subject to appropriation of funds by Congress, there might be unique funding issues that arise with
regard to funding of work.  Further, the Regions should include the following in each order to a federal
agency: "Nothing in this Order shall require the recipient federal agency to violate the Anti-Deficiency Act."

[106] RCRA § 6001(b)(2) contrasts with Executive Order 12580 on Superfund Implementation
(January 23, 1987), which requires EPA to obtain DOJ concurrence before issuing an order to an Executive
department or agency under CERCLA § 106(a).

- 30 -

an approved extension of that period will be considered a waiver of the right to confer with the Administrator.

• If the conference is to be conducted through a direct meeting, the parties of record for the agencies may request to be present during the conference. This request to attend the conference should likewise be in writing and served on the Director, Federal Facilities Enforcement Office, and the parties of record for the agencies. After a determination is made that a direct conference will occur, the Administrator will notify the head of the federal entity who requested the conference and the parties of record for the agencies.

• Following the conclusion of the conference, a person designated by the Administrator will provide a written summary of the issues discussed and addressed. Copies of the written summary will be provided to the parties of record for the agencies. Within thirty days of the conference, the Administrator will issue a written decision with appropriate instruction regarding the finality of the order. This decision should be made part of the administrative record file if one has been compiled.

3.    Administrative orders on consent

a.    Generally

As noted above, EPA may enter into AOCs under Section 7003 when the Region believes that a settlement can be reached without protracted negotiations and that the responsible person is capable of performing the ordered actions within negotiated time frames. Because Section 7003 is triggered only when the conditions at a facility or site may present an imminent and substantial endangerment, protracted negotiations are generally not acceptable.

An AOC should include each of the elements of a UAO (see Section VI.B.2 above). The Region may also choose to include in an AOC provisions relating to:

• Stipulated penalties -- The stipulated penalties provision may include different penalty amounts for different classes of violations (for example, one amount for failure to complete work tasks and another amount for failure to submit reports). This provision should clearly state that penalties begin to accrue on the day after complete performance is due or the date a violation occurs, and that the penalties are due to be paid at a time certain, generally after a written demand for payment. *See, e.g.*, Federal Claims Collection Act, 31 U.S.C. § 3711 *et seq.*; Federal Claims Collection Standards, 4 C.F.R. § 102.2; and EPA regulations at 40 C.F.R. §§ 13.9 and 13.11. This section should also provide for interest on any unpaid stipulated penalty balance. Finally, this section should provide that payment of stipulated penalties does not relieve the respondent of the obligation to perform work under the order nor does it preclude EPA from pursuing any remedies or sanctions that may be available by reason of respondent's failure to comply. To achieve

- 31 -

compliance with all AOCs, Regions should closely monitor compliance with orders and assess stipulated penalties as appropriate.

- Dispute resolution and *force majeure* -- An AOC for extensive cleanup work should include provisions for the resolution of disputes between EPA and the other parties and to address the occurrence of *force majeure* events.

- Right of contribution -- At least one court has recently held that there is a right to contribution in actions brought under Section 7003.[107] This conclusion was based in part on the principle that a right to contribution is an essential component of joint and several liability. Therefore, respondents may seek some representation in an AOC regarding their right to contribution. The Regions should be careful not to suggest that this right can be granted or denied by EPA. Because this right arises by operation of law, an AOC issued under Section 7003 should do no more than acknowledge any right to contribution that a respondent may have.[108]

For additional guidance and examples of specific language that may be used in an AOC under 7003, the Regions may consult with the appropriate contacts in OECA's Office of Site Remediation Enforcement (for facilities or sites needing cleanup work) or Office of Regulatory Enforcement, RCRA Division (for facilities or sites needing restraints on future action).

b.    Entry into administrative orders on consent with federal entities

Section 6001(b)(1) requires that any voluntary resolution or settlement of a RCRA administrative enforcement action against a federal entity be set forth in a consent order. Where the potential endangerment presented allows for brief negotiations, the Region should negotiate an AOC with the federal entity using the same procedures that it would use with a private party.

As noted in Section VI.B.2.b above, Section 6001(b)(2) of RCRA provides that no administrative order issued to a federal entity shall become final until such entity has had the opportunity to confer with the Administrator. In EPA's view, this requirement applies to UAOs only. Because the parties have reached a settlement of the issues, it will not be necessary for the federal entity to confer under Section 6001 with respect to the settled matter.

C.    Judicial Relief Available

An injunction is a court order requiring the respondent to either take an action or not take an action, depending on the circumstances at the facility or site. While exercising its discretion to

---

[107] *Valentine II*, 856 F. Supp. 627.

[108] Because contribution rights under Section 7003 arise out of common law (*see id.*), a private litigant cannot establish joint and several liability in a contribution action.

issue an injunction, a court may order either a specific action or a restraint from acting.  In addition, it may use its discretion to order all or part of the relief requested or to order other relief that it deems appropriate.[109]  The plain language of Section 7003 gives courts the authority to issue injunctions to abate conditions that may present an imminent and substantial endangerment.[110]  The means by which a court will order specific actions or restraints on action may include temporary restraining orders, preliminary injunctions, and permanent injunctions.  A temporary restraining order is a judicial order that prohibits specified activity or otherwise maintains the *status quo* until the court can hold a hearing on the issue.  A preliminary injunction is a judicial order requiring a person to take or refrain from specified action until the court can hold a trial on the issue.  A permanent injunction is a final judicial order that is issued after a trial on the merits and that requires a person to take or refrain from specified action.  Attachment 5 further describes these legal mechanisms.  When choosing whether to seek a permanent injunction, preliminary injunction, or a temporary restraining order, the Region should consult closely with DOJ as early as possible.

      D.      <u>Judicial Review</u>

In addition to describing judicial relief available under Section 7003, Attachment 5 describes judicial review of administrative orders, including the unavailability of pre-enforcement review of Agency orders, the standard and scope of judicial review of orders, and judicial review of settlements.

## VII.    OTHER REQUIREMENTS AND CONSIDERATIONS

      A.      <u>Notification and Posting</u>

Section 7003(a) provides that before the Agency may issue an administrative order, notice must be given to the "affected State."  If EPA and a state have entered into a RCRA enforcement agreement that includes an applicable notice provision, the Region should provide notice in accordance with that provision.  With respect to any other state, the Region should follow the guidance provided in Section VII.A.1 below.

Section 7003(c) requires that notice of hazardous waste presenting an imminent and substantial endangerment be given to the "appropriate local government agencies."  It also requires that notice be posted at the site.  Although the notice and posting requirements of Section 7003(c) apply only to sites containing hazardous waste, the Regions may follow the suggestions provided in Section VII.A.2 below with respect to sites that contain solid waste.

---

[109] *See Price II*, 688 F.2d at 211-12, *citing* S. Rep. No. 172, 96th Cong., 1st Sess., at 5.

[110] *Id.* at 213-14, *citing* H.R. Committee Print No. 96-IFC 31, 96th Cong., 1st Sess. 32 (1979); *see also,* *Conservation Chemical*, 619 F. Supp. at 201.

- 33 -

### 1.      Notice to the affected state

The statute does not specify a time period within which notice of an administrative order to a state should be given, nor a method for providing such notice.  Unless the exigencies of the situation require otherwise, the Region should normally provide written notification to the director of the state agency having jurisdiction over hazardous waste matters at least one week before the Agency issues an administrative order.  Where the conditions require that notification be given within a shorter time frame, the Region may provide notification by telephone, followed by written confirmation, including the date and time of the telephone notification.  The administrative order should recite that notice has been given to the affected state.

Without indicating a time frame, Section 7003(a) requires EPA to provide notice to the affected state regarding any judicial action.  When initiating a judicial action, the Region should consult with DOJ regarding an appropriate process for providing notice to the affected state.

### 2.      Notice to local government agencies/posting

In contrast to the notice requirements of Section 7003(a) which are triggered by a judicial action or the issuance of an administrative order, Section 7003(c) of RCRA requires the Administrator to "provide immediate notice to the appropriate local government agencies" "[u]pon receipt of information that there is hazardous waste at any site which has presented an imminent and substantial endangerment to human health or the environment."  The Administrator must also "require notice of such endangerment to be promptly posted at the site where the waste is located."

To comply with the first notice requirement in Section 7003(c), the Region may provide written notification to the local entity responsible for emergency response (such as the local fire department or hazmat team), the county and/or city health department, and to the highest official(s) in the city or other political subdivision where the facility or site is located (such as the mayor, county executive, or county commission), as soon as possible after EPA receives information that conditions at the facility or site present an imminent and substantial endangerment.  Either before or after the Region provides such notification, an Agency official may telephone the official(s) receiving the notice to explain why the notice is being sent and to answer any questions the official(s) may have.

The Region may fulfill the posting requirement of Section 7003(c) by including language in the judicial complaint or administrative order that requires the defendant or respondent to post notice of the endangerment at the site.  If delay is anticipated, EPA may post the notice or request local authorities to do so.

- 34 -

B.    Public Participation

Under Section 7003(d), whenever a settlement is reached under Section 7003 and "the United States or the Administrator proposes to covenant not to sue or to forbear from suit or to settle any claim" arising under Section 7003, "notice, and opportunity for a public meeting in the affected area, and a reasonable opportunity to comment on the proposed settlement prior to its final entry shall be afforded to the public."  For model public notice language, the Regions should refer to the August 16, 1995 memorandum from Sandra L. Connors of OECA's Office of Site Remediation, entitled "Model Notice Language for Compliance with Public Participation Requirements of Section 7003(d) of RCRA."

1.    Public participation in judicial settlements

As with judicial settlements under other authorities, DOJ ensures that the public is able to comment on judicial settlements under Section 7003.  To supplement DOJ's procedures, the Region may, as appropriate, publish notice of the proposed settlement in the community section of a newspaper of general circulation near the facility or site.

2.    Public participation in administrative settlements

Because an AOC issued under Section 7003 may represent the settlement of a "claim arising under [Section 7003]" within the meaning of Section 7003(d), the Regions should provide public notice and an opportunity to comment on each AOC.  If the administrative settlement addresses only RCRA § 7003 claims, the Region may publish notice of the proposed settlement in the Federal Register and/or in the community section of a newspaper of general circulation near the facility or site.  The Region may publish the notice after the AOC has been signed by the respondent but before it has been signed by the Region.  Alternatively, the Region may publish the notice after the AOC has been signed by both parties.  In either case, the agreement should recite that finalization of the settlement is subject to the public notification requirements of Section 7003(d).

After the expiration of the public comment period, the settlement may be considered final unless EPA receives comments that persuade it to modify or withdraw the settlement. Documentation of the notice, any comments received, EPA's response to the comments, and a memo signed by the appropriate regional official finalizing the settlement should be included in the administrative record file.

Because the statute requires only a "reasonable" opportunity to comment on proposed settlements, the Regions may exercise discretion in deciding how long the public comment period should be held open.  Unless the exigencies of the situation require otherwise, the public comment period should generally be held open for 30 days after the publication of the notice. However, even where emergency action has been taken, the Region should attempt to ensure public involvement.  One means for ensuring public awareness where an emergency action has been

- 35 -

taken would be to hold a public meeting as soon after the issuance of an order as one can be convened.

If the administrative agreement addresses claims under another statute (such as CERCLA) that has its own independent notice and comment requirements, the method of notification should conform to all applicable statutory requirements.

3.     Other appropriate public participation

Although not required by RCRA, the public should be involved in activities conducted under Section 7003 to the maximum extent possible given the exigencies of the situation.  For Section 7003 orders that require cleanup and unless the exigencies of the situation require otherwise, the Regions should ensure that public notice and an opportunity to comment are provided (1) whenever EPA issues an order, (2) during the remedy selection process, and (3) upon the Agency's determination that the cleanup has been completed.  When the exigencies of the situation prevent public notice and an opportunity to comment from occurring when the Agency issues an order or before the remedy has been selected, the Regions should ensure public involvement at the earliest opportunity.

With respect to any type of order issued under Section 7003, the Region may consider holding public meetings to answer any questions or address public concerns if resources are available for such meetings.[111]  As appropriate, the Regions should consider holding public meetings regarding sites that are located near low income or minority populations, especially where they have attracted significant public concern because of accidents or for other reasons, or that present other conditions or issues that may generate a high level of public interest.

In addition, especially if the facility or site is located near low income or minority populations, the Region may consider developing a public participation strategy based on *The Model Plan for Public Participation* developed by the Public Participation and Accountability Subcommittee of the National Environmental Justice Advisory Council (November 1996).[112]

---

[111] For more information about public involvement in RCRA matters generally, *see* "RCRA Public Involvement Manual," EPA/530-R-96-007 (September 1996).  Although this manual refers to corrective action under RCRA § 3008(h), it provides useful suggestions for actions under Section 7003.

[112] For additional background information on environmental justice, *see* Executive Order No. 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations" and the March 17, 1994 memorandum from Jean C. Nelson, General Counsel, to Carol M. Browner, Administrator, regarding EPA responsibilities under Executive Order No. 12898.

- 36 -

C.    Procedural Considerations

    1.    Administrative record file

Although EPA is not legally required to compile an administrative record file for orders issued under Section 7003, the Regions are strongly encouraged to compile an administrative record file that contains the information considered by EPA in determining whether conditions at the site may present an imminent and substantial endangerment and the appropriate actions to abate those conditions, as well as an explanation of the basis for EPA's determinations.  Unless the exigencies of the situation require otherwise, the Regions are strongly encouraged to formally compile the administrative record file before issuing the order.[113]  A carefully compiled administrative record file will facilitate negotiations and conferences with the respondent, serve as background material during the public notice and public comment period, and serve as a basis for any judicial review of an administrative order.

In order to argue that judicial review of an administrative order should be limited to the administrative record, the Agency needs to be able to support its determination that conditions at the facility or site may present an imminent and substantial endangerment and the appropriate actions to abate those conditions using only the information contained in the administrative record.[114]

Evidence contained in the administrative record file may be documentary, testimonial, or physical and may be obtained from a variety of sources, including those listed in Attachment 3. Subject to applicable law restricting the public disclosure of confidential information and deliberative material, the file should include all relevant documents and oral information (reduced to writing) that the Agency considered when determining whether conditions at the site may present an imminent and substantial endangerment and the appropriate actions to abate those

---

[113] The 1984 Guidance stated that at the time the order is issued the Region must have all the evidence necessary to demonstrate that the statutory criteria have been satisfied.  EPA is not legally required to compile an administrative record file, and the exigencies of the situation may sometimes prevent EPA from compiling the file before issuing an order under Section 7003.  EPA has therefore modified its policy with respect to the timing and necessity of compiling an administrative record file for a Section 7003 action.

[114] The 1984 Guidance stated that "all evidence supporting the finding of any imminent and substantial endangerment in the order must be compiled into a single, concise document constituting the endangerment assessment."  EPA is not legally required to compile an "endangerment assessment." Nonetheless, EPA must make a determination that conditions may present an imminent and substantial endangerment.  The information upon which EPA bases its determination (the administrative record) will most likely contain all of the documents that would be used to develop an endangerment assessment.  This guidance document therefore does not advise the Regions to compile endangerment assessments for orders issued under Section 7003.

- 37 -

conditions.[115]

The Region should place a complete copy of the administrative record file in a publicly accessible location within the regional office and another complete copy in a public building (such as a public library) located near the facility or site.  If a complete copy of the administrative record file is available electronically, the Region should also make that version available to the public.  The administrative record file should be readily retrievable (*i.e.*, have an index) and be available for review.  The administrative record file should then be augmented with a copy of the order as well as records on conferences, respondent's objections, public comments, and other appropriate documents, as those documents become available.

2.    Other procedures for unilateral administrative orders

a.    Opportunity to confer

Each UAO issued under Section 7003 should offer the respondent an opportunity to confer concerning the appropriateness of its terms and its applicability to the respondent.  If the respondent requests a conference, the administrative record should be compiled and made available for the respondent to examine.  The conference will help EPA ensure that it has based its order on accurate information and will provide the respondent with an opportunity to ask any questions and to raise any concerns that it may have.  An opportunity to confer may also reveal the unwillingness of the respondent to take necessary action.  EPA can then decide to take necessary action itself or seek judicial remedies.

The conference will normally be held at the regional office and will be presided over by staff selected in accordance with regional delegations and policy.  At any time after the issuance of the order and particularly at the conference, EPA should be prepared to explain the basis for the order and to promote constructive discussions.  The respondent should receive a reasonable opportunity to address relevant issues.  The schedule and agenda for the conference will be left to the discretion of the presiding official, based on these principles.

Following the conference, the presiding official should prepare and sign a written summary of the conference.  The summary should contain (1) a statement of the date(s) and attendees of any conference(s) held, (2) a description of the major inquiries made and views offered by the respondent, and (3) a summary of EPA's responses to the respondent.  This written summary should be placed in the administrative record file.  Where appropriate and not contraindicated by site conditions, the official who issued the original order may issue a written statement staying the effective date of the order pending completion of the conference process.

---

[115] For useful guidance on how to handle confidential and privileged documents as well as other issues, the Regions should consult 40 C.F.R. Part 2, Subpart B.  The Regions may also find it helpful to consult the "Final Guidance on Administrative Records for Selection of CERCLA Response Actions" (OSWER Directive No. 9833.3A-1, December 3, 1990).

- 38 -

b.    Modification, revocation, or stay

If the conference yields new and significant information, EPA may modify, revoke, or stay the order. Any modification of the order should be incorporated into a revised order which is then issued to the respondent. The Region should place an explanation of the modification, stay, or revocation in the administrative record file. In the event of modification, revocation, or stay of the order, the Region should address in the administrative record file any significant issue raised by the respondent with respect to the basis for the order or its provisions.

## VIII.  ENFORCEMENT OF UNILATERAL ADMINISTRATIVE ORDERS AND ADMINISTRATIVE ORDERS ON CONSENT

A.    Elements of an Enforcement Action Initiated under Section 7003(b)

When the respondent to a RCRA § 7003 administrative order has willfully violated or has failed or refused to comply with that order, the Agency may seek civil penalties under Section 7003(b) of up to $5,500[116] for each day in which such violation occurs or such failure to comply continues. The language of Section 7003(b) applies to "any order of the Administrator under subsection (a)." Therefore, this enforcement provision applies to both UAOs and AOCs issued under Section 7003(a). Section 7003(b) further provides that an action to enforce a UAO or AOC be brought in the appropriate United States district court.

A penalty action may be brought in a complaint seeking to enforce the underlying order issued under Section 7003(a) (*i.e.*, for injunctive relief), or in an action solely for untimely or inadequate performance (*i.e.*, for assessment of penalties). The respondent must meet both the quality and timeliness components of a particular requirement to be considered in compliance with the terms and conditions of the order.

Based on constitutional principles, a defendant may assert a defense of "sufficient cause" in an action for penalties under Section 7003. Specifically, a defendant may avoid liability for penalties under Section 7003(b) if the defendant demonstrates it had "an objectively reasonable good faith belief that it was not required to comply with the administrative order after it was issued by the EPA."[117]

Each element of Section 7003(b) is discussed below.

---

[116] *See* n. 14, above.

[117] *Valentine III*, 885 F. Supp. at 1514-15.

- 39 -

1.  "[A]ny person who"

EPA must first establish that the person receiving an order issued under Section 7003(a) is a "person" within the meaning of RCRA § 1004(15) (see Section IV.C.1 above).

2.  "[W]illfully violates, or fails or refuses to comply with any order"

A respondent to an order issued under Section 7003 is liable for penalties if the respondent *either* (1) "willfully" violates the order, or (2) fails or refuses to comply with it.  Since liability under Section 7003 is joint and several, this clause allows enforcement of an order against any respondent who willfully violates or fails or refuses to comply with a Section 7003 order, even though other respondents may be performing the work required by the order.[118]

3.  "[M]ay, in an action brought in the appropriate United States district court to enforce such order, be fined not more than [$5,500] for each day in which such violation occurs or such failure to comply continues"

EPA can seek up to the maximum of $5,500 from each person who does not comply with an order for each day that a willful violation or failure or refusal to comply goes uncorrected.  If all respondents to whom the order was issued have failed to comply, Section 7003(b) penalty claims may be brought as part of an action to enforce the underlying order.  If one or more respondents to the order are complying, penalty claims may be brought against each recalcitrant in an action to enforce the order or in a "penalty only" action.  Thus, in instances where the work required by the order has been fully performed by certain respondents, the United States may initiate an action for penalties against those who violated the order by not participating in the performance of the work, even though a court can no longer grant the injunctive relief sought in a complaint seeking to enforce the order.  If, however, work remains to be done under the order, a court can order each non-complying respondent to perform work in addition to requiring it to pay penalties.

B.  Settling Claims for Civil Penalties under Section 7003(b)

This section provides guidelines for settling claims for civil penalties for noncompliance with administrative orders issued under RCRA § 7003.[119]  The RCRA Civil Penalty Policy (RCPP or the "Penalty Policy") (October 1990) applies to actions under Subtitle C of RCRA, which include violations that carry penalties with a potential statutory maximum of $27,500 a day.  The RCRA Civil Penalty Policy does not apply directly to penalties under Section 7003(b).  However, the principles that form the basis of the Penalty Policy and the penalty calculation methodologies

---

[118] *See Valentine III*, 885 F. Supp. at 1511-15 (finding a defendant potentially responsible under Section 7003 even though other defendants had settled with the United States and were cleaning up the site).

[119] For noncompliance with an administrative order issued jointly under RCRA § 7003 and CERCLA § 106, Regions should seek penalties under CERCLA and any applicable CERCLA penalty policy.

- 40 -

in that policy (for example, for multi-day penalties) generally apply to settlement of penalties under Section 7003. This section will provide additional guidance for applying those principles in the context of enforcement of Section 7003.

The stated purposes of EPA's general civil penalty policies[120] and the RCPP are to ensure that (1) civil penalties under RCRA are assessed in a fair and consistent manner, (2) penalties are appropriate for the gravity of the violation, (3) economic incentives for noncompliance are eliminated, (4) penalties are sufficient to deter additional violations, and (5) compliance is expeditiously achieved and maintained. The Regions should seek to attain these goals when settling claims for penalties under Section 7003(b). To the extent that a noncomplier is deemed eligible, the "Policy on Compliance Incentives for Small Businesses," 61 Fed. Reg. 27984 (June 3, 1996) and the Audit Policy ("Incentives for Self-Policing: Discovery, Disclosure, Correction and Prevention of Violations"), 60 Fed. Reg. 66706 (December 22, 1995), may apply to mitigate penalties sought in settlement of noncompliance with orders issued under Section 7003.

1.    Overview of the penalty calculation process

Section 7003(b) establishes a maximum civil penalty of $5,500 a day for refusal or failure to comply with an administrative order issued under Section 7003. When settling a penalty claim under Section 7003(b), this amount may be reduced according to the facts and circumstances of the noncompliance. Where the order is issued to more than one person, a penalty should be calculated individually for each noncomplier, not divided among noncompliers. Application of these guidelines may yield different settlement amounts for different noncompliers with the same order.

These guidelines outline a four-step process for calculating a penalty for settlement purposes. First, a daily penalty should be determined by evaluating the potential for harm caused by the noncompliance and the extent of deviation from the requirements of the order. Second, the daily penalty should be multiplied by the number of days of noncompliance. Third, if the noncomplier obtains an economic benefit by its noncompliance, that benefit should be calculated and added to the daily penalty, yielding the total penalty. Finally, to arrive at an adjusted total penalty, the gravity-based portion of the penalty may be adjusted by other factors, including any good faith, inability to pay, history of violations, and willfulness or negligence on the part of the respondent. The economic benefit portion of the penalty should be mitigated only to account for litigation risk and documented inability to pay.

2.    Determination of gravity-based penalty amount

A daily penalty amount for violation of an administrative order is calculated by determining the gravity of the noncompliance with the administrative order based on two factors:

---

[120] "Policy on Civil Penalties," Price (February 16, 1984) and "A Framework for Statute-Specific Approaches to Penalty Assessments," Price (February 16, 1984).

- 41 -

the potential for harm resulting from noncompliance and the extent of deviation from the requirements of the order.

a.    Potential for harm

For violation of an Agency order, the potential for harm category will reflect (1) the threat to health and the environment posed by conditions at a facility or site and the effect of the noncompliance on those conditions, and (2) the threat to the integrity of EPA's enforcement program. The Region should consider the factors listed in the RCPP to the extent applicable plus any additional factors relevant to violations of an Agency order that might not arise in the context of regulatory violations. After considering all relevant factors, the Region should determine whether the potential for harm is major, moderate, or minor.

i.    Potential for harm to health or the environment

In evaluating the potential for harm to health or the environment, the Region should consider the potential seriousness of the conditions at the facility or site. Because each administrative order issued under Section 7003 is designed to address conditions that may present an imminent and substantial endangerment, the threat to health and the environment posed by conditions at a facility or site will almost always militate towards a "major" potential for harm to health or the environment. However, considerations of the effect of noncompliance on those conditions may under certain circumstances militate toward a lower potential for harm.[121] If the noncompliance does not aggravate, extend, or increase the potential hazards at the facility or site, a lower potential for harm may be appropriate.

For violations of administrative orders, the extent that failure to comply aggravates the threat to health or the environment may also be relevant. Therefore, some additional factors to consider would be:

•    the extent to which noncompliance with the order aggravates potential harm to health or the environment (for example, where the order required neutralization of highly reactive wastes that threatened workers at the facility or where excessive dioxin emissions continue to threaten nearby residents because the order's requirement to install control equipment has not been met); and

•    the extent to which noncompliance with the order threatens additional environmental

---

[121] Regions should note, however, that "violations may be considered of major significance based on their *potential* for harm, even where no actual damage has resulted." *In re Everwood Treatment Co.*, RCRA Appeal No. 95-1, slip op. at 24 (Envt'l App. Bd. September 27, 1996). In particular, the Environmental Appeals Board held that the adverse effect of a violation on the RCRA program can result in a "major" potential for harm even in the absence of any actual harm to health or the environment. *Id.* at 17-21.

- 42 -

media (for example, where the order required removal of a waste pile to address surface soil contamination and noncompliance may have resulted in a threat to groundwater).

### ii.    Harm to the enforcement program

Harm to EPA's enforcement program posed by violation of an Agency order is somewhat distinct from harm to the RCRA regulatory program posed by violation of specific regulatory requirements. For example, operating without a permit and failure to manifest shipments of hazardous waste are violations that potentially undermine the preventative goals of RCRA's regulatory program. On the other hand, failure to promptly and completely comply with an Agency order may impose additional enforcement burdens on EPA and additional response burdens on other respondents to the order and may undermine EPA's ability to obtain compliance with future orders. Therefore, the Region should consider the following factors in addition to those set forth in the RCPP:

- diversion of government resources resulting from the need to enforce the administrative order; and

- any increased burden on complying respondents based on the noncomplier's failure to coordinate and participate in the work (for example, any difficulty the complying respondents experience in financing the work or obtaining the expertise to conduct the work without the noncomplier's participation).

### b.    Extent of deviation from the requirements of the order

In identifying the extent of deviation from the requirements of an administrative order, the Region should evaluate whether the deviation is major, moderate, or minor. For violations of an Agency order, the extent of deviation component of the penalty should reflect both the noncomplier's general circumstances and the noncomplier's site-specific behavior. Thus, the same type of noncompliance may fall into a higher or lower classification depending on factors that might affect the noncomplier's behavior at the site. The RCPP sets forth some of the factors that may be relevant. While not excusing noncompliance, using these factors to distinguish among noncompliers serves the Agency's goal of achieving both fairness and deterrence in the penalty calculation.

Some additional factors to consider in assessing the extent of deviation from the requirements of an Agency order:

- the extent of noncompliance (*i.e.*, whether the work was inadequately performed or not performed at all); and

- the timeliness of any work that was performed.

- 43 -

c.    Penalty assessment matrix

The Regions should consult the following matrix to determine an appropriate daily penalty.[122]  The matrix is based on a maximum penalty amount of $5,500 and provides broad flexibility in determining an appropriate penalty.  The Regions should note that with a maximum penalty of $5,500 a day, there is less room to accommodate differences between noncompliers by placing a higher premium on the most egregious instances of noncompliance than there is when the statutory maximum is $27,500 a day.  Therefore, in determining the proper penalty amount, the Region should be aware that distinctions made under Section 7003 will likely be more subtle.

| | Extent of deviation | | | |
|---|---|---|---|---|
| Potential for harm | | MAJOR | MODERATE | MINOR |
| | MAJOR | $5,500 - $l,100 | $4,400 - $825 | $3,300 - $605 |
| | MODERATE | $2,420 - $440 | $1,760 - $275 | $1,100 - $165 |
| | MINOR | $660 - $l10 | $330 - $l10 | $110 |

A "major" potential for harm to health, the environment, or the enforcement program could include (l) actual harm to health or the environment, (2) continued or increased exposure, or (3) continued threat of fire or explosion.  A "major" extent of deviation would generally involve total noncompliance or such poor work as to be tantamount to total noncompliance.

A "moderate" potential for harm to health, the environment, or the enforcement program could include continued or aggravated threat to health or the environment where there is no immediate threat of exposure, fire, or explosion.  A "moderate" extent of deviation would involve partial noncompliance, work of poor quality, or a pattern of excessively or routinely delayed compliance.

A "minor" potential for harm to health, the environment, or the enforcement program would be rare at a facility or site that may present an imminent and substantial endangerment. However, where noncompliance has little effect on site conditions, the potential for harm could be minor, depending on the magnitude of harm to the enforcement program.  For instance, failure to submit interim reports may present a "minor" potential for harm if final deadlines are met. Similarly, a "minor" extent of deviation might involve missed interim deadlines or the inadequate

[122] Noncompliance with administrative orders that occurs on or before January 30, 1997 is subject to a maximum civil penalty of $5,000.  The matrix is based on a maximum penalty of $5,500.  For noncompliance on or before January 30, 1997, the per day penalty amount selected from the matrix should be reduced by ten percent.  Where noncompliance occurs both before and after January 30, 1997, the enforcement team should calculate the total penalty for the period before and for the period after, and add the two figures together.

- 44 -

completion of tasks ancillary to the primary requirements of the order.

      3.    <u>Penalties for multi-day violations</u>

      The daily penalty amount should be multiplied by the number of days of noncompliance. Absent extraordinary circumstances, penalties for violations of orders issued under Section 7003 should not be capped, but should instead be assessed for the entire period of the violation. When a respondent fails to perform work under an administrative order, the violation will generally become more serious as time passes.

      When settling claims for a multi-day violation, the Region should determine whether the violation has continued for more than one day, the length of the violation, and whether a multi-day penalty is appropriate. Penalties should be calculated beginning on the day after work is to commence or, for non-work activities, the day after the first missed deliverable is due. The period of noncompliance for work that is inadequately performed should be calculated from the work due date under the order or the date that the inadequate work was performed. The penalty period should end once the deficiency has been corrected. The following are additional issues that may arise in the context of violations of an Agency order.

      If all respondents to an order stop work, the period of noncompliance should run from the last day that activities were performed under the order or, for reporting requirements, from the day following the deadline for the first missed deliverable. The noncompliance period ends either when one or more noncompliers demonstrate compliance with the order or when the work required by the original order is completed under the terms of that order or a subsequent order or settlement.

      When a respondent drops out of a complying group and the group continues to perform the work, the period of noncompliance should begin on the day following the date of the noncomplier's clear, objective indication of intent not to comply further. If the noncomplier had agreed to pay money into a group fund, then the period of noncompliance should begin on the date of the missed payment. For purposes of the penalty calculation, the period of noncompliance ends when (l) the noncomplier resumes compliance with the order, (2) the work required by the order is completed by other respondents, or (3) if EPA initiates action under another statutory authority to complete the work, when EPA completes the work required by the order.

      4.    <u>Economic benefit of noncompliance</u>

      If the noncomplier obtains an economic benefit by its noncompliance, that benefit should be calculated and added to the daily penalty. To ensure that noncompliers do not save money or gain a competitive advantage by failing to comply with an Agency order, the Region should not settle for a penalty amount less than the economic benefit of noncompliance unless (l) it is unlikely, based on the facts of the particular case as a whole, that EPA will be able to recover the economic benefit in litigation, or (2) the respondent has a documented inability to pay the total

- 45 -

proposed penalty. When assessing economic benefit of noncompliance in cases that involve multiple parties, the Regions are encouraged to consult with headquarters.

     5.    <u>Adjustment factors</u>

The Region may take into account a noncomplier's good faith efforts to comply, degree of willfulness in violating an order, history of noncompliance with Agency orders or other requirements, and inability to pay the full amount of the penalty. The first three of these adjustments do not apply to the economic benefit portion of the penalty. Some elements of these adjustment factors, such as level of sophistication or technical expertise, size, and inability to pay, may be particularly applicable to small businesses.

All of the adjustments are cumulative; that is, more than one may apply in any given case. Two caveats apply: (l) where the initial penalty calculation is adjusted downward, the Region should ensure that the noncomplier ends up in a less favorable position than any respondent that did comply with the order, and (2) where the initial penalty calculation is adjusted upward, the total penalty cannot exceed $5,500 for each day in which such violation occurs or such failure to comply continues.

     a.    <u>Application of adjustment factors</u>

     i.  <u>Good faith efforts to comply</u>

The Region may consider adjusting the penalty downward if there is evidence that the noncomplier made good faith efforts to comply with the order. For violation of an administrative order, an adjustment for good faith may also include consideration of the noncomplier's size, capabilities, and level of sophistication; degree of contribution or culpability; and any attempts to participate and coordinate with complying respondents.

     ii.  <u>Degree of willfulness or negligence</u>

Although willfulness is not a statutory prerequisite for enforcement of an administrative order, a higher penalty may be appropriate for a willful violation. Factors relevant to this inquiry include the amount of control the noncomplier had over how quickly the violation was remedied; the noncomplier's involvement with the site, level of knowledge, and technical expertise; and whether compliance was delayed by factors that were not reasonably foreseeable and that were out of the control of the noncomplier.

     iii.  <u>History of noncompliance</u>

In assessing whether a history of noncompliance should be applied to elevate a penalty amount, the Region may consider (1) noncompliance with the order in question or a pattern of noncompliance with other orders, (2) noncompliance with the requirements of RCRA or state

- 46 -

hazardous waste law, and (3) any pattern of disregard of the requirements contained in RCRA regulations or other statutes.

### iv.  Inability to pay

In addition to considering the factors set forth in the RCPP, the Region may consider whether payment of the full amount of the penalty would jeopardize further activities in connection with the order.

### v.  Other unique factors

Other factors may apply to a specific order or respondent that may lead the Region to make additional adjustments in the calculated penalty.  For example, in some cases the Region should consider the risks associated with proceeding to trial on the penalty claim.  Another unique factor may be the respondent's ability and commitment to perform an appropriate supplemental environmental project.[123]

### 6.  Penalties for multiple respondents

Penalties may be sought from all of the respondents who fail to comply with an order issued under Section 7003.  Since each respondent is separately responsible for its own compliance, each respondent that willfully violates or fails or refuses to comply with the order may be subject to the full amount of up to $5,500 a day for each violation.

### 7.  Documentation of penalty claims

The penalty amount should be clearly documented in the case file.  Justifications for penalty calculations, including adjustments, should be clearly explained with references to the circumstances of the specific respondent.  If the Region determines that a particular case requires deviation from these guidelines, this decision should be documented clearly and the justification for developing the alternate penalty should be clearly stated.  The Region should complete a worksheet that explains and justifies the penalty calculated in light of the particular facts of the case.  Attachment 6 is a worksheet for documenting penalty calculations.

---

[123] For information on supplemental environmental projects, the Regions should consult the "Interim Revised EPA Supplemental Environmental Projects Policy" (May 8, 1995).

ATTACHMENT 1

Delegations, Consultations, and Concurrence

The following summary is accurate as of the date of this guidance and all authorities described below are subject to change.

The authority to settle or exercise the Agency's concurrence in the settlement of civil judicial enforcement actions under RCRA has been delegated by the Administrator to the Assistant Administrator for Enforcement and Compliance Assurance (AA-OECA) (Delegation 8-10-C). For judicial settlements that involve the use of Section 7003 outside the cleanup context (for example, to impose controls on future operations at a facility), this authority was redelegated to the Regional Counsels with a requirement for consultation with the Office of Regulatory Enforcement (ORE) if (1) the settlement deviates from applicable penalty policies or does not recover the full economic benefit of noncompliance, or (2) the case raises issues of national significance.[124] For judicial settlements involving cleanup, this authority was redelegated to the Regional Administrators (RAs) with a requirement for consultation with the Director of the Regional Support Division, Office of Site Remediation Enforcement (OSRE) if the settlement significantly deviates from written Agency policy or breaks new ground in an important sensitive area.

The authority to make determinations that a particular activity may present an imminent and substantial endangerment, to issue unilateral administrative orders (UAOs), and to issue administrative orders on consent (AOCs) has been delegated to the Regional Administrators. However, these delegations of authority (Delegations 8-22-A, 8-22-B, and 8-22-C) may be subject to consultation or concurrence with the appropriate division of OECA, as explained below. First, OECA's Federal Facilities Enforcement Office retains a consultation role in all actions in which a federal agency is a defendant or respondent.

Second, for the use of Section 7003 for cleanup work, the Regions must consult with OSRE on the first two AOCs issued by each Region under Section 7003 alone (this requirement has been satisfied by all Regions) and on all UAOs issued under Section 7003 alone. In addition, for administrative orders which significantly deviate from written Agency policy or which break new ground in an important sensitive area, the Regions must consult with the Director of OSRE.[125]

Third, the use of Section 7003 outside the cleanup context is subject to consultation with or concurrence by the Office of Regulatory Enforcement, RCRA Enforcement Division

---

[124] "Redelegation of the Assistant Administrator for OECA's Concurrence Authority in Settlement of Certain Civil Judicial and Administrative Enforcement Actions," Steven A. Herman (July 8, 1994).

[125] "Office of Enforcement and Compliance Assurance and Regional Roles in Civil Judicial and Administrative Site Remediation Enforcement Cases," Steven A. Herman (May 19, 1995).

- 2 -

(ORE-RED) as follows:

- consultation with ORE-RED at the initiation of the action (for example, filing of complaints or appeals);

- concurrence of ORE-RED in dispositive litigation proceedings (for example, when pleadings are filed or hearings or trials are held); and

- consultation with ORE-RED during the settlement process (for example, when negotiating the terms of an administrative order on consent or consent decree).[126]

The authority to refer requests for emergency temporary restraining orders to the Department of Justice has been delegated by the Administrator to the RAs and the AA-OECA. The RAs must notify the AA-OECA when exercising this authority (Delegation 8-10-D).  The authority to refer any other matter to be brought under Section 7003 to the Department of Justice for civil judicial action has been delegated by the Administrator to the RAs and the AA-OECA (Delegation 8-10-A).  The AA-OECA must notify the appropriate Regional Administrator before exercising this authority.

---

[126] *See* "Final Approach for Implementing the July 1994 Case Redelegations in the RCRA Regulatory Enforcement Program," Susan O'Keefe (Nov. 1, 1994).

ATTACHMENT 2

Comparison of RCRA § 7003 to Other Enforcement and Response Authorities

This table does not provide an exhaustive list or description of every statutory authority that may be available to EPA to address endangerments, hazards, releases, etc.  Rather, it summarizes significant aspects of several authorities that are similar to RCRA § 7003.

| | General Purpose | Triggering Activity | Materials Covered | Persons Covered | Response Authority | Additional Notes |
|---|---|---|---|---|---|---|
| **RCRA § 7003(a)** | Abate conditions that may present an imminent and substantial endangerment to health or the environment | Handling, storage, treatment, transportation, or disposal of solid or hazardous waste that may present an imminent and substantial endangerment | Any solid waste as defined in RCRA § 1004(27), including petroleum, or hazardous waste as defined in RCRA § 1004(5) | Any person (including any past or present generator, transporter, owner, or operator) who has contributed or is contributing to any triggering activity | Commence a civil action to restrain from handling, storage, treatment, transportation or disposal, or to take other necessary action<br><br>Take other action, such as issuing an administrative order, necessary to protect public health and the environment | |
| **RCRA § 3008(h)** | Require corrective action or other response measure at any unpermitted treatment, storage, or disposal facility that has or should have had interim status, and some facilities that had interim status but no longer do | Release of hazardous waste into the environment from a facility covered by RCRA § 3008(h) | Hazardous waste as defined in RCRA § 1004(5)<br><br>EPA interprets to cover hazardous constituents | EPA interprets to include the owner or operator of the facility | Issue an administrative order to require corrective action, suspend or revoke interim status authorization, or require other necessary response measure<br><br>Commence a civil action for appropriate relief | |

|  | General Purpose | Triggering Activity | Materials Covered | Persons Covered | Response Authority | Additional Notes |
|---|---|---|---|---|---|---|
| **RCRA § 3013** | Require monitoring, testing, analysis, and reporting at hazardous waste treatment, storage, or disposal facility or site to address substantial hazard to human health or the environment | Presence or release of hazardous waste that may present a substantial hazard | Hazardous waste as defined in RCRA § 1004(5) | Current owner or operator<br><br>Most recent previous owner or operator who could be expected to know about the presence and potential release of the hazardous waste, but only if the current owner or operator could not be expected to know | Issue an administrative order to require monitoring, testing, analysis, and reporting | Legislative history indicates that the standard for substantial hazard is lower than the standard for imminent and substantial endangerment<br><br>If EPA conducts monitoring, testing, analysis, or reporting, it may order the owner or operator to reimburse it for its costs |
| **RCRA § 9003(h)** | Require corrective action with respect to any release of petroleum from an underground storage tank (UST) | Actual release of petroleum from an UST | Petroleum as defined in RCRA § 9001(8) | Operator of the UST<br><br>In the case of an UST in use on 11/8/84 or brought into use after that date, the owner of the UST<br><br>In the case of an UST in use before 11/8/84 but no longer in use on that date, the owner of the UST immediately before the discontinuation of its use | Issue an administrative order or commence a civil action to require corrective action | Owner/operator is liable for the costs of EPA's enforcement action |

| | General Purpose | Triggering Activity | Materials Covered | Persons Covered | Response Authority | Additional Notes |
|---|---|---|---|---|---|---|
| **CERCLA § 104(a)** | Respond to actual or substantial threat of release of hazardous substance<br><br>Respond to actual or substantial threat of release of pollutant or contaminant which may present an imminent and substantial danger to public health or welfare | Actual or substantial threat of release of hazardous substance<br><br>Actual or substantial threat of release of pollutant or contaminant which may present an imminent and substantial danger | Hazardous substance as defined in CERCLA § 101(14), including hazardous waste under RCRA § 3001, but not petroleum<br><br>Pollutant or contaminant as defined in CERCLA § 101(33), but not petroleum | Current owners or operators, owners or operators at time of disposal, generators, and transporters | Perform or require removal or remedial action or any other response measure consistent with the National Contingency Plan | EPA can seek reimbursement of response costs under CERCLA § 107 |
| **CERCLA § 106(a)** | Abate imminent and substantial endangerment to public health or welfare or the environment | Actual or threatened release of hazardous substance that may present an imminent and substantial endangerment | Hazardous substance as defined in CERCLA § 101(14), including hazardous waste under RCRA § 3001, but not petroleum | Current owners or operators, owners or operators at time of disposal, generators, and transporters | Commence a civil action to obtain such relief as may be necessary to abate the danger or threat<br><br>Take other action, such as issuing an administrative order, to protect public health and welfare and the environment | EPA risks a claim against the Hazardous Substance Superfund if the PRPs believe that they are not liable or that EPA was arbitrary and capricious<br><br>EPA can seek reimbursement of response costs under CERCLA § 107 |
| **CWA § 311(c)** | Ensure removal of a discharge, and mitigation or prevention of a substantial threat of a discharge, of oil or a hazardous substance | Discharge or substantial threat of discharge of oil or hazardous substance | Oil as defined in CWA § 311(a)(1) or hazardous substance as defined in CWA § 311(a)(14) | Includes owners and operators | Perform or direct actions to remove the discharge or to mitigate or prevent the threat of a discharge<br><br>Remove and, if necessary, destroy a discharging vessel | |

| | General Purpose | Triggering Activity | Materials Covered | Persons Covered | Response Authority | Additional Notes |
|---|---|---|---|---|---|---|
| **CWA § 311(e)** | Require action to abate an imminent and substantial threat to public health or welfare | Actual or threatened discharge of reportable quantity of oil or hazardous substance that may present an imminent and substantial threat | Oil as defined in CWA § 311(a)(1) or hazardous substance as defined in CWA § 311(a)(14) | Includes owners and operators | Commence a civil action to secure any relief necessary to abate the endangerment  Take any other action, such as issuing an administrative order, necessary to protect public health and welfare | |
| **CWA § 504** | Abate imminent and substantial endangerment to the health or welfare of persons | Pollution source that is presenting an imminent and substantial endangerment | Pollution source or a combination of sources | Any person causing or contributing to the pollution | Commence a civil action to restrain any person causing or contributing to the pollution to stop the discharge of pollutants or to take other necessary action | "Welfare of persons" means the livelihood of such persons |
| **SDWA § 1431** | Abate conditions that may present an imminent and substantial endangerment to the health of persons | Contaminant that is present in, or likely to enter, a public water system or underground drinking water source, and that may present an imminent and substantial endangerment | Contaminant as defined in SDWA § 1401(6) | Includes persons causing or contributing to the endangerment | Take action, such as issuing an administrative order, necessary to protect human health, or commencing a civil action for appropriate relief | EPA may act if the appropriate state and local authorities have not acted to protect human health |

| | General Purpose | Triggering Activity | Materials Covered | Persons Covered | Response Authority | Additional Notes |
|---|---|---|---|---|---|---|
| **CAA § 303** | Abate imminent and substantial endangerment to public health or welfare or the environment | Emission of air pollutants that is presenting an imminent and substantial endangerment | Pollution source or combination of sources (including moving sources) | Any person causing or contributing to the pollution | Commence a civil action to restrain any person causing or contributing to the pollution from emitting air pollutants to stop the emission or to take other necessary action<br><br>Issue an administrative order necessary to protect public health or welfare or the environment | EPA may issue an administrative order if initiating a civil action is not practicable to assure prompt protection |

ATTACHMENT 3

Possible Sources of Evidence

This attachment describes possible sources of evidence related to the three basic legal requirements for initiating an action under RCRA § 7003.  Possible sources of evidence that conditions may present an imminent and substantial endangerment include the following:

- investigative records of EPA and other federal, state, and local agencies (such as inspection reports, sampling and analytical data and related chain of custody and quality control/quality assurance documentation, photographs, and statements by factual and expert witnesses);

- documents submitted, generated, or issued pursuant to RCRA (such as responses to RCRA § 3007 information requests, comprehensive monitoring evaluations (CMEs), Exposure Information Reports, biennial reports, facility assessments (RFAs), facility investigations (RFIs), corrective measures studies (CMSs), and administrative and judicial orders and supporting documentation);

- documents submitted, generated, or issued pursuant to CERCLA (such as responses to CERCLA § 104(e) information requests, CERCLA § 103 notifications of reportable quantities, preliminary assessments (PAs), site investigations (SIs), Hazard Ranking System (HRS) documentation, and remedial investigation/feasibility studies (RI/FSs));

- documents submitted, generated, or issued pursuant to any other environmental statute;

- reports by or consultations with epidemiologists, toxicologists, medical doctors, and Occupational Safety and Health Administration (OSHA) and other health and safety inspectors regarding potential human health effects of site conditions;

- reports by or consultations with public health officials, local doctors, OSHA and other health and safety inspectors, and affected individuals regarding actual human health effects of site conditions;

- reports by or consultations with botanists, biologists, toxicologists, the U.S. Fish and Wildlife Service, natural resource trustees under CERCLA, state and local government agencies, and environmental groups regarding the actual and potential effects of site conditions on plants and wildlife;

- statements by people who live or work in the area of the site; and

- information (such as risk data on specific contaminants) gathered by EPA during rulemaking and other efforts.

- 2 -

Possible sources of evidence that a potential endangerment stems from the handling, storage, treatment, transportation, or disposal of any solid or hazardous waste include the following:

- Investigative records of EPA and other federal, state, and local agencies (such as inspection reports, sampling and analytical data and related chain of custody and quality control/quality assurance documentation, photographs, statements by factual and expert witnesses, statements and interview reports with current and past facility employees, managers, etc., and records of leads or complaints by citizens);

- communications with persons responsible under RCRA § 7003 (such as records of conferences or telephone calls, and written communications);

- documents submitted, generated, or issued pursuant to RCRA (such as RCRA § 3010(a) notifications, Part A or Part B permit applications, responses to RCRA § 3007 information requests, CMEs, Exposure Information Reports, biennial reports, waste manifests, RFAs, RFIs, CMSs, and administrative and judicial orders and supporting documentation);

- documents submitted, generated, or issued pursuant to CERCLA (such as CERCLA § 103 notifications of reportable quantities, responses to CERCLA § 104 information requests, PAs, SIs, and HRS documentation);

- documents submitted, generated, or issued pursuant to any other environmental statute;

- documents regarding the site or facility submitted to or maintained by other federal, state, or local agencies (such as OSHA inspection reports and hearings, and Department of Energy or Department of Transportation permits, licenses or proceedings); and

- information received by EPA during the development of regulations and reports to Congress.

Possible sources of evidence that a person has contributed or is contributing to the handling, storage, treatment, transportation, or disposal of any solid or hazardous waste that may present an imminent and substantial endangerment include the following:

- responses to information requests issued pursuant to RCRA § 3007, CERCLA § 104(e), or any other applicable statutory authority;

- statements of witnesses (such as employees and neighbors);

- business records (such as contracts, invoices, receipts, manifests, and shipping documents);

- 3 -

- federal, state, and local waste management permits, inspection reports, and other documents related to the site and facilities from which the wastes were transported;

- deeds and leases; and

- on-site identification of the person's waste.

ATTACHMENT 4

<u>Resources Available</u>

Listed below are some policy and guidance documents that may assist the Regions in determining whether conditions may present an imminent and substantial endangerment under RCRA § 7003.  Most of the documents were issued to facilitate the exercise of statutory authorities other than Section 7003.  The recommendations contained in many of the documents therefore do not apply to endangerment determinations under Section 7003.  For example, some of these documents address quantification of risk, which is not required by Section 7003.  These documents may nevertheless be helpful and are therefore listed below.

- "Risk Assessment Guidance for Superfund, Volume I:  Human Health Evaluation Manual," which consists of the following:

  - "Part A:  Interim Final" (OSWER Directive No. 9285.7-02B, December 1989);

  - "Part B:  Development of Risk-Based Preliminary Remediation Goals" (OSWER Directive No. 9285.7-0lB, December 1991); and

  - "Part C:  Risk Evaluation of Remedial Alternatives" (OSWER Directive No. 9285.7-0lC, December 1991);

- "Supplemental Guidance to Risk Assessment Guidance for Superfund:  Calculating the Concentration Term, Volume I, Number 1" (OSWER Directive No. 9285.7-08I, May 1992);

- "Risk Assessment Guidance for Superfund, Volume II:  Environmental Evaluation Manual" (OSWER Directive No. 9285.7-0lA, March 1989);

- "Endangerment Assessment Guidance" (OSWER Directive No. 9850.0-1, November 1985);

- "Endangerment Assessment Handbook" (OSWER Directive No. 9850.1, November 1985);

- "Guidance for Risk Characterization" (U.S. Environmental Protection Agency, Science Policy Council, February 1995) (attached to Carol Browner's memorandum dated March 21, 1995 on EPA Risk Characterization Program);

- "Policy for Risk Characterization at the U.S. Environmental Protection Agency" (March 1995) (attached to Carol Browner's memorandum dated March 21, 1995 on EPA Risk Characterization Program);

- 2 -

- "Framework for Ecological Risk Assessment" (EPA/630-R-92-001, February 1992);

- "RCRA Ground-Water Monitoring Technical Enforcement Guidance Document" (EPA/530-SW-86-055, September 1986);

- "RCRA Ground-Water Monitoring:  Draft Technical Guidance" (EPA/530-R-93-001, November 1992); and

- "Health and Safety Audit Guidelines:  SARA Title I, Section 126" (EPA/540-G-89-010, December 1989).

ATTACHMENT 5

Judicial Relief and Judicial Review

## I. JUDICIAL RELIEF AVAILABLE UNDER SECTION 7003

### A. Types of Injunctions

There are three types of injunctions that a court may issue in a 7003 case: temporary restraining orders, preliminary injunctions, and permanent injunctions. In considering appropriate injunctive relief, Regions should consult closely with DOJ.

### 1. Temporary restraining orders

A temporary restraining order (TRO) is an order issued by a judge that prohibits specified activity or maintains the status quo until the court can hear the merits of the issue. An example is a temporary ban on dumping tailings containing hazardous wastes into a lake until the court can hold a hearing on the issue. Unlike a preliminary or permanent injunction, a TRO may be issued without an adversary hearing and lasts only until such a hearing can be held, a maximum of ten days. If necessary, a TRO may be issued without notice to the adverse party. TROs are usually issued only to prevent immediate, irreparable injury that would occur before the judge can hold a hearing on a preliminary injunction.

When asking a court to exercise its discretion to issue a TRO, the United States is not required to comply with the provision of Rule 65(c) of the Federal Rules of Civil Procedure, which requires a private party seeking a TRO to give "security" to indemnify the party subject to a TRO for damages incurred if wrongfully restrained.

### 2. Preliminary injunctions

A preliminary injunction is also a judicial order requiring a person to take or refrain from specified action. A preliminary injunction is issued before a final judgment on the merits and usually is in effect only until a trial on the merits can be held. An example is postponing a trial burn at an incinerator that is alleged to pose an imminent and substantial endangerment until a trial can be held on the issue of whether the incinerator can be operated safely. A preliminary injunction may be unnecessary if a trial can be held before the threatened harm occurs.

There is a heightened standard for judicial action before the merits of the case can be heard and courts may thus merge the preliminary injunction hearing with a hearing on the merits of the case.[1] The United States may therefore seek a preliminary injunction under Section 7003 when it wishes to protect the environment or the public from threatened irreparable injury, and preserve the court's ability to render a meaningful decision on the merits. A preliminary

---

[1] *See* Rule 65(a)(1) of the Federal Rules of Civil Procedure.

- 2 -

injunction can preserve the court's ability to render a meaningful decision either by maintaining the status quo until the court may grant full relief after a hearing, or by returning the parties to the status that existed before the dispute arose.

### 3.    Permanent injunctions

A permanent injunction is a judicial order that requires a person to take or refrain from specified action.  For example, a court order requiring a facility to shut down an incinerator until it has obtained the necessary permits is a permanent injunction.  A permanent injunction does not necessarily last indefinitely (*i.e.,* it may just be for one discrete action that is not continuing in nature); it is "permanent" because it embodies the court's ultimate decision on the matter following a full trial of the case.

In cases of environmental harm, the United States will often want to seek a permanent injunction, particularly when restraints on future actions are included in the relief sought.  The government may seek both preliminary and permanent injunctions (or a TRO, a preliminary, and a permanent injunction) to address the same endangerment when the exigency of the situation dictates immediate action from the court but long-term relief is also appropriate.

## II.    JUDICIAL REVIEW OF ADMINISTRATIVE ORDERS

### A.    Unavailability of Pre-enforcement Review

It is EPA's position that a court cannot review the validity of an administrative order issued under Section 7003 until the United States goes to court to enforce the order.  Although RCRA does not expressly bar such "pre-enforcement review" or otherwise address the timing of judicial review of orders issued under Section 7003, general principles of administrative law preclude pre-enforcement review.  At least one court has found that due process is satisfied by an opportunity to confer with the Agency and the opportunity to challenge liability during a judicial enforcement action.[2]  This ruling is consistent with CERCLA cases decided before the October 1986 amendment of CERCLA, which added the Section 113(h) bar on pre-enforcement review. In most of these early CERCLA cases, the courts denied pre-enforcement review before the bar was made explicit.[3]

Respondents may raise due process issues to justify pre-enforcement review, arguing that it is unfair to impose an order without providing a formal adjudicatory hearing.  At least one court has rejected this argument.[4]  To maximize the chances of successfully defending a Section 7003

---

[2] *United States v. Valentine,* 856 F. Supp. 621, 627 (D. Wyo. 1994).

[3] *See Solid State Circuits, Inc. v. U.S. EPA*, 812 F.2d 383, 386 n.1 (8th Cir. 1987) (cases cited).

[4] *See Valentine*, 856 F. Supp. at 627.  *See also Amoco Oil Co. v. United States*, No. 96 N 1037 (D. Colo. March 28, 1997) (denying pre-enforcement review of an order issued under RCRA § 3008(h)).

- 3 -

order against this type of challenge, EPA should maintain a comprehensive administrative record file and provide respondents with an opportunity to consult with the Agency regarding the applicability, validity, and terms of the order.  Courts in the context of RCRA § 7003 and under other similar statutes have found that due process is served by the availability of a sufficient cause defense.

B.    Standard and Scope of Review of Administrative Orders

RCRA does not contain an express statutory standard for judicial review of administrative orders.  Under these circumstances, general principles of administrative law apply.  As outlined below, review of agency decisions regarding endangerment determinations and remedy selection generally is on the administrative record and courts will overturn an agency order only if it is deemed "arbitrary and capricious."  The arbitrary and capricious standard gives administrative agencies broad discretion in deciding how to administer the law.  In addition, courts will generally examine whether proper procedures were followed, and will also address due process concerns.

Section 706 of the Administrative Procedure Act (APA), which provides for review of agency actions, including agency orders, generally limits review of agency action to review of the administrative record compiled by the agency.[5]  To help avoid review of Agency decision based on information beyond that contained in the administrative record, Regions should ensure that administrative record supporting their Section 7003 orders is complete and demonstrates that the Agency considered all relevant factors.  In addition, the Region should ensure that there is no basis for a respondent to argue that the Agency failed to follow proper procedures or that it engaged in improper behavior or acted in bad faith.  If the record is inadequate, courts may remand the decision back to EPA.

Under APA § 706, a court's review of final agency actions  will look to whether those actions were "arbitrary and capricious," unless Congress has provided another standard of review.  "When the EPA asks a court. . . to enforce a lawful (nonarbitrary) EPA order, the court must enforce it."[6]  Although there do not appear to be any cases that address the standard of court review of orders issued under Section 7003, the arbitrary and capricious standard has been applied to review of a RCRA § 3013 order.[7]  This supports application of the arbitrary and capricious standard to EPA decisions embodied in Section 7003 orders as well.  Further, this case law is consistent with general principles of administrative law which support the application of the "arbitrary and capricious" standard to decisions within the particular expertise of the Agency.

---

[5] *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414-417 (1971).  *See also United States v. Seafab Metal Corp.*, 28 Env't Rep. Cas. (BNA) 1231, 1233 (W.D. Wash. 1988) (RCRA § 3013 order).

[6] *United States v. Ottati & Goss*, 900 F.2d 429, 433-34 (1st Cir. 1990) (CERCLA § 106 case).

[7] *Seafab Metal*, 28 E.R.C. at 1233.

- 4 -

Finally, courts may consider whether EPA has afforded the respondent(s) due process, as required by the Constitution.  Due process does not necessarily mandate an evidentiary hearing prior to issuance or enforcement of the order.  Rather, the requirement is flexible and requires that respondents have an opportunity to comment on the evidence "at a meaningful time, in a meaningful manner."[8]  Although there does not appear to be a clear standard for how much process is enough, the Regions should at a minimum ensure that the respondent has the opportunity to comment on the order and to confer with the Agency regarding compliance with the order.

---

[8] *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976); *United States v. Seymour Recycling Corp.*, 679 F. Supp. 859, 864 (S.D. Ind. 1987) (citation omitted).

**WORKSHEET CONTAINING SITE-SPECIFIC INFORMATION**
**IS ENFORCEMENT CONFIDENTIAL -- DO NOT RELEASE**

ATTACHMENT 6

**WORKSHEET FOR DOCUMENTATION OF PENALTY CLAIMS**

Date of calculation:

Site name and location:

Case name:

Enforcement team members and telephone numbers:

**Step 1:  Assign Daily Penalty Amount**

Justification for harm classification (review the factors and definitions found in Section VIII.B.2)

List harm classification _____ and list the extent of deviation classification _____.
List dollar amount of penalty selected from appropriate cell in matrix $_____.

*Describe potential for harm to health or the environment:*

*Describe harm to the enforcement program:*

Justification for the extent of deviation classification (review the factors and definitions found in Section VIII.B.2.)

**WORKSHEET CONTAINING SITE-SPECIFIC INFORMATION**
**IS ENFORCEMENT CONFIDENTIAL -- DO NOT RELEASE**

*Describe the extent and type of work performed and/or not performed:*

*Describe the quality of the work performed:*

*Describe the timeliness of work:*

Justification for choice of penalty within range of matrix box selected:

**Daily penalty amount = $_____**

**Step 2:  Calculate Penalties for Multi-Day Violations**

i.  Period of noncompliance is _____ (date) to _____ (date).  Number of days of noncompliance is _____.

Justification

ii.  Daily penalty amount (from Step 1) $_____ x Number of days of noncompliance _____ = **Penalties for multi-day violations = $_____.**

- 2 -

**WORKSHEET CONTAINING SITE-SPECIFIC INFORMATION
IS ENFORCEMENT CONFIDENTIAL -- DO NOT RELEASE**

**Step 3:  Determine Economic Benefit of Noncompliance**

Justification -- Use BEN computer model where appropriate and attach BEN model printout or, if BEN was not used, explain how economic benefit determination was made:

**Economic benefit of noncompliance = $_____**

**Step 4:  Apply Adjustment Factors**

i.  Good faith efforts to comply -- reduction of $_____ or percent reduced _____.

Justification:

ii.  Degree of willfulness or negligence -- increase of $_____ or percent increased _____.

Justification:

iii.  History of noncompliance -- increase of $_____ or percent increased _____.

- 3 -

**WORKSHEET CONTAINING SITE-SPECIFIC INFORMATION
IS ENFORCEMENT CONFIDENTIAL -- DO NOT RELEASE**

Justification:

iv.  Inability to pay -- reduction of $_____or percent reduced _____.

Justification:

v.  Other unique factors -- reduction of $_____or percent reduced _____, or increase of $_____ or percent increased _____.

Justification:

**Total reduction or increase based on adjustment factors = $_____ (or total percent if not initially calculated as dollar amount = _____%).**  It may be necessary to break out the reduction or increase to the gravity portion of the penalty claim $_____ and the economic benefit portion of the penalty claim $_____ if the strength of the litigation case differs for each portion of the claim.  The justification should state clearly whether the concern is for the gravity portion or the economic portion or both.  Adjustments may be specified as percentages of the penalties for multi-day violations and then calculated as dollar amounts.

Justification for breakout, if any:

**WORKSHEET CONTAINING SITE-SPECIFIC INFORMATION
IS ENFORCEMENT CONFIDENTIAL -- DO NOT RELEASE**

**Step 5:  Calculate Total Penalty Settlement**

      Penalties for multi-day violations (from Step 2)      $_____

+ Economic benefit of noncompliance (from Step 3)      +  _____

± Total reduction or increase based on adjustment factors
      (from Step 4)      ±  _____

_____

    **Total penalty settlement**      **$_____**