**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN B. POLLACK AND BLUE ECO LEGAL COUNCIL, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 08 C 320 |
| UNITED STATES DEPARTMENT OF | ) | Judge Guzmán |
| JUSTICE, UNITED STATES COAST | ) | |
| GUARD, UNITED STATES NAVY, | ) | |
| UNITED STATES MARINE CORPS, AND | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| DEFENSE, | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' REPLY MEMORANDUM OF**
**LAW IN SUPPORT OF ITS MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    PLAINTIFFS' OPPOSITION CONFIRMS THEIR LACK OF STANDING . . . . . 1

II.   THE FBI'S RESPONSE ACTION TRIGGERS THE CERCLA SECTION
      113(h) BAR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  PLAINTIFFS ALLEGE *NO* CWA OR RCRA VIOLATION AS TO COAST
      GUARD EXERCISES OR RCRA REGULATORY VIOLATION AS TO
      THE FBI RANGE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

IV.   THE LACK OF MANDATORY NOTICE DOOMS SOME OF PLAINTIFFS'
      CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.    PLAINTIFFS OFFER NO REASON WHY THEIR CERCLA CLAIMS
      SURVIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

VI.   PLAINTIFFS' COUNT V TORT CLAIMS SHOULD BE DISMISSED . . . . . . . 12

VII.  PLAINTIFFS' PURPORTED "NEW FACTS" ARE IMPROPERLY RAISED . 14

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

## TABLE OF AUTHORITIES

**FEDERAL CASES:**

*Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 11, 12

*Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275 (3d Cir. 2000) . . . . . . . . . . 12

*City of Highland Park v. Train*, 519 F.2d 681 (7th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Combs v. United States*, No. 2:04-CV-306, 2008 WL. 2278661 (E.D. Tenn.
   May 30, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Cromer v. EPA*, 143 F. Supp. 2d 1376 (M.D. Ga. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Davis v. United States*, 244 F. Supp. 2d 878 (N.D. Ill. 2002), *aff'd*, 375 F.3d
   590 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Deloria v. Veterans Admin.*, 927 F.2d 1009 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Environmental Waste Control, Inc. v. ATSDR*, 763 F. Supp. 1576 (N.D. Ga. 1991) . . . . . . . . . . . 5

*Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . 10

*Frey v. EPA*, 270 F.3d 1129 (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Frey v. EPA*, 403 F.3d 828 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Friends of Earth, Inc. v. Laidlaw Envitl. Servs., Inc.*, 528 U.S. 167 (2000) . . . . . . . . . . . . . . . . 1, 3

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*,
   484 U.S. 49 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Hallstrom v. Tillamook County*, 493 U.S. 20 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707 (1985) . . . . . . . . . . . . . . 11

*Hughes v. United States*, 701 F.2d 56 (7th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*International Paper Co. v. Ouellette*, 479 U.S. 481 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Johnson v. United States*, 906 F. Supp. 1100 (S.D. W. Va. 1995) . . . . . . . . . . . . . . . . . . . . . . . 14

ii

*Key Tronic Corp. v. United States*, 511 U.S. 809 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Laine v. Weinberger*, 541 F. Supp. 599 (C.D. Cal. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

*McNeil v. United States*, 508 U.S. 106 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*,
   453 U.S. 1 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Miller v. United States*, 418 F. Supp. 373 (D. Minn. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Murrey v. United States*, 73 F.3d 1448 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*North Shore Gas Co. v. EPA*, 930 F.2d 1239 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Perry v. Village of Arlington Heights*, 186 F.3d 826 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 3

*Pollack v. Dep't of Defense*, 507 F.3d 522 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Pollack v. Dep't. of Defense*, No. 06 C 2659 (N.D. Ill. filed Dec. 15, 2006), *aff'd,*
   *Pollack v. Dep't. of Defense,* 507 F.3d 522 (7th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Redland Soccer Club, Inc. v. Dep't of the Army*, 55 F.3d 827 (3d Cir. 1995) . . . . . . . . . . . . . 12, 13

*Richland-Lexington Airport Dist.v. Atlas Properties, Inc.*, 854 F. Supp.
   400 (D.S.C. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Smith v. Potter*, 208 F. Supp. 2d 415 (S.D.N.Y. 2002), *aff'd sub nom*,
   *APWU v. Potter,* 343 F.3d 619 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161 (3d Cir. 2005) . . . . . . . . . . 11

*United States v. Hardage*, 982 F.2d 1436 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Valluzzi v. United States Postal Service*, 775 F. Supp. 1124 (N.D. Ill. 1991) . . . . . . . . . . . . . . . 14

*Zehner v. Trigg*, 133 F.3d 459 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**STATE CASES :**

*Young v. Byrco Arms*, 821 N.E.2d 1078 (Ill. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**STATUTES:**

Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1387:

Section 505(c)(1), 33 U.S.C. § 1365(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-9675:

Section 104(b)(1), 42 U.S.C. § 9604(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Section 107(a), 42 U.S.C. § 9607(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Section 107(a)(4)(B), 42 U.S.C. § 9607(a)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Section 107(f)(1), (2), 42 U.S.C. § 9607(f)(1), (2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Section 107(f)(1), (2)(A)-(B), 42 U.S.C. § 9607(f)(1), (2)(A)-(B) . . . . . . . . . . . . . . . . . . . . . 10

Section 113(h), 42 U.S.C. § 9613(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Section 120(a)(4), 42 U.S.C. § 9620(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Federal Tort Claims Act ("FTCA"):

28 U.S.C. § 2675(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 2675(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901-6992k:

Section 7002(b)(2)(B), 42 U.S.C. § 6972(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Submerged Lands Act, 43 U.S.C. §§ 1301 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**REGULATIONS:**

40 C.F.R. § 135.2(a)(3) ......................................................... 10

40 C.F.R. § 135.3(a) ............................................................ 10

40 C.F.R. § 254.2(a)(3) ......................................................... 10

40 C.F.R. § 254.3(a) ............................................................ 10

40 C.F.R. § 266.201 ............................................................. 9

40 C.F.R. § 266.202(a)(1) ....................................................... 9

40 C.F.R. § 300.5 ............................................................... 5

40 C.F.R. § 300.410(c)(2), (d) .................................................. 5

40 C.F.R. § 300.700(c)(5) ....................................................... 12

40 C.F.R. § 300.700(c)(6) ....................................................... 12

**FEDERAL REGISTER:**

71 Fed. Reg. 43,403 (Aug. 1, 2006) ............................................. 8

72 Fed. Reg. 520 (Jan. 5, 2007) ................................................ 7

**EXECUTIVE ORDER:**

Exec. Order No. 12,580, 3 C.F.R. 193 (1987 Comp.) .............................. 5

## INTRODUCTION

Plaintiffs' opposition[1] to the United States' Motion to Dismiss (Dkt. 47 and Memorandum in Support, Dkt. 48 ("Def. Mem.")) concedes key arguments, fails to address others, and does not meaningfully refute any of the United States' arguments. Plaintiffs have not shown that they have standing to bring Counts I-IV in the Second Amended Complaint (Dkt. 26-2, "Complaint" or "SAC") or that their FBI Range claims are not barred by Section 113(h) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Nor have Plaintiffs' shown that they exhausted their administrative remedies and named the correct defendant as required by the Federal Tort Claims Act ("FTCA"). These failings, and others addressed below, demonstrate that this Court lacks subject matter jurisdiction and should dismiss the Complaint in its entirety.

## I.    PLAINTIFFS' OPPOSITION CONFIRMS THEIR LACK OF STANDING

It is Plaintiffs' burden to establish the "irreducible constitutional minimum" of standing: that they have suffered an injury-in-fact, fairly traceable to the Defendants, that can be redressed by this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Our opening brief established the Complaint's utter failure even to allege these required components of standing. Def. Mem. at 8-11. Plaintiffs affidavits and arguments in opposition likewise fail to show what the law so plainly demands – that they be "among the injured," *id.* at 563 (citation omitted), and that "they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Friends of Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 183 (2000) (internal quotation marks and citation omitted).

The Affidavits Show No Injury-In-Fact: The cookie-cutter affidavits of Steven Pollack and Darren Miller lay bare their lack of standing.[2] Both reside in Highland Park, Illinois, approximately 14 miles from the FBI Range, and neither claims to use or enjoy Foss Park or the Lake Michigan waterfront in the vicinity of the FBI Range. While both generically claim to "enjoy the public areas along the Illinois portion of Lake Michigan," approximately 63-miles of shoreline, they do not assert that this includes the area in the vicinity of the FBI Range. To the contrary, they assert that the FBI Range "makes it *less likely* that I *will* visit these public areas." Pollack Aff. ¶ 6; Miller Aff. ¶ 6 (emphasis added). With the exception of Pollack's visits to the FBI Range and Foss Park during this

---

[1] Plaintiffs split their opposition between their Reply in Support of Plaintiffs' Motion for Preliminary Injunction (Dkt. 55, "PI Reply") and Response to Defendants' Motion to Dismiss (Dkt. 59, "MTD Resp.").

[2] The only substantive difference being Pollack's amorphous and uncognizable "concern[]" that the impact of lead munitions on freshwater and ocean fish is "lessening my desire to consume fish." Pollack Aff. ¶ 7.

litigation (for which he is both a plaintiff and counsel), neither individual testifies to past or intended future visits to Foss Park or the vicinity of the FBI Range. They express mere "concern[]" for the *actual* "visitors to these public areas." *Id*. Both affiants speak to watching "wildlife in the Great Lakes watershed," an area that encompasses all or part of 8 states and much of Ontario, Canada, but they do not claim to do so in any area at issue in this litigation. Even if Blue Eco members reside in Lake County, that does not show that those members have suffered any injury-in-fact, as those members are described as mere "likely users" of Foss Park and the FBI Range environs. PI Reply at 7.

Subjective "Concern" Over the Drinking Water Supply is Not Injury: Plaintiffs also fail to show injury-in-fact based on alleged impacts to drinking water. The Complaint does not allege, and the affidavits do not show, that any Blue Eco member drinks North Chicago water, the only water supply allegedly affected. SAC ¶¶ 21, 22. In any case, the Complaint documents that North Chicago's drinking water is well within safe regulatory levels for lead and that the Illinois Environmental Protection Agency ("IEPA") deems it safe. *See* Def. Mem. at 10. Plaintiffs' argument that Blue Eco members live in communities that use the "general water supply" from Lake Michigan, PI Reply at 8, is far too vague and still fails to allege that a Blue Eco member drinks impacted water.

Equally unavailing are Pollack and Miller's twin expressions of "concern[]" that the discharges of lead munitions . . . into Lake Michigan is negatively affecting the drinking water supply of Highland Park" and "other local municipalities" (notably, neither attests to drinking tap water in these unspecified municipalities). Pollack Aff. ¶ 4; Miller Aff. ¶ 4. Plaintiffs concede that the drinking water intake crib for Highland Park, where both affiants live, is approximately 13 miles from the FBI Range. PI Reply at 8. Like North Chicago's, Highland Park's water supply is well within safe regulatory levels for lead according to Highland Park's 2008 Drinking Water Quality Report (9.2 parts per billion as compared to the "Lead Action Level" of 15 ppb), and the city states that "IEPA has determined that Lake Michigan has some of the best drinking water quality in the state." *See* Att. 1. Also like North Chicago, Highland Park identifies the likely source of lead contamination as "[c]orrosion of household plumbing systems; Erosion of natural deposits." *Id*. An order from the Court in this case would not redress the condition of lead in the Highland Park water supply, and Plaintiffs' expressions of concern are merely "subjective apprehensions" untethered to reality and are not cognizable injury-in-fact. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) ("the reality of the threat . . ., not the plaintiff's subjective apprehensions," is the cognizable injury).

Plaintiffs' "New" Members Cannot Establish Standing: By launching a "membership drive" to obtain members from North Chicago *after* the United States challenged their standing, Plaintiffs effectively concede the matter. Prior to filing the Complaint until at least April 18, 2008, Blue Eco's membership included no individuals residing in North Chicago. Blue Eco Aff., Apr. 18, 2008 (Att. 2). In an e-mail, Plaintiffs' counsel proclaimed May 13, 2008, to be a "banner day in Blue Eco Legal Council's membership drive" because "people from North Chicago joined our organization." *See* Att. 3; *see also* PI Reply at 7 ("Blue Eco *now* has members from North Chicago") (emphasis added). Plaintiffs mistakenly believe that adding *new* members from North Chicago cured their standing problems, as it is well-established that they needed standing when they filed the Complaint. *See, e.g., Laidlaw*, 528 U.S. at 180 ("[W]e have an obligation to assure ourselves that [Plaintiff] had Article III standing at the outset of the litigation."); *Lujan,* 504 U.S. at 571 n.4 (standing must be "assessed under the facts existing when the complaint is filed").

Furthermore, if standing is lacking when the suit commenced, a plaintiff cannot cure a standing defect during the course of litigation. In *Perry v. Village of Arlington Heights,* 186 F.3d 826 (7th Cir. 1999), the Seventh Circuit considered the standing of a plaintiff challenging provisions of the Arlington Heights Municipal Code concerning the seizure and disposal of abandoned vehicles. The plaintiff "rented an apartment in Arlington Heights and obtained title to an automobile solely to establish standing" after the complaint was filed. *Id.* at 830. Despite the plaintiff's submission of affidavits establishing these facts, the district court dismissed the amended complaint, which the Seventh Circuit affirmed finding:

> Because standing goes to the jurisdiction of a federal court to hear a particular case, it must exist at the commencement of the suit. It is not enough for Perry to attempt to satisfy the requirements of standing as the case progresses. The requirements of standing must be satisfied from the outset and in this case, they were not.

*Id.* (citation omitted). This case presents the same situation. When Plaintiffs filed (and then twice amended) their complaint, neither Pollack nor any Blue Eco member had a cognizable connection to the City of North Chicago, its drinking water supply, Foss Park, or the general vicinity of the FBI Range. Plaintiffs' "membership drive" came too late to stave off dismissal.

Plaintiffs Fail to Establish Standing for Their Coast Guard Claims: It would be generous to call Plaintiffs' efforts to establish their standing to challenge the Coast Guard live-fire training activities half-hearted. The complained-of Coast Guard exercises in the Great Lakes were completed

in 2006 and then formally halted. Plaintiffs make no allegation, even now, that they are injured by those completed exercises, and the affidavits do not mention *any* alleged Coast Guard activities. Plaintiffs thus concede our arguments as to these claims. Def. Mem. at 10-11. Indeed, Plaintiffs offer only a vague argument that their standing to sue is somehow self-evident because individuals "took time out of their busy lives to write substantive comments" in opposition to the Coast Guard's proposed rule (now withdrawn) to establish permanent safety zones on the Great Lakes for live-fire training exercises. PI Reply at 9. However, that other members of the public may have concern about the Coast Guard's proposal says nothing about Plaintiffs' standing, nor does participation in an administrative rulemaking process constitute injury.

Regarding unspecified Coast Guard activities in unidentified areas of the "East Coast" that Plaintiffs also purport to challenge, Plaintiffs again fail to respond to our arguments. *See* Def. Mem. at 10-11. The affidavits from Illinois residents Pollack and Miller (the only ones submitted) address no actual or potential injury from such activities, and Plaintiffs *still* identify no specific Coast Guard activities or locations beyond the Great Lakes that are of concern. That some Blue Eco members allegedly reside on the "East Coast" does not aid Plaintiffs, as they identify no action by Defendants that injures those members. Plaintiffs' opposition confirms that alleged violations by the Coast Guard on the "East Coast" are premised entirely on a single line in a Coast Guard press release and that Plaintiffs do not allege a single fact that could establish injury-in-fact. *See* MTD Resp. at 4; *see also* Def. Mem. at 17-18. Simply put, "there is no there there."

## II.   THE FBI'S RESPONSE ACTION TRIGGERS THE CERCLA SECTION 113(h) BAR

Plaintiffs do not seriously contest that the plain requirements of CERCLA Section 113(h) and the overwhelming case law applying that provision bar their FBI Range claims. *See* Def. Mem. at 11-16. Plaintiffs argue only that the timing and, to a lesser extent, format of the FBI's response action somehow prevent the application of Section 113(h). PI Reply at 10-13; MTD Resp. at 6-9. This argument is readily refuted by the description in our opening brief, supported by an affidavit, describing the process, content and timetable for the FBI's response action at the FBI Range. In sum, beginning with the EAC Report in 2006,[3] well before the Complaint was filed, the FBI has initiated and is conducting, subject to a schedule, a series of actions under CERCLA to evaluate the release or

---

[3] Plaintiffs breathlessly label the EAC Report a "secret document." MTD Resp. at 11. However, the United States disclosed it to Plaintiffs at the outset of this litigation, offered to produce it (which Plaintiffs declined), and attached a letter to that effect to its Rule 26 conference statement filed with the Court. *See* Dkt. 16.

threatened release of hazardous substances and to develop an appropriate response. Def. Mem. at 2-3, 12-13, Att. 5 thereto (Lorenz Decl.).

Plaintiffs argue, vaguely and without citing authority, that CERCLA requires "consultation with [a] regulatory agency," presumably EPA and IEPA. PI Reply at 13. Their suggestion that those agencies, and not the FBI, must conduct the response action is in error. CERCLA authorizes the President to investigate potential releases of contaminants. 42 U.S.C. § 9604(b)(1). For releases or threatened releases at sites which are not on the National Priorities List ("NPL") (*e.g.,* the FBI Range), the head of the agency in control of the facility (here, the FBI) conducts the necessary investigations, monitoring, testing, etc. *See* Def. Mem. at 11; Exec. Order No. 12,580, 3 C.F.R. 193, 195 (1987 Comp.); 40 C.F.R. § 300.5 ("lead agency" can be EPA, Coast Guard, or other federal agency).[4]

Plaintiffs again miss the mark by quibbling that, because it is called a "Phase I" study, the EAC Report cannot be part of a CERCLA response action. PI Reply at 11-12. A removal site evaluation, which includes the preparation of a preliminary assessment, may include, *inter alia,* data collection, literature searches, and both on- and off-site inspection. 40 C.F.R. § 300.410(c)(2), (d); *see also* Def. Mem. at 12-14. The National Contingency Plan ("NCP") does not specify the types of studies that can be prepared and evaluated during this stage of the process and gives no indication that a study like the EAC Report cannot be used in the preparation of a preliminary assessment. Moreover, courts consistently have found that various agency actions initiating the preliminary assessment process constitute a "removal or remedial" action triggering the Section 113(h) bar. *See Smith v. Potter*, 208 F. Supp. 2d 415, 420-21 (S.D.N.Y. 2002)(CERCLA removal action commenced with testing and investigation related to a threat of anthrax contamination), *aff'd sub nom*, *APWU v. Potter,* 343 F.3d 619 (2d Cir. 2003); *Environmental Waste Control, Inc. v. ATSDR*, 763 F. Supp. 1576, 1579-80 (N.D. Ga. 1991) (preparing "Health Assessment" describing suspected hazards and recommending further action is "removal" action triggering Section 113(h) bar).

Neither the NCP nor the case law impose specific documentation requirements for testing and investigation, thus allowing agencies to apply discretion tailored to the site-specific circumstances surrounding the investigation of the release or threatened release of a hazardous substance and identifying an appropriate response. *See North Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir.

---

[4] Plaintiffs make a confused and misguided argument based on Recourse Conservation and Recovery Act ("RCRA") Section 7002(b)(2)(B), 42 U.S.C. § 6972(b)(2)(B). *See* MTD Resp. at 7-8. That provision has no bearing on the application of CERCLA Section 113(h) to bar Plaintiffs' FBI Range claims.

1991) ("a measure that is ordered as part of a remedial plan, and that is reasonably related to the plan's objectives so that it can fairly be considered an organic element of the plan, is itself remedial within the meaning of section 113(h)"); *Frey v. EPA*, 403 F.3d 828, 834-35 (7th Cir. 2005) ("[I]t is quite clear that EPA is entitled to gather data and assess alternatives before selecting an appropriate response."). Furthermore, to the extent its reasoning even applies to such an early stage of response action, the conduct and timetable of the FBI's response action at the FBI Range comports with *Frey*'s guidance that a plan to study and investigate a CERCLA site include a "timetable or other objective criterion by which to assess" when study and investigation may be completed. *Id.* at 834.

Plaintiffs' opposition confirms that their FBI Range claims are prohibited "challenges to removal or remedial action selected under [CERCLA] Section 104," 42 U.S.C. § 9613(h), as Plaintiffs leave no doubt that they aim to ensure that *their* chosen expert will perform a particular remedy that *they* prefer. MTD Resp. at 8-9. Indeed, Plaintiffs profess to have determined that, under their reading of the NCP and various statutes and regulations, there is one, and only one, possible remedy at the FBI Range. *Id.* Plaintiffs do not merely "challenge" the FBI's response action but, rather, devise to *supplant* it through litigation with one of their choosing. This result would undermine the entire CERCLA scheme and the NCP's detailed procedures; short-circuit the well-considered role of federal agencies in addressing environmental issues at their own facilities; and impermissibly exclude the EPA, regulatory agencies, and the public from the process. CERCLA Section 113(h) plainly prohibits such an outcome. *See* Def. Mem. at 13-15.[5]

### III.    PLAINTIFFS ALLEGE *NO* CWA OR RCRA VIOLATION AS TO COAST GUARD EXERCISES OR RCRA REGULATORY VIOLATION AS TO THE FBI RANGE

Plaintiffs Allege No "Ongoing" CWA or RCRA Violation by the Coast Guard: The opposition does nothing to address Plaintiffs' failure to allege an ongoing Clean Water Act ("CWA") violation by the Coast Guard *anywhere* or a RCRA regulatory violation in the Great Lakes when the Complaint

---

[5] Plaintiffs rely on *Frey v. EPA*, 270 F.3d 1129, 1132 (7th Cir. 2001), to argue that this Court must convert the Motion to Dismiss on Section 113(h) grounds into a motion for summary judgment. MTD Resp. at 1-2. By its terms, *Frey* does not require as much. Moreover, in *Pollack v. Dep't. of Defense*, 507 F.3d 522 (7th Cir. 2007), the Seventh Circuited affirmed under CERCLA Section 113(h) a district court's Rule 12(b) dismissal of a challenge to an ongoing Department of Defense ("DoD") CERCLA cleanup. *See also Pollack v. Dep't. of Defense*, No. 06 C 2659 (N.D. Ill. filed Dec. 15, 2006) (Att. 4). The Seventh Circuit repeatedly has characterized Section 113(h) as a jurisdictional provision, *see* Def. Mem. at 13-14 (citing cases), and even Plaintiffs' quote from *Frey* frames a Section 113(h) argument as a "jurisdictional challenge[]." MTD Resp. at 2 (quoting *Frey*, 270 F.3d at 1132). As this Court has allowed jurisdictional fact discovery on the United States' 113(h) defense, any distinction in *Frey* between Rules 12(b)(1) and (b)(6) is largely academic.

was filed, as they must for this Court to have subject matter jurisdiction. *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 57 (1987); *see* Def. Mem. at 16-18, 19-21. Instead, Plaintiffs confuse *Gwaltney*'s "ongoing violation" requirement with the mootness doctrine. *See* PI Reply at 9; MTD Resp. at 3. The Coast Guard formally halted Great Lakes training exercises in January 2007 (the last occurring in September 2006), stating in a *Federal Register* notice: "The Coast Guard will not conduct further gunnery training on the Great Lakes to satisfy non-emergency training requirements unless the Coast Guard publishes notice of its proposed action, allows the public an opportunity to comment, and publishes a final rule." 72 Fed. Reg. 520, 521 (Jan. 5, 2007). The United States does not argue that this action mooted Plaintiffs' claims. Rather, our opening brief establishes that when the Complaint was filed there were no *ongoing* Coast Guard training activities in the Great Lakes, meaning that Plaintiffs' allegations pertained to only "wholly past violations," which cannot establish jurisdiction under the CWA and RCRA citizen suit provisions. The Coast Guard's *Federal Register* notice halting live-fire training exercises on the Great Lakes and more than 20 months of practice consistent with that notice easily meet the *Gwaltney* standard that there be no "reasonable likelihood that a past polluter will continue to pollute in the future." 484 U.S. at 57. They cite no authority, and there is none, for their contention that a violation must be deemed likely to recur absent formal enforcement action or the issuance of a permit for prior discharges. MTD Resp. at 3

Indeed, the Complaint does not allege that *any* specific Coast Guard activity in *any* location is ongoing and constitutes a CWA or RCRA regulatory violation; it describes only completed and formally halted Coast Guard training exercises. Def. Mem. at 16-17, 19-21. Plaintiffs strain through argument to characterize two Coast Guard activities on the Great Lakes as "ongoing" violations, PI Reply at 9-10, but fail because the Complaint hints at neither. Regardless, any Coast Guard participation in a Camp Perry shooting competition in the "summer of 2007" was completed, Plaintiffs admit, well before the Complaint was filed (*i.e.,* is wholly past). *Id.* at 9. Moreover, the activity is a land-based, non-training activity completely unrelated to those at issue in the Complaint. *See, e.g.,* SAC ¶¶ 5, 31 (describing "live-fire training exercises on all five United States Great Lakes" and firing from Coast Guard "vessels"). Plaintiffs point to another allegedly ongoing activity – live-fire training on Lake Erie near Camp Perry – but concede that it was "conducted . . . in the past." PI Reply at 9. As confirmed by the document they cite, a May 2001 *Coast Guard* magazine article (*see id.* Ex. 9), this supposedly "ongoing" violation occurred nearly seven years before the Complaint was filed and

more than five years before the Coast Guard formally halted Great Lakes training exercises. Undeterred, Plaintiffs speculate that such training must still be continuing. *Id.* at 9.

Finally, as noted, Plaintiffs do not allege a single fact as to allegedly ongoing CWA violations from training exercises on the "East Coast." They argue that combining specific allegations of *prior, halted* activity on the Great Lakes and amorphous hints of unspecified activities at unidentified locations on the "East Coast" somehow satisfies *Gwaltney*. MTD Resp. at 3. However, the CWA and case law require much more, *see* Def. Mem. at 16-18, and Plaintiffs offer no authority in support of their position. Even if the Coast Guard's halted Great Lakes live-fire training proposals and prior exercises could be seen as a single, national program (which they are *not*, *see* 71 Fed. Reg. 43,403 (Aug. 1, 2006) (addressing only "Great Lakes" training)), Plaintiffs still must identify a good faith basis to allege all of the essential elements of an ongoing CWA violation by the Coast Guard on the "East Coast." They have not done so. Plaintiffs also fail to explain why their "East Coast" claims can be brought in this Court, as the CWA venue provision allows CWA citizen suits to be filed only where the pollution "source" is located. 33 U.S.C. § 1365(c)(1). Conceding that their venue problem is "interesting," Plaintiffs can only implore the Court to exercise "national judicial" power over unspecified Coast Guard activities alleged to be occurring in unidentified areas on the "East Coast." MTD Resp. at 4. The law requires otherwise, and Plaintiffs cite no authority for their position.

The Count II RCRA Regulatory Claims Remain Baseless: Plaintiffs fatally ignore three arguments as to their RCRA regulatory violation claims. First, Plaintiffs still do not identify a specific RCRA requirement, such as a regulatory provision, that supposedly has been violated with respect to the FBI Range or the Coast Guard's training in Lake Michigan. This failure also suffices to show that they did not allege an "ongoing" RCRA regulatory violation concerning the FBI Range or the Coast Guard training exercises in the Great Lakes. *See* Def. Mem. at 19-20. Second, Plaintiffs concede that bullets (lead or otherwise) discharged to Lake Michigan from the FBI Range or during Coast Guard training are not regulatory "solid waste" under RCRA. *See id.* at 20-21 (citing cases). Third, Plaintiffs concede that the Military Munitions Rule – under which the firing of munitions for their intended purpose is not the discarding of waste material for regulatory purposes – applies to Coast Guard training exercises in the Great Lakes. *Id.* at 21.

Having ignored these arguments, each dispositive and requiring dismissal for the claims at issue, Plaintiffs try to change the subject by erroneously contending that the Defendants' "central

assertion" is that the discharges at issue "are . . . not off-range." MTD Resp. at 5.  This issue is not even raised in our opening brief for the simple reason that the on-range/off-range distinction that Plaintiffs raise is irrelevant to what constitutes a regulatory "solid waste" under the Military Munitions Rule.  The rule provides that a "military munition is not a solid waste when . . . used for its intended purpose," and identifies purposes that include "training military personnel" and are not confined to activities that occur within a range.  40 C.F.R. § 266.202(a)(1).  In any event, the designated areas of prior Coast Guard training in the Great Lakes constitute a "military range" within the meaning of the rule.  *See* 40 C.F.R. § 266.201 ("designated land and *water areas* set aside, managed and used to . . . train military personnel" including "impact areas") (emphasis added).  Part and parcel of such designated water areas under the rule (*i.e.*, the "range") is the land beneath, and Plaintiffs point to no contrary indication in the rule.  Thus, having conceded that the Military Munitions Rule applies to their RCRA claim against the Coast Guard, Plaintiffs fail to address its requirements.  Moreover, such a reading is consistent with the case law, which Plaintiffs also fail to address, finding that shot or ordnance discharged to water as part of their ordinary and expected use are not "solid waste" subject to RCRA regulatory requirements.  *See* Def. Mem. at 20-21 (citing cases).[6]

## IV.    THE LACK OF MANDATORY NOTICE DOOMS SOME OF PLAINTIFFS' CLAIMS

Plaintiffs' admitted failure to provide mandatory pre-suit notice to the Coast Guard of alleged CWA violations on the "East Coast"[7] and to the Department of Justice (FBI) with respect to Plaintiffs' Foss Park RCRA claims is a jurisdictional defect that requires dismissal of those claims.  *See, e.g., Hallstrom v. Tillamook County*, 493 U.S. 20, 25-31 (1989) (notice a mandatory condition precedent to RCRA citizen suit and noting similarity to CWA and other environmental statute notice provisions); *see also* Def. Mem. at 18, 22.  Moreover, the pre-suit notice requirement must be strictly applied, as the Supreme Court vigorously rejected the "flexible or pragmatic" construction that Plaintiffs advocate.  493 U.S. at 26 ("The language of this provision could not be clearer."); *see also City of Highland Park v. Train*, 519 F.2d 681, 690-91 (7th Cir. 1975) (requiring strict compliance with the

---

[6] Plaintiffs belatedly and vaguely suggest that their federal RCRA and CWA claims are also brought under the Illinois law of trust beneficiary or public trust, as well as the Submerged Lands Act, 43 U.S.C. §§ 1301 *et seq.*  However, Counts I and II reference neither of these purported sources of this Court's jurisdiction, and Plaintiffs do not identify an applicable waiver of the United States' sovereign immunity for such claims.  *See also infra* at 11 (discussing Plaintiffs' purported common law trust claims).

[7] Nor did Plaintiffs provide notice of their new allegations concerning Coast Guard actions near Camp Perry.

nearly identical Clean Air Act citizen suit notice provision).

Plaintiffs' failure to provide *any* notice to DoD requires dismissal of all claims against DoD. Plaintiffs do not contend that they sent a notice letter to DoD. Instead, they urge that the notice provisions be liberally construed or deemed to be constructive notice, for instance, by arguing that notice to the Navy or Attorney General also constitutes notice to DoD, a separate agency. They cite no authority for their position and do not address the abundant case law confirming the stringency of the notice requirements. Beyond these problems, Plaintiffs' position fails to satisfy the specific requirements of EPA's regulations on citizen suit notice, requiring, among many other types of information, identification of "the person or persons responsible for the alleged violation." 40 C.F.R. § 135.3(a) (CWA); 40 C.F.R. § 254.3(a) (nearly identical requirements under RCRA). Moreover, where the alleged violator is a federal agency (such as DoD), notice by personal service or certified mail "upon the head of such agency" is required. 40 C.F.R. § 135.2(a)(3); 40 C.F.R. § 254.2(a)(3). As Plaintiffs did not satisfy these requirements, their claims against DoD must be dismissed.

## V.    PLAINTIFFS OFFER NO REASON WHY THEIR CERCLA CLAIMS SURVIVE

Our opening brief established four reasons why Plaintiffs' CERCLA claims must be dismissed. Plaintiffs fail even to address, and thus concede, two of them, namely: (1) that they fail to identify a specific, substantive requirement of CERCLA that the United States has violated to support this Court's CERCLA citizen suit jurisdiction; and (2) that the CERCLA citizen suit provision does not authorize the injunctive relief (*i.e.*, clean up) they seek from this Court. Def. Mem. at 23, 24. Plaintiffs fare no better on their CERCLA claim for natural resource damages or response costs.

Count IV of the Complaint is brought under CERCLA, not Illinois law. *See* SAC ¶¶ 45-52. CERCLA expressly defines who may recover "damages for injury to, destruction of, or loss of natural resources," extending that authority to only an appropriately designated public "trustee," such as the United States, a State, or an Indian tribe. 42 U.S.C. § 9607(f)(1), (2)(A)-(B). Courts have uniformly held that only entities so designated can pursue a claim for natural resource damages, and that, for instance, private persons and municipalities cannot. *See* Def. Mem. at 25 (citing cases as to private persons); *see also, e.g., Fireman's Fund Ins. Co. v. City of Lodi*, 302 F.3d 928, 944 (9th Cir. 2002) (as to municipalities). Plaintiffs completely ignore CERCLA Section 107(f)(1)'s express limiting language and the governing case law, thus conceding that those requirements govern. Additionally, in enacting CERCLA, Congress established a comprehensive set of claims and enforcement

mechanisms such that Plaintiffs' claimed cause of action for natural resource damages cannot be implied. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 14-15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate.").

To the extent Plaintiffs now purport to assert a "trust beneficiary" claim under Illinois common law, no such claim appears in the Complaint. Even if the Court were to consider such a state law claim, Plaintiffs cite no case supporting its existence, and the United States is aware of none. Additionally, Plaintiffs completely fail to identify an applicable waiver of the United States' sovereign immunity that would allow such a state law claim. Absent a clear and express waiver of sovereign immunity in federal statutory text, Federal courts have no subject matter jurisdiction to hear claims against the United States. *See* Def. Mem. at 6-7, 26 (citing cases). While CERCLA Section 120(a) waives the United States' sovereign immunity for certain state law claims, it does so only in narrow circumstances concerning State-led removal or remedial action not present here. *See* 42 U.S.C. § 9620(a)(4). CERCLA's waiver of sovereign immunity for natural resource damages is limited to claims brought by an appropriately designated trustee. *See* 42 U.S.C. § 9607(f)(1), (2).[8]

Plaintiffs also fail to allege that they have incurred any response costs, which alone justifies dismissal of their CERCLA claim. *See* 42 U.S.C. § 9607(a)(4)(B) (Plaintiffs must incur "necessary costs of response . . . consistent with the [NCP]"); Def. Mem. at 23-24. As a belated attempt to cure this pleading defect through argument, Plaintiffs now claim that their *litigation* costs are necessary response costs under CERCLA. This argument fails for multiple reasons. To be recoverable, necessary response costs must actually respond (*i.e.*, relate directly to removal or remediation of) to the release or threatened release of a hazardous substance. 42 U.S.C. § 9607(a); *see also United States v. Hardage*, 982 F.2d 1436, 1448 (10th Cir. 1992) ("The heart of the definitions of removal and remedy are 'directed at containing and cleaning up hazardous substance releases.'") (citation omitted); *United States v. E.I. Dupont De Nemours & Co. Inc.*, 432 F.3d 161, 172-73 (3d Cir. 2005) (same). Plaintiffs make no showing that their claimed litigation costs were "necessary to the containment and cleanup" of a hazardous substance release. *See Akzo Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761, 765

---

[8] To the extent a state law trust beneficiary theory may provide for a natural resource damage claim, such a claim has been displaced by CERCLA Section 107(f). *Hillsborough County v. Automated Medical Labs, Inc.*, 471 U.S. 707, 712-13 (1985) (the Supremacy Clause invalidates state laws that interfere with or are contrary to federal law); *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[e] goal.").

n.6 (7th Cir. 1994). Indeed, Seventh Circuit precedent is clear that necessary response costs *do not* include costs incurred primarily to support a plaintiff's litigation position. *Id.* (citing *Hardage*).

Plaintiffs' reliance on *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994), is misplaced. In that case, the Supreme Court recognized that, in limited situations, efforts "might well be performed by engineers, chemists, private investigators, or other professionals who are not lawyers" and that *some* costs associated with litigation may constitute a necessary cost of response under CERCLA. *Id.* at 819-20. However, the Supreme Court expressly *excluded* costs to pursue litigation. *Id.* Following *Key Tronic,* courts have disallowed even costs more closely related to a cleanup (such as for health risk assessments) and claimed costs for witness fees. *See Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 294 (3d Cir. 2000); *Redland Soccer Club, Inc. v. Department of the Army*, 55 F.3d 827, 850 (3d Cir.1995). Plaintiffs vaguely refer to their efforts in this case, but fail to show that they are anything more than efforts to develop their litigation position. *See Black Horse Lane*, 228 F.3d at 295-96 (consulting costs that did not involve direct cleanup efforts unrecoverable).

Plaintiffs also fail to allege, or even to argue, that their litigation costs are necessary or consistent with the NCP as required by Section 107(a)(4)(B). Indeed, private party actions must comply with all applicable provisions of the NCP, *see* 40 C.F.R. § 300.700(c)(5) (listing potentially applicable provisions), including, for example, extensive "community relations" requirements. *See* 40 C.F.R. § 300.700(c)(6) ("[p]rivate parties undertaking response actions should provide an opportunity for public comment"). Plaintiffs' failure to address yet another *prima facie* element of their CERCLA response costs claim is alone cause for dismissal. *Zehner v. Trigg*, 133 F.3d 459, 462 (7th Cir. 1997). For all of the foregoing reasons, and the additional reasons in our opening brief to which Plaintiffs failed to respond, Plaintiffs' CERCLA claims must be dismissed.

## VI.    PLAINTIFFS' COUNT V TORT CLAIMS SHOULD BE DISMISSED

Plaintiffs' opposition offers no reason why its Count V claims should not be dismissed for their failure to exhaust administrative remedies and to name the proper defendant – both of which deprive this Court of jurisdiction. Plaintiffs' failure to file an administrative claim is a jurisdictional bar to their tort claim. *See McNeil v. United States*, 508 U.S. 106, 110-11 (1993). Their suggestion that this Court should construct an administrative claim by piecing together a letter sent to the Department of Justice ("DOJ") and notice-of-intent-to-sue letters lacks legal support. *Cf.* MTD Resp. at 12. Plaintiffs sent their letters in the context of threatened non-tort litigation, and never implicated

any tortious damages or any involvement by the Navy, Marines, or DoD. Plaintiffs also fail to address the fact that environmental statutes establish their own separate and distinct prerequisites to litigation. *See* Def. Mem. at n.24 and citations therein. Plaintiffs further fail to address the law that an intent to file suit under environmental statutes does not constitute an administrative tort claim. *See Cromer v. EPA*, 143 F. Supp. 2d 1376, 1381-82 (M.D. Ga. 2001); *Richland-Lexington Airport Dist. v. Atlas Properties, Inc.*, 854 F. Supp. 400, 413 (D.S.C. 1994). It is notable that Plaintiffs' environmental notice of intent to sue letters, on their face, do not purport to be administrative claims, nor do they mention the FTCA. In the context of environmental statutes, Plaintiffs' assertion that the Coast Guard violated public nuisance law does not constitute the "detailed statement of facts" (*Murrey v. United States*, 73 F.3d 1448, 1452) (7th Cir. 1996) or "money damages in sum certain" (*Deloria v. Veterans Admin.*, 927 F.2d 1009, 1011 (7th Cir. 1991)) required for a valid administrative claim.

In their opposition, Plaintiffs attempt to characterize their $75,000 demand as money damages in a sum certain "for bullets discharged into the Nation's waters." MTD Resp. at 12. Plaintiffs' demand – whether $75,000 or $20 million[9] – is not a sum certain because they have no cognizable damages, as required by both the FTCA and state substantive law. *See Laine v. Weinberger*, 541 F. Supp. 599, 604 (C.D. Cal. 1982) (dismissing a FTCA claim for want of jurisdiction, because plaintiffs did not and could not allege any provable damages resulted from alleged public nuisance); *Young v. Byrco Arms*, 821 N.E.2d 1078, 1083 (Ill. 2004) (an individual has standing to bring a public nuisance claim under Illinois law only if he or she has "suffered harm of a kind different from that suffered by other members of the public.") (internal quotation omitted). The lack of tort damages is underscored by Plaintiffs' request that the Court order Defendants to make payments as donations to third party charities, which is impermissible injunctive relief under the FTCA. *See Redland Soccer Club*, 55 F.3d at 848 n.11 (injunctive relief in the form of remedial action is not available under the FTCA).

Even if the Court were to construe Plaintiffs' letter to DOJ as an administrative claim, Count

---

[9] Pursuant to 28 U.S.C. § 2675(b), Plaintiffs can only seek damages, in addition to those sought before a federal agency, if "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." *See also Davis v. United States*, 244 F. Supp. 2d 878, 880 (N.D. Ill. 2002) (burden is plaintiffs' to establish newly discovered evidence or intervening facts), *aff'd*, 375 F.3d 590 (7th Cir. 2004). Here, Plaintiffs have argued that they did not know the extent of bullets allegedly discharged into public waters. Even if that discharge had been alleged to cause tort damages, Plaintiffs have failed to show how any particular evidence about the quantity of discharge justified any increase from their initial appraisal, much less one demanding more than two hundred times their original amount.

V was never presented to the appropriate federal agency. Plaintiffs concede the mandate that "[a]n action shall not be instituted upon a claim against the United States for money damages . . . unless the claimant shall have first presented the claim to the appropriate Federal agency. . . ." 28 U.S.C. § 2675(a). However, Plaintiffs claim that they satisfied the administrative claim requirement "by making their claim for damages to natural resources to Defendants' attorneys," which was "sufficient to put the entire Executive Branch on notice." MTD Resp. at 11, 12. Such reasoning has been soundly rejected. *See, e.g.*, *Johnson v. United States*, 906 F. Supp. 1100, 1103-04 (S.D. W.Va. 1995) (action barred by failure to present a claim to the appropriate federal agency within two years despite timely notice to the U.S. Attorney); *Miller v. United States*, 418 F. Supp. 373, 376-77 (D. Minn.1976) ("[t]he statute requires that the claim be 'presented in writing to the appropriate federal agency,' not that it come to the attention of the United States Attorney by some other means"); *Combs v. United States*, No. 2:04-CV-306, 2008 WL 2278661, *4 (E.D. Tenn. May 30, 2008) (notice to DOJ and U.S. Attorney insufficient). Plaintiffs' "unitary executive" theory is an invitation to ignore the statute's plain language requiring that a claim be presented to the "appropriate federal agency," 28 U.S.C. § 2675(a), that this Court should decline.

Although Plaintiffs' "unitary executive theory" does not apply in the administrative tort claims context, the FTCA provides that the only proper defendant in federal court is the United States and that no federal agency may be sued in its own name. *See Hughes v. United States*, 701 F.2d 56, 57-58 (7th Cir. 1982) (dismissing FTCA suit where plaintiff only timely sued federal agency – not the United States); *Valluzzi v. United States Postal Service*, 775 F. Supp. 1124, 1125 (N.D. Ill. 1991) (same). Plaintiffs have not named the United States, and have failed to address this Court's lack of jurisdiction under the FTCA for claims against individual agencies. *See* Def. Mem. at 27 (citing cases). Accordingly, the Court should dismiss Count V.

## VII.   PLAINTIFFS' PURPORTED "NEW FACTS" ARE IMPROPERLY RAISED

Rather than respond to our arguments, *see* Def. Mem. at 27-30, Plaintiffs march through a series of extraneous "new facts," allegations, and insinuations that have no bearing on their PI Motion or the Motion to Dismiss and, at most, relate to the continued and fully-briefed Motion for Temporary Restraining Order ("TRO Mot.") (Dkt. 27). *See* PI Reply at 1-6. Pre-dating both the TRO Motion and Plaintiffs' Foss Park RCRA claim (Count IV), the PI Motion is premised on environmental concerns attendant to allegedly unpermitted discharges of lead shot into Lake Michigan from the FBI Range and

into unidentified "navigable waters" from Coast Guard vessels.  PI Mot. at 1.  By contrast, the TRO

Motion relates to *only* the Foss Park RCRA claim and is premised on public safety concerns arising

from the potential for bullets to enter Foss Park from the FBI Range.

Improperly raised for the first time in the PI Reply, these matters are in any case irrelevant and

should be disregarded.  But for one exception below, we do not respond to the many inaccuracies,

mischaracterizations, and insinuations in Plaintiffs' presentation (and the related, equally irrelevant

affidavits concerning Plaintiffs' uneventful tracer round test).  We will address those matters if and

when they are properly raised.  Regarding Plaintiffs' misleading characterization of the United States'

statements at the April 1, 2008, TRO hearing, the full hearing transcript (Dkt. 50; "Tr."), and even the

excerpt in the PI Reply, makes abundantly clear that the TRO Motion, our opposition, and the hearing

concerned, in the Court's words, "ricochets or bullets or projectiles . . . from the shooting range

spilling over *into the park*." Tr. at 12-13 (emphasis added).  *See also id.* at 13-14 ("the possibility that

shots are going *into the park* from the range? Does anyone know of any such incident, information,

complaint?"), 17 (summing up the preceding colloquies as "never a single incident as far as anyone

here knows that would indicate that there were bullets ricocheting from the range *into the park*")

(emphasis added).  Additionally, the United States' counsel indicated the very preliminary nature of

the FBI's evaluation of the allegations in the TRO Motion. *Id.* at 13, 18.

In the light of the appropriate context, it is immaterial that the EAC Report mentioned that,

in August 2001, a likely, but unconfirmed, bullet fragment ricochet from the FBI Range struck (but

did not injure) an individual working on the property to the north of the FBI Range (Foss Park borders

the FBI Range to the south).[10]  Even less pertinent is a 1990 letter written by the Lake County Board

to the FBI and the letter's litany of objections to the mere existence of the FBI Range – including

generic "public safety" concerns unsupported by mention of a single incident in Foss Park or

elsewhere. PI Reply, Ex. 1. The letter read in full reveals the Board's overriding concern to be, not

public safety, but that the "FBI firing range is an obstacle to the growth of the economic life of the

City of North Chicago" and that it "imped[es] private investment." *Id.* at FBI002210.

## CONCLUSION

The Court should dismiss the Complaint for the above reasons and those previously raised.

---

[10] The Defendants produced the EAC Report to Plaintiffs and informed the Court of the 2001 incident in their
Status Report, which attached a letter to Plaintiffs on the matter. (Dkt. 53, filed May 12, 2008).

Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General

Dated: July 1, 2008            /s/ David S. Gualtieri
DAVID S. GUALTIERI
MATTHEW R. OAKES
Environment and Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
(202) 514-4767; (202) 514-8865 (fax)
David.Gualtieri@usdoj.gov

PATRICK J. FITZGERALD
United States Attorney

/s/Linda A. Wawzenski
LINDA A. WAWZENSKI
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1994
linda.wawzenski@usdoj.gov

16