**Index of Attachments**

Attachment 1: City of Highland Park 2008 Drinking Water Quality Report

Attachment 2: Blue Eco Legal Council Affidavit with member list, Apr. 18, 2008

Attachment 4: May 13, 2008 e-mail from S. Pollack to D. Gualtieri

Attachment 4: *Pollack v. Dept. of Defense*, No. 06 C 2659 (N.D. Ill. filed Dec. 15, 2006) (order of dismissal), *aff'd,* 507 F.3d 522 (7th Cir. 2007)

**Attachment 1:  City of Highland Park 2008 Drinking Water Quality Report**

# CITY OF HIGHLAND PARK

## 2008 Drinking Water Quality Report

The City of Highland Park is pleased to present its 2008 Annual Water Quality Report. This report, as required by Federal law, is designed to inform all customers about the quality water and services that are delivered each day. The City's continuing goal is to provide all of its consumers with a safe and dependable supply of drinking water. As part of this process, the City wants all customers to understand the efforts that are continually made to improve the water treatment process and to protect water resources. In short, the City of Highland Park is committed to ensuring the quality of your water.

The City of Highland Park Water Plant draws its water from a 54" Intake Pipe located one mile from shore, in Lake Michigan. This Intake Pipe is situated in 30 feet of water, adjacent to two smaller pipes that are 20 and 16 inches in diameter, which also feed water to the filtration plant.

In 2002 Illinois EPA (IEPA) conducted a federally mandated Source Water Assessment of Highland Park, and it is available to consumers by contacting the Water Plant. IEPA has determined that Lake Michigan has some of the best drinking water quality in the state. Also, IEPA has determined that sources of potential contaminants for Highland Park intakes include sediment, shoreline erosion, wet weather sewer overflows, wastewater treatment bypasses, stormwater runoff, and air deposition. Some of the potential contaminants are: inorganic compounds, synthetic organics, and volatile organics. Please visit www.cityhpil.com/pw/water.html for more information.

All sources of drinking water are subject to potential contamination by constituents that are naturally occurring or are man made. Those constituents can be microbes, organic or inorganic chemicals, or radioactive materials. All drinking water, including bottled water, may reasonably be expected to contain at least small amounts of some contaminants. The presence of contaminants does not necessarily indicate that the water poses a health risk. More information about contaminants and potential health effects can be obtained by calling the Environmental Protection Agency's Safe Drinking Water Hotline at 1-800-426-4791.





**The City of Highland Park Water Plant** routinely monitors drinking water for constituents, in accordance with all state and federal laws. The table shows the results of contaminants monitoring for the period between January 1 and December 31, 2007.

The Sources of drinking water (both tap water and bottled water) include rivers, lakes, streams, ponds, reservoirs, springs and wells. As water travels over the surface of the land or through the ground, it can dissolve naturally occurring minerals and radioactive material and can pick up substances resulting from the presence of animals or from human activity. Possible contaminants consist of:

**Microbial Contaminants,** such as viruses and bacteria, which may come from sewage treatment plants, septic systems, agricultural livestock operations, and wildlife;

**Inorganic Contaminants,** such as salts and metals, which can be naturally occurring or result from urban stormwater runoff, industrial, or domestic wastewater discharges, oil and gas production, mining or framing;

**Pesticides and Herbicides,** which may come from a variety of sources such as agriculture, urban stormwater runoff and residential uses;

**Organic Chemical Contaminants,** including synthetic and volatile organic chemicals, which are by-products of industrial processes and petroleum production, and can also come from gas stations, urban stormwater runoff and septic systems;

**Radioactive Contaminants,** which may be naturally occurring or be the result of oil and gas production and mining activities.

In order to ensure that tap water is safe to drink, USEPA prescribes regulations that limit the amount of certain contaminants in water provided by public water systems. FDA regulations establish limits for contaminants in bottled water, which must provide the same protection for public health.

**Turbidity** – Turbidity is a measure of the cloudiness of the water and is monitored because it is a good indicator of water quality and the effectiveness of our filtration system and disinfectants.

**Sodium** – There is not a state or federal MCL for sodium. Monitoring is required information to consumers and health officials that are concerned about sodium intake due to dietary precautions. If the level is greater than 20 mg/l, and you are on a sodium-restricted diet, you should consult a physician.

**Unregulated Contaminants** – A maximum contaminant level (MCL) for this contaminant has not been established by either state or federal regulations, nor has mandatory health effects language. The purpose for monitoring this contaminant is to assist USEPA in determining the occurrence of unregulated contaminants in drinking water and whether future regulation is warranted.

In addition to the contaminants listed in the following table, the City of Highland Park tests for the presence of 69 other contaminants, which were not detected during this calendar year. These contaminants include 14 Inorganic Compounds (i.e. Arsenic), 29 Synthetic Organic Compounds (i.e. Atrazine), 20 Volatile Organic Compounds (i.e. trichloroethylene), and 6 State Regulated Compounds (i.e. Aldrin and DDT). Also, our water system was required to monitor for the contaminants required under the Unregulated Contaminant Monitoring Rule (UCMR). None of the contaminants was detected. Results may be obtained by calling the contact listed on this report.

The City of Highland Park is in full compliance with all state and federal regulations governing the control of lead and copper within public drinking water supplies. The water was last sampled in 2005.

| Lead MCLG | Lead Action Level (AL) | Your Water | # Sites Over Lead AL | Copper MCLG | Copper Action Level (AL) | Your Water | #Sites Over Copper AL | Likely Source of Contamination |
|---|---|---|---|---|---|---|---|---|
| 0 | 15 ppb | 9.2 ppb | 3 | 1.3 ppm | 1.3 ppm | 0.3 ppm | 0 | Corrosion of household plumbing systems; Erosion of natural deposits |

| Contaminant | State MCL | Your Water | Violation | Explanation and comment |
|---|---|---|---|---|
| Zinc | 5000 ppb | 7 ppb | NO | Erosion of natural deposits; Leaching |
| Sulfate | 500 ppm | 27 ppm | NO | Erosion of natural deposits; Leaching |

In most cases, the *"Level Found"* column represents the *highest* sample result data collected during the calendar year. The *"Range of Detections"* column represents a range of *individual* sample results, from lowest to highest that were collected during the calendar year. If a date appears in the *"Date of Sample"* column, the Illinois EPA requires monitoring for this contaminant less than once per year because the concentrations do not frequently change. If no date appears in the column, monitoring for this contaminant was conducted during the calendar year.

| Contaminant (units) | EPA MCLG | EPA MCL | Highland Park highest Level Found | Range of detection | Violation Yes/NO | Date of Sample (if not tested annually) | Typical Source of Contamination |
|---|---|---|---|---|---|---|---|
| Turbidity (%<0.3 NTU) | n/a | TT | 100 | n/a | NO | – | Soil runoff. |
| Turbidity (1.0 NTU) | n/a | TT | 0.09 | n/a | NO | – | Soil runoff. |
| Alpha emitters (pCi/L) | 0 | 15 | 0.6 | n/a | NO | | Erosion of natural deposits |
| Radium (combined 226/228 (pCi/L) | 0 | 5 | 0.1 | n/a | NO | | Erosion of natural deposits |
| Barium (ppm) | 2 | 2 | 0.019 | 0.019-0.019 | NO | | Discharge of drilling wastes; Discharge from metal refineries; Erosion of natural deposits. |
| Fluoride (ppm) | 4 | 4 | 0.98 | 0.98-0.98 | NO | – | Erosion of natural deposits; Water additive which promotes strong teeth; Discharge from fertilizer and aluminum factories. |
| Nitrate (As N) | 10 | 10 | 0.42 | 0.42-0.42 | NO | | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits. |
| Nitrate & Nitrite (ppm) | 10 | 10 | 0.37 | 0.22-0.37 | NO | | Runoff from fertilizer use; Leaching from septic tanks, sewage; Erosion of natural deposits. |
| Chloramines (ppm) | 4 | 4 | 0.9 | 0.65-0.90 | NO | | Water additive used to control microbes. |
| Total Haloacetic Acids (HAA5) (ppb) | n/a | 60 | 10.8 | 2.9-10.8 | NO | | By-product of drinking water chlorination. |
| Total Organic Carbon | n/a | 9,000 | 2.0 | 1.5-2.0 | NO | | Naturally present in the environment. |
| TTHM [Total trihalomethanes] (ppb) | n/a | 80 | 21.9 | 12.4-21.9 | NO | – | By-product of drinking water chlorination. |
| Sodium (ppm) | n/a | n/a | 5.0 | n/a | NO | – | Erosion of naturally occurring deposits; Used as water softener. |



In this table you will find many terms and abbreviations you might not be familiar with. To help you better understand these terms we've provided the following definitions:

**Unit Descriptions**
**mg/L – milligrams per liter** or the number of milligrams of substance in one liter of water.
**ppm - Parts per million** or Milligrams per liter (mg/L).
**ppb - Parts per billion** or Micrograms per liter (Ig/L).
**pCi – picocuries per liter,** used to measure radioactivity.
**NTU - Nephelometric Turbidity Unit,** used to measure of the cloudiness in drinking water.
**NA** – not applicable

**Drinking Water Definitions**
**TT - Treatment Technique** or a required process intended to reduce the level of a contaminant in drinking water.
**MCL - Maximum Contaminant Level** or the highest level of a contaminant that is allowed in drinking water. MCLs are set as close to the MCLGs as feasible using the best available treatment technology.
**MCLG - Maximum Contaminant Level Goal** or the level of a contaminant in drinking water below which there is no known or expected risk to health. MCLGs allow for a margin of safety.
**AL – Action Level** or the concentration of a contaminant which, if exceeded, triggers treatment or other requirements which a water system must follow.
**MRDLG – Maximum Residual Disinfection Level Goal** or the level of a drinking water disinfectant below which there is no known or expected risk to health.
**MRDL – Maximum Residual Disinfectant Level** or the highest level of a disinfectant allow in drinking water.
**MPL – Maximum Permissible Level** that is state assigned

Some people may be more vulnerable to contaminants in drinking water than the general population. Immuno-compromised persons such as persons with cancer undergoing chemotherapy, persons who have undergone organ transplants, people with HIV/AIDS or other immune system disorders, some elderly, and infants can be particularly at risk from infections. These people should seek advice about drinking water from their health care providers. EPA/CDC guidelines on appropriate means to lessen the risk of infection by cryptosporidium and other microbiological contaminants are available from the Safe Drinking Water Hotline (800-426-4791).



If you have any questions about this report or your water utility in general, please contact

**Don Jensen, City of Highland Park**
**Water Plant Superintendent,**
**(847) 433-4355.**

**Attachment 2: Blue Eco Legal Council Affidavit with member list, Apr. 18, 2008**

Affidavit – by Steven Pollack
As Executive Director for
Blue Eco Legal Council

**BEFORE ME**, the undersigned Notary, ___Darren Miller___ *[name of Notary before whom affidavit is sworn]*, on this 18rd day of April, 2008, personally appeared Steven Pollack, known to me to be a credible person and of lawful age, who being by me first duly sworn, on his oath, deposes and says:

1. The Blue Eco Legal Council (Blue Eco) was founded in 2004.
2. Blue Eco is a grass-roots all volunteer organization and is not set up as a formal not-for-profit corporation for purposes of soliciting funds or conferring tax free status for donations. As such, there are no organizing documents. Blue Eco does not charge its members any dues.
3. Blue Eco is an environmental advocacy and pro bono legal services organization. It focuses on watchdog litigation against the executive branch of government when it, through its extensive operations, violates the environmental laws it is sworn to enforce. Blue Eco will also litigate against private polluters when there are lapses in enforcement by the executive branch. Blue Eco also reaches out to other environmental advocacy groups to offer pro bono legal services as requested.
4. Blue Eco's watchdog activities center around threats to water resources in the United States although other environmental threats will be considered on a case by case basis.
5. Blue Eco does not have any formal structure except that all volunteer efforts are coordinated by executive director Steven Pollack. The members volunteer their time as available and as needed. Many members are attorneys and volunteer their time and expertise for legal proceedings including drafting court documents, attending court hearings, and giving counsel. Other members have a scientific background and volunteer their expertise as needed. Finally, there are members who join simply because they support Blue Eco's purpose and efforts.
6. Blue Eco's membership is in a constant state of flux. New members join via the internet or by calling. Sometimes members give up their membership when called upon to volunteer beyond their comfort level such as being deposed by the government. Blue Eco's purpose is not to attain large numbers of passive members but rather to create an organization where members can help ensure the environmental laws are enforced by volunteering as they see fit.
7. The following is Blue Eco's current list of members:

| | | | |
|---|---|---|---|
| DiPiano, Mick | Sparta | NJ | 07871 |
| Barcita, Pamela | Chesapeake | VA | 23323 |
| Becker, Joel | Virginia Beach | VA | 23452 |
| Donour, Frederic | Norfolk | VA | 23518 |
| Charles, Joan | Hampton | VA | 23669 |
| Breedlove, Lilian | Girard | OH | 44420 |
| Futrell, Holly | Chesterton | IN | 46304 |
| Wilmore, Sandra | Gary | IN | 46403 |
| Powers, Stephanie | Waterford | MI | 48328 |

| | | | |
|---|---|---|---|
| Bruce, Christi | Clintonville | WI | 54929 |
| Hansell, R. Stephen | Florence | MT | 59833 |
| Pollack, Steven | Highland Park | IL | 60035 |
| Miller Darren | Highland Park | IL | 60035 |
| Harris, David | Highland Park | IL | 60035 |
| Pollack, Gerald | Highland Park | IL | 60035 |
| Miller, Greg | Glen Ellyn | IL | 60138 |
| Strege, Amy | Highwood | IL | 60040 |
| Kitt, Michael | Park Ridge | IL | 60068 |
| Marks, Jeffrey | Buffalo Grove | IL | 60089 |
| Kybartas, Stashu | Chicago | IL | 60613 |
| Tersch, Walter | Chicago | IL | 60625 |
| James, Walter | Grapevine | TX | 76051 |
| Rutherford, Karen | Wenatchee | WA | 98801 |

[signature of affiant]

Steven Pollack, Executive Director
Blue Eco Legal Council
3390 Commercial Ave
Northbrook, IL 60062
steve@ecoesq.com

Subscribed and sworn to before me, this __18th__ [day of month] day of __April__ [month], 20_08_.

[Notary Seal:]

[signature of Notary]

Darren Miller
[typed name of Notary]

Official Seal
Darren K. Miller
Notary Public State of Illinois
My Commission Expires 06/28/08

NOTARY PUBLIC
My commission expires: __6/28__, 20_08_.

**Attachment 3:   May 13, 2008 e-mail from S. Pollack to D. Gualtieri**

**Gualtieri, David S (ENRD)**

| | |
|---|---|
| **From:** | Steven B. Pollack [Steve@EcoEsq.com] |
| **Sent:** | Tuesday, May 13, 2008 3:54 PM |
| **To:** | Gualtieri, David S (ENRD) |
| **Cc:** | Oakes, Matthew (ENRD) |
| **Subject:** | Supplement to Blue Eco's Jurisdictional Discovery |
| **Attachments:** | MemberList.xls |


MemberList.xls

    It has been a banner day in Blue Eco Legal Council's ongoing membership drive.  Two more people from North Chicago joined our organization today bringing the current North Chicago total to three.

Here is our updated membership list that will be submitted via affidavit with our Reply to our MPI and Response to your MTD.

Best regards,

Steve

Steven B. Pollack, Attorney
Executive Director, Blue Eco Legal Council
3390 Commercial Ave.
Northbrook, IL 60062
847-436-9566
www.ecoesq.com

Blue Eco Legal Council - Membership

| Name | City | State | Zip |
|---|---|---|---|
| DiPiano, Mick | Sparta | NJ | 7871 |
| Barcita, Pamela | Chesapeake | VA | 23323 |
| Becker, Joel | Virginia Beach | VA | 23452 |
| Donour, Frederic | Norfolk | VA | 23518 |
| Charles, Joan | Hampton | VA | 23669 |
| Breedlove, Lilian | Girard | OH | 44420 |
| Futrell, Holly | Chesterton | IN | 46304 |
| Wilmore, Sandra | Gary | IN | 46403 |
| Powers, Stephanie | Waterford | MI | 48328 |
| Bruce, Christi | Clintonville | WI | 54929 |
| Hansell, R. Stephen | Florence | MT | 59833 |
| Pollack, Steven | Highland Park | IL | 60035 |
| Darren Miller | Highland Park | IL | 60035 |
| Harris, David | Highland Park | IL | 60035 |
| Pollack, Gerald | Highland Park | IL | 60035 |
| Amy Strege | Highwood | IL | 60040 |
| Leon Rockingham Jr. | North Chicago | IL | 60064 |
| Theodore Wilder | North Chicago | IL | 60064 |
| Devon Mosesel | North Chicago | IL | 60064 |
| Kitt, Michael | Park Ridge | IL | 60068 |
| Marks, Jeffrey | Buffalo Grove | IL | 60089 |
| Greg Miller | Glen Ellyn | IL | 60138 |

**Attachment 4:**  *Pollack v. Dept. of Defense*, No. 06 C 2659 (N.D. Ill. filed Dec. 15, 2006) (order of dismissal), *aff'd,* 507 F.3d 522 (7th Cir. 2007)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Blanche M. Manning | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 06 C 2659 | **DATE** | December 15, 2006 |
| **CASE TITLE** | Pollack v. U.S. Department of Defense | | |

**DOCKET ENTRY TEXT**

The plaintiff's motion for leave to file a surreply is denied as the court finds that the proposed surreply would not be of assistance to the court. The defendants' motion to dismiss [#22] is granted and the complaint is dismissed without prejudice as premature. To the extent that Mr. Pollack believes that he can file an amended complaint consistent with this order and Rule 11 of the Federal Rules of Civil Procedure, he may do so by January 12, 2007.

■[ For further details see text below.]                                    Docketing to mail notices.

### STATEMENT

Pro se plaintiff Steven Pollack has filed suit against the United States Department of Defense, Donald Rumsfeld in his capacity as the Secretary of the Department of Defense, the United States Department of the Army, Francis Harvey as his capacity as the Secretary of the Department of the Army, the United States Department of the Navy, and Donald Winter in his capacity as the Secretary of the Department of the Navy. In a nutshell, Mr. Pollack is dissatisfied with environmental work being performed at Fort Sheridan, Illinois, a former Army post located approximately twenty-five miles north of Chicago. The defendants seek to dismiss Mr. Pollack's complaint in its entirety for lack of jurisdiction and failure to state a claim. For the following reasons, the motion to dismiss is granted and the complaint is dismissed without prejudice as premature. To the extent that Mr. Pollack believes that he can file an amended complaint consistent with this order and Rule 11 of the Federal Rules of Civil Procedure, he may do so by January 12, 2007.

*Standard for a Rule 12(b)(1) & 12(b)(6) Motion to Dismiss*

The standard of review for a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction depends upon the purpose of the motion. See *Freiburger v. Emery Air Charter, Inc.*, 795 F. Supp. 253, 256 (N.D. Ill.1992). If the defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *United Transp. Union v. Gateway Western Ry. Co.*, 78 F.3d 1208 (7th Cir.1996). If, however, the defendant denies or controverts the truth of the jurisdictional allegations, the court may properly "look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. F.D.I.C.*, 999 F.2d 188, 191 (7th Cir.1993) (citations omitted).

(continued)

## STATEMENT

For both a Rule 12(b)(1) and Rule 12(b)(6) motion to dismiss, dismissal is proper if it appears beyond doubt that the plaintiff cannot prove any set of facts consistent with the pleadings that would entitle him to the relief requested. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The court also notes that, where the court's jurisdiction has been controverted, "the party invoking jurisdiction has the burden of supporting the allegations of jurisdictional facts by competent proof," *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979), and by a preponderance of the evidence that there is a reasonable probability that jurisdiction exists, *NLFC, Inc., v. Devcom Mid-America, Inc.*, 45 3d 231, 237 (7th Cir.1995).

*Background*

Fort Sheridan was closed in 1993. Prior to the closure, the Army performed certain environmental assessments pursuant to §§ 104 and 120 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA), 42 U.S.C. §§ 9604 and 9620. As a result of these assessments, the Army is cleaning up a 20-acre parcel at Fort Sheridan known as Landfills 6 & 7 (the "Site"). The Army has conducted interim response actions at the Site, but the final remedy has not yet been implemented. Mr. Pollack is dissatisfied with the remedial proceedings at Fort Sheridan. He also asserts that the inter-agency transfer of land from the Army to the Navy and the Navy's subsequent privatization transactions violate CERCLA and seeks to set these transactions aside.

Mr. Pollack's complaint alleges that the court may exercise jurisdiction over this dispute under the federal question statute, 28 U.S.C. § 1331, and pursuant to CERCLA's citizen suit provision, 42 U.S.C. § 9659.

*Federal Question Jurisdiction*

As noted by the government, the United States is immune from suit unless it consents and the court may not exercise jurisdiction over a suit against the United States unless it first consents. *United States v. Mitchell*, 463 US. 206, 212 (1983). The authorization to file federal question suits in § 1331 "is not the kind of unequivocal statutory language sufficient to abrogate the Eleventh Amendment" and thus does not abrogate the government's immunity from suit. *See, e.g., Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 55-56 (1996). Thus, § 1331 does not confer subject matter jursdiction over Mr. Pollack's claims.

*Jurisdiction Under CERCLA*

Mr. Pollack next contends that jurisdiction is proper under the citizen suit provision of CERCLA, 42 U.S.C. § 9659. The defendants, however, direct the court's attention to §113(h)(4) of CERCLA, 42 U.S.C. § 9613(h)(4), which prohibits citizen suits challenging CERCLA response actions prior to completion of the response work. According to the defendants, because remediation at the Site is ongoing, Mr. Pollack's complaint attempt to challenge the defendants' remediation decisions is premature.

Section 113(h) addresses the timing of judicial review and provides that:

> No federal court shall have jurisdiction under federal law . . . to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606( a) of this title, in any action except one of the following: . . . .

(continued)

## STATEMENT

  (4) An action under section 9659 of this title (relating to citizen suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

42 U.S.C. § 9613(h)(4).

  The Seventh Circuit has held that a citizen cannot file a pre-enforcement, pre-implementation challenging a CERCLA response action. *Frey v. E.P.A.*, 403 F.3d 828, 832 (7th Cir. 2005) (CERCLA § 113(h) "[requires] a citizen seeking to challenge a remediation action to wait for the selected action to be completed"); *Schalk v. Reilly*, 900 F.2d 1091, 1095 (7th Cir. 1990) (subject to the stated exceptions, federal courts lack subject matter jurisdiction to consider citizen challenges to uncompleted remedial actions). Recognizing that this rule dooms any effort to challenge the ongoing remedial actions at the Site, Mr. Pollack argues that he is trying to challenge the legality of the defendants' transfer of the Site and adjacent property at Fort Sheridan and that the transfer of this property is unrelated to the remediation. According to Mr. Pollack, the transfers should be set aside because Army and Navy did not properly consult with the U.S. Environmental Protection Agency before making them, and the government should not be allowed to transfer the property again until it complies with environmental laws. Mr. Pollack argues that rulings regarding the transfer of property are unrelated to a challenge to the remediation efforts at the Site.

  The court disagrees. The complaint, among other things, asks the court to:

(1) declare that the federal defendants have violated, and continue to violate, requirements under 42 U.S.C. § 9620 and the APA;

(2) set aside federal defendants' 1993 and 2005 transfer by deed of Landfill 6 & 7 [the Site] and the adjacent federal property contaminated by the landfill;

(3) preliminarily and permanently enjoin the federal defendants from transferring ownership, by deed, of any portion of Landfill 6 & 7 and the adjacent contaminated federal property until defendants (a) comply with CERCLA's standards and complete the CERCLA process; (b) complete a final remedial feasibility study, allow public comments, and issue a Decision Document pursuant to CERCLA; and (c) demonstrate to USEPA that all completed remedial action is operating properly and successfully.

Complaint ¶ 101.

  Count I, which challenges the propriety of remedial actions taken at the Site under CERCLA, is clearly directed at the remediation efforts. The rest of the complaint challenges the transfer of property at the Site. From a practical perspective, voiding the past transfers of the Site would cause remediation efforts there to grind to a halt. In *Schalk v. Reilly*, the plaintiffs asserted that they were "merely asking that certain procedural requirements be met" as opposed to challenging remediation efforts. 900 F.2d at 1097. The Seventh Circuit held that the relief requested by the plaintiffs would "impact the implementation of the remedy" and thus was improper while remediation efforts were ongoing. *Id.* The Seventh Circuit then went on to state that the plaintiffs were actually challenging the remedy because their requests for additional studies "can only be to demonstrate the need for a different remedy." *Id.*

(continued)

Case 1:06-cv-02659   Document 40   Filed 12/15/2006   Page 4 of 4

## STATEMENT

The court finds this reasoning instructive. The court appreciates Mr. Pollack's sincere interest in environmental issues near his home. Nevertheless, the relief he seeks in his lengthy complaint is directed at halting the current work at the site and changing the direction of any additional work there. Accordingly, it is premature under § 113(h)(4) of CERCLA.

The court has carefully considered Mr. Pollack's remaining arguments about § 113(h)(4) and will not address them in detail as they do not merit discussion. The court also commends Mr. Pollack's efforts as well as the very helpful and thorough briefs from the government.