IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN B. POLLACK and BLUE ECO, LEGAL COUNCIL, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 08 C 320 ) ) |
| UNITED STATES DEPARTMENT OF JUSTICE, UNITED STATES COAST GUARD, UNITED STATES NAVY, UNITED STATES MARINE CORPS, and UNITED STATES DEPARTMENT OF DEFENSE, | ) Judge Ronald A. Guzmán ) ) ) ) ) ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs have sued various departments of the federal government for their alleged violations of the Clean Water Act ("CWA"), 33 U.S.C. § 1365, the Resource Conservation Recovery Act ("RCRA"), 42 U.S.C. § 6972, the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9659 and for damages under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). The case is before the Court on defendants' motion pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) to dismiss the second amended complaint for lack of subject matter jurisdiction. For the reasons set forth below, the Court grants the motion.

**Facts**

Between January 19, and September 12, 2006, the U.S. Coast Guard discharged 62,584 bullets, made primarily of lead, into the Great Lakes during eighteen live-fire training exercises. (Second Am. Compl. ¶ 5.) Lead is listed as a toxic chemical under the Emergency Planning and

Community Right-to-Know Act. *See* 42 U.S.C. § 11002; 40 C.F.R. § 372.65. The Coast Guard discharged the bullets into the Great Lakes without a permit under the CWA and has taken no action to retrieve them. (Second Am. Compl. ¶¶ 7, 13.)

On December 18, 2006, the Coast Guard issued a press release saying that it had "withdraw[n] the Notice of Proposed Rulemaking to establish 34 safety zones for live-fire training on the Great Lakes." (*Id.*, Ex. D, Coast Guard Press Release of 12/1/8/06.) The release also said that the Coast Guard would "not conduct live-fire training on the Great Lakes to satisfy non-emergency training requirements unless [it] publish[ed] a rule." (*Id.*)

On March 10, 2007, plaintiffs submitted a Freedom of Information Act request to the Justice Department seeking documents regarding the FBI firearms training that occurs at the Great Lakes Naval Base in North Chicago, Illinois. (*Id.*, Ex. F, Letter from Pollack to FBI of 3/10/07.) In response, plaintiffs received, among other things, an April 25, 1986 real estate appraisal of the FBI's North Chicago facility, which says that the "property has been used for a firing range since 1918" and uses 2,975 acres of Lake Michigan as "the impact area for overfiring." (*Id.*, Ex. G, Real Estate Appraisal of 4/25/86 at 1-2.) Consequently, the appraisal states, [h]azardous waste contamination, primarily from lead, may pose a threat to ground water and possibly to lake waters." (*Id.* at 1.) Plaintiffs allege that the FBI continues to use the North Chicago firing range and discharges, or allows other agencies to discharge, lead bullets into the lake. (*Id.* ¶ 18.)

Plaintiffs also allege that there are two water intake areas in the range impact area, one of which is for drinking water used by the city of North Chicago. (*Id.* ¶ 21.) The City of North Chicago's Water Quality Report for 2006 shows that two of the water sites it sampled had concentrations of lead in excess of 15 parts per billion ("ppb"), the maximum allowed by law. (*Id.*, Ex. K, 2006 North Chicago Water Quality Report.)

Plaintiffs contend that the government's operation of the North Chicago firing range violates CWA, RCRA, CERCLA and constitutes a public nuisance, and they seek a declaration that defendants have damaged the water and land surrounding the firing range, an order requiring them to stop firing lead bullets into that area and remediate the damage they have caused, and an award of damages.

## **Discussion**

There are two kinds of Rule 12(b)(1) motions: those that attack the sufficiency of the jurisdictional allegations and those that attack the factual basis for jurisdiction. Facial attacks are subject to the same standard as motions pursuant to Rule 12(b)(6) motions; that is, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor. *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 946 (7th Cir. 2002). However, in factual attacks, like this one, "the court is not bound to accept the truth of the allegations in the complaint." *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998). "Rather, the plaintiff has the obligation to establish jurisdiction by competent proof, and the court may properly look to evidence beyond the pleadings in this inquiry." *Id.*

Defendants argue that the Court lacks jurisdiction over the claims asserted in the second amended complaint because neither plaintiff has standing to pursue them. An individual plaintiff has standing to sue if he suffered a particularized injury, *i.e.*, one that affects him "in a personal and individual way," that is fairly traceable to defendants' conduct and can be redressed by a decision in his favor. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 & n.1 (1992). Defendants say Pollack has not satisfied the particularized injury element.

With respect to that element, plaintiffs allege that Pollack "lives several miles south of . . . North Chicago," which obtains its drinking water from the firing range impact area and has recently detected lead in its drinking water. (Second Am. Compl. ¶¶ 9, 21-22.) However, the story told by the evidence plaintiffs submitted is a bit different.

For example, Pollack attests that he lives in Highland Park, about thirteen miles south of the North Chicago water intakes. (*See* Pls.' Reply Supp. Mot. Prelim. Inj. at 8; *id.*, Exs., Pollack Aff. ¶ 3.) Moreover, though Highland Park's water is drawn from Lake Michigan, it uses different intake pipes than those that supply North Chicago. *See* City of Highland Park 2008 Drinking Water Quality Report at 1, available at, http://www.ci.highland-park.il.us/pdf/pw/waterQualityReport.pdf. Further, Highland Park's latest water quality report shows that three of its sampling sites had lead in excess of the federal limit of 15 parts per billion ("ppb"), but the overall lead level in the city's drinking water is below that level. *Id.* at 3.

Plaintiffs do not dispute those facts but point out that North Chicago's water has a higher concentration of lead, 11 ppb, than Highland Park's. (*See* Pls.' Reply Supp. Mot. Prelim. Inj., Exs., Ex. K, 2006 North Chicago Water Quality Report.) Given that fact, and the dynamic nature of the lake's water, *see* U.S. E.P.A & Gov't of Canada, *Great Lakes: Environmental Atlas and Resource Book,* ch. 2, § 4, available at, http://epa.gov/greatlakes/atlas/index.html, plaintiffs say the risk that the lead found in North Chicago's water will migrate to the intakes for Highland Park is sufficiently concrete to support the injury component of standing.

Assuming, *arguendo*, that the movement of the lake's water could cause contaminants found near North Chicago to migrate to Highland Park, Pollack would have standing only if the evidence showed that the migration has injured him. It does not. On the contrary, the most recent reports for North Chicago and Highland Park show that the lead levels in those cities' drinking water are 11 ppb

4

and 9.2 ppb, respectively, well below the 15 ppb limit set by the government. *See* City of Highland Park 2008 Drinking Water Quality Report, available at, http://www.ci.highland-park.il.us/pdf/pw/waterQualityReport.pdf at 3; (Pls.' Reply Supp. Mot. Prelim. Inj., Exs., Ex. K, 2006 North Chicago Water Quality Report).

Plaintiffs acknowledge that the reported lead levels are within governmental limits, but they say that fact is not dispositive of the injury issue because: (1) the bullets will continue to degrade as long as they remain in the lake; and (2) the lead level readings from North Chicago and Highland Park are "limited in number and do not account for the ability of lead to bioaccumulate in tissue and organs." (Pls.' Reply Supp. Mot. Prelim. Inj. at 8.)

Plaintiffs have not, however, offered evidence that supports those assertions. The 1986 appraisal of the North Chicago site says that it has been used as a firing range since 1918, and, as a result, the surrounding land and water are contaminated by lead. (Second Am. Compl., Ex. G, Real Estate Appraisal of 4/25/86 at 1-2.) If, as plaintiffs assert, lead bullets continuously degrade when they are in water, then North Chicago and Highland Park's historical drinking water quality reports should show a consistent increase in lead levels. And, perhaps they do. But plaintiffs have not provided those reports or any other evidence that shows lead levels have been on the rise or connects those increases to bullet degradation. Nor have they shown, through affidavits or otherwise, that the water tests done by North Chicago and Highland Park are "limited in number," that lead accumulates in human organs and tissue, or that the 15 ppb lead level established by the government does not account for that accumulation. Absent such evidence, plaintiffs have not demonstrated that Pollack's drinking water has been or is likely to be rendered unsafe by defendants' operation of the North Chicago range.

Alternatively, Pollack says he has been injured because: (1) "the enjoyment [he] get[s] [from] observing" the migration of "shorebirds and water fowl" to and from "the Great Lakes watershed" is "lessen[ed]" by his "concern[] that the lead munitions . . . will harm [the birds]"; (2) he is "less likely" to use the "public areas along the Illinois portion of Lake Michigan" because he fears that "the lead munitions . . . at Foss Park and the beach below the [range] will harm" visitors to those areas; and (3) his "desire to consume fish" from "the waters of the United States" is decreased because he fears the "fish [are] coming into contact with" water contaminated by bullets from the North Chicago range. (Pls.' Reply Supp. Mot. Prelim. Inj., Exs., Pollack Aff. ¶¶ 5-7.)

There is no question that injury to aesthetic interests, like enjoying wildlife and the natural environment, can be sufficient to confer standing. *See Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972). But "injury in fact . . . requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 735 (quotation omitted).

Pollack has not made the requisite showing. He does not say that he: (1) watches birds that feed at, nest on or routinely use the land or water near the range and his pursuit is being tarnished by fear that the bullets will harm the birds; (2) has stopped using the land near the range, or uses it less, because of his fears of contamination; or (3) has stopped consuming, or decreased his consumption of, Lake Michigan fish because he fears that the bullets have contaminated it. Instead, he says that: (1) his enjoyment of avian migration "from the Great Lakes watershed" is lessened by his fear that the birds in that area – which encompasses all five of the Great Lakes and is 750 miles wide, http://epa.gov/greatlakes/basicinfo.html – are being harmed by bullets from North Chicago; (2) he is "less likely" to visit any portion of Illinois' shoreline, which is sixty-one miles long, *see* National Park Service, *Great Lakes Shoreline Recreation Area Survey*, at 1, available at, http://www.nps.gov/history/history/online_books/rec_area_survey/great-lakes/il.htm, because he

6

fears that people who visit that land will be harmed by contamination from the range; and (3) he has less desire to eat fish from U.S. waters, a source that presumably includes all bodies of water within or bordering on this country, because he fears that the fish have been in contact with water contaminated by bullets from the range. (Pls.' Reply Supp. Mot. Prelim. Inj., Exs., Pollack Aff. ¶¶ 5-7.) In other words, Pollack says he has standing to sue because defendants have harmed his general interest in the welfare of the wildlife and environment of the entire Great Lakes, not because their actions have harmed him in any personal or individual way as Article III requires. *See Sierra Club*, 405 U.S. at 735 (allegations that land development in a national park "would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations" did not give the Sierra Club standing to contest the development because there was no evidence that its members used the park "in any way that would be significantly affected by the proposed" development). Defendants' motion to dismiss Pollack's claims for lack of subject matter jurisdiction is, therefore, granted.

The result is the same for Blue Eco Legal Council, "an environmental organization with an interest in the environmental safety of the Great Lakes watershed" whose members are "Great Lakes residents whose drinking water supply and natural environment is harmed by Defendants' actions." (Second Am. Compl. ¶ 3.) Blue Eco has standing if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Like Pollack, the other members of Blue Eco have standing to sue only if defendants' alleged actions harm or threaten to harm them in some concrete way. Pollack, as Executive Director of Blue

Eco, submitted an affidavit that says he and twenty-seven other people are members of the organization. (Pls.' Reply Supp. Prelim. Inj., Exs., Blue Eco Aff. ¶ 7.) As noted above, plaintiffs have not shown that Pollack has standing, and the record is equally barren for the other members of the group.[1] Because plaintiffs have not shown that Blue Eco satisfies the first element of organizational standing, the Court grants defendants' motion to dismiss its claims for lack of subject matter jurisdiction.

### Conclusion

For the reasons set forth above, the Court grants defendants' motion to dismiss the second amended complaint for lack of subject matter jurisdiction [doc. no. 47], and strikes as moot plaintiffs' motions for a temporary restraining order [doc. no. 27], a preliminary injunction [doc. no. 13] and to expedite the motion for preliminary injunction [doc. no. 28]. This case is terminated.

**SO ORDERED.**                                        **ENTERED: September 12, 2008**

_____
**HON. RONALD A. GUZMAN**
**United States District Judge**

---

[1] Plaintiffs submitted the affidavit of only one other Blue Eco member, Darren Miller, whose injury assertions are identical to those made by Pollack in paragraphs five and six of his affidavit. (*Compare* Pls.' Reply Supp. Mot. Prelim. Inj., Exs., Pollack Aff. ¶¶ 5-6, *with id.*, Miller Aff. ¶¶ 5-6.)